**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Americore Holdings, LLC, *et al*.,[1] | ) Case No. 19-61608-grs |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) Honorable Gregory R. Schaaf |

**DECLARATION OF GRANT WHITE IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Grant White, hereby make this statement under 28 U.S.C. § 1746 and state that:

1. I am the Founder and CEO of Americore Holdings, LLC, Americore Health, LLC and Americore Health Enterprises, LLC (collectively, "Americore"). Further, I directly or indirectly own the vast majority of the equity interests in all of the Debtors. In my capacity as the CEO of Americore and the majority owner of the Debtors, I am familiar with each of the Debtors and their operations. That being said, as the CEO of Americore, whenever possible I have tried to defer control over vendor payments at the hospital level to each hospital's respective CEO. I have always deferred control over healthcare operations and patient care to each hospital's CEO and management team.

2. On December 31, 2019 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") thereby initiating these chapter 11 cases (the "Chapter 11 Cases").

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

Subsequently, the Debtors have also filed certain motions and other pleadings (the "First Day Pleadings").  I am authorized by the Debtors to submit this declaration (the "First Day Declaration") on their behalf in support of the First Day Pleadings.

3. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently during the Chapter 11 Cases, as well as avoid certain adverse consequences that might otherwise result from the commencement of the Chapter 11 Cases.  Among other things, the First Day Pleadings seek relief aimed at sustaining the operations of the Debtors so that vendors, employees, and creditors are not adversely impacted by the Chapter 11 Cases and to maintaining the confidence of the Debtors' various stakeholders, vendors and employees to preserve value that would otherwise quickly erode.  Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to stabilize their business operations and maximize value for the benefit of their creditors.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operations of the Debtors; and (b) maximize and preserve the value of the Debtors' bankruptcy estates.

4. I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records.  Except as otherwise indicated, all facts set forth in the First Day Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information provided to me by other members of the Debtors' management team or professionals retained by the Debtors, or (d) my opinion based on experience and knowledge of the Debtors' operations and financial condition.  If called upon, I could and would testify competently to the facts set forth herein.

A. **General Background on the Debtors**

5. I founded Americore in February of 2017 as a healthcare company focused on

saving and revitalizing rural communities through the acquisition and management of rural hospitals across the United States.  From its beginning, Americore purchased distressed hospitals in underserved communities, which hospitals were themselves in need of a turnaround even before Americore's involvement.  For example, Americore purchased St. Alexius Hospital out of its own chapter 11 bankruptcy case, Americore's purchase of Ellwood City Hospital saved that financially troubled hospital from closure, and likewise Americore's purchase of Izard Medical Center saved that financial troubled hospital from closure.  But for Americore's purchase of these hospitals they would have been closed years ago, and the patients they have treated in under serviced areas would never have received timely, local medical treatment.  Americore and the other Debtors ultimately owned and operated five hospitals, although not all at the same time.  Americore and the other Debtors now own and operate two open hospitals, one closed hospital, and two companies which still own receivables – and owe creditors – related to two hospitals that Americore and the other Debtors have sold.  A corporate organization chart of the Debtors and their non-debtor affiliates is attached hereto as **Exhibit A**.  A summary of the Debtors' hospitals is set forth below.

       *I.*     *Ellwood Medical Center*

6.     In February, 2017, the Debtors formed Ellwood Medical Center, LLC, Ellwood Medical Center Real Estate, LLC and Ellwood Medical Center Operations, LLC as indirect subsidiaries of Americore Health, LLC.  Ellwood Medical Center, LLC is effectively a holding company which merely owns the equity interests in Ellwood Medical Center Real Estate, LLC and Ellwood Medical Center Operations, LLC, its subsidiaries.  Together, these entities own and operate a rural hospital in Ellwood City, PA.

