**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Americore Holdings, LLC, *et al.*, | ) | Case No. 19-61608-grs |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Honorable Gregory R. Schaaf |

**EMERGENCY MOTION OF THE COMMONWEALTH OF PENNSYLVANIA
FOR DETERMINATION THAT THE AUTOMATIC STAY DOES NOT APPLY
OR, IN THE ALTERNATIVE,
FOR RELIEF FROM THE AUTOMATIC STAY**

## I.    INTRODUCTION

The Commonwealth of Pennsylvania, by its Attorney General Josh Shapiro, moves this

Court under Bankruptcy Code 11 U.S.C. § 362, Federal Rule of Bankruptcy Procedure 4001, and

Local Bankruptcy Rule 4000-1 for an order determining that the automatic stay imposed by

Bankruptcy Code 11 U.S.C. § 362 does not apply to the Commonwealth of Pennsylvania's

pending, prepetition enforcement action filed in *In re: Ellwood City Hospital, A Pennsylvania*

*Nonprofit Corporation*, Court of Common Pleas, Lawrence County, Pennsylvania, Orphans' Court

Division, Docket No. 70081 of 2017, M.D., or, in the alternative, for an order of relief from the

automatic stay.

Ellwood City Hospital ceased operating on December 10, 2019. The Commonwealth of

Pennsylvania petitioned the Lawrence County Orphans' Court on December 23, 2019 to enforce

that Court's 2017 court-approved sale and transfer of substantially all of the charitable assets of

the nonprofit Ellwood City Hospital to certain of the for-profit debtors[1] in exchange for those debtors' agreement to operate the hospital and its emergency services for the residents of Lawrence County, Pennsylvania, through the year 2027. The Commonwealth of Pennsylvania, by this enforcement action, seeks to stop and prevent harm to the residents of Lawrence County by ensuring that they have access to healthcare services including emergency services and by preventing the diversion of charitable assets which are intended to be used for the welfare and benefit of Lawrence County residents. As the Orphans' Court matter affects the health, safety, and welfare of the residents of Lawrence County, Pennsylvania, the police or regulatory power exception to the automatic stay, 11 U.S.C. § 362(b)(4), applies, and this Court should authorize the Commonwealth of Pennsylvania to proceed with its enforcement action.

## II.    FACTUAL, PROCEDURAL, AND LEGAL BACKGROUND

1.      The Commonwealth of Pennsylvania is a sovereign state, represented by its Attorney General Josh Shapiro, and the Pennsylvania Office of Attorney General ("OAG").

2.      The OAG's main office is located at Strawberry Square, Harrisburg, PA 17120; the OAG also maintains satellite offices throughout the Commonwealth of Pennsylvania.

3.      Upon information and belief, debtors Ellwood Medical Center, LLC, Ellwood Medical Center Operations, LLC, and Ellwood Medical Center Real Estate, LLC, are all located and engage in business at 724 Pershing Street, Ellwood City, PA 16117, in Lawrence County, Pennsylvania.

---

[1] The named defendants in the Commonwealth of Pennsylvania's enforcement action filed in the Court of Common Pleas, Lawrence County, Pennsylvania, Orphans' Court Division, Docket No. 70081 of 2017, M.D., are the following debtors in these jointly administered cases: Americore Health, LLC, No. 19-61607-grs; Americore Health Solutions, LLC; Ellwood City Medical Center Operations, LLC, No. 19-61615-grs; and Ellwood City Medical Center, LLC, No. 19-61613-grs. Mr. Grant R. White is also named as a defendant in the Pennsylvania Orphan's Court enforcement action.

4.    Upon information and belief, debtors Americore Holdings, LLC, Americore Health Enterprises, LLC, and Americore Health, LLC, are all located and conduct business at 3933 South Broadway, St. Louis, Missouri, 63118.

5.    Upon information and belief, all debtors are managed and ultimately owned by Mr. Grant R. White. **Docket No. 11, Exhibit A**.

6.    Debtors each filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code in the Eastern District of Kentucky on December 31, 2019.

7.    This Honorable Court approved the Debtors' various bankruptcy cases consolidated for administration. **Docket Nos. 9 and 60**.

8.    This Court has jurisdiction of the matters pursuant to 28 U.S.C. § 1334.

9.    The Commonwealth of Pennsylvania's Emergency Motion for Determination that the Automatic Stay does not Apply or, in the Alternative, for Relief from the Automatic Stay is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

10.    The Ellwood City Hospital (hereinafter sometimes "ECH"), located in Ellwood City, Lawrence County, Pennsylvania, operated continuously as a nonprofit, community-based hospital since 1910.

11.    ECH served and provided for the healthcare needs of Ellwood City and its surrounding communities within a thirty-mile radius; the continued operation of ECH and its emergency room was central to the Commonwealth of Pennsylvania's essential governmental functions of promoting the health, welfare, and safety of its residents. A true and correct copy of the Declaration of Susan Coble, Deputy Secretary for Quality Assurance for the Commonwealth of Pennsylvania's Department of Health, is attached hereto and fully incorporated herein as **Exhibit J**. <u>See</u> Exhibit J generally.

12.     ECH expanded over time, from its humble beginnings operating out of a residence, to a hospital campus and ancillary real estate, medical offices, and other buildings. This expansion over many years was directly attributable to the support and charitable contributions of the residents of Ellwood City, Lawrence County, Pennsylvania.

