# EXHIBIT B

**IN THE COURT OF COMMON PLEAS**
**OF LAWRENCE COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

| | |
|---|---|
| **COMMONWEALTH**<br>**OF PENNSYLVANIA**<br>**BY ATTORNEY GENERAL JOSH**<br>**SHAPIRO,** | **CIVIL ACTION**<br><br>Case No.: 70081 of 2017, M.D. |

**COMMONWEALTH**
**OF PENNSYLVANIA**
**BY ATTORNEY GENERAL JOSH**
**SHAPIRO,**

        **Plaintiff,**

        **v.**

**AMERICORE HEALTH, LLC,**
**AMERICORE HEALTH SOLUTIONS,**
**LLC, ELLWOOD CITY MEDICAL**
**CENTER OPERATIONS, LLC,**
**ELLWOOD CITY MEDICAL CENTER,**
**LLC,**

        **-and-**

**GRANT WHITE**, Individually and as Chief
Executive Officer of Americore Health, LLC,
and as President and owner of Americore
Health Solutions, LLC,

        **Defendants.**

**CIVIL ACTION**

Case No.: 70081 of 2017, M.D.

**PETITION TO ENFORCE ASSET**
**PURCHASE AGREEMENT AND**
**FOR MONETARY DAMAGES**

Filed on behalf of the Commonwealth
of Pennsylvania by Attorney General
Josh Shapiro,
Plaintiff.

**Counsel of Record:**
Mark A. Pacella
Chief Deputy Attorney General
Pa. I.D.: No. 42214
Eugene Herne
Senior Deputy Attorney General
Pa. I.D.: No. 82033
**Charitable Trusts and Organizations**
**Section**
Office of Attorney General
1251 Waterfront Place, Mezzanine
Pittsburgh, PA 15222
412-565-7680

Nancy A. Walker
Chief Deputy Attorney General
Pa. I.D.: No. 66816
Christopher S. Hallock
Deputy Attorney General
Pa. I.D.: No. 307004
Catherine Twigg
Deputy Attorney General
Pa. I.D.: No. 327406
**Fair Labor Section**
Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
215-560-2402



DEC 23 2019

PRO & CLERK

The Commonwealth of Pennsylvania, acting as *parens patriae* through its Attorney General, Josh Shapiro, files this action to redress and enjoin the defendants' continuing violations of the March 6, 2019 Asset Purchase Agreement approved by this Honorable Court and in support thereof, avers the following:

## BACKGROUND

On September 22, 2017 this Court approved the sale of the former nonprofit Ellwood City Hospital to the Ellwood City Medical Center, Americore Health, LLC, Americore Health Solutions, LLC, and Grant White based upon the defendants' representations memorialized in the Asset Purchase Agreement entered into on March 6, 2017. On or about December 9, 2019, the Office of Attorney General began receiving numerous complaints from current and former Ellwood City Medical Center employees alleging that: (1) Defendants failed to pay wages owed to employees; (2) employees were denied unemployment compensation benefits after their layoff as a result of Defendants' failure to remit unemployment compensation contributions and file timely reports with the Office of Unemployment Compensation; and, (3) various other employee and citizen complaints. The public interest will be served by this Honorable Court entering an order granting the relief requested herein.

## PARTIES

1.     Plaintiff, the Commonwealth of Pennsylvania acting as *parens patriae* through its Attorney General, Josh Shapiro ("Attorney General"), is the chief law enforcement officer of the Commonwealth and maintains an office at 1600 Arch Street, Suite 300, Philadelphia, Pennsylvania 19103, and also throughout the Commonwealth.

2.     Defendant, Americore Health, LLC ("Americore"), is a for-profit Delaware corporation that maintains a registered corporate address at 1201 Orange Street, Wilmington,

2

Delaware 19801, and a principal place of business at 501 SE 2nd Street, Apartment 901, Fort Lauderdale, Florida 33301.

3.    Upon belief, Americore Health Solutions, LLC ("Health Solutions"), is a for-profit Delaware corporation with a principal place of business at 501 SE 2nd Street, Apartment 901, Fort Lauderdale, Florida 33301, and is the controlling member of Americore. At all times relevant and material Health Solutions has been owned and controlled by defendant Grant White.

4.    Defendant, Ellwood City Medical Center Operations, LLC, is a for profit Delaware corporation with a registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, and owns and operates Ellwood City Medical Center.

5.    Defendant, Ellwood City Medical Center, LLC ("ECMC") is a for-profit corporation operating the hospital located at 724 Pershing Street, Ellwood City, Lawrence County, Pennsylvania 16117. At all times relevant and material ECMC has been owned and controlled by defendant Ellwood City Medical Operations and Americore Helath, LLC.

6.    Grant White ("White") is an adult individual residing at 6857 Crest Road, Rancho Palos Verdes, California 90275. At all times relevant hereto, White was the Chief Executive Officer of Americore, and in that capacity directed, supervised, controlled, approved, formulated, authorized, ratified, benefited from, and/or otherwise participated in the acts and practices hereinafter described.

## FACTS

7.    Ellwood City Hospital was founded in 1910 as a 10-bed community hospital in a residential home.

8.    Financing to construct the hospital's current location on Pershing Street is the result of private donations from many local residents and businesses.

3

9.      After nearly One-Hundred (100) years of operation as a non-profit, the hospital encountered economic difficulties and was put up for sale.

10.      In 2017, the Hospital was sold to Americore and White to operate as a for-profit business under the name of Ellwood City Medical Center, LLC.

11.      Prior to the sale, the Attorney General and this Court reviewed and approved the terms of sale based, in part, upon representations made by Americore and/or White.

12.      The representations made include that, among other things, Defendants would operate a licensed hospital and licensed emergency department for ten (10) years, would make annual contributions funding the employee defined-benefit pension fund, and otherwise comply with all federal and state laws.

13.      Shortly after the sale, there were reports of employees not receiving wages, resulting in several state and local investigations commencing.

14.      In November of 2019, the emergency department closed when the Pennsylvania Department of Health determined the hospital had failed to comply with various licensing requirements regarding the functionality of emergency room equipment.

15.      Upon information received, on or about November 22, 2019, the regularly scheduled pay day, no employees received remuneration for time worked.

16.      Upon information received, on or about November 25, 2019, employees received a capped amount of Five-Hundred and Fifty Dollars ($550) in wages regardless of the amount employees were actually owed. The majority of the approximately one-hundred and seventy (170) employees were owed more than Five-Hundred and Fifty Dollars ($550).

17.      Upon information received, on or about November 27, 2019, some employees received up to an additional Two-Hundred and Fifty Dollars ($250).

18.    Upon information received, on or about November 28, 2019, more than ninety (90) employees were laid off without notice.

19.    Upon information received, employee terminations continued after November 28, 2019, and to date, approximately one-hundred and fifty-two (152) employees have been laid off and none has received notice.

20.    Upon information received, on or about December 6, 2019, the next regularly scheduled payday, none of the approximately one-hundred and seventy (170) employees received remuneration for time worked.

21.    Upon information received, on or about December 7, 2019, employees who were laid off and filed for unemployment compensation began receiving notices from the Pennsylvania Department of Labor and Industry, Office of Unemployment Compensation, that their applications for benefits were denied due to no reports of earning being submitted by ECMC for certain quarters.

22.    Upon information received, on or about December 12, 2019, the Office of Unemployment Compensation sent agents to ECMC to obtain the information necessary to review claims and begin awarding benefits.

23.    Upon information received, although some employees have received benefits, Defendants remain delinquent on well over One-Hundred Thousand Dollars ($100,000) of unemployment compensation contributions.

24.    According to news reports, Defendants Americore and White have engaged in similar activity around the country.

25.    It was reported that Americore purchased the non-real estate assets of the Pineville Community Hospital Association in Pineville, Kentucky in March 2017, and began doing business

by and through its subsidiary, Pineville Medical Center, Inc. ("PMC") and engaged in the following:

    a.  PMC went into Chapter 7 bankruptcy in November 2018; and

    b.  Bankruptcy proceedings revealed that PMC was delinquent on three payrolls and related tax obligations totaling roughly Seven-Hundred Thousand Dollars ($700,000).

26.    Likewise, news agencies reported that Americore purchased the Lee County Hospital building, located in Lee County, Virginia, and entered into a management agreement with the county hospital authority in 2017, and the following took place:

    a.  As part of the deal, Americore was required to have the hospital licensed and open by December 31, 2018; and

    b.  Lee County issued Americore a notice of default when it failed to meet that deadline.

27.    Defendants purchased the Ellwood City Hospital, a charitable nonprofit institution, in September of 2017.

28.    Due to Ellwood City Hospital's charitable status and the terms of the Asset Purchase Agreement, review of the sale was required by the Office of Attorney General and the Lawrence County Orphans' Court.

29.    To secure a no-objection letter from the Attorney General and approval of this Court, Defendants made material representations that in exchange for assuming ownership of Ellwood City Hospital, no money would be paid, but that Defendants would, among other things, operate a licensed hospital and licensed emergency room twenty-four (24) hours per day, seven (7) days a week, three-hundred and sixty-five days a year (365), for the next ten (10) years.

6

(September 22, 2017 Order of Court, Paragraphs 3, 5 and 14, and Conclusions of Law at paragraph

3) (attached hereto as "Exhibit A").

30.     Based on Defendants' representations that they would maintain a licensed hospital

and emergency room for at least ten years, the Attorney General did not object to the purchase of

ECMC and this Court found that the transaction would not constitute or result in an unlawful

diversion of charitable assets.

31.     On September 22, 2017, this Court issued an Order approving the sale.

32.     In that Order, the Court stated:

> The Pennsylvania Attorney General's Office shall have continuing
> standing to sue for monetary damages or to enforce the provisions
> of the Asset Purchase Agreement, Amended Escrow Agreement,
> and side letter agreement as amended by agreement of the parties on
> August 30, 2017 and under 28 Pa. Code § 101.143.

(Exhibit A, September 22, 2017 Order of Court, Paragraph 1(e)).

33.     By failing to maintain a licensed hospital and emergency room, Defendants have

diverted charitable assets to their pecuniary benefit in violation of the Asset Purchase Agreement

and September 22, 2017 Order of Court.

    i.     *Unlawful Withholding of Employees' Wages*

34.     To secure a no-objection letter from the Attorney General and approval by this

Court, Defendants made material representations regarding compliance with Pennsylvania law.

35.     Section 260.3(a) of the Pennsylvania Wage Payment and Collection Law, 43 P.S.

§ 260.3(a), provides that employers must pay all wages due to employees on regularly scheduled

paydays designated in advance.

36.     Upon information received, on or about November 22, 2019, employees of ECMC

received communications from Beverly Annarumo, CEO of ECMC, that they would not be

receiving their paychecks, which were scheduled for distribution that day pursuant to a biweekly

wage payment arrangement.

37.    The communications stated:

> We did receive some funds today from Corporate; however, it is not
> enough to pay everyone in full. Anyone with a paycheck that was
> under $550 will receive their full paycheck. For those of us that have
> paychecks that are over $550[,] you will be given a check today for
> $550.00. The $550.00 is the equivalent of earning $9.20 an hour for
> 80 hours and having taxes taken out at 25%. I know this is
> disappointing for all of us, but I wanted everyone to have some
> money before Thanksgiving. I will try to get additional money to
> you all on Wednesday. Checks will be available at 4:30 p.m. in your
> departments. Anyone with a remaining paycheck of $550.00 or less
> will receive the rest of their paycheck today. For everyone else with
> a remaining amount owed to them higher than $550.00, they will be
> receiving a check for an additional $250.00. The checks are now
> available in your departments for pick up. There will be no one in
> H.R. this afternoon for any arrangements to be made, so please
> check with your departments directly. Thank you!

38.    Annarumo also notified employees on or about November 22, 2019 that the

emergency department and inpatient services of ECMC had been temporarily suspended.

39.    On or about November 25, 2019, employees received checks in an amount up to

Five-Hundred and Fifty Dollars ($550.00), regardless of the amount they were owed.

40.    On or about November 27, 2019, employees whose November 22, 2019 paychecks

should have been in excess of Five-Hundred and Fifty Dollars ($550.00) received up to an

additional Two-Hundred and Fifty Dollars ($250.00) on November 27, 2019.

41.    Employees whose November 22, 2019 paychecks should have been in excess of

Eight-Hundred Dollars ($800) were never paid the balance of their wages due.

42.    On the following regularly scheduled pay date, December 6, 2019, no ECMC

employee was paid.

43.    To date, employees have not received the balance of their wages.

44.    Further, no employee was provided notice of the layoff or advised of a return-to-work date.

ii.    *Defendants Failed to Make Required Disposition of Unemployment Compensation Contributions and File Quarterly Reports.*

45.    To secure a no-objection letter from the Attorney General and approval by this Court, Defendants made material representations that they would comply with Pennsylvania employment tax laws and regulations.

46.    All employers and employees in the Commonwealth are required to make contributions to the Unemployment Compensation Fund ("UC Fund").  43 P.S. § 781; 43 P.S. § 781.4.

47.    Employers are responsible for withholding employee contributions, and for remitting employee contributions to the UC Fund.  43 P.S. § 781.4.

48.    Employers are required to file two (2) reports on or before the last day of the month immediately following the end of the calendar quarter for which the reports are filed. These are known as the Employer's Report for Unemployment Compensation and the Employer's Quarterly Report of Wages Paid to Each Employee (collectively, "Reports").  34 Pa. Code § 63.52.

49.    The Employer's Report for Unemployment Compensation establishes the amount of contributions due, and the Employer's Quarterly Report of Wages Paid to Each Employee depicts the amount of wages paid to each employee. 34 Pa. Code § 63.52.

50.    Upon information and belief, since purchasing ECMC in 2017, Defendants have taken payroll deductions from employees in the amounts required by the Unemployment Compensation Act, 43 P.S. § 751 *et seq.*

51.    Upon information received, Defendants failed to report paying any wages to employees, did not made the required employer contributions to the UC Fund, and did not remit

9

to the UC Fund employee contributions collected between the fourth quarter of 2018 through the second quarter of 2019.