7.     Ellwood Medical Center Real Estate, LLC is a property owning company which owns the real property where the hospital is located, and which also leases out certain medical

offices and out-patient services. An appraisal dated May 25, 2018 for Ellwood Medical Center Real Estate, LLC's real property is attached hereto as **Exhibit B**. That appraisal values the real property at $22,500,000. Ellwood Medical Center Real Estate, LLC has two secured creditors with mortgages on its real property. The first priority mortgage holder is Penn Med, LLC with a claim in the alleged amount of $5,257,049.00 (the "Penn Med Claim"). The Penn Med Claim is allegedly comprised of $4,500,000 in principal, a $500,000 "bonus payment," $11,249 in late fees, $225,800 in interest, and $20,000 in attorneys' fees. Penn Med, LLC alleges that Americore Health, LLC and Ellwood Medical Center, LLC are guarantors for the Penn Med Claim. On November 12, 2019, Penn Med, LLC filed a confession of judgment with the Lawrence County Court of Common Pleas, Pennsylvania in the case pending as *Penn Med LLC v. Americore Health, LLC*, Case No. 11166-19. Penn Med, LLC also sought the appointment of a receiver in that case, but the hearing to appoint a hearing was scheduled for the Petition Date and was stayed.

8. Pelorus Equity Group, Inc. ("Pelorus") serves as broker for lenders to Ellwood Medical Center Real Estate, LLC under the terms of a Secured Note dated November 29, 2018 in the amount of $2,500,000. The obligations under this Secured Note are secured by a second priority mortgage on Ellwood Medical Center Real Estate, LLC's real estate.

9. Ellwood Medical Center Operations, LLC is the entity which operated the hospital. In November, 2019, the Pennsylvania Department of Health ordered the hospital to close because of a malfunctioning CT scanner. Since that time, Ellwood Medical Center Operations, LLC has dramatically reduced its staff to just a few office personal in charge of billing and medical records, as well as a custodial service which is in charge of maintaining and securing the hospital buildings. Ellwood Medical Center Operations, LLC has significant debts, but it also has significant accounts receivable comprised of Medicare / Medicaid, insurance

claims, and third-party payors. Indeed, Ellwood Medical Center Operations, LLC believes it has eight-figures of accounts receivables which are owed to it, and which it has been stymied in recovering from an insurer. Among Ellwood Medical Center Operations, LLC's creditors are: Utica Leaseco, LLC its primary equipment lessor; App Group International and Hop Capital, LLC secured creditors with liens on all assets[2]; and trade payables. What is more, Ellwood Medical Center Operations, LLC also owes back wages to a number of the employees who were dismissed after the Department of Health ordered the hospital to be closed, unpaid taxes, a shortfall in their employee's 401(k) program, and pension liability that Ellwood Medical Center Operations, LLC assumed when it purchased the hospital in 2017. Ellwood Medical Center, LLC and Americore are under investigation from the Pennsylvania Attorney General and federal authorities related to unpaid wages, unpaid taxes, and billing issues.

## II.    *Izard County Medical Center*

10.    Established in 1952, Izard County Medical Center is a critical access hospital located in Calico Rock, Arkansas. The hospital offers in-patient, out-patient, laboratory, radiology, physical therapy services, and a 24-7 emergency room. In July, 2017, Americore Health, LLC acquired Izard County Medical Center, LLC.

11.    Izard County Medical Center, LLC operates the hospital and leases it from Calico Rock Med LLC. Calico Rock Med LLC alleges that Izard County Medical Center, LLC is in default of its lease and that it owes in excess of $300,000. Calico Rock Med LLC has filed a complaint against Izard County Medical Center, LLC in the Circuit Court of Izard County, Arkansas in the case pending as *Calico Rock Med LLC v. Izard County Medical Center, LLC et al.*, Case No. 33-cv-19-109. In that case, Calico Rock Med LLC sought the appointment of a

---

[2]    I believe that App Group International and Hop Capital, LLC have actually had their claims satisfied, yet their UCC-1 financing statements have not yet been released.

receiver, but the hearing on that appointment which was scheduled for January 2, 2020 was stayed by the commencement of the Chapter 11 Cases. Izard County Medical Center, LLC has significant other debts, but it also has significant accounts receivable comprised of Medicare / Medicaid, insurance claims, and third-party payors. Among Izard County Medical Center, LLC's creditors are: App Group International and Hop Capital, LLC secured creditors with liens on all assets,[3] and trade payables.