13.     As the surrounding communities' reliance on access to healthcare from ECH grew, ECH's capabilities and responsibilities to provide appropriate access to healthcare to the communities surrounding Ellwood City also grew.

14.     However, by 2017, ECH had been losing in excess of four million dollars a year for a few years. In 2017, prior to debtors' purchase of substantially all of ECH's charitable assets, ECH experienced losses of approximately $3,500,000. A true and correct copy of the September 22, 2017 Order of Court entered by Judge David H. Acker, Court of Common Pleas, Lawrence County, which made this Finding of Fact is attached hereto and fully incorporated herein as **Exhibit A**. See Exhibit A, pp. 2-3, ¶ 6.

15.     ECH's continued operating losses caused ECH and Ellwood City community leaders to explore opportunities to continue ECH's operations as both a hospital and an emergency room.

16.     ECH explored and negotiated with several potential purchasers.

17.     ECH and the debtors entered into negotiations about the debtors' ability to continue to operate ECH as an acute care hospital and emergency room.

18.     Debtors' offer to purchase ECH's charitable assets was the only viable offer ECH received. Exhibit A, p. 3, ¶ 8.

19.     On March 6, 2017, ECH and the debtors entered into an Asset Purchase Agreement ("APA") and Amended Escrow Agreement. A true and correct redacted copy of the APA is

attached hereto and fully incorporated herein as part of **Exhibit B**, the Commonwealth of Pennsylvania's Petition to Enforce Asset Purchase Agreement and for Money Damages**.** The APA details the rights and obligations arising from the debtors' purchase of substantially all of the charitable assets of ECH, a nonprofit corporation, the purpose of which was to operate an acute care hospital and 24/7 emergency room serving the people of Lawrence County, Pennsylvania. Exhibit A, p. 7, ¶¶ 1 - 2.

20.    At the time of debtors' purchase of substantially all of ECH's charitable assets, the parties and the Court relied upon a June 5, 2017 report prepared by Health Care Appraisers, Inc. for the debtors. The intended purpose of the report was to document the purchase price that debtors paid to acquire substantially all of ECH's charitable assets. The several hundred page detailed report indicated the fair market value of the ECH real estate. The fair market value of the ECH real estate at the time of the purchase was significantly less than the fair market value of the ECH real estate presented to the Court via the appraisal included in the First Day Declaration. The report also summarized the value of the other ECH charitable assets to be transferred to the debtors as well as the amount of the ECH liabilities to be assumed by the debtors. The difference in value between ECH assets transferring to the debtors and total ECH liabilities being assumed by the debtors was comparatively small. The report may not be produced pursuant to a confidentiality agreement.

21.    Pennsylvania law requires a nonprofit corporation to obtain an Order of Court before it transfers all or substantially all of its assets that are committed to charitable purposes to protect against an unlawful diversion of charitable assets. 15 Pa. C.S. § 5547(b). A true and correct copy of 15 Pa. C.S. § 5547(b) is attached hereto and fully incorporated herein as **Exhibit C**.

22.    Likewise, 15 Pa. C.S. § 5976(b) provides that, "[i]f the assets of the corporation include any property committed to charitable purposes, the board of directors or other body shall apply to the court for an order pursuant to section 5547(b) (relating to nondiversion of certain property) specifying the disposition of property." A true and correct copy of 15 Pa. C.S. § 5976(b) is attached hereto and fully incorporated herein as **Exhibit D**.

23.    As ECH had always operated as a non-profit hospital and now sought to transfer substantially all of its assets to the for-profit debtors, on June 26, 2017, ECH petitioned the Lawrence County, Pennsylvania, Orphans' Court to approve the APA.

24.    Pennsylvania law charges the OAG with the responsibility of representing the interests of the general public in all matters concerning property committed to charitable purposes through the OAG's power as *parens patriae*. *Commonwealth v. Barnes Foundation*, 159 A.2d 500, 505 (Pa. 1960)("Attorney General . . . by virtue of the powers of [the] office, is authorized to inquire into the status, activities and functioning of public charities"); *In re Milton Hershey Sch. Tr.*, 807 A.2d 324, 330 (Pa. Cmwlth. 2002)("Attorney General has authority to inquire whether an exercise of a trustee's power, even if authorized under the trust agreement, is inimical to the public interest"); *Estate of Feinstein*, 527 A.2d 1034 (Pa. Super. 1987)(Attorney General's *parens patriae* role is completely independent of the charity and its legal counsel . . . "The Attorney General represents a broader interest than that of the charity alone. He must protect the interests of the public at large 'to whom the social and economic benefits of [charitable] trusts accrue'" *Id*. at 1036 n. 3, citing *In re Pruner's Estate*, 136 A. 2d 107, 109 (Pa. 1957); *In Re Roxborough Memorial Hospital*, 17 Fid. Rep.2d 412, 423 (O.Ct. Phila. 1997)("all property held by a nonprofit corporation is held in trust to carry out its charitable purposes. All property held by a charitable nonprofit including the operating revenues, grants, donations,

bequests, etc. generated therefrom, constitute property committed to charitable purposes."); *In re Allegheny Health Education and Research Foundation*, 252 B.R. 309, 252 B.R. 332 (1999)(Attorney General's *parens patriae* powers to protect debtor's charitable assets from the reach of creditors fell within the police power exception to the automatic stay under the federal Bankruptcy Code). That power has been codified at Section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732-204(c), which states in pertinent part that, "[t]he Attorney General shall represent the Commonwealth . . . in any action brought by or against the Commonwealth . . . and may intervene in any other action, including those involving charitable bequests and trusts." A true and correct copy of 71 P.S. § 732-204(c) is attached hereto and fully incorporated herein as **Exhibit E**.