## CLAIMS FOR RELIEF

## COUNT ONE

### Violations of the Asset Purchase Agreement and Order Approving the Sale

52.    Plaintiff re-alleges and incorporates by this reference all prior paragraphs of this Petition.

53.    Pursuant to 15 Pa.C.S. § 5976, it is unlawful to sell property committed to charitable purposes if the sale will divert the assets from the purposes to which the property was originally committed without an Order approving the sale pursuant to 15 Pa.C.S. § 5547.

54.    The September 22, 2017 Order that determined the sale of Ellwood City Hospital to the Defendants would not result in a diversion of charitable assets was based upon the Defendants' commitments and representations to the Attorney General and this Court that they would maintain a licensed hospital and emergency room 24 hours per day, seven days per week, 365 days per year, for ten years.

55.    By failing to satisfy the requisite ten-year (10) period that supported the sale to the Defendants for no financial or other consideration the Defendants have breached the terms of the Asset Purchase Agreement as well as the representations that the Attorney General and this Court relied upon in approving the sale.

56.    The Defendants' breach resulted in mass employee layoffs and employee wages being owed.

57.    As alleged, this Court's September 22, 2017 Order that approved the sale specifically provides that "[t]he Pennsylvania Attorney General's Office shall have continuing

10

standing *to sue for monetary damages or to enforce the provisions of the Asset Purchase Agreement . . .*" (emphasis added).

## COUNT TWO

### Failure to compensate the employees of the Ellwood City Medical Center

58. Plaintiff re-alleges and incorporates by this reference all prior paragraphs of this Petition.

59. When Defendants purchased Ellwood City Hospital, it was agreed that the hospital and emergency department would be kept open and functional and in accordance with the laws of the Commonwealth of Pennsylvania for ten (10) years and other terms pertaining to the maintenance of employees' status of benefits were set forth in the Asset Purchase Agreement.

60. A functioning hospital and emergency department necessitates, among other things, staffing and paying employees in accordance with Pennsylvania wage law.

61. Pennsylvania law explicitly requires employers to pay all wages due to employees on regularly scheduled paydays designated in advance. 43 P.S. § 260.3(a).

62. Defendants have failed to comply with both Pennsylvania law and the terms of the Asset Purchase Agreement by not paying employees' wages owed.

63. The resulting breaches of the Asset Purchase Agreement caused extreme financial hardship to the current and past employees of the Ellwood City Medical Center.

## COUNT THREE

### Failure to comply with Pennsylvania Employment Tax Law

64. Plaintiff re-alleges and incorporates by this reference all prior paragraphs of this Petition.

11

65.    When Defendants purchased Ellwood City Hospital, Defendants agreed to adhere to all federal and state income and employment tax laws.  March 6, 2019 APA § 7.2(b)(attached hereto as "Exhibit B").

66.    Pennsylvania law explicitly requires employers to withhold employee contributions to remit those contributions to the UC Fund.  43 P.S. § 781.4.

67.    Employers are required to file two (2) reports on or before the last day of the month immediately following the end of the calendar quarter for which the reports are filed. These are known as the Employer's Report for Unemployment Compensation and the Employer's Quarterly Report of Wages Paid to Each Employee (collectively, "Reports").  34 Pa. Code § 63.52.

68.    Defendants have failed to comply with both Pennsylvania law and the terms of the Asset Purchase Agreement by not remitting to the UC Fund unemployment taxes that were withheld from employee paycheck, and by not filing quarterly reports as is required.

## COUNT FOUR

### Failure to make required pension contributions

69.    Plaintiff re-alleges and incorporates by this reference all prior paragraphs of this Petition.

70.    Pursuant to the APA, Defendant agreed to assume all liabilities including the Pension Plan obligations.

71.    At the time of Closing, the Pension Plan was adequately funded and all insurance payments were current.

72.    Defendant agreed to continue making annual contributions to the employee pension plan.

12

73.    Defendant has breached the terms of the APA by failing to make the required pension contributions.

74.    That breach resulted in financial harm to the past and current employees of the Ellwood City Medical Center.

## PRAYER FOR RELIEF

WHEREFORE, the Attorney General respectfully requests that this Honorable Court enter an order:

1.    Declaring Defendants' conduct as described herein to be in violation of the terms of the Asset Purchase Agreement, contrary to the material representations relied upon by the Attorney General and this Court in approving the sale, and constitutes an unlawful diversion of charitable assets resulting in the Defendants' private pecuniary benefit prohibited by 15 Pa.C.S. §§ 5547 and 5976;

2.    Permanently enjoining Defendants and all other persons acting on their behalf, directly or indirectly, from engaging in any future violations;

3.    Ordering Defendants to take all action necessary to bring ECMC into compliance with emergency room licensure requirements, including operational equipment, and continue to operate ECMC as required under the APA;

4.    Divesting Defendants of all legal and equitable ownership rights in ECMC should they fail to bring ECMC into licensure requirements and appointing a trustee or receiver to operate ECMC;

5.    Ordering Defendants to pay all outstanding wages to affected employees;

6.    Ordering Defendants to remit payment of unemployment compensation taxes;

7.    Ordering Defendants to pay all outstanding pension contributions;

8.    Compel Defendants to provide an accounting of financial expenditures from September 22, 2017 through to the present;

9.    Directing Defendants to pay the Attorney General's investigative and litigation costs incurred in connection with this matter; and

10.    Granting such other relief as this Court deems necessary and appropriate.

Dated: December 23, 2019

Respectfully submitted,

Josh Shapiro
Attorney General

By:    _Eugene Herne_

Eugene Herne
Senior Deputy Attorney General

14

# Exhibit A

Sep 22 2017 14:01  Judge Acker  7246562284                    page 1



JUDGE'S CHAMBERS
FIFTY-THIRD JUDICIAL DISTRICT
COURT OF COMMON PLEAS OF LAWRENCE COUNTY
NEW CASTLE, PENNSYLVANIA 16101

DAVID H. ACKER
JUDGE

PHONE    724-656-2168
FACSIMILE  724-656-2284

# FAX TRANSMISSION

### RETURN FAX NUMBER: (724) 656-2284

THE INFORMATION TRANSMITTED BY THIS FACSIMILE IS CONSIDERED PRIVILEDGED AND CONFIDENTIAL AND IN INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT REPSONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU SHOULD BE AWARE THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.   IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE UNITED STATES POSTAL SERVICE. THANK YOU.

DATE: ___9/22/17___                    Fax: _____215-851-1420_____

TO: _____Michael C. Falk, Esquire_____

FROM: _____David H. Acker, Judge_____

IN RE: _____In re: Ellwood City Hospital_____

NUMBER OF PAGES BEING TRANSMITTED: ___14___ (INCLUDING COVER PAGE)

MESSAGE:

| | |
|---|---|
| **IN RE: ELLWOOD CITY HOSPITAL,** : | **IN THE COURT OF COMMON PLEAS** |
| **A Pennsylvania Nonprofit Corporation** : | |
| : | **LAWRENCE COUNTY, PENNSYLVANIA** |
| : | |
| : | **DOCKET NO. 70081 OF 2017, M.D.** |

## ORDER OF COURT

**AND NOW,** this **22nd** day of **SEPTEMBER, 2017,** a Petition for Approval of Sale and Transfer of Substantially all Assets of a Nonprofit Hospital and Related Entities and for a Finding of Non Diversion of Charitable Assets having been filed by the Ellwood City Hospital, following hearings on August 2, 2017 and August 30, 2017 with the Ellwood City Hospital represented by Michael Falk, Esquire and Lanta Wang, Esquire, the Attorney General represented by Eugene Herne, Esquire, and Americore Health, LLC represented by Kristen Del Sole, Esquire, this Court makes the following **FINDINGS OF FACT, CONCLUSIONS OF LAW** and enters the following **ORDER:**

### FINDINGS OF FACT

1.    A Petition was filed by the Ellwood City Hospital, a Nonprofit Nonstock Corporation, on June 26, 2017 asking for Court approval of a sale and transfer of substantially all assets of the charitable corporation to Americore Health, LLC and Ellwood Medical Center, LLC.

2.    Under the Asset Purchase Agreement approved by Ellwood City Hospital on March 6, 2017, the Ellwood City Hospital, as a nonprofit corporation, agreed, subject to Court approval and approval by the Pennsylvania Attorney General, to transfer to Americore Health, LLC and Ellwood Medical Center, LLC, substantially all of the assets of the Ellwood City Hospital, including all of its real estate (the hospital campus and all ancillary real estate, including medical offices and buildings) and all equipment, and receivables and other listed assets including all assets of Ellwood City Health Organization, Inc., Outreach Care Group, Inc., and Apple Occupational Health Services, Inc.

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

3.    Under the terms of the Asset Purchase Agreement, no money would be paid to the Ellwood City Hospital. However, the Agreement called for Americore Health, LLC and Ellwood Medical Center, LLC to assume all liabilities for the Ellwood City Hospital Employees Defined Pension Plan, to pay certain listed financial obligations of the Ellwood City Hospital and to operate a licensed hospital and licensed emergency room twenty-four hours, seven days a week, three hundred and sixty-five days a year, for the next ten years.

4.    The parties to the agreement are: for the "Sellers" the Ellwood City Hospital, a Pennsylvania Nonprofit Corporation, Ellwood City Health Organization, Inc., a for nonprofit corporation, Outreach Care Group, Inc. a for profit subsidiary, and Apple Occupational Health Services, Inc., a for profit subsidiary; for the "Buyers" Americore Health, LLC and Ellwood Medical Center, LLC. The Ellwood City Hospital Foundation is not a party to the Asset Purchase Agreement.

5.    The following witnesses were called:

a.    Christopher Little, Vice President of Finance and Chief Financial Officer of the Ellwood City Hospital and the Ellwood City Hospital Foundation, called by the Ellwood City Hospital;

b.    Christy Spoa, Chairman of the Board of Trustees of the Ellwood City Hospital and the Ellwood City Hospital Foundation, called by Ellwood City Hospital;

c.    Nicholas Janiga, a real estate and business appraiser, called by Ellwood City Hospital;

d.    Jeffrey Schapel, the auditor for the Ellwood City Hospital Defined Benefit Pension Plan, called by the Ellwood City Hospital;

e.    Grant White, CEO of Americore Health, LLC and Ellwood Medical Center, LLC, called on behalf of Americore Health, LLC.

6.    Christopher Little testified that he has been involved with the Ellwood City Hospital and the Ellwood City Hospital Foundation for twenty-three years, and that the

hospital has been losing in excess of four million dollars a year for a number of years. He put the losses of the hospital for 2017 as follows:

     a.   January, $500,000.00;

     b.   February, $600,000.00;

     c.   March, $800,000.00;

     d.   April, $900,000.00;

     e.   May, $700,000.00.

7.    Mr. Little testified that the Asset Purchase Agreement for the Ellwood City Hospital that had been negotiated had two purposes. First, to maintain an acute care hospital and a 24 hour / 7 day per week emergency room operating in Ellwood City for the next ten years. Second, to maintain the Ellwood City Hospital Foundation assets.

8.    Mr. Little testified that there were no other options available to the Ellwood City Hospital. Mr. Little testified that no other organization contacted by the Ellwood City Hospital would guarantee to keep an acute care hospital operating with 24/7 emergency room services. Mr. Little testified that unless the Asset Purchase Agreement with Americore Health, LLC and Ellwood Medical Center, LLC was approved by the Court, the Ellwood City Hospital would be closed as quickly as possible and all assets liquidated and all debts, including the pension obligations would be fully paid and the hospital would close.

9.    Mr. Little testified that the Ellwood City Hospital could only meet its obligations with the assistance of the Ellwood City Hospital Foundation and that their combined assets would only be sufficient to pay off debts, fund the Ellwood City Hospital Employee Defined Benefit Pension obligations and to wind up the business of closing the hospital.

10.    The current assets of the Ellwood City Hospital Foundation are sufficient to fully fund the Ellwood City Hospital Employees Defined Benefit Pension Plan and to pay all hospital debts and obligations.

11.   Americore Health, LLC is a Delaware Limited Liability Company formed January, 2017. Ellwood City Medical Center, LLC is a Delaware Limited Liability Company formed February 13, 2017.

12.   In connection with the proposed transfer, Americore Health, LLC and Ellwood Medical Center, LLC also entered into an Escrow Agreement with the Ellwood City Hospital and its related companies to deposit the sum of four million dollars into an escrow account with US Bank National Association.  Under the terms of the Escrow Agreement, money can only be withdrawn from the escrow account with the authorization of both Americore Health, LLC's and Ellwood City Hospital's representative.  The Agreement does not set forth how the Seller's and Buyer's representatives will be chosen.

13.   The Asset Purchase Agreement calls for the Ellwood City Hospital and its related companies to transfer the assets immediately upon the consummation of the Asset Purchase Agreement and does not call for any lien or encumbrance or mortgage on any of the properties conditioned on Americore's performance of its obligations under the contract.  There is nothing in the Agreement to prevent Americore Health, LLC or Ellwood Medical Center, LLC from transferring property.  According to Mr. Little, Americore will walk away from this Agreement if any such restrictions are placed on the property or equipment.

14.   Mr. Little initially testified that he understood the Agreement to require Americore to keep a specific number of services open for ten years.  Mr. Little later testified that his understanding was that the only obligation of Americore Health, LLC and Ellwood Medical Center, LLC was to maintain and operate for ten years a hospital licensed under the laws and regulations of the Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Health and to keep open for the next ten years an emergency room that remains licensed and operating under the laws of the Commonwealth of Pennsylvania and the Commonwealth Department of Health regulations

4

for an emergency room 24/7 365 days a year. The written terms of the Asset Purchase Agreement and not the opinion of Mr. Little are the binding commitments of the parties.

15.     Under the terms of the Asset Purchase Agreement Section 12.15, Americore Health, LLC and Ellwood Medical Center, LLC can only reduce the services that Americore Health, LLC and Ellwood Medical Center, LLC have agreed to maintain if such reduction is approved by the Local Advisory Board created under 12.6 of the Asset Purchase Agreement. Under that section, the members of the Ellwood City Hospital current board, an undefined number of medical staff members, and unnamed community leaders would comprise the Local Advisory Board. No mechanisms were set forth in the Agreement as to how the remaining members would be chosen or how the Local Advisory Board would operate or vote.