### III.    St. Alexius Hospital

12.     On September 5, 2018, Promise Healthcare Group, LLC and certain of its affiliates including Success Healthcare 2, LLC, St. Alexius Properties, LLC, and St. Alexius Hospital Corporation #1 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware and commenced the cases pending as *In re Promise Healthcare Group, LLC et al.*, Chapter 11 Case No. 18-12491-CSS.

13.     On January 8, 2019, the United States Bankruptcy Court for the District of Delaware entered an order authorizing the sale of the equity interests in Success Healthcare 2, LLC to Americore Holdings, LLC. As a result, Americore Holdings, LLC is the direct owner of the equity interests of Success Healthcare, 2, LLC. Success Healthcare 2, LLC is in turn a holding company for St. Alexius Properties, LLC, which owns the real estate on which the St. Alexius Hospital, medical office building and nursing school are located, and St. Alexius Hospital Corporation #1, which owns and operates the hospital and nursing school. The hospital and nursing school are located in St. Louis, MO.

14.     St. Alexius Properties, LLC is a property owning company which owns the real

---

[3]    Again, I believe that App Group International and Hop Capital, LLC have actually had their claims satisfied, yet their UCC-1 financing statements have not yet been released.

property where the hospital, medical office building and nursing school are located. Appraisals dated July 17, 2018 for the two "campuses" of St. Alexius Properties, LLC's real property are attached hereto as **Exhibit C**. Those appraisals value the real property at $43,000,000. St. Alexius Properties, LLC has two secured creditors with mortgages on its real property. The first priority mortgage holder is Toby Mug Financing, LLC with a claim in the alleged amount of $1,250,000. A first priority mortgage may be held by Pelorus on a loan issued between Pelorus and Americore Holdings, LLC, to which St. Alexius Properties, LLC may be a guarantor. The amount of this potential claim is in the principal amount of $6,300,000.

15. The following entities assert liens on St. Alexius Hospital Corporation #1's assets:

   a. HMFCH Inc., asserting a security interest in inventory, A/R/, and equipment;

   b. Smart Business, asserting a security interest in assets, including A/R, inventory, equipment, and intangibles;

   c. Corporation Services Company, as representative of unknown entity, asserting a security interest in all assets; and

   d. CT Corporation Systems, as representative of unknown entity, asserting a security interest in all assets.

In addition to these secured claims, St. Alexius Hospital Corporation #1 has a number of other significant obligations including trade payables (both those assumed from the *In re Promise Healthcare Group, LLC et al.* bankruptcy case and their own trade-debt) and an order for Americore Holdings, LLC to comply with the asset purchase agreement in the *In re Promise Healthcare Group, LLC et al.* bankruptcy case which exposes Americore Holdings, LLC and Success Healthcare 2, LLC to approximately $1,000,000 in liability. Unfortunately, because of the inability to obtain traditional financing St. Alexius Hospital Corporation #1 has been financing itself on very high-interest rate loans, merchant cash advances, and occasional capital

injections from me.

16. St. Alexius Hospital Corporation #1 has significant accounts receivables, and positive book value considering the value of its real estate and relatively little secured debt. St. Alexius Hospital Corporation #1 also has significant value from its nursing school and medical residency slots. During the less than one year period during which Americore owned and operated St. Alexius Hospital Corporation #1 the company made significant strides to pay down the trade payables assumed in the *In re Promise Healthcare Group, LLC et al.* bankruptcy case. Indeed, but for the actions of Third Friday (defined and described below), Americore Holdings, LLC, Success Healthcare 2, LLC, St. Alexius Properties, LLC and St. Alexius Hospital Corporation #1 would not be debtors in these Chapter 11 Cases. These companies had just settled a lawsuit and reached payment plans with many of their vendors. Indeed, these companies were on the precipice of closing on traditional finances just before Third Friday took destructive actions.

### IV.    Pineville Medical Center

17. The Debtors have sold their hospital operations related to Pineville Medical Center, LLC – which formerly operated a community hospital in Pineville, KY. Nevertheless, Pineville Medical Center, LLC still owns accounts receivable which it intends to collect on, and it is a defendant related to significant litigation claims, including claims asserted by the Commonwealth of Kentucky for penalties related to unpaid payroll and for tax claims.