25.    As such, the OAG represented, and still represents, the interests of the general public in ECH's Lawrence County Orphans' Court action.

26.    As documented in Conclusion of Law No. 3 on Page 7 of Exhibit A, Lawrence County Orphans' Court Judge David H. Acker found that the transfer of substantially all of ECH's assets to the debtors would constitute "a diversion of a charitable organization's assets" unless the parties to the APA satisfied two material obligations. Exhibit A, p. 7, ¶ 3.

27.    The first obligation was to "fully fund and satisfy the obligations of the Ellwood City Hospital Employee's Defined Benefit Plan." The second obligation was "to keep the Ellwood City Hospital open and operating for the next ten years as a full time 24/7 365 day per year hospital licensed and operating under the laws and regulations of the Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Health with a fully licensed emergency room operating 24/7 365 days per year operating in accordance with the laws and regulations of the

Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Health."
Exhibit A, p. 7, ¶ 3.

28.     Judge Acker also made additional Findings of Fact and Conclusions of Law in his September 22, 2017 Order. <u>See</u> Exhibit A.

29.     The Findings of Fact were based on hearings which Judge Acker conducted on August 2, 2017 and on August 30, 2017. <u>See</u> Exhibit A.

30.     During the hearings on the sale petition, Christopher Little, Vice President of Finance and Chief Financial Officer of ECH and the ECH Foundation, testified that he had served as CFO for 23 years and that ECH had no other options. He testified that, aside from debtors, no other entity which ECH approached to purchase its assets "would guarantee to keep the acute care hospital operating with 24/7 emergency room services." Exhibit A, pp. 1-3, ¶¶ 1, 5a, 8.

31.     ECH CFO Little testified that, unless the Court approved the APA, ECH "would be closed as quickly as possible and all assets liquidated and all debts, including pension obligations would be fully paid." Exhibit A, p. 3, ¶ 8.

32.     ECH CFO Little also testified that ECH "could only meet its obligations with the assistance of the Ellwood City Hospital Foundation and that their combined assets would only be sufficient to pay off debts, fund the Ellwood City Hospital Employee Defined Benefit Pension obligations and to wind up the business of closing the hospital." Exhibit A, p. 3, ¶ 9.

33.     ECH CFO Little testified that the "current assets of the Ellwood City Hospital Foundation are sufficient to fully fund the Ellwood City Hospital Employees Defined Benefit Pension Plan and to pay all hospital debts and obligations." Exhibit A, p. 3, ¶ 10.

34.     ECH CFO Little testified too that, if ECH required that the debtors' purchase of ECH be conditioned on debtors' performance through a lien, encumbrance, or mortgage on the ECH property, the debtors would walk away from the purchase. Exhibit A, p. 4, ¶ 13.

35.     At the hearings on the sale petition, Mr. Jeffrey Schapel, the auditor of ECH's Employee Defined Benefit Pension Plan, testified that, as of the audit for the period ending June 30, 2017, the Defined Benefit Pension Plan was underfunded by $7,984,499. Exhibit A, p. 6, ¶ 17.

36.     Under the terms of the APA, the debtors paid no money to ECH, but the debtors agreed "to assume all [of ECH's] liabilities for the Ellwood City Hospital Employees Defined Benefit Plan, to pay certain listed financial obligations of the Ellwood City Hospital and to operate a licensed hospital and licensed emergency room twenty-four hours, seven days a week, three hundred and sixty-five days a year, for the next ten years." See Exhibit A, p. 2, ¶ 3.

37.     Under the terms of the Amended Escrow Agreement, the debtors deposited $4 million into an escrow account. Exhibit A, p. 4, ¶ 12.

38.     The APA called for ECH and its related companies to transfer their assets immediately upon the consummation of the agreement. Exhibit A, p. 4, ¶ 13.

39.     By his September 22, 2017 Order of Court, which includes Findings of Fact and Conclusions of Law, Lawrence County Pennsylvania Orphans' Court Judge David H. Acker approved the APA, Amended Escrow Agreement, and Side-Letter. Exhibit A.

40.     Judge Acker's Order is binding on the debtors.

41.     Debtors began operating ECH on October 31, 2017. A true and correct copy of the Declaration of E. William Matthews, acting Chief Executive Officer for ECH Legacy, Inc., f/k/a Ellwood City Hospital and the Executive Director of the Ellwood City Community Health

Foundation, is attached hereto and fully incorporated herein as **Exhibit F**. See Exhibit F, ¶ 4;
Exhibit J, ¶ 13.

42.     Upon information and belief, ECH continued to operate as a medical facility until
December 10, 2019, when it closed. Exhibit F, ¶ 6; see also a true and correct copy of the
Declaration of Anthony J. Court, Mayor of Ellwood City, which is attached hereto and fully
incorporated herein as **Exhibit G**. See Exhibit G, ¶ 22. Exhibit J, ¶ 44.

43.     Upon information and belief, ECH Chief Executive Officer Beverly Annarumo
resigned her position effective January 3, 2020. During the January 8, 2020 hearings on the First
Day Motions, debtors' counsel represented to this Court that debtors have extended Ms.
Annarumo's employment by two weeks.