16.     At the insistence of the Attorney General's Office and the Court, certain modifications were made to the Initial Escrow Agreement which is attached to the Asset Purchase Agreement as Exhibit I. An Amended Escrow Agreement was submitted to the Court along with a side letter agreement dated August 10, 2017. On August 30, 2017, the parties agreed to modify Paragraph 1 of the side letter agreement to read as follows:

> "Maintenance of the Escrow Account. Buyer and Sellers agree to maintain the Escrow Account until the earlier of : (i) the date on which the disbursement of all of the Escrow Funds (as that term is defined in the Escrow Agreement) pursuant to the Escrow Agreement occurs; or (ii) following the second anniversary of the date of the Escrow Agreement, the date on which all liability associated with the Retirement Plan for Employees of The Ellwood City Hospital (the "Pension Plan") has been fully satisfied according to the Federal Pension Benefit Guarantee Corporation. If, at any time following the second anniversary of the Escrow Agreement, all liability associated with the Pension Plan has theretofore been fully satisfied according to the Federal Pension Benefit Guarantee Corporation and any Escrow Funds remain, then Buyer and Sellers agree to issue a Joint Written Direction (as that term is defined in the Escrow Agreement) to the Escrow Agent (as that term is defined in the Escrow Agreement) requesting disbursement of such remaining Escrow Funds to Buyer."

17.    Jeffrey Schapel, the auditor for the Ellwood City Hospital Employee Defined Benefit Pension Plan, testified that as of the audit for the period to June 30, 2017, the Defined Benefit Pension Plan was underfunded by $7,984,499.00. He explained that the Pension Fund is being fully funded over seven years with annual payments being made on January 15 of each year.

18.    Mr. Schapel testified that the language in the Amended Escrow Agreement regarding when a pension plan is fully satisfied according to the Pension Benefit Guarantee Corporation means that the Defined Benefit Plan will not be "fully satisfied according to the Pennsylvania Benefit Guarantee Corporation" until all pension obligations have been fully paid or a separate insurance contract (other than the Pension Benefit Guarantee Corporation Insurance) has been purchased to cover all future pension benefits. This Court finds that this definition is the definition intended by the parties by the wording of the Amended Escrow Agreement and the side letter agreement as modified by the parties at the hearing on August 30, 2017.

19.    Mr. Schapel testified that the Ellwood City Hospital has been paying insurance premiums to the Pension Benefit Guarantee Corporation and that even if the Ellwood City Hospital went bankrupt immediately and Americore Health, LLC and Ellwood Medical Center, LLC failed in their obligations to fully fund the Defined Benefit Pension Plan, the insurance provisions of the Pension Benefit Guarantee Corporation would pay 100% of the benefits due to the past and present employees entitled to benefits from the Ellwood City Hospital Employee's Defined Benefit Plan. The Defined Benefit Plan was frozen in 2003 and no new additional obligations will be incurred.

20.    The other Ellwood City Hospital retirement plans including the 403(b) Retirement Savings Plan, and the 401(k) Voluntary Investment Plan are not involved in the Asset Purchase Agreement or the transfer to Americore Health, LLC or Ellwood

Medical Center, LLC. The assets of the 403(b) and 401(k) Plans will remain in place and unaffected by the Asset Purchase Agreement.

21.   Attorney Herne, on behalf of the Attorney General's Office, stated that the Attorney General recommends approval of the Asset Purchase Agreement and the Amended Escrow Agreement and side letter agreement as modified by agreement on 8/20/17.

## CONCLUSIONS OF LAW

1.   The Ellwood City Hospital is a nonprofit corporation whose purpose is the operation of an acute care hospital and 24/7 emergency room serving the people of Ellwood City.

2.   The proposed transfer of assets will transfer substantially all of the assets of the Ellwood City Hospital to two for profit companies, Americore Health, LLC and Ellwood Medical Center, LLC.

3.   The transfer of substantially all of the assets of the Ellwood City Hospital and its related for profit corporations constitutes a diversion of a charitable organization's assets unless Americore Health, LLC and Ellwood Medical Center, LLC fulfill their obligations to (1) fully fund and satisfy the obligations of the Ellwood City Hospital Employee's Defined Benefit Plan, and (2) to keep the Ellwood City Hospital open and operating for the next ten years as a full time 24/7 365 day per year hospital licensed and operating under the laws and regulations of the Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Health with a fully licensed emergency room operating 24/7 365 days per year operating in accordance with the laws and regulations of the Commonwealth of Pennsylvania and the Commonwealth of Pennsylvania Department of Health. See 35 P.S. § 448.103; 35 P.S. § 448.806(l); 28 Pa. Code § 101.31; 28 Pa. Code § 101.1 – 101.196; 28 Pa. Code § 117.1 – 117.58 and all applicable laws and regulations.

4.      The Asset Purchase Agreement as it was originally written did not contain sufficient provisions for the enforcement by the "Sellers" of the "Buyers" obligations. However, in Court, the Ellwood City Hospital, Americore Health, LLC, and Ellwood Medical Center, LLC agreed that the Pennsylvania Attorney General's Office has and will maintain standing to sue for monetary damages and to enforce the provisions of the Asset Purchase Agreement, the Escrow Agreement and the side letter agreement as modified.

5.      12.15 of the Asset Purchase Agreement reads as follows:

> "Continuation of Services. For a period of ten (10) years immediately following the Closing Date, Buyer will continue to operate the Hospital at its current location, will maintain the Hospital as a licensed hospital as that term is defined in 35 P.S. § 448.802a on the Closing Date, and will maintain an emergency department at the Hospital that is open twenty-four (24) hours per day and seven (7) days per week ("24/7"). In the event that Buyer decides to voluntarily discontinue or reduce services or hours of operation at such 24/7 emergency department or relinquish the Hospital's license as a hospital in Pennsylvania during the ten (10) year period following the Closing, such voluntary discontinuation, reduction or relinquishment, as applicable, must be approved by the Local Advisory Board."

The Local Advisory Board's function is to review any request by Americore Health, LLC and Ellwood Medical Center, LLC to "voluntarily discontinue or reduce services or hours of operation at such 24/7 emergency department or relinquish the hospital's license as a hospital in Pennsylvania during the ten year period following the closing ...." of the Asset Purchase Agreement. As previously stated, the Asset Purchase Agreement does not adequately define how the members of the Local Advisory Board will be chosen or how the Board will function. In order for the Court to approve the transfer, the parties will have to agree to the following clarifications regarding the composition and the function of the Local Advisory Board:

a.      The initial members of the Board shall consist of the current members of the Ellwood City Hospital Board, the Mayor of Ellwood City, a designated representative

of the Ellwood City Borough Council, the Operations Officer of the Ellwood City Police Department, and a designated representative of the Lawrence County Commissioners.

      b.    After the initial seating of the Board, the following officials shall be members of the Board as the persons in those offices change: the Mayor of Ellwood City, the Operations Officer of the Ellwood City Police Department, a designated representative of the current Ellwood City Borough Council, and a designated representative of the current Lawrence County Commissioners.

      c.    Additional members may be appointed to the Board by majority vote of the Board members provided that at least one half of the then current members of the Board are present and available to vote. If at any time the membership of the Board falls below seven, the President Judge of the Court of Common Pleas of Lawrence County or his designee shall appoint sufficient members to increase the number to the minimum of seven.

      d.    The quorum necessary for any vote of the board shall be at least one half of the then current members of the Board.

      e.    No member of the Board may be employed by or have any financial connection to or interest in Americore Health, LLC, Ellwood Medical Center, LLC, or any related company.

      f.    Any request for a reduction in services must be submitted by Americore Health, LLC and Ellwood Medical Center, LLC to the Board in writing, with copies given to each member of the Board, the Pennsylvania Attorney General's Office, and the President Judge of the Court of Common Pleas of Lawrence County.

      6.    Under paragraph 4 of the Amended Escrow Agreement, withdrawals and the spending of the escrowed money must be approved by both the "Buyers" and the "Sellers" representatives. The Asset Purchase Agreement does not adequately define how the representatives of the parties will be chosen. In order to clarify this matter, the parties will have to agree that the Buyers (Americore Health, LLC and Ellwood Medical

Center, LLC) will choose one combined representative and the Local Advisory Board will choose one representative. Both representatives will have to agree to any withdrawal or use of any of the escrowed money.

　　　7.　　The term "fully satisfied according to the Federal Pension Benefit Guarantee Corporation," in the Amended Escrow Agreement and side letter agreement is defined as stated in Paragraph 18 of the Findings of Fact.

　　　8.　　The proposed transfer of assets is a diversion of charitable assets unless it advances the charitable purpose of the Ellwood City Hospital, which is the continuation hospital operations for the people of Ellwood City. To this end, the Asset Purchase Agreement contains provisions that contractually obligate Americore Health, LLC and Ellwood Medical Center, LLC to continue operations of a licensed hospital with a licensed emergency room 24/7 365 days per year for a ten year period. The Asset Purchase Agreement as authorized by the Ellwood City Hospital Board transfers substantially all of the assets of the Ellwood City Hospital, without lien or encumbrance, immediately upon the consummation of the Agreement and before Americore Health, LLC and Ellwood Medical Center, LLC have performed their ten year obligation to keep the hospital emergency room open. The Ellwood City Hospital Board has made clear through its presentation of evidence and witnesses that it will close the hospital as quickly as possible unless the Court approves the Asset Purchase Agreement. The Ellwood City Hospital Employees Defined Pension Plan is protected by the insurance that has been purchased in the past through the Pension Benefit Guarantee Corporation. The 403(b) and 401(k) plans will remain in place and unaffected by the Asset Purchase Agreement. While the Court would like to have seen greater protections in the plan for the Sellers, given the alternative of an almost immediate closure of the hospital and the winding up of its business, this Court will approve the Asset Purchase Agreement and finds that the transfer is not a diversion of the assets of a charitable corporation if the provisos as stated by the Court are approved by the parties.

## ORDER OF COURT

1.    The Asset Purchase Agreement and Amended Escrow Agreement and transfer of assets in accordance with the Asset Purchase Agreement dated March 6, 2017, is approved if the parties approve in writing to the following clarifications and provisions:

   a.    The Local Advisory Board under 12.6 of the Asset Purchase Agreement shall consist of the following members and will operate as follows:

      i.    The initial members of the Board shall consist of the seven current members of the Ellwood City Hospital Board, the Mayor of Ellwood City, a designated representative of the Ellwood City Borough Council, the Operations Officer of the Ellwood City Police Department and a designated representative of the Lawrence County Commissioners.

      ii.    After the initial seating of the Board, the following officials shall be members of the Board as the persons in those offices change:  the Mayor of Ellwood City, the Operations Officer of the Ellwood City Police Department, a designated representative of the current Ellwood City Borough Council, and a designated representative of the current Lawrence County Commissioners.

      iii.    Additional members may be appointed to the Board by majority vote of the Board members provided that at least one half of the then current members of the Board are present and available to vote. If at any time the membership of the Board falls below seven, the President Judge of the Court of Common Pleas of Lawrence County may appoint sufficient members to increase the number to the minimum of seven.

      iv.    The quorum necessary for any vote of the board shall be at least one half of the then current members of the Board.

      v.    No member of the board may be employed by or have any financial connection to or interest in Americore Health, LLC, Ellwood Medical Center, LLC, or any related company.

vi.    Any request for a reduction in services must be submitted by Americore Health, LLC and Ellwood Medical Center, LLC to the Board in writing, with copies given to each member of the Board, the Pennsylvania Attorney General's Office, and the President Judge of the Court of Common Pleas of Lawrence County.

b.    The "Buyers representative" under paragraph 1 of the Amended Escrow Agreement shall be one person collectively chosen by Americore Health, LLC and Ellwood Medical Center, LLC.  The "Sellers representative" under paragraph 1 of the Amended Escrow Agreement shall be one person chosen by the Local Advisory Board. Both representatives must agree on any withdrawal, transfer or use of any escrowed money.

c.    The Pennsylvania Attorney General shall formally issue a letter recommending approval of the requested transfer from the Ellwood City Hospital and its affiliated companies to Americore Health, LLC and Ellwood Medical Center, LLC.

d.    The full amount of the escrowed money must be deposited with US Bank National Association and an Escrow Agent Agreement must be signed by US Bank National Association and approved by the Pennsylvania Attorney General's Office before any transfer of assets is made to the Buyers or any representative of the Buyers.

e.    The Pennsylvania Attorney General's Office shall have continuing standing to sue for monetary damages or to enforce the provisions of the Asset Purchase Agreement, Amended Escrow Agreement and side letter agreement as amended by agreement of the parties on August 30, 2017 and under 28 Pa Code § 101.143.

f.    Paragraph 1 of the August 10, 2017 side letter agreement modifying the Amended Escrow Agreement shall read as follows:

"Maintenance of the Escrow Account. Buyer and Sellers agree to maintain the Escrow Account until the earlier of : (i) the date on which the disbursement of all of the Escrow Funds (as that term is defined in the Escrow Agreement) pursuant to the Escrow Agreement occurs; or (ii) following the second anniversary of the date of the Escrow Agreement, the date on which all liability associated with the Retirement Plan for Employees of The Ellwood City Hospital (the

53RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

12

"Pension Plan") has been fully satisfied according to the Federal Pension Benefit Guarantee Corporation. If, at any time following the second anniversary of the Escrow Agreement, all liability associated with the Pension Plan has theretofore been fully satisfied according to the Federal Pension Benefit Guarantee Corporation and any Escrow Funds remain, then Buyer and Sellers agree to issue a Joint Written Direction (as that term is defined in the Escrow Agreement) to the Escrow Agent (as that term is defined in the Escrow Agreement) requesting disbursement of such remaining Escrow Funds to Buyer."

g.    Copies of all regulatory inspection and licensing matters concerning the hospital and emergency room facilities and operations will be copied and forwarded by Americore Health, LLC and Ellwood Medical Center, LLC to the Pennsylvania Attorney General's Office and to each member of the Local Advisory Board.

h.    Copies of all payments to the Ellwood City Hospital Defined Benefit Plan and each yearly audit of the Plan shall be sent by Americore Health, LLC and Ellwood Medical Center, LLC to the Pennsylvania Attorney General's Office and to each member of the Local Advisory Board.

i.    A copy of the signed Escrow Agreement and amended side letter agreement and the Escrow Agent Agreement shall be forwarded to the Court.