18. Pineville Medical Center, LLC previously operated a hospital in Pineville, KY that it purchased from Pineville Community Hospital Association, Inc. ("PCHA"). PCHA only sold the hospital operations, equipment, and receivables to Pineville Medical Center, LLC and PCHA rented the real property on which the hospital was located to Pineville Medical Center, LLC. Within months of the sale of the hospital, PCHA filed a voluntary chapter 7 bankruptcy

case with this Court pending as *In re Pineville Community Hospital Association, Inc.*, Chapter 7 Case No. 18-61486-grs (the "Chapter 7 Case"). PCHA's bankruptcy filing negatively impacted Pineville Medical Center, LLC's ability to collect on accounts receivable and caused Pineville Medical Center, LLC to pay certain obligations of PCHA that it otherwise would not have. What is more, the chapter 7 trustee for PCHA filed an adversary complaint against Pineville Medical Center, LLC for back rent. On June 3, 2019, this Court entered an order in the Chapter 7 Case approving a compromise between Pineville Medical Center, LLC and the chapter 7 trustee for PCHA under the terms of which Pineville Medical Center, LLC transferred the hospital operations and assets (except for accounts receivable) to the bankruptcy estate and the chapter 7 trustee released Pineville Medical Center, LLC of her claims for rents against it.

**B.    Third Friday Fund and the Debtors' Pre-Petition Date Efforts at Reorganization**

19.    The Debtors are parties to the following agreements with The Third Friday Fund Total Return, L.P. ("Third Friday"):

a. That Loan and Security Agreement by and between Americore Health, LLC and The Third Friday Total Return Fund, L.P. dated as of January 2, 2018 as subsequently amended and modified (the "Health Loan Agreement");

b. That Loan and Security Agreement by and between Americore Holdings, LLC and The Third Friday Total Return Fund, L.P. dated as of May 1, 2018 as subsequently amended and modified (the "Holdings Loan Agreement" and together with the Health Loan Agreement the "Third Friday Loan Agreements"); and

c. Certain forbearance agreements between myself, Americore and Third Friday (collectively, the "Forbearance Agreements").

9

20. Since entering into the Third Friday Loan Agreements, Third Friday and its principal Michael Lewitt have in part directed and controlled the Debtors' use of cash. This included having the Debtors, even those Debtors without direct liability to Third Friday like St. Alexius Hospital Corporation #1 and Ellwood Medical Center Operations, LLC, make transfers to Third Friday and Michael Lewitt, or repay creditors of those entities.

21. During the past several months the Debtors have been engaged in active negotiations to find financing and restructure their debts. Ostensibly Third Friday and Mr. Lewitt were assisting in this effort, however, they failed for months to provide millions in promised financings. Third Friday's actions were actually detrimental to that restructuring and were the cause of these emergency Chapter 11 Cases. At one point Third Friday ordered the Debtors to stop working on refinancing and said that his designee Sam Halim; however, Third Friday was actually using information about the Debtors to raise capital for itself, and not the Debtors. This undermined our refinancing efforts and chilled the market. Ultimately, on December 24, 2019, Third Friday wrongfully called the Third Friday Loan Agreements in default.

22. In December 2019 Third Friday filed UCC-1 financing statements against all of the Debtors asserting security interests, even though many of the Debtors have no liability to Third Friday. Third Friday and Mr. Lewitt increased their efforts to control the Debtors' finances and strip cash out of the Debtors' accounts as evidenced by among other things the e-mail dated December 24, 2019 attached hereto as **Exhibit D** in which he states "You've already spent a bunch of it [old AR]. I sent you a default notice this morning and I am going to seek my remedies immediately. If I have to file this company or shut down the hospitals so be it (Ellwood is already closed so we are down to St Alexius). But I am not going to let this continue. Do not pay anything else until you get my written permission." In another e-mail sent on December 27,

10

2019 attached hereto as **Exhibit E** with the subject line "STOP MOVING MONEY WITHOUT MY PERMISSION" (capitalization in the original), Mr. Lewitt instructs Mr. White "DO NOT WIRE ANY MORE MONEY OUT OF ANY ACCOUNT WITHOUT MY PERMISSION. I DON'T CARE IF YOU CAN'T PAY BILLS. THAT IS NOT YOUR JOB ANYMORE." (capitalization in the original).