44.     By closing ECH, debtors breached the APA, Amended Escrow Agreement, and
Side-Letter, and violated Judge Acker's September 22, 2017 Order (hereinafter sometimes
"Governing Documents"), all of which require debtors to continue to operate ECH as a hospital
with emergency room services for ten years for the benefit of the residents of Lawrence County,
Pennsylvania. Exhibit A, p. 10, ¶ 8; Exhibit F, ¶ 5.

45.     Debtors were fully informed of ECH's financial condition prior to entering into the
Governing Documents.

46.     As evidenced by the Governing Documents and Judge Acker's Order at Page 1,
debtors were represented by legal counsel during both the process leading up to the purchase and
at the hearings before Judge Acker.

47.     As evidenced by the Governing Documents and Judge Acker's Order, debtors
agreed and accepted the transfer of ECH's charitable assets knowing full well that they were then

obligated to operate Ellwood City Hospital and its emergency room for ten years from the date of the approval of the APA.

48.     The debtors' continued operation of ECH as a hospital with emergency room services for ten years which complied with the laws of the Commonwealth of Pennsylvania and benefitted the residents of Lawrence County was the main impetus that caused ECH to agree to transfer substantially all of its charitable assets to the for-profit debtors without receiving any value in exchange. Exhibit A, p. 3, ¶ 8.

49.     ECH relied upon the debtors and the Governing Documents as demonstrated by its transfer of substantially all of its charitable assets to the for-profit debtors.

50.     The residents of Lawrence County, the OAG, and Judge Acker all relied upon the debtors' representations and agreements. Exhibit G, ¶¶ 19, 20, 22-24.

51.     By closing ECH, debtors have breached the APA and violated Judge Acker's Order regarding the Local Advisory Board. Exhibit F, ¶¶ 5, 7; Exhibit G, ¶¶ 5-11, 14-18. See also a true and correct copy of the Declaration of David Kingston, Police Lieutenant of the Ellwood City Police Department, which is attached hereto and fully incorporated herein as **Exhibit H**. See Exhibit H, ¶¶ 4-14.

52.     Under Section 12.5 of the APA, the debtors may reduce services that they agreed to maintain only if such reduction is approved by the Local Advisory Board created under Section 12.6 of the APA. Exhibit A, p. 5, ¶ 15; Exhibit F, ¶¶ 5, 7; Exhibit G, ¶¶ 10, 18; Exhibit H, ¶¶ 6, 14.

53.     Upon information and belief, debtors did not seek approval from the Local Advisory Board before it closed ECH and laid off staff. According to Ellwood City Mayor Anthony J. Court and Police Lieutenant David Kingston, both members of the Local Advisory

Board, there were only two meetings held after debtors purchased ECH in 2017 and neither of those meetings addressed the closing of the hospital. Exhibit F, ¶¶ 5, 7; Exhibit G, ¶¶ 14, 15, 18; Exhibit H, ¶¶ 7-10, 15.

54.     Upon information and belief, since debtors purchased ECH's assets, they have not scheduled meetings or sought the approval of the Local Advisory Board to implement other reductions to healthcare services. Examples of debtors' prior, unilateral modifications and diminutions in healthcare services without notice to or approval by the Local Advisory Board include the following: (a) wound care and cafeteria for staff and visitors both closed on August 8, 2018; (b) nuclear medicine services decreased - no weekends or holidays effective August 27, 2018; (c) MRI services decreased from 8 hours per day to 6 hours per day effective August 27, 2018; (d) MRI services further decreased - no Friday service effective February 2, 2019; (e) CT scanner inoperable with no scheduled repairs effective November 11, 2019; and (f) numerous other deficiencies in healthcare services directly attributable to debtors' nonpayment of vendor invoices from October 2018 through ECH's closure in December 2019. See Exhibits G, H, and J generally.

55.     Under Section 12.6 of the APA, the Local Advisory Board was created expressly to protect access to healthcare for residents of Ellwood City and its surrounding communities.

56.     The President Judge of Lawrence County, Pennsylvania, retains jurisdiction over the Local Advisory Board, filling vacancies should the number of members fall below seven. Exhibit A, p. 11, ¶ 1.

57.     In breach of the Governing Documents and in violation of Judge Acker's Order, debtors have, since at least December 10, 2019, failed to satisfy the requirement to operate ECH in accordance with the laws and regulations of the Commonwealth of Pennsylvania and the

Commonwealth of Pennsylvania Department of Health. Exhibit A, p. 7, ¶ 3. See Exhibit J generally.

58.     Upon information and belief, on November 27, 2019, the Commonwealth of Pennsylvania Department of Health issued a ban on admission and suspension of emergency department services to ECH for serious violations of the Commonwealth's Health Care Facilities Act. Exhibit J, ¶ 40.

59.     By its November 27, 2019 notification to ECH, however, the Pennsylvania Department of Health did not revoke ECH's operating license. Exhibit J, ¶¶ 40, 49.

60.     Since debtors purchased ECH's assets, from December 21, 2017 through debtors' voluntary discontinuation of ECH's operations on December 10, 2019, the Pennsylvania Department of Health has issued forty (40) citations to debtors. See Exhibit J generally.