5.    The Prothonotary shall be responsible for properly serving a copy of this Order upon counsel of record; and if a party has no counsel, then upon said party at their last known address as contained in the Court's file, in accordance with Pa.R.C.P. 236 and Rule L236.

BY THE COURT:

_____ J.

David H. Acker, Judge

cle

B3RD
JUDICIAL
DISTRICT

LAWRENCE COUNTY
PENNSYLVANIA

13

# Exhibit B

*Execution Version*

ASSET PURCHASE AGREEMENT

by, among, and between

ELLWOOD CITY HOSPITAL,

ELLWOOD CITY HEALTH ORGANIZATION, INC.,

OUTREACH CARE GROUP, INC.,

APPLE OCCUPATIONAL HEALTH SERVICES, INC.,

AMERICORE HEALTH, LLC

and

ELLWOOD MEDICAL CENTER, LLC

Dated as of March 6, 2017

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND INTERPRETATION

1.1   Definitions ........................................................................................................ 1

1.2   Interpretation.................................................................................................... 1

ARTICLE 2 TRANSFER OF ASSETS; ASSUMPTION OF LIABILITIES

2.1   Transfer of Sellers' Assets .............................................................................. 2

2.2   Excluded Assets............................................................................................... 4

2.3   Assumed Liabilities ........................................................................................ 5

2.4   Excluded Liabilities ........................................................................................ 5

2.5   Consideration................................................................................................... 6

2.6   Capital Commitment........................................................................................ 6

2.7   Waiver of Bulk Sales Law Compliance.......................................................... 6

2.8   Tax Allocation ................................................................................................. 7

ARTICLE 3 CLOSING

3.1   Closing............................................................................................................. 7

3.2   Effective Time ................................................................................................. 7

3.3   Deliveries by Sellers at Closing...................................................................... 7

3.4   Deliveries by Buyer at Closing....................................................................... 8

3.5   Capital Commitment Escrow........................................................................... 9

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1   Incorporation, Qualification and Capacity...................................................... 9

4.2   Powers; Consents; Absence of Conflicts With Other Agreements................. 9

4.3   Binding Effect................................................................................................ 10

4.4   No Outstanding Rights................................................................................... 10

4.5   Title; Purchased Assets ................................................................................. 10

4.6   Affiliates; Affiliate Agreements ................................................................... 11

4.7   Financial Information ..................................................................................... 11

4.8   Permits and Approvals................................................................................... 12

4.9   Intellectual Property....................................................................................... 12

4.10   Government Program Participation/Accreditation......................................... 13

4.11   Regulatory Compliance; Illegal Payments.................................................... 15

4.12   Contracts ........................................................................................................ 15

i

**TABLE OF CONTENTS**
(continued)

                                                                                    Page

4.13    Tax Matters ................................................................................................ 16
4.14    Real Property; Condition of Title ........................................................... 17
4.15    Personal Property ..................................................................................... 19
4.16    Insurance ................................................................................................... 19
4.17    Employee Benefit Plans ........................................................................... 19
4.18    Employees and Employee Relations ....................................................... 22
4.19    Medical Staff; Physician Relations ......................................................... 23
4.20    Legal Proceedings .................................................................................... 23
4.21    Absence of Changes ................................................................................. 23
4.22    Environmental Matters ............................................................................ 24
4.23    Immigration Act ....................................................................................... 25
4.24    WARN Act ................................................................................................ 25
4.25    Credit Balance Reports ............................................................................ 26
4.26    Charitable Funds ...................................................................................... 26
4.27    Inventory ................................................................................................... 26
4.28    Hill Burton Loans .................................................................................... 26
4.29    Brokers or Finders ................................................................................... 26

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER

5.1     Limited Liability Company Capacity ...................................................... 26
5.2     Powers; Consents; Absence of Conflicts With Other Agreements ........ 27
5.3     Binding Effect ........................................................................................... 27
5.4     Litigation ................................................................................................... 27
5.5     Brokers or Finders ................................................................................... 27
5.6     Acknowledgement Regarding Representations and Warranties ............ 27
5.7     Availability of Funds ................................................................................ 27

ARTICLE 6 PRE-CLOSING COVENANTS

6.1     Access to Information ............................................................................... 28
6.2     Operations ................................................................................................. 28
6.3     Negative Covenants .................................................................................. 30
6.4     Notification of Certain Matters ............................................................... 31
6.5     Approvals .................................................................................................. 32
6.6     Additional Financial Information ............................................................ 32
6.7     Tail Insurance ........................................................................................... 33

**TABLE OF CONTENTS**
(continued)

                                                                        Page

6.8    No-Shop..........................................................................................33
6.9    Contract Compliance .......................................................................33
6.10   Disclosure Schedules .......................................................................33

ARTICLE 7 EMPLOYEES AND EMPLOYEE BENEFITS

██  ██████████████████████████████████████████
██  ██████████████████████████████████████████
██  ██████████████████████████████████████████

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

8.1    Compliance With Covenants .............................................................35
8.2    Representations and Warranties........................................................35
8.3    Approvals and Permits.....................................................................36
8.4    Environmental Due Diligence...........................................................36
8.5    Action/Proceeding/Litigation...........................................................36
8.6    Consents of Certain Third-Parties to Assumed Contracts .................36
8.7    Title Insurance Policies....................................................................36
8.8    Indebtedness....................................................................................36
8.9    Material Adverse Development .........................................................37
8.10   Fair Market Value Report.................................................................37
8.11   Exhibits and Schedules ....................................................................37
8.12   Closing Deliveries...........................................................................37

ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

9.1    Compliance With Covenants .............................................................37
9.2    Representations and Warranties........................................................37
9.3    Approvals and Permits.....................................................................37
9.4    Action/Proceeding/Litigation...........................................................38
9.5    Exhibits and Schedules ....................................................................38
9.6    Closing Deliveries...........................................................................38
9.7    Environmental Due Diligence...........................................................38

ARTICLE 10 TERMINATION

10.1   Termination.....................................................................................38
10.2   Effect of Termination.......................................................................39

ARTICLE 11 PERMITTED EXCEPTIONS, TITLE INSURANCE & TAXES

11.1   Title to Property ..............................................................................39

## TABLE OF CONTENTS
### (continued)

Page

11.2    Permitted Exceptions ...................................................................................41

11.3    Transfer Taxes ............................................................................................41

11.4    Cooperation on Tax Matters ........................................................................42

ARTICLE 12 ADDITIONAL COVENANTS

12.1    Noncompetition; Non-Solicitation................................................................42

12.2    Confidentiality ............................................................................................42

12.3    Remedies.....................................................................................................43

12.4    Assumed Contracts ......................................................................................43

12.5    Medical Staff...............................................................................................43

12.6    Local Advisory Board..................................................................................43

12.7    Additional Acts ...........................................................................................43

12.8    Sellers' Cost Reports ...................................................................................44

12.9    Post-Closing Access to Information .............................................................44

12.10   Sellers' Remedial Actions............................................................................44

12.11   Use of Controlled Substances Permits..........................................................44

12.12   Use of Names..............................................................................................45

12.13   Public Statements........................................................................................45

12.14   Indigent Care...............................................................................................45

12.15   Continuation of Services..............................................................................45

12.16   Misdirected Payments..................................................................................45

ARTICLE 13 CERTAIN POST-CLOSING REMEDIES

13.1    Survival of Representations and Warranties, and Covenants ..........................46

13.2    Remedies.....................................................................................................46

ARTICLE 14 INTERIM MANAGEMENT SERVICES

14.1    Interim Management Services ......................................................................49

ARTICLE 15 GENERAL

15.1    Choice of Law; Dispute Resolution..............................................................50

15.2    Specific Performance ...................................................................................50

15.3    Benefit; Assignment ....................................................................................50

15.4    Cost of Transaction......................................................................................51

15.5    No Third-Party Beneficiaries.......................................................................51

15.6    Waiver.........................................................................................................51

15.7    Notices ........................................................................................................51

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| 15.8 | Severability | 52 |
| 15.9 | Divisions and Headings of this Agreement | 52 |
| 15.10 | No Inferences | 52 |
| 15.11 | Tax and Regulatory Advice and Reliance | 52 |
| 15.12 | Entire Agreement; Amendment | 52 |
| 15.13 | Execution of this Agreement | 53 |
| 15.14 | Ellwood City Hospital Foundation | 53 |

## LIST OF DISCLOSURE SCHEDULES

| | |
|---|---|
| Schedule 2.1(a) | Owned Real Property |
| Schedule 2.1(b) | Leased Real Property |
| Schedule 2.1(f)(1) | Assumed Leases |
| Schedule 2.2(d) | Excluded Contracts |
| Schedule 2.2(e) | Excluded Seller Plans |
| Schedule 2.2(f) | Excluded Donor Restricted Funds |
| Schedule 2.2(h) | Excluded Entities |
| Schedule 2.2(k) | Excluded Seller Bank Accounts |
| Schedule 2.2(l) | Other Excluded Assets |
| Schedule 3.3(m) | Material Consents |
| Schedule 4.1 | Members of Sellers |
| Schedule 4.2(b) | Sellers' Healthcare Regulatory Consents and Other Consents |
| Schedule 4.4(a) | Equity or Ownership Interests |
| Schedule 4.4(b) | Outstanding Rights |
| Schedule 4.6(b) | Affiliate Agreements |
| Schedule 4.7(a) | Financial Statements |
| Schedule 4.7(b) | Sellers' Financial Position |
| Schedule 4.7(c) | Liabilities |
| Schedule 4.7(d) | Sellers' Material Indebtedness |
| Schedule 4.8(a) | Permits and Approvals |
| Schedule 4.8(b) | Waivers |
| Schedule 4.9(a) | Third Party Intellectual Property |
| Schedule 4.9(c) | Exceptions to Right to Assign Intellectual Property |
| Schedule 4.9(h) | Registered Intellectual Property |
| Schedule 4.10(a) | Government Program Participation/Accreditation |
| Schedule 4.10(b) | Investigations |
| Schedule 4.10(c) | Cost Reports |
| Schedule 4.10(d) | Claims, Actions, Appeals |
| Schedule 4.10(f) | Healthcare -- Exceptions to Remediation |
| Schedule 4.11(a) | Regulatory Compliance |

| Schedule 4.12(a) | Material Contracts |
|---|---|
| Schedule 4.12(c) | Assumed Contract Exceptions |
| Schedule 4.12(d) | Assumed Contracts with Third-Party Consent Requirements |
| Schedule 4.13 | Tax Matters |
| Schedule 4.14(a) | Real Property List |
| Schedule 4.14(b) | Real Property Exceptions |
| Schedule 4.14(c)(i) | Leases |
| Schedule 4.14(c)(ii) | Leases Exceptions |
| Schedule 4.14(c)(iii) | Rent Roll |
| Schedule 4.14(d) | Buildings and Systems Exceptions |
| Schedule 4.14(e) | Public Utility Notices |
| Schedule 4.15 | Personal Property |
| Schedule 4.16 | Insurance Policies |
| Schedule 4.17(a) | Employee Benefit Plans |
| Schedule 4.17(b) | Seller Plan Exceptions |
| Schedule 4.17(d) | Multiemployer Plan |
| Schedule 4.17(f) | Claims re Seller Plans |
| Schedule 4.17(h) | Post-Termination Welfare Benefits |
| Schedule 4.17(i) | Defined Benefit Plans |
| Schedule 4.17(k) | Benefits Payments At Consummation of Transaction |
| Schedule 4.18(a) | Employees |
| Schedule 4.18(b) | Employment, Severance & Termination Agreements |
| Schedule 4.18(c) | Employee Collective Bargaining Agreements |
| Schedule 4.18(d) | Employee Relations |
| Schedule 4.18(e) | Exceptions to Compliance with Collective Bargaining Agreements |
| Schedule 4.18(f) | Exceptions to Compliance with Employment Laws |
| Schedule 4.18(g) | Exceptions to Current Employment Agreements |
| Schedule 4.19 | Medical Staff List and Proceedings |
| Schedule 4.20 | Litigation |
| Schedule 4.21 | Absence of Changes |
| Schedule 4.22 | Environmental Matters |
| Schedule 4.24 | WARN Act; Employment Loss |
| Schedule 5.2(b) | Buyer's Healthcare Regulatory Consents and Other Consents |
| Schedule 6.2 | Pre-Closing Operations |
| Schedule 6.3 | Negative Covenants |

## LIST OF EXHIBITS

| Exhibit A | Form of Deed |
|---|---|
| Exhibit B | Form of Leasehold Assignment and Assumption Agreements |
| Exhibit C | Form of Tenant Estoppel |
| Exhibit D | Form of Landlord Estoppel |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Assignment and Assumption Agreements |
| Exhibit G | Form of FIRPTA Certificate |
| Exhibit H | Form of Limited Power of Attorney |

Exhibit I            Form of Escrow Agreement
Exhibit J            Interim Management Agreement
Exhibit K            Sellers' Facilities

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of March 6, 2017 ("Execution Date") by and among Ellwood City Hospital, a nonprofit corporation formed under the laws of the Commonwealth of Pennsylvania ("ECH"), Ellwood City Health Organization, Inc., a corporation formed under the laws of the Commonwealth of Pennsylvania ("ECHO"), Outreach Care Group, Inc., a corporation formed under the laws of the Commonwealth of Pennsylvania ("OCG"), Apple Occupational Health Services, Inc., a corporation formed under the laws of the Commonwealth of Pennsylvania ("AOHS", and together with ECH, ECHO and OCG, each, a "Seller" and, collectively, "Sellers"), and Americore Health, LLC, a Delaware limited liability company and Ellwood Medical Center, LLC, a Delaware limited liability company (collectively, "Buyer"). Sellers and Buyer are each a "Party" and collectively, the "Parties".