23. On Friday December 27, 2019, the same date as that e-mail, Mr. White and the CEOs and authorized employees of Americore, St. Alexius Hospital Corporation #1 and Ellwood Medical Center Operations, LLC were no longer able to view or access the Debtors' bank accounts at US Bank, N.A. On Monday December 30, 2019, Mr. White learned that he and his team had been removed as authorized users for the bank accounts and that Mr. Lewitt and Third Friday now asserted control over the bank accounts. Indeed, Mr. Lewitt even interfered with the Debtors' operations by contacting the Debtors' employees and informing them that he was in control of the Debtors and that Mr. White was fired.

24. The Debtors believe that there is absolutely no legal basis for this. On December 30, 2019, Americore Holdings, LLC's counsel reach out to Mr. Lewitt to try and resolve the issue in the e-mail exchange attached hereto as **Exhibit F**. Mr. Lewitt did not provide specific basis in the legal documents for his assertion of control, as a lender, over the Debtors but rather made general statements about Mr. White's alleged "bad acts." Mr. Lewitt claimed he was acting at the direction of regulators, but has made no proof of that. Mr. Lewitt even threatened to report Americore Holdings, LLC's counsel to the bar association for disciplinary actions because for interacting with the Debtors' employees. During this timeframe, the Debtors discovered that Third Friday used its control of the bank accounts to transfer $130,000 out of the Debtors' accounts on December 30, 2019 despite Third Friday's knowledge of the critical needs of the hospital for supplies, employee health costs, etc.

25. The Debtors do not know the amount of the claim that Third Friday may assert against them, however, the Debtors' counsel dispute such claim based upon counterclaims for fraudulent transfers, tortious interference, and various other claims. The Debtors intend to investigate and litigate these claims within the Chapter 11 Cases. Indeed, as set forth in the emails attached hereto as **Exhibit G**, Third Friday and Mr. Lewitt have continued to attempt to assert control over the Debtors after the commencement of the Chapter 11 Cases and have willfully ignored letters from the Debtors' counsel regarding the automatic stay and its protections. Indeed, the Debtors believe that Third Friday even attempted to transfer cash out of the Debtors' bank accounts after the Petition Date.

26. Without any access to cash the Debtors realized that without immediate legal action they would be unable to meet payroll or pay vendors critical for patient safety. During the afternoon of December 30, 2019, the Debtors and their legal team decided to commence emergency chapter 11 cases. With very little lead time the Debtors' counsel filed chapter 11 petitions for each of the Debtors in the early morning hours of New Years Eve, December 31, 2019, and have spent the remainder of the week working with the Debtors' employees, vendors and regulators to gather information for the First Day Pleadings.

**C.    Facts Relevant to the First Day Pleadings**

27. The Debtors filed the First Day Pleadings, which request various forms of relief. Generally, the First Day Pleadings have been designed to meet the Debtors' goals of: (a) continuing the Debtors' operations in the Chapter 11 Cases with as little disruption as possible; (b) maintaining the confidence and support of the Debtors' employees, suppliers and vendors during the Debtors' reorganization process; (c) establishing procedures for the smooth and efficient administration of the Chapter 11 Cases; and (d) obtaining the authorization to use Cash Collateral and debtor-in-possession financing.

28.     I have reviewed and discussed with the Debtors' counsel each of the First Day Pleadings filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference the factual statements set forth in the First Day Pleadings.  It is my belief that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve a successful reorganization.

29.     It is my further belief that, with respect to those First Day Pleadings requesting the approval of the Debtors' use of Cash Collateral and debtor-in-possession financing is essential for the Debtors so that they may sustain their operations and maximize the value of the businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 5, 2020                    _____
                                                Grant White