61.     Upon information and belief, on or about December 9, 2019, the OAG began receiving numerous complaints from current and former ECH employees who alleged that the debtors had failed to pay wages owed to ECH employees and make pension contributions on behalf of ECH employees. The ECH employees further reported that, after they had been laid off, they were initially denied unemployment benefits because debtors had failed to timely file required reports and remit unemployment contributions to the Commonwealth of Pennsylvania Department of Labor and Industry Office of Unemployment Compensation. See Exhibit F, ¶¶ 5, 8; Exhibit G, ¶ 21.

62.     Upon information and belief, on or about November 22, 2019, which was a regularly scheduled payday for ECH employees, no ECH employees received wages for the hours that they worked.

63.     Upon information and belief, on or about November 25, 2019, ECH employees received a capped amount of five-hundred fifty dollars ($550) in wages, regardless of the amount that was actually owed to each ECH employee. The majority of the approximately one-hundred seventy-one (171) employees were owed more than five-hundred fifty dollars ($550) for their work.

64.     Upon information and belief, on or about November 27, 2019, some ECH employees received up to an additional two-hundred fifty dollars ($250) in wages.

65.     Upon information and belief, on or about December 6, 2019, the next regularly scheduled payday for ECH employees, none of the approximately one-hundred seventy-one (171) ECH employees were paid wages for the hours that they worked.

66.     Upon information and belief, on or about December 6, 2019, debtors furloughed eighty-nine (89) of ECH's one-hundred seventy-one (171) employees. In a second round of layoffs, on or about December 11, 2019, debtors furloughed an additional fifty-seven (57) employees.

67.     Upon information and belief, on December 10, 2019, the debtors discontinued ECH's remaining clinical services and closed the hospital's doors, in breach of the Governing Documents and in violation of Judge Acker's Order. See Exhibit A generally; Exhibit F, ¶ 6; Exhibit G, ¶ 22.

68.     Upon information and belief, debtors furloughed ECH employees without advance notice to those employees or to the Local Advisory Board and debtors have not fully paid those employees for the hours that they worked, both in violation of applicable federal and state laws and regulations. Exhibit G, ¶ 18; Exhibit H, ¶¶ 14, 15.

69.     Upon information and belief, debtors withheld funds from employees' pay for short-term disability benefits but then failed to remit those funds to the insurer and did not refund the affected employees.

70.     Upon information and belief, debtors failed to make required ECH Employees Defined Benefit Pension Plan contributions, in breach of the Governing Documents and in violation of Judge Acker's Order.[2] Exhibit F, ¶¶ 5, 8.

71.     In the less than two and one-half years since ECH transferred substantially all of its charitable assets to the for-profit debtors, debtors' actions and inactions have rendered their continued compliance with the Governing Documents and Judge Acker's Order an impossibility and the debtors have accordingly frustrated the material purpose of the transfer of charitable assets; debtors' actions therefore constitute an unlawful diversion of a charitable organization's assets. Exhibit A, p. 7, ¶ 3; see Exhibit J generally.

72.     Judge Acker's September 22, 2017 Order provides for the OAG's "continu[ed] standing to sue for monetary damages or to enforce the provisions of the Asset Purchase Agreement, Amended Escrow Agreement and Side Letter agreement as amended by agreement of the parties on August 30, 2017 and under 28 Pa Code § 101.143." Exhibit A, p. 12, ¶ 1(e).

73.     Pursuant to the OAG's *parens patriae* responsibility to represent the interests of the general public in all matters concerning property committed to charitable purposes, Section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732-204(c), and in accordance with Judge Acker's Order, the Commonwealth of Pennsylvania, by its attorney, the OAG, filed an enforcement action

---

[2] Simultaneous to the filing of this motion, the Commonwealth has also filed an Emergency Motion of the Commonwealth of Pennsylvania as *Parens Patriae* for Entry of an Order under 11 U.S.C. §§ 105 and 507 Directing Debtors to Pay Pre-Petition Wages and Related Items of former Ellwood Employees. The issues raised by that motion are appropriately before this Court and not the Orphans' Court of Lawrence County, Pennsylvania.

against the debtors in the Court of Common Pleas, Lawrence County, Pennsylvania, Orphans'

Court Division, Docket No. 70081 of 2017, M.D., on December 23, 2019. **Exhibit B.**

74.    The enforcement action seeks to redress and enjoin the debtors' diversion of

charitable assets to their pecuniary benefit in violation of the Governing Documents and Judge

Acker's Order.

75.    In its Petition, the Commonwealth of Pennsylvania seeks equitable relief from the

Orphans' Court to restore and ensure continued access to healthcare, including emergency

services, and to promote the public interest and welfare of the residents of Lawrence County,

Pennsylvania, in the form of injunctive and declaratory relief.

76.    Specifically, the Commonwealth of Pennsylvania asks the Orphans' Court to enter

orders which provide the following:

a.    Debtors must comply with Judge Acker's September 22, 2017 Order under

penalty of contempt sanctions;

b.    Debtors must comply with all Pennsylvania legal and regulatory

requirements governing the operation of a hospital facility including the provision of

emergency services;

c.    Debtors must provide an accounting of expenditures of funds from the date

of the debtors' purchase of ECH's assets to the present; and,

d.    If the debtors fail to comply, the debtors should be completely divested of

any interest in the ECH assets and a trustee or receiver should be appointed to oversee and

lead the ECH operations to ensure assets are not diverted from their charitable purposes.