## RECITALS

WHEREAS, Sellers own, lease and operate the Facilities and engage in the Business; and

WHEREAS, Sellers desire to sell to Buyer, and Buyer desires to acquire from Sellers, substantially all of the assets used in the operation of the Facilities, all as more fully set forth herein;

NOW, THEREFORE, for and in consideration of the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

1.1     Definitions.  The capitalized terms in this Agreement shall have the meanings ascribed to them in the Preamble and in Annex A, as applicable.

1.2     Interpretation.  In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the Exhibits and disclosure schedules hereof, and references to Articles, Exhibits, Recitals, Sections or Schedules are references to the Articles, Exhibits, Recitals, Sections or disclosure schedules of this Agreement; (b) the terms "including" or "include" shall all be interpreted to read, "including, without limitation"; (c) references to any Person shall include references to such Person and their respective successors and permitted assigns; (d) the terms "hereof," "herein," "hereby" and derivative or similar words will refer to this entire Agreement; (e) references to any document (including this Agreement) are references to that document as amended, modified, supplemented, extended or renewed by the Parties from time to time, in the manner provided therein (or herein); (f) references to any law, rule or regulation include such law, rule or regulation as amended, restated, supplemented, superseded or otherwise modified from time to time, unless otherwise specified; (g) the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural; and (h) the terms "date hereof" and "date of this Agreement" and similar terms shall mean the Execution Date.

### ARTICLE 2
### TRANSFER OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Transfer of Sellers' Assets. At the Closing, Sellers shall assign, transfer, convey and deliver to Buyer or its designated affiliates, including AH of Ellwood City Hospital, LLC ("Hospital Subsidiary"), a Delaware limited liability company, and AH of Ellwood City Real Estate, LLC ("Real Estate Subsidiary"), a Delaware limited liability company, or such other affiliates as Buyer may direct prior to Closing, free and clear of all Encumbrances other than Permitted Exceptions, all of Sellers' right, title and interest in and to all assets of every kind, character or description, whether real, personal or mixed, tangible or intangible (other than the Excluded Assets), owned, leased or licensed by Sellers on the Closing Date that are held for use or used in the Business, including the following items (collectively, the "Purchased Assets"):

(a)     any and all real property that is owned by Sellers and used in connection with the operation of, or acquired for the benefit of, the Facilities, including the real property described on Schedule 2.1(a), together with Sellers' right, title and interest in and to all buildings, improvements and fixtures located thereupon and all appurtenances (including all construction in progress) and rights thereto (the "Owned Real Property");

(b)     to the extent assignable and transferrable, any and all real property that is leased, subleased or licensed to Sellers by another Person (whether an Affiliate or otherwise) related to, associated with or used in connection with the operation of, or acquired for the benefit of, the Facilities and described on Schedule 2.1(b), together with all buildings, improvements and fixtures located thereupon and all appurtenances (including all construction in progress) and rights thereto that are leased, subleased or licensed to Sellers (the "Leased Real Property");

(c)     all equipment, medical equipment, fixtures, machinery, computer hardware and other data processing equipment, vehicles, office furnishings, leasehold improvements and other tangible personal properties owned or held by Sellers or used in the operation of the Facilities (the "Personal Property");

(d)     all Inventory;

(e)     to the extent assignable and transferable, all documents, records, operating manuals, policies, procedures, and files with respect to the operation of the Facilities, including all financial, billing, patient, medical, accreditation, public program participation, business, operational, quality assurance, credentialing, peer review, facilities and systems maintenance, real property, educational, marketing and other records, Architectural Plans, structure or system drawings, manuals, and materials (in paper, electronic or other form) and on-site regulatory compliance records;

(f)     all of the rights and interests of Sellers, to the extent assignable and transferrable, in all contracts and Capital Lease Obligations of Sellers, except the Excluded Contracts (the "Assumed Contracts"), including (1) Leases listed on Schedule 2.1(f)(1) (the "Assumed Leases") and (2) Sellers' Medicare and Medicaid provider agreements and associated provider numbers (the "Assumed Provider Agreements"), and all rights arising out of such Assumed Contracts;

(g)     all Accounts Receivables;

(h)     to the extent assignable and transferable, all Permits, Environmental Permits and Approvals issued or granted to Sellers by or pending before Governmental Entities and

accreditations/certifications issued to Sellers by accrediting bodies, which relate to the ownership or operation of the Facilities;

(i)     all Intellectual Property;

(j)     all advance payments, prepayments or prepaid expenses made by Sellers relating to the operation of the Facilities;

(k)     to the extent assignable and transferrable, all rights in all warranties of any vendor or manufacturer in connection the Personal Property and all rights to enforce covenants not to compete with respect to the Purchased Assets or the Business;

(l)     all insurance proceeds (after application of Sellers' deductibles or co-insurance payments) arising in connection with property damage to the Purchased Assets;

(m)     general intangible rights of the Business, including goodwill;

(n)     all files and records relating to the Transferred Employees, including those regarding work history, benefits and pensions, as well as such of Sellers' policies, manuals and similar materials as are reasonably necessary for Buyer to address personnel, benefits or other issues, or resolve disputes, regarding Transferred Employees;

(o)     all domain names and telephone and fax numbers;

(p)     any rights of Sellers to receive, or any expectancy of Sellers in, any state or federal grants or subsidies, allocation payments or other reimbursement pool;

(q)     to the extent assignable and transferrable, the software, licenses and information systems used in the Business;

(r)     any rebates paid or payable in respect to the period prior to Closing under or in respect of any group purchasing organization agreements in which Sellers participate that relate to purchases of goods or services prior to Closing;

(s)     any claims, rights, credits, causes of action and rights of set-off of Sellers (whether known or unknown, contingent or otherwise) against third parties related to the Purchased Assets (including the Assumed Contracts), contractual or otherwise, accruing or arising prior to the Closing; provided, however, that in no event shall the terms of this Section 2.1(s) be interpreted to permit Buyer to assert any right of set off or right of recoupment against Sellers;

(t)     all rights in any insurance policies of Sellers covering the Purchased Assets to the extent such Purchased Assets were impaired prior to the Effective Time;

(u)     all cash security deposits held by Sellers under the Assumed Leases (together with accrued interest thereon, if any);

(v)     to the extent not included in any of the foregoing, (i) any assets included in the Interim Balance Sheet, except for assets used, consumed or disposed of in the Ordinary Course of Business since the Interim Balance Sheet Date, and (ii) any assets purchased or otherwise acquired since the Interim Balance Sheet Date, which are not reflected on the Interim Balance Sheet but which are held or used in the Business;

(w)     all rights to reimbursement for services rendered, and medicine, drugs and supplies provided, by Sellers to individuals who are patients of the Business on or before the Effective Time, but who are not discharged until after the Closing Date;

(x)     the Seller Plans, except the Excluded Seller Plans, and any and all assets associated therewith or set aside to fund liabilities related thereto (the "Assumed Seller Plans"); and

(y)     Sellers' bank accounts, except the Excluded Seller Bank Accounts (the "Assumed Seller Bank Accounts").

2.2     Excluded Assets. Notwithstanding anything herein to the contrary, the following assets are excluded from the Purchased Assets and shall be retained by Sellers (the "Excluded Assets"):

(a)     any Permits, Environmental Permits and Approvals that are not assignable or transferrable;

(b)     cash, cash equivalents including investments, and restricted use assets whether internally designated or externally designated as of the Closing Date (other than the Assumed Seller Bank Accounts).

(c)     all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables disposed of, expended, or exhausted prior to the Effective Time in the ordinary course of business and items of equipment and other assets transferred or disposed of prior to the Effective Time in a manner permitted by this Agreement;

(d)     all agreements, contracts, commitments, leases, purchase orders, and other arrangements that are set forth on Schedule 2.2(d) (the "Excluded Contracts");

(e)     all Seller Plans set forth on Schedule 2.2(e), and any contracts or agreements related thereto and all funds and accounts held thereunder (the "Excluded Seller Plans");

(f)     any donor restricted funds of Sellers and any agreements and obligations related thereto, including those set forth on Schedule 2.2(f);

(g)     the corporate books and records of Sellers;

(h)     any shares of capital stock, membership interests, partnership interests or other ownership in any Person, including the entities set forth on Schedule 2.2(h), and including any return premiums and profit allocations related thereto;

(i)     the rights of Sellers under this Agreement and all related documents;

(j)     rights to refunds in respect of any Tax for periods or portions thereof ending prior to or on the Closing Date resulting from requests therefor submitted by Sellers to a Governmental Entity prior to the Effective Time;

(k)     Sellers' bank accounts set forth on Schedule 2.2(k) (the "Excluded Seller Bank Accounts"); and

(l)     any other assets that are set forth on Schedule 2.2(l).

2.3    <u>Assumed Liabilities</u>.    On the terms and subject to the conditions set forth in this Agreement, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Sellers (collectively, the "<u>Assumed Liabilities</u>") and no other Liabilities.

(a)    all Liabilities in respect of the Assumed Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Sellers on or prior to the Closing;

(b)    all Liabilities of Sellers arising under or in connection with the Assumed Seller Plans, including the retirement plan for Employees of The Ellwood City Hospital;

(c)    all current trade accounts payable due to third parties; and

(d)    all Liabilities in respect of that certain Addendum dated as of May 22, 2015, by and between The Ellwood City Hospital and Healthland, and any amendments thereto.

2.4    <u>Excluded Liabilities</u>.    Notwithstanding anything herein to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Sellers or any of their Affiliates (the "<u>Excluded Liabilities</u>") of any kind or nature whatsoever other than the Assumed Liabilities. Sellers shall pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include the following:

(a)    any Liabilities of Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Sellers (or any stockholder or Affiliate of Sellers) relating to the Business or the Purchased Assets for any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date; (ii) Taxes, other than Transfer Taxes, that arise out of the consummation of the transactions contemplated hereby; or (iii) Taxes of Sellers (or any stockholder or Affiliate of Sellers), which Taxes relate to an event or transaction occurring before the Closing Date, that become a Liability of Buyer as a transferee or successor by operation of contract or Law;

(c)    any Liabilities relating to or arising out of the Excluded Assets;

(d)    any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)    any Liabilities of Sellers arising under or in connection with any Excluded Seller Plans;

(f)    any Liabilities of Sellers for any present or former employees, officers, directors, retirees, independent contractors or consultants of Sellers arising out of or relating to the period prior to the Closing Date, including, without limitation, any Liabilities associated with any claims

for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments, except to the extent such Liabilities relate to the Assumed Seller Plans;

(g)      any environmental claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Sellers;

(h)      any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Sellers on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(i)      any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Sellers (including with respect to any breach of fiduciary obligations by same);

(j)      any Liabilities under the Excluded Contracts or any other Contracts, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Sellers of such Contracts prior to Closing;

(k)      any Liabilities associated with debt, loans or credit facilities of Sellers and/or the Business owing to financial institutions, except the Assumed Liabilities; and

(l)      any Liabilities arising out of, in respect of or in connection with the failure by Sellers or any of their Affiliates to comply with any Law or Order.

2.5    Consideration.

(a)      Consideration. ████████████████████████████████████

████████████████████████████████████████████████████████

(b)      Fair Market Value. Prior to the Closing Date, Buyer shall obtain an opinion from an independent certified appraiser with experience valuing tax-exempt hospitals confirming the fair market value of the Purchase Price as of the Closing ("Valuation"). In the case where the Purchase Price is below the lower limit of the Valuation, the Parties agree that the Purchase Price shall be adjusted to equal the lower limit of the Valuation subject to Buyer's rights pursuant to Sections 8.10 and 10.1(f).

2.6    Capital Commitment. ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

2.7    Waiver of Bulk Sales Law Compliance. Buyer hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Purchased Assets are located and all other similar laws applicable to bulk sales and transfers.

2.8    Tax Allocation. The Parties hereby agree that Buyer shall prepare a preliminary allocation of an amount totaling the sum of the (a) Assumed Liabilities and (b) all other capitalized costs (i) first, among each Seller and (ii) second, among the Purchased Assets of each Seller, in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provisions of state, local or foreign law, as appropriate) (the "Allocation"). Buyer shall deliver the proposed Allocation to Sellers within one hundred twenty (120) calendar days after the Closing Date. Sellers shall thereafter have thirty (30) calendar days to approve or disapprove of such proposed Allocation, such approval not to be unreasonably withheld, conditioned or delayed (the "Sellers' Review Period"). Sellers and Buyer shall work in good faith to resolve any disputes relating to the preliminary Allocation. If Sellers and Buyer are unable to resolve any such dispute within thirty (30) days after the end of the Sellers' Review Period, then such dispute shall be resolved finally and conclusively by an independent accounting firm, the costs of which shall be borne equally by Buyer and Sellers. Buyer, Sellers and their Affiliates shall report, act and file Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Allocation agreed to by the Parties or as otherwise determined pursuant to this Section. No Party shall take any position (whether on any Tax Return or in connection with any audit or other examination) that is inconsistent with the finally determined Allocation unless required to do so by applicable Law.

## ARTICLE 3
## CLOSING

3.1    Closing. Subject to the satisfaction or waiver by the appropriate Party of all the conditions precedent to Closing specified in Article 8 and Article 9, the consummation of the Transactions (the "Closing") shall take place at such date and/or location as the Parties may mutually designate in writing (the "Closing Date").

3.2    Effective Time. The Transactions shall be effective as of 12:00:01 a.m. eastern time (the "Effective Time") on the date following the Closing Date, unless otherwise agreed in writing by Sellers and Buyer.