77.    On December 27, 2019, Judge Acker ordered the defendants in the enforcement

action "to file verified answers to the allegations contained in the Petition to Enforce Asset

Purchase Agreement and for Monetary Damages." A true and correct copy of the December 27, 2019 Order of Court entered by Judge David H. Acker, Court of Common Pleas, Lawrence County, is attached hereto and fully incorporated herein as **Exhibit I.**

78.     On December 31, 2019, the defendants turned debtors and filed for Chapter 11 protection under the Bankruptcy Code in this Court.

## III.     LEGAL ARGUMENT

79.     The Commonwealth of Pennsylvania's Orphans' Court Petition, filed by the OAG on December 23, 2019 against the debtors, falls within the Commonwealth's police or regulatory power and is thus excepted from the Bankruptcy Code's automatic stay provisions pursuant to 11 U.S.C. § 362(b)(4).

80.     When a debtor files a petition in bankruptcy under Chapter 11 of the Bankruptcy Code, the filing automatically stays specified proceedings against the debtor. Under 11 U.S.C. § 362(a)(1), the petition generally stays the commencement or continuation of judicial, administrative or other proceedings against the debtor that were, or could have been, brought before the bankruptcy petition was filed. *See Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 760 (6th Cir. 2012).

81.     Certain proceedings, however, are excepted from the automatic stay. *Id*. Thus, while the automatic stay "'repel[s] ... many prepetition collection actions, [s]ome governmental attacks on the estate ... penetrate the barrier.'" *In re Robinson*, 764 F.3d 554, 559 (6th Cir. 2014)(quoting *In re Javens*, 107 F.3d 359, 363 (6th Cir. 1997)).

82.     One exception to the automatic stay provides the following:

> . . . the commencement or continuation of an action or proceeding by a governmental unit … to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the

> governmental unit to enforce such governmental unit's or organization's police
> or regulatory power . . .

11 U.S.C. § 362(b)(4).

83.    This "police or regulatory power" exception to the automatic stay was broadly construed in favor of the states by the Third Circuit Court of Appeals in *Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania*, 733 F.2d 267 (3d Cir. 1983). In *Penn Terra*, the Third Circuit reversed both the bankruptcy and district courts allowing the enforcement of a Pennsylvania Commonwealth Court injunction issued after the commencement of the bankruptcy proceeding. The Commonwealth Court injunction in *Penn Terra* required the Chapter 7 debtor to comply with mandated environmental cleanup obligations, notwithstanding that the cost of the cleanup would exhaust the assets of the debtor's estate. *Id*. at 269-70.

84.    To support its broad interpretation of the police or regulatory power exception to Section 362(b)(4) of the Bankruptcy Code, the Third Circuit relied on the legislative history of the statute:

> Paragraph (4) excepts commencement or continuation of actions and proceedings
> by governmental units to enforce police or regulatory powers. Thus, where a
> government unit is suing a debtor to prevent or stop violation of fraud,
> environmental protection, consumer protection, safety, or similar police or
> regulatory laws, or attempting to fix damages for violation of such law, the action
> or proceeding is not stayed under the automatic stay. *Id*. at 272.

85.    In its analysis, the Third Circuit stated that, although Congress has the ability under its bankruptcy power to "pre-empt the States, even in their exercise of police power, the usual rule is that congressional intent to pre-empt will not be inferred lightly." *Id*.

86.     The *Penn Terra* Court then stated:

> Given the general rule that pre-emption is not favored, and the fact that, in restoring
> power to the States, Congress intentionally used such a broad term as "police and
> regulatory powers," we find that the exception to the automatic stay provision
> contained in subsections 362(b)(4)-(5) should itself be construed broadly, and no
> unnatural efforts be made to limit its scope. The police power of the several States
> embodies the main bulwark of protection by which they carry out their
> responsibilities to the People; its abrogation is therefore a serious matter. Congress
> should not be assumed, therefore, to have been miserly in its refund of that power
> to the States. Where important state law or general equitable principles protect some
> public interest, they should not be overridden by federal legislation unless they are
> inconsistent with explicit congressional intent such that the supremacy clause
> mandates their supersession. *Id*. at 273.

87.     An adverse financial impact on debtors' estate is not "all controlling" and does not
narrow the Commonwealth of Pennsylvania's police or regulatory power exception under Section
362(b)(4) of the Bankruptcy Code. On the contrary, as the Third Circuit recognized in *Penn Terra*,
almost everything costs money and an injunction which does not compel some expenditure or loss
of monies may often be an "effective nullity:" "It appears that, in defining the scope of the
exception to the automatic stay, the Bankruptcy Court in this case placed too much weight on the
value of preserving the corpus of the debtor's funds and estate under its own exclusive control.
Admittedly, that goal is normally central to the statutory scheme of the Bankruptcy Code. As noted
at the beginning of this opinion, however, in some instances this policy is in inexorable conflict
with other, no less salutary, governmental goals. We believe that the resolution of this conflict is

contained in the statute itself. In enacting the exceptions to section 362, Congress recognized that in some circumstances, bankruptcy policy must yield to higher priorities. Indeed, if the policy of preservation of the estate is to be invariably paramount, then one could not have exceptions to the rule. Since Congress did provide for exceptions, however, we may assume that the goal of preserving the debtor's estate is not always the dominant goal." *Id*. at 278.