3.3    Deliveries by Sellers at Closing. At or before the Closing and unless otherwise waived in writing by Buyer, Sellers shall deliver to Buyer, the Hospital Subsidiary, the Real Estate Subsidiary, or such other subsidiary as designated by Buyer the following:

(a)    Deeds containing special or limited warranty of title, fully executed by the applicable Seller in recordable form, conveying to Buyer or its designee good and marketable fee title to the Owned Real Property described in Schedule 2.1(a) in the form of Exhibit A;

(b)    with respect to those Assumed Leases where Sellers are tenants or subtenants, duly executed and acknowledged Leasehold Assignment and Assumption Agreements, in the form of Exhibit B, with respect to each Leased Real Property;

(c)    with respect to those Assumed Leases with an annual rental amount in excess of $10,000, an estoppel certificate from each of the Tenants listed on Schedule 2.1(f)(1), in the form of Exhibit C (a "Tenant Estoppel");

(d)    an estoppel certificate from each landlord of a Leased Real Property with an annual rental amount in excess of $10,000 made pursuant to the provisions of the applicable Lease for such Leased Real Property, in the form of Exhibit D (a "Landlord Estoppel");

(e)    one or more duly executed general bills of sale, in the form of Exhibit E;

(f)     one or more duly executed assignment and assumption agreements, in the form of Exhibit F;

(g)     a copy of resolutions duly adopted by the governing body of each Seller authorizing and approving the performance of the Transactions and the execution and delivery of this Agreement and the documents described herein and the change of name contemplated by Section 12.12, certified as true and of full force and effect as of Closing, by a duly authorized officer;

(h)     any employment security release or similar release provided by the Pennsylvania Department of Labor and Industry;

(i)     a certificate of subsistence of each Seller issued by the Office of the Secretary of the Commonwealth of Pennsylvania dated the most recent practical date on or prior to the Closing Date;

(j)     evidence of the release of all Encumbrances (other than Permitted Exceptions) on the Purchased Assets;

(k)     a FIRPTA Certificate for each Seller, duly executed by each Seller, in the form of Exhibit G;

(l)     the Limited Power of Attorney, duly executed by the applicable Seller(s), in the form of Exhibit H;

(m)     those consents and waivers of third parties specified in Schedule 3.3(m), in form and substance reasonably acceptable to Buyer;

(n)     a Secretary's Certificate of Incumbency for the officer(s) of each Seller executing this Agreement and the documents described herein, executed by a duly authorized officer;

(o)     an Officer's Certificate, certifying that the conditions in Sections 8.1 and 8.2 have been satisfied, in all material respects;

(p)     a Funds Flow Memorandum, duly executed by Sellers;

(q)     an escrow agreement in the form of Exhibit I (the "Escrow Agreement") duly executed by Buyer; and

(r)     such other instruments, certificates, consents and documents, as Buyer reasonably deems necessary to effectuate the Transactions in accordance with the terms hereof.

3.4     Deliveries by Buyer at Closing. At or before the Closing and unless otherwise waived in writing by Sellers, Buyer shall deliver to Sellers the following:

(a)     copies of resolutions duly adopted by the governing body of each of Buyer authorizing and approving Buyer's performance of the Transactions and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of Closing by an appropriate officer of Buyer;

(b)     counterparts to one or more assignment and assumption agreements duly executed by Buyer or its designated subsidiary, in the form of Exhibit F;

(c)    counterparts to the Limited Power of Attorney, duly executed by Buyer or its designated subsidiary, in the form of Exhibit H;

(d)    a certificate of good standing of each of Buyer, the Hospital Subsidiary, and the Real Estate Subsidiary issued by the office of the Secretary of State of the State of Delaware dated the most recent practical date on or prior to the Closing Date;

(e)    a Secretary's Certificate of Incumbency for the officer(s) of each of Buyer, the Hospital Subsidiary, the Real Estate Subsidiary and any other affiliate of Buyer executing this Agreement and the documents described herein, executed by a duly authorized officer;

(f)    an Officer's Certificate of Buyer, certifying that the conditions in Sections 9.1 and 9.2 have been satisfied, dated as of the Closing Date;

(g)    a Funds Flow Memorandum, duly executed by Buyer;

(h)    counterpart to the Escrow Agreement duly executed by Buyer; and

(i)    such other instruments, certificates, consents and documents as Sellers reasonably deem necessary to effectuate the Transactions in accordance with the terms hereof.

3.5    Capital Commitment Escrow. ███████████████████████████████████
███████████████████████

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As of the date hereof and as of the Closing Date (except to the extent any of the following requires a different date), Sellers, jointly and severally, represent and warrant to Buyer the following:

4.1    Incorporation, Qualification and Capacity.    ECH is a non-profit corporation, duly incorporated and validly existing in good standing under the Laws of the Commonwealth of Pennsylvania. Each of ECHO, OCG, and AOHS is a corporation, duly incorporated and validly existing in good standing under the Laws of the Commonwealth of Pennsylvania. All of the respective owners or members of Sellers are listed on Schedule 4.1. Each Seller is duly licensed and qualified to do business under all applicable Laws of any Governmental Entity having jurisdiction over the Business, and has the lawful power to own, lease and operate its assets and properties and conduct its business in the place and manner now conducted, including, as appropriate, operating the Business. No Seller is licensed or qualified to do business in any jurisdiction other than the Commonwealth of Pennsylvania and there is no other jurisdiction in which the ownership, use or leasing of its assets or properties, or the conduct or nature of its business, makes such licensing or qualification necessary. The execution and delivery by each Seller of this Agreement and the documents described herein, the performance by each Seller of its obligations under this Agreement and the documents described herein and the consummation by each Seller of the Transactions and the documents described herein have been duly and validly authorized and approved by all necessary corporate actions, including, to the extent required, any applicable board and member approvals, on the part of such Seller, and none of such actions has been modified or rescinded and all of such actions remain in full force and effect.

4.2    Powers; Consents; Absence of Conflicts With Other Agreements.    Each Seller has the requisite power and authority to conduct its business as now being conducted, to enter into this

Agreement and to perform its obligations hereunder. The execution, delivery and performance of this Agreement and the documents described herein by Sellers, and the consummation by Sellers of the Transactions and documents described herein, as applicable:

(a) are not in contravention or violation of any of the terms of any Seller's articles of incorporation, bylaws, or other organizational document;

(b) do not require any material Approval, Permit or Environmental Permit of, or filing or registration with, or other action by, any Governmental Entity to be made or sought by any Seller, except (i) the Healthcare Regulatory Consents set forth in Schedule 4.2(b) and (ii) as otherwise set forth on Schedule 4.2(b); and

(c) assuming the Approvals and Permits set forth on Schedule 4.2(b) are obtained, will not conflict in any material respect with or result in any material violation of or default under (with or without notice or lapse of time or both) or give rise to a right of termination, cancellation or acceleration of any obligation, lien or to loss of a benefit under, or permit the acceleration of any obligation or result in the creation of any Encumbrance (other than Permitted Exceptions) upon any of the Facilities or the Purchased Assets under (i) any Contract or (ii) any Law applicable to any of the Facilities or the Purchased Assets or to Buyer's operation of the Facilities and the Business following the Closing as they are operated on the date hereof and as of the Closing Date or (iii) any Order by which any of the Facilities or Purchased Assets are bound.

4.3     Binding Effect. Subject to the receipt of the Approvals set forth in Section 4.2 and on Schedule 4.2(b), this Agreement and all other Ancillary Agreements to which each Seller becomes a Party have been duly and validly executed and delivered by Sellers, and, assuming the due authorization, execution and delivery of this Agreement and each respective Ancillary Agreement by Buyer, are and will constitute the valid and legally binding obligations of such Seller and are and will be enforceable against it in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights and remedies generally and except as enforceability may be subject to general principles of equity.

4.4     No Outstanding Rights.

(a) Except as set forth on Schedule 4.4(a), (a) no Sellers own, of record or beneficially, directly or indirectly, any shares of capital stock or other comparable equity interest of any Person, (b) to Sellers' Knowledge, no Seller is a party to any agreement relating to the formation of any other Person, and (c) to Sellers' Knowledge, no Seller has any contractual right or obligation to acquire any direct or indirect equity or ownership interest in any other Person.

(b) Except as set forth on Schedule 4.4(b), to Sellers' Knowledge, there are no outstanding rights (including any right of first refusal), options or Contracts made on behalf of any of Sellers or their Affiliates providing for, permitting or requiring any Person any current or future right to require any Seller or any Affiliate of any Seller or, following the Closing Date, Buyer, to sell, lease or transfer to such Person or to any third party any interest in any of the Facilities or Purchased Assets.

4.5     Title; Purchased Assets.

(a) Sellers have good and marketable title to the Purchased Assets free and clear of all Encumbrances, except for Permitted Exceptions. At the Closing, Sellers shall convey all of their right, title and interest in, including good and marketable title to, the Purchased Assets to Buyer free and clear of all Encumbrances, except for Permitted Exceptions and the Assumed Liabilities.

(b)     The Purchased Assets and the Excluded Assets (but only to the extent the Excluded Assets are specifically identified in this Agreement or the schedules hereto) constitute all assets that are held or used by any Seller or any Affiliate or otherwise necessary for the conduct of the Business substantially in the manner conducted as of the date of this Agreement and consistent with past practice.

4.6     Affiliates; Affiliate Agreements.

(a)     Sellers hold all interests in or the right to control the use or disposition the Purchased Assets.

(b)     Except as set forth on Schedule 4.6(b): (a) no Seller owes any amount to, or has any customer, supplier or distributor Contract with (other than amounts reimbursable for expenses and salary arising in the Ordinary Course of Business to such individuals), any Affiliate or any of its other directors, trustees, officers, employees or consultants; and (b) there are no customer, supplier or distributor Contracts presently in effect between any Seller, on the one hand, and any director, trustee, officer or shareholder of any Seller or any Affiliate of the foregoing, on the other hand.

4.7     Financial Information.

(a)     Attached hereto as Schedule 4.7(a) are true and correct copies of: (a) the audited consolidated balance sheet of Sellers as of June 30, 2016 (the "Audited Balance Sheet") and the audited consolidated balance sheet of Sellers as of each of June 30, 2014 and June 30, 2015, together with the audited consolidated statements of earnings, changes in shareholders' equity and cash flows for the respective fiscal years then ended, including the notes thereto, in each case examined by and accompanied by the report of independent public accountants; and (b) the unaudited consolidated balance sheet of Sellers as of December 31, 2016 (the "Interim Balance Sheet") and the unaudited consolidated statements of earnings, changes in shareholders' equity and cash flows for the six (6) months then ended (such unaudited statements collectively with the Interim Balance Sheet, the "Interim Financial Statements"). All of the foregoing financial statements (including the notes thereto, if any) are hereinafter collectively referred to as the "Financial Statements."

(b)     Except as set forth in Schedule 4.7(b), the Financial Statements present fairly, in all material respects, the financial position and results of operations of Sellers, on a consolidated basis, as of the dates and for the periods indicated, in each case in conformity with GAAP applied on a consistent basis throughout the periods covered thereby, and subject, in the case of the Interim Financial Statements, to the absence of footnote disclosures and normal year-end adjustments.

(c)     Except as set forth in Schedule 4.7(c), Sellers have no Liabilities whether or not required by GAAP to be reflected or reserved against in the Audited Balance Sheet or the Interim Balance Sheet, except for (A) Liabilities reflected or reserved against in the Audited Balance Sheet or the Interim Balance Sheet and (B) current Liabilities incurred in the Ordinary Course of Business since the date of the Audited Balance Sheet that are not individually or in the aggregate material to the operations of the Business.

(d)     Schedule 4.7(d) accurately lists as of the date hereof and will set forth as of Closing all of Sellers' material outstanding Indebtedness, and shall specifically identify all outstanding Capital Lease Obligations.

4.8     Permits and Approvals.

(a)     Schedule 4.8(a) lists all material Permits, Environmental Permits and Approvals issued or granted by a Governmental Entity and owned or held by or issued to a Seller or an Affiliate of a Seller in connection with the Business, and, to Sellers' Knowledge, such Permits, Environmental Permits and Approvals constitute all Permits, Environmental Permits and Approvals necessary for the conduct of the Business as currently conducted.  Sellers are, and will be at the Closing, the duly authorized holders of such Permits, Environmental Permits and Approvals, all of which are in full force and effect and unimpaired. Except as set forth in Schedule 4.8(a), no approval by or permission from any Governmental Entity relating to any such Permit, Environmental Permit or Approval will be or is needed as a result of the Transactions contemplated in this Agreement. Each Facility's pharmacies, laboratories and all other ancillary departments located at such Facility and operated by a Seller or an Affiliate of a Seller for the benefit of such Facility, which are required to be specially licensed, are duly licensed by each appropriate Governmental Entity, and a list of such licenses is set forth on Schedule 4.8(a). True and complete copies of all such Permits, Environmental Permits and Approvals set forth on Schedule 4.8(a) have been delivered to Buyer.

(b)     The Business is in compliance in all material respects with all Permits and Approvals required by Law. To Sellers' Knowledge, except as provided in Schedule 4.8(b), no waivers of any Laws have been granted or are required for the operation of the Business as currently conducted by Sellers, nor has grandfathered compliance status with respect to such Laws been granted. There are no provisions in any such Permits and Approvals which preclude or limit Sellers from operating the Business as it is currently operated.  There is not now pending nor, to Sellers' Knowledge, threatened, any action by or before any Governmental Entity to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any of the Permits and Approvals, and all of the Permits and Approvals are and shall be effective, unrestricted and in good standing now and as of the Closing Date.

(c)     Sellers hold all material accreditations/certifications issued by accrediting bodies that are necessary or customary for the operation of the Business. There is not now pending nor, to Sellers' Knowledge, threatened any action by any accrediting body to revoke, cancel, rescind, suspend, restrict, modify or non-renew any such accreditation/certifications, and all such accreditations/certifications are and shall be effective unrestricted and in good standing (other than any ordinary course surveys and deficiency reports for which Sellers have submitted plans of correction, copies of which have been previously provided to Buyer) as of the date hereof and as of the Closing Date.

(d).     To Sellers' Knowledge, each of the Facilities is in compliance with all applicable fire code regulations.

4.9     Intellectual Property. Except for Intellectual Property constituting Excluded Assets:

(a)     Schedule 4.9(a) sets forth a complete and accurate list of all Intellectual Property licensed from third parties (the "Third Party Intellectual Property") other than Off-the-Shelf Software.

(b)     Sellers own and will own at the Closing all Seller Intellectual Property free and clear of all Encumbrances other than Permitted Exceptions.  The Seller Intellectual Property includes all of the Intellectual Property necessary in the conduct of the Business as currently conducted.