88.    As the Sixth Circuit has aptly and succinctly stated, "Congress clearly intended for the police power exception to allow governmental agencies to remain unfettered by the bankruptcy code in the exercise of their regulatory powers." *In re Commerce Oil Co.*, 847 F.2d 291, 295 (6th Cir. 1988); *see also Bickford v. Lodestar Energy, Inc.*, 310 B.R. 70, 76 (E.D. Ky. 2004). Thus, as a general matter, Section 362 does not stay governmental proceedings to enforce statutes protecting human health and the environment. *In re Commerce Oil Co*, 847 F.2d. at 295–97.

89.    Consequently, courts have found that many types of governmental actions fall within the 11 U.S.C. § 362(b)(4) exception: Title VII actions brought by the Equal Employment Opportunity Commission to enforce its power to eradicate employment discrimination. *Equal Employment Opportunity Commission v. Halls Motor Transit Company*, 789 F.2d 1011 (3d Cir. 1986); *Equal Employment Opportunity Commission v. Rath Packing Company*, 787 F.2d 318 (8th Cir. 1986). *See also Lancaster v. Tennessee,* 831 F.2d 118, 122 (6th Cir.1987) (trustee must comply with applicable environmental law); *Ahrens Aircraft, Inc. v. NLRB*, 703 F.2d 23 (1st Cir. 1983)(proceeding brought by the National Labor Relations Board for back pay); *NLRB v. Evans Plumbing Company*, 639 F.2d 291 (5th Cir. 1981)(proceeding brought by the National Labor Relations Board for reinstatement); *Board of Governors of the Federal Reserve System v. MCorp. Financial, Inc.*, 502 U.S. 32 (1991)(administrative proceeding filed by the Federal Reserve System); *Davis v. Sheldon*, 691 F.2d 176 (3d Cir. 1982)(criminal bad check prosecution); *Brennan*

*v. Poritz*, 198 B.R. 445 (D. N.J. 1996)(civil action for securities fraud, obstruction of investigation,

and racketeering); *Dole v. Hansbrough*, 113 B.R. 96 (D. D.C. 1990)(ERISA action); and *In Re*

*Olympia Holdings Corp.*, 161 B.R. 524 (M.D. Fla. 1993)(regulatory action brought by the

Interstate Commerce Commission).

90.     Like those government actions, the Commonwealth of Pennsylvania's enforcement

action here -- intended to protect the public's access to healthcare -- clearly falls within the police

or regulatory exception. <u>See</u> Exhibits B and J generally.

91.     Pennsylvania's case law makes clear the role and authority of the OAG in cases

involving public charities and, indeed, all property committed to charitable purposes: "The

beneficiary of charitable trusts is the general public to whom the social and economic advantages

of the trusts accrue. But because the public is the object of the settlors' benefactions, private parties

have insufficient financial interest in charitable trusts to oversee their enforcement. Consequently,

the Commonwealth itself must perform this function if charitable trusts are to be properly

supervised. The responsibility for public supervision has traditionally been delegated to the

attorney general to be performed as an exercise of his *parens patriae* powers. These are the ancient

powers of guardianship over persons under disability and of protectorship of the public interest

which originally were held by the Crown of England as the 'father of the country,' and which as

part of the common law devolved upon the states and federal government. Specifically, these

powers permitted the sovereign, wherever necessary, to see to the proper establishment of charities

through his officer, the attorney general, and to exercise supervisory jurisdiction over all charitable

trusts." *Pruner Estate*, 136 A.2d 107, 109 (Pa. 1957)(citations and footnotes omitted).

92.     Not surprisingly, the court in *Pruner* deemed the attorney general an indispensable

party in such actions: "Our legislature recognized the historic interest of the attorney general in

charitable trusts as well as the benefits to be gained from his appearance in litigation affecting

them, by requiring that he be given notice of proceedings for the application of *cy pres*. . . . This

enactment did not enlarge the powers of the attorney general in *cy pres* proceedings, but rather

statutorily affirmed his responsibility in such actions. For, not only in actions involving the

application of *cy pres* but in every proceeding which affects a charitable trust, whether the action

concerns invalidation, administration, termination or enforcement, the attorney general must be

made a party of record because the public as the real party in interest in the trust is otherwise not

properly represented." *Pruner Estate*, 136 A.2d at 109-110. *See also Voegtly Estate*, 151 A.2d 593

(Pa. 1959).

93.      According to the legislative history of 11 U.S.C § 362(b)(4), Congress specifically

intended to carve out an exception from the automatic stay protections afforded a debtor's estate

to allow governments to pursue such legal actions without being stayed by bankruptcy

proceedings: "Thus, where a governmental unit is suing a debtor to prevent or stop violations of

fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws,

or attempting to fix damages for violation of such a law, the action or proceeding is not stayed

under the automatic stay." *Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*,

474 U.S. 494, 504 (1986).

94.      To determine whether proceedings fall within the police or regulatory exception to

the automatic stay, the Sixth Circuit has "applied two 'related, and somewhat overlapping' tests:

the pecuniary purpose test and the public policy test." *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d

374, 385 (6th Cir. 2001); *see also In re Commerce Oil Co*, 847 F.2d at 295–96.

95.      Under the pecuniary purpose test, courts evaluate "whether the governmental

proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's

property, and not to matters of public safety. Those proceedings which relate primarily to matters of public safety are excepted from the stay." *Chao*, 270 F.2d at 385*; see also In re Nortel Networks, Inc.*, 669 F.3d 128, 139-140 (3d Cir. 2011).