(c)     Sellers hold and will hold at the Closing valid licenses to use all Third Party Intellectual Property as used in the Business as of the date hereof and as of the Closing Date.  Except as

set forth on Schedule 4.9(c) and subject to Permitted Exceptions, Sellers have and will have at the Closing all rights necessary to assign, transfer and convey to Buyer pursuant to this Agreement all rights of Sellers in and to all Intellectual Property, free and clear of any Encumbrances other than Permitted Exceptions.

(d)     The conduct of the Business, as conducted currently does not or, to Sellers' Knowledge, at any time in the past did not infringe, misappropriate or violate any Intellectual Property rights owned or controlled by any third party. To Sellers' Knowledge, as of the date hereof and as of the Closing Date, there is no unauthorized use, disclosure, infringement or misappropriation by a third party of any Seller Intellectual Property.

(e)     No Seller or Affiliate of Sellers has brought any Legal Proceeding for infringement of Seller Intellectual Property or breach of any license or Contract involving Intellectual Property against any third party. No written claim by any third party contesting the validity, enforceability or ownership of any Seller Intellectual Property has been made, is currently outstanding, or, to Sellers' Knowledge, is threatened. To Sellers' Knowledge, no such claim has been made, is currently outstanding or is threatened against any licensor to the Sellers of Third Party Intellectual Property.

(f)     Except as set forth in the Assumed Contracts, no necessary registration, maintenance and renewal fees that are the responsibility of Sellers or their Affiliates in connection with the Intellectual Property pursuant to Assumed Contracts are due and payable as of the date hereof and none will be due and payable as of the Closing Date.

(g)     No Seller has entered into any written agreement granting to any Person the right to control the prosecution or registration of any of the Seller Intellectual Property.

(h)     Schedule 4.9(h) lists all Seller Intellectual Property that is registered or is the subject of a pending application for registration in any country or territory.

4.10     Government Program Participation/Accreditation.

(a)     Except as set forth on Schedule 4.10(a), each Facility that participates in a Government Reimbursement Program is: (i) eligible to receive payment without restriction under the Government Reimbursement Programs for services provided to qualified beneficiaries; and (ii) qualified to participate in and has current provider agreements (with one or more provider numbers) with the Government Reimbursement Programs and/or their MACs (or other fiscal intermediaries). All of the provider numbers used by Sellers in connection with the Business are listed on Schedule 4.10(a).

(b)     Except as set forth on Schedule 4.10(b), each Facility that participates in a Government Reimbursement Program is in compliance in all material respects with the conditions of participation for such Government Reimbursement Program. Except as set forth on Schedule 4.10(b), there is not pending, nor, to Sellers' Knowledge, is there threatened, any proceeding or investigation under the Government Reimbursement Programs involving Sellers or the Business, or to Sellers' Knowledge, any Person who as of the date hereof or as of the Closing Date is an officer, director, trustee, Employee or agent of Sellers in connection with such Facilities.

(c)     Cost Reports for each of the Facilities that participates in a Government Reimbursement Program were filed when due. Except as set forth on Schedule 4.10(c), the Cost Reports are in all material respects complete and correct; such Cost Reports do not claim, and, to Sellers Knowledge, none of such Facilities has received payment or reimbursement in excess of, the amount

provided by Law; all amounts shown as due from any of such Facilities in the Cost Reports either were remitted with such Cost Reports or will be remitted when required by applicable Law, and all amounts shown in the corresponding Notices of Program Reimbursement as due have been or prior to Closing will be paid when required under applicable Law. Except to the extent that liabilities or contractual adjustments with respect to such Facilities under the Government Reimbursement Programs have been properly reflected and adequately reserved in the Financial Statements, to Sellers' Knowledge, Sellers have not received notice of any dispute or claim by any Governmental Entity, fiscal intermediary or other Person regarding the Government Reimbursement Programs or the participation by any of such Facilities in such programs. Complete and correct copies of all such reports for the three (3) most recently completed fiscal years of Sellers have been furnished to Buyer.

(d)    Except as set forth on Schedule 4.10(d), and other than any routine post-payment audits conducted in the normal course by MACs, RACs or private insurance companies, there are no claims, actions or appeals pending before any Governmental Entity with respect to any Cost Reports or claims filed on behalf of Sellers with respect to any of the Facilities that participates in a Government Reimbursement Program, on or before the date of this Agreement (nor shall there be as of Closing, except as disclosed in writing to Buyer), or any disallowances by any Governmental Entity in connection with any audit of such Cost Reports. Except as set forth on Schedule 4.10(d), no validation review or program integrity review related to the Business, or the consummation of the Transactions has been conducted by any Governmental Entity in connection with any Government Reimbursement Programs, and, to Sellers' Knowledge, no such reviews are scheduled, pending or threatened against Sellers with respect to the Business or the consummation of the Transactions.

(e)    All billing practices of Sellers with respect to the Business with respect to Government Reimbursement Programs and Private Health Plans have been in compliance in all material respects with all applicable Laws, regulations and policies of such Government Reimbursement Programs and Private Health Plans, and to Sellers' Knowledge, neither Sellers nor any physician practices affiliated with Sellers have billed or received any material payment or reimbursement in excess of amounts allowed by Law or such payors.

(f)    Sellers have provided to Buyer true and complete copies of the most recent accreditation survey report and deficiency list with respect to each Facility and plan of correction, if any, issued by a Governmental Entity. Except as set forth on Schedule 4.10(f), each Facility is implementing remediation of any such deficiencies.

(g)    To Sellers' Knowledge, neither Sellers nor any of their Affiliates, any director, trustee, employee or officer of Sellers or any of their Affiliates, or any agent acting on behalf of or for the benefit of any of the foregoing, has, directly or indirectly, in connection with any of the Facilities or the Business, engaged in any activities that are prohibited or are cause for civil monetary penalties, criminal sanctions or other legal sanctions under any Medical Reimbursement Program Laws.

(h)    To Sellers' Knowledge, neither Sellers nor any of their Affiliates, nor any director, trustee, officer or Employee of Sellers nor any of their Affiliates, is a party to any Contract (including any joint venture or consulting agreement) related to or affecting the Business with any physician, health care facility, hospital, nursing facility, home health agency or other Person who is in a position to make or influence referrals to or otherwise generate business for the Business, to provide services, lease space, lease equipment or engage in any other venture or activity, in a manner or to the extent that any of the foregoing is prohibited by Medical Reimbursement Program Laws.

4.11    Regulatory Compliance; Illegal Payments.

(a)    Except as set forth on Schedule 4.11(a), Sellers are in compliance in all material respects with all applicable statutes, rules, regulations and requirements of Governmental Entities having jurisdiction over each Facility, the Purchased Assets and the Business. Each of Sellers has timely filed all material forms, applications, reports, statements, data and other information required to be filed with Governmental Entities with respect to the Business.

(b)    No Seller, nor to the Sellers' Knowledge, any officer, director, trustee, manager, personnel or agent of any Seller, or any other Person on behalf of any Seller, has made or authorized, directly or indirectly, any payment of funds of, or relating to, any Seller which is prohibited by any Laws, including laws relating to bribes, gratuities, kickbacks, lobbying expenditures, political contributions and contingent fee payments.

4.12    Contracts.

(a)    Schedule 4.12(a) lists all of the following Contracts to which any Seller is a party or by which it is bound and that are primarily related to the Business or by which the Purchased Assets or Facilities may be bound or affected (collectively, the "Material Contracts"):

(i)    Contracts for the employment of any individual on a full-time or part-time basis providing annual compensation in excess of $100,000 and Contracts for the services of any individual on a consulting or other basis providing compensation (on an annualized basis) in excess of $100,000;

(ii)    Contracts regarding severance, termination or separation of employment or other relationship; and Contracts regarding change in control or retention bonus or similar arrangements;

(iii)    Contracts with any labor union or association representing any Employees;

(iv)    Contracts relating to the administration of the Seller Plans and Assumed Seller Plans;

(v)    Contracts relating to the Indebtedness and Capital Lease Obligations and any other Indebtedness;

(vi)    Contracts that involve the annual expenditure of more than $50,000 in the aggregate or require performance by any party more than one (1) year from the date hereof that, in either case, are not terminable by such Seller without cause (and without penalty or termination fee) on less than one hundred twenty (120) days' notice;

(vii)    Contracts relating to the ownership or use of Owned Real Property or Leased Real Property;

(viii)    Contracts with any Private Health Plans;

(ix)    Contracts with a Governmental Entity;

(x)    Contracts relating to cleanup, abatement or other actions in connection with Environmental, Health and Safety Liabilities;

(xi)    Contracts with a group purchasing organization;

(xii)    Contracts regarding the management of the Facilities;

(xiii)    Contracts concerning a partnership, joint venture or similar arrangement;

(xiv)    Contracts containing a non-solicitation or non-compete which is binding upon any Seller with respect to any of the Purchased Assets or Facilities; and

(xv)    Contracts which grant or convey rights of first refusal, or contain "most favored nation" pricing arrangement, special warranty or similar provisions.

(b)    Correct and complete copies of the Material Contracts have been delivered to Buyer by Sellers. No Seller is a party to any oral arrangement or understanding relating to the Business that if in writing would constitute a Material Contract.

(c)    Each Assumed Contract is valid and existing as to the applicable Seller, and to the Knowledge of the applicable Seller, each Seller has duly performed, in all material respects, its obligations under each Assumed Contract to which it is a party to the extent that such obligations to perform have accrued or the term thereof has not expired; and except as set forth on Schedule 4.12(c), to Sellers' Knowledge, no breach or default, alleged breach or default, or event or condition which would (with the passage of time, notice or both) constitute a breach or default under any Assumed Contract by Sellers or any other party or obligor with respect thereto, has occurred or exists.

(d)    Schedule 4.12(d) identifies each Assumed Contract that, by its terms, requires a third party's consent to assignment (or notification thereof) in order for Sellers to assign such Assumed Contracts to Buyer in accordance with the terms of this Agreement.

(e)    Sellers have delivered to Buyer true and correct copies of all Assumed Contracts.

4.13    Tax Matters. Except as set forth on Schedule 4.13:

(a)    Each of Sellers is an entity organized under U.S. federal or state law, and all of the Facilities and Purchased Assets are located in the United States;

(b)    None of the Facilities or Purchased Assets are treated, for U.S. federal income tax purposes, as either stock of a corporation or interests in a partnership. None of the Facilities or Purchased Assets are equity interests in an entity that is treated as disregarded from its owner for U.S. federal income tax purposes;

(c)    ECH is (i) exempt from taxation under Subtitle A of the Code by virtue of being described in Section 501(c)(3) of the Code; and (ii) exempt from state and local income taxation under applicable analogous provisions of state and local Tax laws.

(d)    All Tax Returns required to be filed by, or on behalf of, any Seller with respect to the Facilities or Purchased Assets have been filed within the time (including any valid extensions thereof) and in the manner provided by Law, and all such Tax Returns are true, correct and complete in

all material respects (provided, for the avoidance of doubt, that any statements in a Tax Return relevant to the continuing eligibility of any Seller, or any Affiliate of any Seller, for exemption from any Tax shall be deemed to be material for purposes of this Section 4.13), and all amounts shown due on such Tax Returns have been paid on a timely basis;

(e)     All Taxes for which any Seller may have any liability (whether disputed or not) which have become or are due with respect to the Facilities or Purchased Assets, and any assessments received by any Seller, either have been paid or have been adequately reserved for in accordance with GAAP on the financial statements of Sellers;

(f)     There are no liens for any Tax on any of the Facilities or Purchased Assets, except for statutory liens for current Taxes not yet due and payable;

(g)     All Taxes required to be withheld or collected by any Seller in compliance with the payroll tax and other withholding provisions of all applicable Laws have been so withheld or collected, and all such Taxes withheld or collected have been timely, duly and validly remitted to the proper Governmental Entity. All IRS Forms W-2, Forms 1099 and other required information returns, as well as any and all analogous state or local information returns, have been timely filed with the proper Governmental Entity, and all required information statements in respect of such information returns have been properly delivered to the appropriate recipients thereof; and

(h)     (i) No audit or other examination of any Tax Return is presently in progress, and no notice of a claim or pending investigation has been received or to Seller's Knowledge has been threatened, alleging that: (A) any Seller may not have been fully exempt from any Tax for any period for which Sellers filed any Tax Return claiming such exemption; or (B) any Seller otherwise has a duty to file any Tax Return or pay any Tax or is otherwise subject to the taxing authority of any jurisdiction in any manner, nor in connection therewith has any Seller received any notice or questionnaire from any Governmental Entity in any jurisdiction which suggests or asserts that such Seller may have a duty to file such Tax Returns or pay such Taxes, or otherwise is subject to the taxing authority of such jurisdiction; and (ii) no Seller has executed a waiver of any statute of limitations or other extension of the period for the assessment or collection of any Tax, which waiver or extension remains outstanding.

4.14     Real Property; Condition of Title.

(a)     Real Property.     Schedule 4.14(a) lists all real property and interests in real property owned in fee simple by Sellers and used in connection with the Business, such ownership interest being comprised of a fee simple interest in the land described on Schedule 4.14(a) (the "Land"), together with:

(i)     improvements, buildings and fixtures now or hereafter located on or to the Land, including the buildings identified on Schedule 4.14(a) (the "Improvements");

(ii)     Sellers' interest in all easements, rights of way, hereditaments and other appurtenances thereto (including appurtenant rights in and to public streets, roads, lands and alleys in front of and adjacent to the Land), including all development rights, easements, rights-of-way and other similar interests, any strips and gores adjacent to the Land, any award made or to be made in lieu of any of the foregoing, and any award for damage to the Land or Improvements by reason of the change of grade of any street, road or avenue, and any and all other interests of every kind granted to Sellers, as owner of the Owned Real Property;

(iii)     Sellers' interest as landlord in and to the Leases;

(iv)    all Architectural Plans or design specifications relating to the development of the Land and Improvements; and

(v)    all claims and recorded or unrecorded interests therein, including any and all options to acquire such real property.