96.     The Commonwealth of Pennsylvania has a fundamental interest in promoting the health, safety, and welfare of its citizens. Here, specifically it has an interest in promoting and protecting access to healthcare for the residents of Lawrence County, Pennsylvania.

97.     The Commonwealth of Pennsylvania is also charged with regulating charities, including their assets, and is armed with the tools -- the laws -- for doing so.

98.     If the automatic stay enjoins the Commonwealth from advancing its Petition in Orphans' Court, there will be fundamental harm to residents of the Commonwealth of Pennsylvania, depriving them of access to healthcare including emergency services. See Exhibits G and H generally.

99.     "The inquiry under the 'pecuniary interest' test is 'whether the enforcement would result in a pecuniary *advantage* to the government *vis-a-vis* other creditors of the bankruptcy case.'" *United States v. Vanguard Healthcare, LLC*, 565 B.R. 627, 632–33 (M.D. Tenn. 2017)(quoting *Chao*, 270 F.3d at 388 n. 9).

100.    Clearly – and there is no evidence to the contrary -- the Commonwealth did not file the Petition in Orphans' Court to protect any pecuniary interest of its own in debtors' estate. The Commonwealth has no ownership interest in the assets at stake. Rather, the Commonwealth filed the petition seeking equitable and declaratory relief to protect the residents of Lawrence County and charitable assets located within the Commonwealth. See Exhibits B and J generally.

101.    Conversely, if the Commonwealth cannot proceed with its Orphans' Court Petition, it is the debtors who may be unjustly enriched precisely for failing to act in accordance with the Governing Documents and Judge Acker's Order.

102.    Under the public policy test, courts also evaluate whether proceedings "adjudicate private rights [or] effectuate public policy. Those proceedings that effectuate public policy are excepted from the stay." *Chao v. Hosp. Staffing Servs., Inc*. at 385-86.

103.    The Commonwealth of Pennsylvania's Orphans' Court Petition does not seek to benefit any one's private rights but instead seeks to promote and protect access to healthcare including emergency services for the residents of Lawrence County, Pennsylvania, and to protect charitable assets located within the Commonwealth. See Exhibits B and J generally.

104.    The debtors' continuing breach of the Governing Documents and violations of Judge Acker's Order are irreparably harming the residents of Lawrence County, Pennsylvania. See Exhibits G, H, and J generally.

105.    The access to healthcare including emergency services that was central and material to the court-approved purchase and transfer of virtually all of ECH's charitable assets to the for-profit debtors can best be addressed by the Pennsylvania Orphans' Court.

106.    The Pennsylvania Orphans' Court can hold the debtors accountable for full performance under the Governing Documents that they entered into "with their eyes wide open" and upon which the residents of Lawrence County, Pennsylvania, rely.

IV.    **CONCLUSION**

107.    The Commonwealth of Pennsylvania's concern for its citizens' health, safety, and welfare and its responsibility to oversee charitable assets will, in this case, be most appropriately heard and determined by the Pennsylvania Orphans' Court – the very same Court that issued the Order which debtors have now violated.

108.    The Commonwealth of Pennsylvania therefore respectfully requests that this Honorable Court enter the proposed order declaring that the automatic stay does not apply to the Commonwealth of Pennsylvania's Orphans' Court Petition or, in the alternative, lifting the automatic stay so the Commonwealth of Pennsylvania may pursue the Orphans' Court Petition.

Respectfully submitted,

JOSH SHAPIRO
ATTORNEY GENERAL

Dated: January 14, 2020          By:    */s/ Jason L. Swartley* _____
Jason L. Swartley
Chief Deputy Attorney General
PA Attorney No. 78213
Pennsylvania Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Tel: (717) 705-7326
Fax: (717) 772-4526
Email: jswartley@attorneygeneral.gov

## **NOTICE**

Please take notice that the foregoing motion shall come on for hearing before the Honorable

Gregory R. Schaaf at the U.S. Bankruptcy Court, Community Trust Building, Second Floor

Courtroom, 100 East Vine Street, Lexington, Kentucky, 40507, on January 17, 2020, at 9:00 a.m.

Respectfully submitted,

JOSH SHAPIRO
ATTORNEY GENERAL


Dated: January 14, 2020          By:   */s/ Jason L. Swartley*
                                       Jason L. Swartley
                                       Chief Deputy Attorney General
                                       PA Attorney No. 78213
                                       Pennsylvania Office of Attorney General
                                       15th Floor, Strawberry Square
                                       Harrisburg, PA 17120
                                       Tel: (717) 705-7326
                                       Fax: (717) 772-4526
                                       Email: jswartley@attorneygeneral.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on January 14, 2020, the foregoing Motion was served electronically through the Court's ECF system to all persons receiving electronic notifications in the Chapter 11 cases. Also, on January 14, 2020, a copy of the Motion was sent via electronic mail to the Debtors' Counsel and the Office of the United States Trustee at the addresses set forth below:

| | |
|---|---|
| Office of the United States Trustee<br>E-mail: Bradley.Nerderman@usdoj.gov | James R. Irving, Debtors' Counsel<br>E-mail: jirving@bgdlegal.com |
| Christopher B. Madden, Debtors' Counsel<br>E-mail: cmadden@bgdlegal.com | April A. Wimberg, Debtors' Counsel<br>E-mail: awimberg@bgdlegal.com |

*/s/ Jason L. Swartley*
Jason L. Swartley