Schedule 4.14(a) sets forth (a) the street address, and, to the extent practicable, legal description of each such parcel of Land, and (b) a brief description (to the extent practicable) of the Improvements on each such parcel of Land. To Sellers' Knowledge, neither Sellers nor any of their Affiliates have created any Encumbrance (other than Permitted Exceptions) that will interfere with Buyer's use of the Facilities and the Purchased Assets in a manner consistent with the current use by Sellers and their Affiliates. Sellers own and at Closing will convey good and marketable fee simple title to each parcel of the Owned Real Property free and clear of any Encumbrance, except for Permitted Exceptions. At Closing, Sellers will assign a valid and enforceable leasehold interest in the Leased Real Property to Buyer. Such properties and assets, together with all properties and assets held by Sellers under the Leases, include all tangible and intangible property, assets, contracts and rights reasonably necessary for the operation of the Business as presently conducted.

(b)    Owned Real Property. Except as otherwise disclosed in Schedule 4.14(b), with respect to each parcel of Owned Real Property: (i) there are no pending or, to Sellers' Knowledge, threatened condemnation proceedings, suits or administrative actions relating to the Owned Real Property or other matters adversely affecting the current use, occupancy or value thereof; (ii) other than rights of third parties arising under any Lease, Assumed Contract or Permitted Exception, there are no Contracts granting to any party or parties the right of use or occupancy of any portion of the parcels of Owned Real Property; (iii) the Facilities have received all approvals of Governmental Entities (including licenses and permits) required in connection with Sellers' ownership or operation thereof and, to Sellers' Knowledge, are in compliance, in all material respects, with applicable Laws, ordinances, rules and regulations; (iv) other than rights arising under any Lease or Assumed Contract or Permitted Exception, there are no outstanding options or rights of first refusal to purchase the parcels of Owned Real Property, or any portion thereof or interest therein; (v) there are no third parties (other than Tenants under Leases) in possession of the parcels of Owned Real Property; (vi) neither Sellers nor any of their Affiliates, has received notice of any special assessment which may affect any parcel of Owned Real Property; and (vii) the Owned Real Property is, and until Closing shall be, insured against casualty on a full replacement cost basis by one or more insurance policies maintained by Sellers.

(c)    Leases. Schedule 4.14(c)(i) lists all Leases where any Seller is a lessee or sublessee (copies of which have previously been furnished to Buyer), or a lessor or sublessor, in each case, setting forth (a) the lessor and lessee thereof and the date of each of the Leases, and (b) the street address of each Leased Real Property. Except as set forth on Schedule 4.14(c)(ii): (i) no Seller nor any Affiliate has entered into any Leases with respect to the Real Property or the Business; (ii) each Lease in respect of the Real Property constitutes a legal, valid and binding obligation of Sellers or their Affiliate that is a party thereto, is in full force and effect, has not been amended and Sellers are not in default or breach thereunder and to Sellers' Knowledge, the other party thereto is not in default or breach thereof; (iii) no event has occurred which, with the passage of time or the giving of notice or both, would cause a breach of or default under any of such Leases by any Seller, or, to Sellers' Knowledge, by other parties; and (iv) with respect to each such parcel of Leased Real Property (A) Sellers or their Affiliate have valid leasehold interests in such leased premises, and (B) neither Sellers nor any Affiliates have received notice of (1) any condemnation proceeding with respect to any portion of the Leased Real Property or any access thereto, or (2) any special assessment which may affect any parcel of Leased Real Property. True and complete copies of all such Leases and all amendments, modifications and supplements existing as of the date hereof have been delivered to Buyer. No Tenant is in arrears in the payment of

any such rent for more than one (1) calendar month, except as set forth on <u>Schedule 4.14(c)(ii)</u>. All work required to be performed by the lessor or sublessor under each of the Leases has been completed and paid for, except as set forth on <u>Schedule 4.14(c)(ii)</u>. All rents and any additional charges due under such Leases are being billed to the Tenants in accordance with the schedule set forth on <u>Schedule 4.14(c)(iii)</u>.

(d)     <u>Buildings and Systems</u>. Except as set forth on <u>Schedule 4.14(d)</u>, to Sellers' Knowledge, each of the following systems of the Hospital or other Owned Real Property: plumbing, electrical, mechanical, or heating, ventilation and air conditioning, sewage, roofing, foundation and floors (collectively, the "<u>Buildings and Systems</u>") are now, and shall be at Closing in working order. Except as set forth on <u>Schedule 4.14(d)</u>, to Sellers' Knowledge, there are no outstanding requirements, recommendations or requests from any Governmental Entity requiring any repairs or work to be done with respect to the improvements of the Buildings and Systems.

(e)     <u>Utilities</u>. To Sellers' Knowledge, all public utilities, including water, sewer, gas, electricity and telephone, required for the operation of the Facilities and the other Owned Real Property, or any portion thereof, are operating and provide adequate service to the Facilities and the other Owned Real Property to continue operations in the manner in which they are now operating and as expected to be conducted in the future by Sellers. Except as set forth on <u>Schedule 4.14(e)</u>, no Seller has received written notice from any public utility regarding any material arrearages, fines or penalties relating to utility services with respect to the Facilities and the other Owned Real Property.

4.15     <u>Personal Property</u>. <u>Schedule 4.15</u> sets forth a true and complete, in all material respects, list of (i) all fixed assets owned or leased by, in the possession of or used by Sellers in connection with the Business, and having, in the aggregate with all other similar items, a value in excess of $25,000, and (ii) except as to Intellectual Property, all other tangible and intangible personal property, rights and assets owned by Sellers necessary for the conduct of the Business and having, in the aggregate with all other similar items, a value in excess of $25,000. Sellers own and hold, and will own and hold on the Closing Date, good title to all tangible personal property assets and, except as to Intellectual Property, valid title to all intangible assets included in the Facilities and Purchased Assets free and clear of all Encumbrances, except Permitted Exceptions and rights of owners under leases or licenses of assets leased or licensed to Sellers in the Ordinary Course of Business under Assumed Contracts. To Sellers' Knowledge, the tangible personal property of Sellers is in good working condition and repair, reasonable wear and tear excepted.

4.16     <u>Insurance</u>. Schedule 4.16 lists all insurance policies or self-insurance funds maintained by Sellers as of the date of this Agreement covering the ownership and operation of the Purchased Assets or any of the Facilities, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverage. Sellers are not in default under any such policies. Except as described on <u>Schedule 4.16</u>, all of such policies are now and will be until the Closing in full force and effect. Except as described on <u>Schedule 4.16</u>, Sellers have received no notice of default under any such policy or notice of any pending or threatened termination or cancellation, coverage limitation or reduction or material premium increase with respect to any such policy.

4.17     <u>Employee Benefit Plans</u>.

(a)     <u>Schedule 4.17(a)</u> lists (i) each employee benefit plan within the meaning of Section 3(3) of ERISA (whether or not ERISA applies to such employee benefit plan), and (ii) any other employee benefit or executive compensation plan, fund, agreement, program, policy, or arrangement, including any employment agreement, retention agreement and bonus program, whether written or unwritten, formal or informal, (A) which is or has been maintained or contributed to within the last six

(6) years by any Seller or by any other member of any Sellers' Controlled Group for the benefit of any Employee or former employee of any Sellers or their Affiliates at the Facilities or the Purchased Assets or (B) under which any Seller or any other member of any Sellers' Controlled Group has or may have any outstanding present or future obligations to contribute or other liability, whether voluntary, contingent or otherwise (collectively, the "Seller Plans"). With respect to each Seller Plan, (i) no Legal Proceeding has been instituted or, to Sellers' Knowledge, threatened against or involving such Seller Plan (other than nonmaterial routine claims for benefits and appeals of such claims), any trustee or fiduciaries thereof, or Sellers, (ii) such Seller Plan is not under audit, or, to Sellers' Knowledge, investigation, by the IRS or any other Governmental Entity, (iii) to Sellers' Knowledge, there is no reasonable basis for any such Legal Proceeding, (iv) all contributions (including all employer contributions and employee salary reduction contributions), distributions, reimbursements and premium payments for all periods ending prior to or as of the Closing Date shall have been made by Sellers or properly accrued, (v) with respect to any insurance contract providing funding under any Seller Plan, to Sellers' Knowledge, there is no material liability for any retroactive rate adjustment arising from events occurring prior to the Closing Date, and (vi) to Sellers' Knowledge, there has been no prohibited transaction (as defined in Section 406 of ERISA and 4975 of the Code, or Section 503 of the Code, as applicable) or breach of fiduciary duty (as determined under ERISA or state law, as applicable).

(b)     With respect to each Seller Plan, Sellers have heretofore delivered to Buyer true and complete copies of the Seller Plan and trust documents and any amendments thereto (or if the Seller Plan is not written, a true and reasonably complete description thereof), summary plan descriptions, all insurance contracts or other funding arrangements and the most recent third party administration contracts, all material communications received or sent to any Governmental Entity, the most recent actuarial reports and accountant's opinions of the plan's financial statements, if applicable, the most recent estimate available to Sellers of any potential Multiemployer Plan withdrawal liability of Sellers and their Controlled Group members, the most recent determination letter received from the IRS to the extent that any Seller Plan is a "tax-qualified" retirement plan under Section 401(a) of the Code, and, in the case of any Seller Plan subject to ERISA, the three most recent Form 5500 annual reports, as filed, and all other material documents pursuant to which the Seller Plan is maintained, funded, and administered. Each Seller Plan complies in all respects with applicable Law, the Code and all applicable laws, and each Seller Plan has been operated in compliance with the terms thereof in all respects. Neither Sellers nor any members of Sellers' Controlled Group have improperly excluded any eligible employee from participation in any Seller Plan. Except as set forth on Schedule 4.17(b), each Seller Plan that is intended to be tax-qualified under Section 401(a) of the Code is so qualified and, to Sellers' Knowledge, there are no currently existing circumstances that could reasonably result in revocation of any such determination. The trusts maintained under each such tax qualified plan are exempt from taxation under Section 501(a) of the Code.

(c)     The Purchased Assets are not, and there is no existing factual basis for them to become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of any Seller being considered to be aggregated with another trade or business pursuant to Section 414 of the Code or Section 4001(b)(1) of ERISA ("Controlled Group").

(d)     Except as set forth on Schedule 4.17(d), neither Sellers nor any member of their Controlled Group has at any time sponsored, contributed to, has or had an "obligation to contribute" (as defined in ERISA Section 4212) or has or had any liability, whether voluntary, contingent or otherwise with respect to a Multiemployer Plan, either as an employer or a joint employer. With respect to each Multiemployer Plan set forth on Schedule 4.17(d), in its three (3) most recently completed plan years, there has not been a "contribution decline" or "partial cessation" (as each is defined in Section 4205 of ERISA) with respect to Sellers or any of their Controlled Group members.

(e)    Neither Sellers nor any member of Sellers' Controlled Group has at any time sponsored or contributed to or has or had any liability, whether voluntary, contingent or otherwise with respect to a "single employer plan" (as defined in ERISA Section 4001(a)(15), whether or not ERISA would apply to such plan) to which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13), whether or not ERISA would apply to such plan) are not part of the same Controlled Group.

(f)    Except as set forth on <u>Schedule 4.17(f)</u>, there are no actions, audits or claims pending or, to Sellers' Knowledge, threatened against any Seller or any Seller Plan with respect to such Sellers maintenance of the Seller Plans, other than routine claims for benefits.

(g)    To the extent applicable, the members of Sellers' Controlled Group have complied with all of the continuation coverage requirements of Section 1001 of the Consolidated Omnibus Budget Reconciliation Act of 1985 and ERISA Sections 601 through 608, with the requirements of Section 5000 of the Code, and any applicable state laws requiring Sellers or any member of Sellers' Controlled Group to provide group health continuation coverage to employees, former employees and other eligible Persons.

(h)    Except as set forth on <u>Schedule 4.17(h)</u>, no Seller Plan provides health, dental, life insurance or other welfare benefits (whether on an insured or self-insured basis) to Employees after their retirement or other termination of employment (other than continuation coverage required under COBRA which may be purchased at the sole expense of the Employee).

(i)    Except as set forth on <u>Schedule 4.17(i)</u>, no Seller has at any time sponsored or contributed to or has or had any liability, whether voluntary, contingent or otherwise with respect to a defined benefit plan. With respect to any defined benefit plan listed on <u>Schedule 4.17(i)</u>, Sellers have fully disclosed the current funding status of the plan and properly accounted for their obligations with respect to such plans on its financial statements. Except as set forth on <u>Schedule 4.17(i)</u>, neither Sellers nor any member of Sellers' Controlled Group participates in, contributes to, or otherwise has any current or contingent liability or obligation under or with respect to any plan that is or was subject to Title IV of ERISA or Section 412 of the Code. No Seller nor any member of Sellers' Controlled Group has any current or contingent liability or obligation by reason of at any time being treated as a single employer under Section 414 of the Code with any other Person.

(j)    Each agreement, contract or other arrangement to which the a Seller is a party that is a "nonqualified deferred compensation plan" subject to Section 409A of the Code has been maintained in all material respects in documentary and operational compliance with Section 409A of the Code and the regulations thereunder and no amounts under any such agreement, contract, or other arrangement is or has been subject to the interest and additional tax set forth under Section 409A of the Code. No Seller has any actual or potential obligation to reimburse or otherwise "gross-up" any Person for the interest or additional tax set forth under Section 409A of the Code. Each Seller Plan that is intended to constitute an "eligible deferred compensation plan" within the meaning of Section 457(b) of the Code satisfies the requirements of said Code section.

(k)    Except as set forth on <u>Schedule 4.17(k)</u>, the consummation of the transactions contemplated by this Agreement will not (i) trigger any existing contract right for, or otherwise entitle any Employee to, severance pay or termination benefits, (ii) accelerate the time of payment or vesting (except to the extent required by Section 411 of the Code), or increase the amount of compensation due to any such Employee, (iii) obligate Sellers to pay or otherwise be liable for any compensation, vacation days, pension contribution or other benefits to any Employee for periods before the Closing Date, (iv) require assets to be set aside or other forms of security to be provided for any liability under a Seller Plan