or (v) result in any "parachute payment" (within the meaning of Section 280G of the Code or any corresponding provision of state, local, or non U.S. Tax law).

4.18    Employees and Employee Relations.

(a)    Schedule 4.18(a) lists all Employees as of the date set forth therein, including the following information, as applicable: (i) position; (ii) date of hire; (iii) department or administrative unit assigned; (iv) current annual salary or hourly wage; and (v) accrued vacation, holidays and/or sick leave; (the "Employee List").

(b)    Sellers have delivered to Buyer complete and accurate copies of each employment, consulting, and similar agreement pertaining to the Business to which any Seller is a party. Except as disclosed on Schedule 4.18(b) or Schedule 4.18(c), no Seller is a party to or bound by any Contract, Order or statutory obligation (other than the WARN Act) pertaining to the Business (i) for the employment or provision of services (including as an independent contractor or consultant) by any individual, that is not terminable by such Seller without penalty upon thirty (30) days' notice or less, or (ii) relating to the payment of any severance or termination payment, bonus or death benefit to any Employee, former employee or their estates or designated beneficiaries, except for proceeds under any standard employee benefit insurance policies that may be in effect.

(c)    Schedule 4.18(c) identifies the labor or collective bargaining agreements, if any, including all side agreements, memoranda of understanding, arbitration awards construing or modifying the terms of any such agreements, and any other ancillary agreements applicable to the Employees. Prior to the date hereof, Sellers have delivered to Buyer a copy of each agreement listed on Schedule 4.18(c), if any. Sellers, without violating their statutory obligation to bargain in good faith, shall not negotiate any changes to, or extensions of, said collective bargaining agreements, or present substantive proposals to the applicable labor unions with respect to any such proposed changes or extensions, without first consulting with Buyer and securing its prior written consent to same. Except as described on Schedule 4.18(c), in connection with Sellers' operation of the Business: (i) no labor union or employee association has been certified as the collective bargaining agent for any group of Employees; (ii) there is no current, or to Sellers' Knowledge threatened, union organizing activities or campaign, or labor union demand for recognition or neutrality, with respect to any Employees or that could otherwise affect Sellers; (iii) to Sellers' Knowledge, no petition has been filed or proceeding instituted by or on behalf of any Employee or group of Employees with the National Labor Relations Board or any other Governmental Entity exercising lawful jurisdiction over Sellers seeking recognition of a bargaining representative; and (iv) no Employee is represented by a labor union.

(d)    Except as set forth on Schedule 4.18(d), there are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving Sellers, or (ii) unfair labor practice charges or complaints pending or, to Sellers' Knowledge, threatened by or on behalf of any Employee or group of Employees, and Sellers have not experienced any such pending or threatened strikes, work stoppages, work slowdowns, lockouts, unfair labor practice charges or complaints since December 31, 2012.

(e)    Except as described on Schedule 4.18(e), each Seller is in compliance in all material respects with all collective bargaining agreements, if any, arbitration awards or other Contracts relating to employment of represented or non-represented Employees, and there are no grievances or arbitrations pending under any such collective bargaining agreements.

(f)    Except as set forth on Schedule 4.18(f): (i) each Seller is in compliance in all material respects with all Laws relating to employment, denial of employment or employment

opportunity and termination of employment; (ii) no Seller is a party to, or otherwise bound by, any settlement agreement or consent decree with, or citation by, any Governmental Entity relating to Employees or employment practices; (iii) there is no charge of discrimination in employment or employment practices against Sellers, on any basis, including age, gender, race, religion, national origin, disability, marital status, sexual orientation or other legally protected characteristic, or charge of retaliation, which is now pending or, to Sellers' Knowledge, threatened, before the United States Equal Employment Opportunity Commission, or any other Governmental Entity in any jurisdiction in which Sellers have employed or currently employs any Employee or any probable cause determination with respect to any such charge; (iv) no Seller is liable for any payment to any trust or other fund or to any Governmental Entity with respect to unemployment compensation benefits, workers' compensation benefits, social security or other benefits or obligations for Employees (other than routine payments to be made in the normal course of business and consistent with past practice); and (v) there is no claim with respect to payment of wages, salary or overtime pay, or unpaid withholding taxes or other sums as required by any appropriate Governmental Entity that is now pending or, to Sellers' Knowledge, threatened, before any Governmental Entity with respect to any current or former Employees.

(g)     Except as set forth on Schedule 4.18(g), to Sellers' Knowledge: (i) no officer or senior manager has any present intention to terminate or materially alter his or her relationship with any Seller, other than as contemplated by this Agreement and the agreements to be entered into pursuant to this Agreement; and (ii) no Employees are in violation of any material term of any employment contract, patent disclosure agreement, enforceable noncompetition agreement or any enforceable non-solicitation or other restrictive covenant, in each case, to a former employer relating to the right of any such Employee to be employed by Sellers.

4.19     Medical Staff; Physician Relations.  Sellers have delivered to Buyer complete and correct copies of the Bylaws, Rules and Regulations of the medical staff applicable to the Facilities, as currently in effect. Except as set forth on Schedule 4.19, there are no pending, or, to Sellers' Knowledge, threatened, proceedings with the medical staff members at the Facilities or applicants or allied health professionals. Schedule 4.19 lists all members of the medical staff and allied health professional staff of the Facilities as of the date hereof and as of the Closing Date, including each person's name, department, and assignment status.

4.20     Legal Proceedings.  Schedule 4.20 contains an accurate list and summary description of all Legal Proceedings with respect to or affecting the Facilities and the Purchased Assets to which Sellers or any of their Affiliates is a party (including Governmental Entity and third party payor audits and related proceedings), as well as settlements, Orders or conciliation agreements under which Sellers or any of their Affiliates has current or future obligations with respect to the Facilities or Purchased Assets. Except to the extent set forth on Schedule 4.20, there are no Legal Proceedings, compliance reports, notices of violation or information requests pending, or, to Sellers' Knowledge, threatened against (i) any Seller or its Affiliates with respect to the Business, or (ii) any Employee.

4.21     Absence of Changes.  Except as set forth in Schedule 4.21, between the date of the Audited Balance Sheet and the date hereof, there has not been any transaction or occurrence in which Sellers or any of their Affiliates, in connection with the Purchased Assets, have:

(a)     suffered any damage, destruction or loss with respect to or affecting any of the Facilities or Purchased Assets in an amount in excess of $50,000;

(b)     written down or written up the value of any Inventory (including write-downs by reason of shrinkage or markdowns), except in the Ordinary Course of Business;

(c)     determined as collectible any Account Receivable or any portion thereof which was previously considered uncollectible, or written off as uncollectible any Account Receivable or any portion thereof, except for write-downs, write-ups and write-offs in the Ordinary Course of Business;

(d)     postponed or delayed the payment of any accounts payable or other expense in excess of $10,000 that is not in dispute in a manner that is not consistent with past practice;

(e)     accelerated the collection of (or discount of) any Accounts Receivable in excess of $10,000 in a manner that is not consistent with past practice;

(f)     made any capital expenditure or commitment for additions to property, plant, equipment, intangible or capital assets or for any other purpose, other than in the Ordinary Course of Business in an amount in excess of $100,000;

(g)     acquired any assets, including acquired any business, whether by merger, consolidation, the purchase of a substantial portion of the assets or equity interests of such business or otherwise, except in the Ordinary Course of Business;

(h)     sold, leased, transferred or otherwise disposed of any of the Facilities or Purchased Assets in excess of $100,000;

(i)     granted or incurred any obligation for any material increase in the compensation of any Employee (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) or created any Seller Plan, in each case, other than in the Ordinary Course of Business;

(j)     incurred, assumed or guaranteed any indebtedness, or made any loans, advances or capital contributions to, or investments in, any other Person;

(k)     cancelled, settled, compromised, waived or released any right or claim (or series of related rights and claims) either involving more than $100,000 or outside the Ordinary Course of Business;

(l)     made any change in any method of accounting or accounting principle, practice or policy;

(m)     filed for bankruptcy; or

(n)     agreed, so as to legally bind the Sellers or affect the Facilities or the Purchased Assets, whether in writing or otherwise, to take any of the actions set forth in this Section 4.21 and not otherwise permitted by this Agreement.

4.22    Environmental Matters.

(a)     Except as set forth on Schedule 4.22:

(i)     Except in compliance with applicable Environmental Laws, and in concentrations which would not be reasonably likely to result in an obligation to report to a Governmental Entity, investigate, remediate, correct or monitor any environmental condition, there are no Hazardous Materials located in, on, over, under, at or from any Facility, Owned Real Property, or, to Sellers' Knowledge, Leased Real Property. Except in material compliance with applicable Environmental Laws,

no portion of any Facility or Real Property is being used, has been used by Sellers, or, to Sellers' Knowledge, has been used by any other Person for Hazardous Activity.

(ii)    Sellers, the Facilities, the Real Property and the Business and the operations of Sellers are in compliance in all material respects with all applicable Environmental Laws and have at all times during Sellers' operations been in compliance in all material respects with all applicable Environmental Laws. There are no conditions existing at any Facility or Real Property that have resulted in, or which with the giving of notice or the passage of time or both, could reasonably be expected to result in, any Environmental, Health and Safety Liabilities of Sellers or their respective business or operations. Sellers have not received any written notice of any Environmental, Health and Safety Liabilities and relating to any Facility, Real Property, or the conduct of the Business or the operations of Sellers.

(iii)    Sellers have or have timely applied for all material Environmental Permits. Sellers, the Business, Sellers' operations, the Facilities and the Real Property are in material compliance with the terms and conditions of all such Environmental Permits.

(b)    Neither this Agreement nor the consummation of the transaction that is the subject of this Agreement will result in any obligations for any Remediation, or notification to or consent of Governmental Entities or third parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental Laws.

(c)    Sellers have provided to Buyer all material environmental reports, assessments, audits, studies and investigations in their custody, possession or control concerning Sellers, the Facilities, the Real Property and the Former Real Property.

(d)    None of the matters disclosed on Schedule 4.22, individually or in the aggregate, is reasonably likely to result in a Material Adverse Development.

4.23    Immigration Act. Sellers are in compliance, in all material respects, with the terms and provisions of the Immigration Act with respect to the operation of the Facilities and the Purchased Assets. No Seller has received any written notice of any actual or potential violation of any provision of the Immigration Act (it being acknowledged that receipt of Social Security Administration "no match letters" does not constitute notice of any actual or potential violation of any Law) and there are no, and, since December 31, 2007, have not been any, citations, investigations, administrative proceedings or formal complaints of violations of U.S. immigration laws imposed, pending or threatened before the U.S. Department of Homeland Security (including the U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection), U.S. Department of Labor, U.S. Department of State or before any other Governmental Entity against or involving any of Sellers.

4.24    WARN Act. Schedule 4.24 lists the full name of each Employee of Sellers who furnished services at any of the Facilities or the Purchased Assets who has experienced an Employment Loss in the ninety (90) days preceding the date of this Agreement. Except as set forth on Schedule 4.24 or at the request of Buyer, Sellers do not presently intend to take any action that would result in an Employment Loss by any Employee or Person who furnishes services at any of the Facilities or the Purchased Assets between the date of this Agreement and the Closing Date. Buyer, whether in its capacity as manager of the Facilities or otherwise, shall not act or cause the Sellers to act in a manner which may implicate the WARN Act or give rise to any liability pursuant to the WARN Act. For purposes hereof, "Employee" shall mean any Employee, including officers, managers and supervisors, but excluding Employees who are employed for an average of fewer than twenty (20) hours per week or who

have been employed for fewer than six (6) of the preceding twelve (12) months, unless Employees working fewer than twenty (20) hours per week or employed fewer than six (6) months are protected by a current or then-existing federal, state or local plant closing law.

4.25    Credit Balance Reports.  Sellers have delivered to Buyer accurate and complete copies of their Medicare and Medicaid quarterly credit balance reports for the past four quarters.

4.26    Charitable Funds.  As of the Effective Time, Sellers hold no charitable funds donated to it for the purposes of supporting the Business.

4.27    Inventory.  The Inventory consists of a quality and quantity usable and saleable in the ordinary course of business, except for obsolete items of below standard quality, all of which have been written off or written down in net realizable value.

4.28    Hill Burton Loans.  Sellers have no outstanding financial obligations to repay any loans, grants, or loan guarantees pursuant to the Hill-Burton Act (42 U.S.C. §§ 291a *et. seq.*)

4.29    Brokers or Finders.  Other than Juniper Advisory, LLC, neither Sellers nor any of their Representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transactions.

NEITHER THE SELLERS, ANY AFFILIATES THEREOF, NOR ANY ADVISERS (FINANCIAL, LEGAL OR OTHERWISE), HAVE MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER RELATING TO THE SELLERS OR THE BUSINESS OR OTHERWISE IN CONNECTION WITH THE CONTEMPLATED TRANSACTIONS, OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN OR THE OTHER TRANSACTION DOCUMENTS, WHICH ARE MADE SOLELY BY THE SELLERS.  WITHOUT LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF BUYER

As of the date hereof and as of the Closing Date (except to the extent any of the following speaks as of a specific date, such as the date hereof), Buyer, jointly and severally, represents and warrants to Sellers the following:

5.1    Limited Liability Company Capacity.  Buyer is a limited liability company duly formed and validly existing in good standing under the Laws of the State of Florida.  Buyer is duly authorized, qualified to do business and in good standing under all applicable Laws of any Governmental Entity having jurisdiction over the business of Buyer and has the lawful power to own, lease and operate its properties and conduct its business in the place and manner now conducted.  The execution and delivery by Buyer of this Agreement and the documents described herein, the performance by Buyer of its obligations under this Agreement and the documents described herein and the consummation by Buyer of the Transactions and the documents described herein have been duly and validly authorized and approved by all necessary action, including, to the extent required, any applicable board and member approvals, on the part of Buyer and none of such actions have been modified or rescinded and all of such actions remain in full force and effect.

5.2     Powers; Consents; Absence of Conflicts With Other Agreements.   The execution, delivery and performance of this Agreement and the documents described herein by Buyer and the consummation by Buyer of the Transactions and documents described herein, as applicable:

(a)     are not in contravention or violation of any of the material terms of its Articles of Organization, operating agreement or other organizational documents of Buyer required for performance of Buyer hereunder;

(b)     do not require any Approval or Permit of or filing or registration with or other action by, any Governmental Entity to be made or sought by Buyer, except (i) the Healthcare Regulatory Consents set forth in Schedule 5.2(b) and (ii) as otherwise set forth on Schedule 5.2(b); and

(c)     assuming the Approvals and Permits set forth on Schedule 5.2(b) are obtained, will not conflict in any material respect with or result in any violation of or default under (i) any contract by which Buyer is bound or (ii) any Law applicable to or (iii) any Order by which Buyer or its business is bound.

5.3     Binding Effect.   Subject to the receipt of the Approvals set forth in Section 5.2 and on Schedule 5.2(b), this Agreement and all other Ancillary Agreements to which Buyer will become a party hereunder have been duly and validly executed and delivered by Buyer, and, assuming the due authorization, execution and delivery of this Agreement and each respective Ancillary Agreement by Sellers, are and will constitute the valid and legally binding obligations of Buyer and are and will be enforceable against Buyer in accordance with the respective terms hereof and thereof, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights and remedies generally and except as enforceability may be subject to general principles of equity.

5.4     Litigation.   There is no Legal Proceeding pending or, to the knowledge of Buyer, threatened against or affecting Buyer, that has or would reasonably be expected to have a material adverse effect on Buyer's ability to timely consummate the Transactions. Notwithstanding the foregoing, each of Sellers acknowledge and agree that, for all purposes of this Agreement, Buyer makes no representation or warranty regarding Buyer's ability to consummate the Transactions consistent with the Antitrust Laws.

5.5     Brokers or Finders.   Neither Buyer nor any of its Representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Transactions.

5.6     Acknowledgement Regarding Representations and Warranties.   NEITHER THE BUYER, ANY AFFILIATES THEREOF, NOR ANY ADVISERS (FINANCIAL, LEGAL OR OTHERWISE), HAVE MADE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER RELATING TO THE BUYER OR OTHERWISE IN CONNECTION WITH THE CONTEMPLATED TRANSACTIONS, OTHER THAN THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN OR THE OTHER TRANSACTION DOCUMENTS, WHICH ARE MADE SOLELY BY THE BUYER.

5.7     Availability of Funds.   Buyer will on the Closing Date have immediately available funds in cash that are sufficient to pay the amounts then payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement. Buyer is not now insolvent and will not be rendered insolvent by any of the Transactions. Buyer has assets, and immediately after giving effect to the Transactions, will have assets, (both tangible and intangible) with a fair saleable value in excess of the amount required to pay their Liabilities as they come due. Buyer has adequate capital for the conduct of

its business and discharge of its debts currently due and payable. Buyer is not involved in any proceeding by or against it as a debtor before any Governmental Entity under Title 11 of the United States Bankruptcy Code or any other insolvency or debtors' relief act, whether state, federal or foreign, or for the appointment of a trustee, receiver, liquidator, assignee, sequestrator or other similar official for any part of any Buyer's property.

## ARTICLE 6
## PRE-CLOSING COVENANTS

6.1     Access to Information.

(a)     Between the date of this Agreement and the Closing Date, to the extent permitted by Law and with prior written notice from Buyer and coordination with Sellers, Sellers shall afford to Buyer and its Representatives (i) access, during normal business hours, to and the right to inspect, the plants, properties (including the Real Property), books and records, litigation materials and other documents and information relating to the Facilities, Purchased Assets and Assumed Liabilities, and (ii) access, during normal business hours, to Sellers' employees and medical staff members, and shall furnish Buyer and its Representatives with such additional financial and operating data and other information of Sellers in Sellers' possession, custody or control relating to the Facilities, Purchased Assets and Assumed Liabilities as Buyer or its Representatives may from time to time reasonably request.

(b)     Between the date of this Agreement and the Closing Date, to the extent permitted by Law and with prior written notice from Buyer and coordination with Sellers, Sellers shall afford to Buyer and its Representatives access to the Owned Real Property and, subject to consent of the landlord if applicable, the Leased Real Property to conduct any environmental, health or safety inspections or investigations, which may include sampling or testing of soils, surface water, groundwater, ambient air or improvements at, on or under the Real Property or sampling of the Facilities. Buyer agrees that, after performing any inspections or investigations, Buyer shall restore the Real Property to its original condition (or as close as reasonably possible to such condition) and repair any damage to same caused by the performance of such inspections or investigations. Notwithstanding the foregoing, all access and inspection activities contemplated by this Agreement shall be subject to the prior reasonable approval of Sellers (which approval may only be granted by Carolyn Izzo or her designee).

(c)     Buyer agrees that Buyer's right of access and investigation under this Section 6.1 will be exercised in such a manner as to not interfere with the operation of Sellers' Business and patient care. Furthermore, all disclosures of information shall be consistent with the confidentiality, wall agreements or any other non-disclosure agreements entered into (or to be entered into) among Sellers, its representatives and Sellers (including Affiliates of Sellers).

6.2     Operations.     From the date hereof until the Closing Date, except as set forth in Schedule 6.2 or otherwise agreed to in writing by the Parties, each Seller shall, with respect to the Business (unless prior written consent of Buyer is received) and with Buyer's assistance as further described in Article 14:

(a)     carry on the Business in substantially the same manner as it has heretofore and not make any material change in personnel, operations, finance or accounting policies (unless required under GAAP) of the Facilities or the Purchased Assets;

     (b)    maintain the Facilities and the Purchased Assets and all parts thereof in working order and in condition as at present, ordinary wear and tear excepted, and make all normal, planned and budgeted capital expenditures related to the Purchased Assets and/or the Facilities;

     (c)    perform its obligations under Assumed Contracts;

     (d)    keep in full force and effect present insurance policies on the Facilities and the Purchased Assets (unless a policy is canceled or terminated in the Ordinary Course of Business and concurrently replaced with a policy or arrangement with substantially similar coverage, with no gap in coverage);

     (e)    (i) maintain and preserve the business organization with respect to the Facilities and Purchased Assets intact in all material respects; (ii) use commercially reasonable efforts to retain present Employees at the Facilities and maintain its relationships with physicians and medical staff, suppliers, customers and others having business relations with the Facilities and Purchased Assets; and (iii) refrain from inducing any Employees (other than Employees who do not receive offers of employment from Buyer prior to Closing) to leave employment at the Facilities in order to be employed elsewhere by any Seller or its Affiliates;

     (f)    permit and allow reasonable access by Buyer (which shall include the right to send written materials, all of which shall be subject to Sellers' reasonable approval prior to delivery) to make offers of post-Closing employment to any of Sellers' personnel (including access by Buyer for the purpose of conducting open enrollment sessions for Buyer's employee benefit plans and programs) and to establish relationships with physicians, medical staff and others having business relations with Sellers;

     (g)    with respect to deficiencies, if any, cited by any Governmental Entity or accreditation body in the most recent surveys conducted by each, use commercially reasonable efforts to cure or develop and timely implement a plan of correction that is acceptable to any Governmental Entity or such accreditation body;

     (h)    timely file or cause to be filed all Tax Returns relating to the Facilities and the Purchased Assets required to be filed with any Governmental Entity, pay all required Taxes relating to the Facilities and the Purchased Assets as they come due and take any actions required to maintain ECH's exemption under Sections 501(a) and 501(c)(3) of the Code;

     (i)    comply in all material respects with all Laws (including Environmental Laws) applicable to the conduct of the Business;

     (j)    maintain all material Approvals, Permits and Environmental Permits relating to the Facilities, Purchased Assets and Assumed Liabilities in good standing;

     (k)    notify Buyer within five (5) Business Days of any material or adverse change to the condition of the Facilities or Purchased Assets, or to the business or operations thereof, including any Material Adverse Development or any circumstance or events that are reasonably likely to lead to a Material Adverse Development;

     (l)    use commercially reasonable efforts to terminate any Lease that is not an Assumed Lease listed on <u>Schedule 2.1(f)(1)</u> and provide evidence of such termination to be effective on or prior to the Closing to Buyer;

(m)     use commercially reasonable efforts to obtain the Tenant Estoppels and Landlord Estoppels in accordance with the terms of Section 3.3(c) and Section 3.3(d);

(n)     afford Buyer and its Affiliates an opportunity to provide input with respect to other significant or material matters pertaining to the Business through the Interim Management Agreement further described in Article 14; and

(o)     collect Accounts Receivable and pay trade accounts payable due to third parties in substantially the same manner as it has heretofore;

6.3     Negative Covenants.  From the date hereof to the Closing Date, except as set forth in Schedule 6.3, or as required by Law or provided for under the Interim Management Agreement further described in Article 14, no Seller will, with respect to the Business (without the prior written consent of Buyer):

(a)     enter into any Contract, or incur or agree to incur any Liability, outside the Ordinary Course of Business with a value in excess of $100,000;

(b)     notify any payor to send payments to, or cause any Accounts Receivable to be deposited in, any account other than Assumed Seller Bank Accounts, or sell or factor any Accounts Receivable;

(c)     postpone or delay the payment of any accounts payable or other expense in excess of $10,000 that is not in dispute in a manner that is not consistent with past practice;

(d)     accelerate the collection of (or discount of) any Accounts Receivable in excess of $10,000 in a manner that is not consistent with past practice;

(e)     materially increase compensation payable or to become payable or make a significant bonus payment to or otherwise enter into one or more significant bonus or severance Contracts with any Employee or agent or under any personal services Contract, except in the Ordinary Course of Business in accordance with existing personnel policies;

(f)     sell, assign or otherwise transfer or dispose of any, or waive or settle any claims regarding, the Facilities or Purchased Assets outside the Ordinary Course of Business;

(g)     pay or agree to pay any material settlement or increased benefits under (or create) any Seller Plan or to any Employee;

(h)     (i) amend, modify or terminate any Assumed Contract (except in conformity with this Agreement and in a commercially reasonable manner in the Ordinary Course of Business); (ii) by action or inaction, abandon, terminate, cancel, forfeit, waive or release any material rights of any Seller, in whole or in part, with respect to the Facilities or Purchased Assets or encumber any of them, except for Permitted Exceptions; (iii) effect any corporate merger, business combination, reorganization or similar transaction or take any other action, corporate or otherwise, which could reasonably be expected to affect materially and adversely Sellers' ability to perform in accordance with this Agreement; (iv) cancel or permit the cancellation or lapse of insurance coverage on the Purchased Assets or the Facilities; or (v) settle any dispute or threatened dispute with any Governmental Entity regarding the Facilities or Purchased Assets;

(i)    amend or terminate or otherwise modify any employment Contract or enter into any new employment Contract with any Person, except in the Ordinary Course of Business;

(j)    materially amend, terminate or otherwise materially modify any Seller Plan, except for amendments required to comply with this Agreement or applicable Law;

(k)    incur any indebtedness for borrowed money or guarantee the indebtedness of another Person for an amount in excess of $100,000;

(l)    enter into any contract or commitment other than a capital expenditure (as allowed under Section 6.3(m) below) in excess of $100,000;

(m)    make any capital expenditure commitment in excess of $100,000 or additions to property, plant, equipment, intangible or capital assets or for any other purpose;

(n)    make or change any material Tax election, change any method of accounting or settle any claim or dispute with any Governmental Entity in respect of any Tax related to the Purchased Assets or Facilities;

(o)    take or omit to take any action which could result in ECH losing its tax-exempt status under Sections 501(a) and 501(c)(3) of the Code; or

(p)    amend or agree to amend the articles or certificate of incorporation, bylaws or other governing documents of any Seller or otherwise take any action relating to any liquidation or dissolution of any Seller, except as expressly contemplated by this Agreement.

6.4    <u>Notification of Certain Matters</u>.    At any time from the date of this Agreement to the Closing Date:

(a)    Sellers shall give written notice to Buyer as promptly as reasonably feasible of (i) the occurrence, or failure to occur, of any event that has caused any representation or warranty of Sellers contained in this Agreement to be untrue in any material respect, and (ii) any failure of any Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

(b)    Sellers shall promptly notify Buyer of any material written notice or other communication from any Governmental Entity in connection with the Transactions; and (ii) any Legal Proceedings commenced or, to Seller's Knowledge, threatened against, or relating to the consummation of the Transactions.

(c)    Buyer shall give written notice to Sellers as promptly as reasonably feasible of (i) the occurrence, or failure to occur, of any event that has caused any representation or warranty of Buyer contained in this Agreement to be untrue in any material respect, and (ii) any failure of Buyer to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

(d)    Buyer shall promptly notify Sellers of: (i) any material written notice or other communication from any Governmental Entity in connection with the Transactions; and (ii) any Legal Proceedings commenced or, to Buyer's Knowledge, threatened against, or relating to the consummation of the Transactions.

(e)     All such notices shall provide a reasonably detailed description of the relevant circumstances.

6.5   Approvals.

(a)     Responsibility for Approvals Generally.   Buyer shall be responsible for obtaining, and shall use commercially reasonable efforts to obtain, as promptly as practicable, all Approvals, Permits and Environmental Permits of any Governmental Entities required of Buyer to consummate the Transactions and to operate the Facilities and Purchased Assets following Closing in substantially the same manner as currently operated by Sellers.   Sellers shall be responsible for obtaining, and shall use commercially reasonable efforts to obtain, as promptly as practicable, all Approvals of Governmental Entities and third parties required of Sellers to consummate the Transactions.   Buyer, on the one hand, and Sellers, on the other hand, shall (i) cooperate with one another in their respective efforts to obtain all Approvals, Permits and Environmental Permits of any Governmental Entities required to consummate the Transactions and to permit Buyer to operate the Facilities and Purchased Assets following Closing in substantially the same manner as currently operated by Sellers, and (ii) provide such other information and communications to any Governmental Entity as may be reasonably requested.

(b)     Fundamental Change Transactions Affecting Health Care Nonprofits.   The Parties shall (i) cooperate in initiating informal discussions with the AG concerning the form and substance of the notice for approval of the Transaction as required under the AG Protocol for Fundamental Change Transactions Affecting Health Care Nonprofits; (ii) cooperate in the preparation and submission thereof to the AG and any filings with the Orphans' Court ("AG and Orphans' Court Approval Process").   Following the submission of the notice and filings, the Parties shall work together to timely submit any information and documents requested in connection therewith by the AG, the Orphans' Court and any other Governmental Entity associated with the AG and Orphans' Court Approval Process.   Each Party shall pay for their own costs associated with the submission of such notice.

(c)     Medicare/Medicaid Change of Ownership.   The Parties shall cooperate and take all commercially reasonable actions to cause the Assumed Provider Agreements to be transferred, to the extent assignable, to Buyer as of the Closing, including by submitting to each of CMS and the Pennsylvania Medicaid program on a timely basis the applicable enrollment form with respect to the Medicare and Medicaid changes of ownership.

(d)     Third Party Consents.   Sellers shall promptly apply for and use its best efforts to obtain before Closing all consents (and make all notifications) required to assign the Assumed Contracts to Buyer at Closing.

6.6   Additional Financial Information.   From the date hereof until the Closing Date, Sellers will deliver to Buyer unless such information is prepared by Buyer or one of its Affiliates pursuant to Article 14:

(a)     within thirty (30) days after the end of each calendar month, copies of the unaudited balance sheets and the related unaudited statements of income and cash flows of Sellers for each month then ended and for the fiscal year-to-date then ended, in each case to be prepared in accordance with GAAP, except that footnotes may be omitted;

(b)     within sixty (60) days after the end of each fiscal quarter, copies of the unaudited balance sheet and the related unaudited statements of income and cash flows of Sellers for the

fiscal quarter then ended and for the fiscal year-to-date then ended, in each case to be prepared in accordance with GAAP, except that footnotes may be omitted; and

        (c)     within one hundred twenty (120) days after the end of each fiscal year, copies of the audited balance sheet and the related audited statements of income and cash flows of Sellers for the fiscal year then ended, in each case to be prepared in accordance with GAAP.

    6.7    <u>Tail Insurance</u>. If necessary to avoid a gap in coverage, Sellers shall, at their sole cost and expense, obtain "tail" insurance to insure against professional and general liabilities of the Facilities (including malpractice and workers compensation insurance) relating to the period prior to the Effective Time. The insurance shall be for a tail period equal to the applicable statute of limitations plus one (1) year, have coverage levels equal to the current policies insuring Sellers, and name Buyer as an additional named insured.

    6.8    <u>No-Shop</u>. Sellers agree that they shall not, and shall direct and use commercially reasonable efforts to cause their respective Representatives (including any investment banker, attorney or accountant retained by them) not to: (a) offer for sale, lease or other disposition any of the Facilities, all or any significant portion of the Purchased Assets or any ownership interest in any entity owning any of the Facilities or any of the Purchased Assets; (b) solicit offers to buy any of the Facilities, all or any significant portion of the Purchased Assets or any ownership interest in any entity owning any of the Facilities or the Purchased Assets; (c) initiate, encourage or provide any documents or information to any third party in connection with, discuss or negotiate with any Person regarding any inquires, proposals or offers relating to any disposition of any of the Facilities or all or any significant portion of the Purchased Assets or a merger or consolidation of any entity owning any of the Facilities or any of the Purchased Assets; or (d) enter into any agreement or discussions with any party (other than Buyer) with respect to the sale, lease, assignment or other disposition of any of the Facilities or all or any significant portion of the Purchased Assets or any ownership interest in any entity owning any of the Facilities or any of the Purchased Assets or with respect to a merger or consolidation of any entity owning any of the Facilities or any of the Purchased Assets. Sellers will promptly communicate to Buyer the substance of any inquiry or proposal concerning any such transaction.

    6.9    <u>Contract Compliance</u>. Sellers shall, upon notice from Buyer that any Contract to which any Seller is a party is not in compliance with Law, take commercially reasonable efforts to promptly modify such Contract so that it is in compliance with Law prior to the Closing.

    6.10    <u>Disclosure Schedules</u>. From time to time prior to the Closing, the Parties shall provide, supplement or amend with reasonable frequency the information contained in the disclosure schedules. If such information reflects, individually or in the aggregate, matters that are or may constitute a Material Adverse Development, Buyer shall have the option to terminate this Agreement. In the event Buyer elects not to terminate this Agreement as a result of a disclosure and elects to consummate the transactions contemplated hereby, the updated disclosure schedules shall replace, in whole or in part as the case may be, the disclosure schedules previously delivered hereunder for all purposes.

## ARTICLE 7
## EMPLOYEES AND EMPLOYEE BENEFITS

    7.1





7.2



7.3

## ARTICLE 8
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

8.1    Compliance With Covenants.    All of the covenants and obligations that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

8.2    Representations and Warranties.    All of Sellers' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered

individually), shall have been accurate as of the date of this Agreement and as of the time of the Closing as if then made, except if the subject matter of such inaccuracy is, or would reasonably be expected to result in, a Material Adverse Development. Each of the representations and warranties in this Agreement that contains an express materiality qualification, shall have been accurate in all respects as of the date of this Agreement, and shall be accurate in all respects as of the time of the Closing as if then made.

   8.3   Approvals and Permits.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that Sellers have:

      (a)   received a letter from the AG and a court order from the Orphans' Court indicating that they have no objection to the Transaction as contemplated under the AG and Orphans' Court Approval Process;

      (b)   received all Approvals that are required to: (i) consummate the Transactions and (ii) operate the Facilities and the Purchased Assets in the same manner as currently operated by Sellers, in each case without any conditions that are unacceptable to Buyer in its sole discretion; and

      (c)   received all required Permits and Environmental Permits from all Governmental Entities whose approval is required to consummate the Transactions and for Buyer to operate the Facilities and Purchased Assets in the same manner as currently operated by Sellers, or with respect to any such Permits and/or Environmental Permits that are not possible to obtain prior to Closing, Buyer and Sellers shall have received assurances, reasonably satisfactory to Buyer, that such Permits and/or Environmental Permits shall be obtained promptly after Closing and retroactive to the Closing Date, in each case without any conditions that are unacceptable to Buyer in its sole discretion.

   8.4   Environmental Due Diligence.  Buyer shall be reasonably satisfied with the findings and conclusions of the Phase I Report and any required Phase II Report.

   8.5   Action/Proceeding/Litigation.  No Governmental Entity shall have issued an Order restraining or prohibiting the Transactions; no Governmental Entity shall have commenced or threatened in writing to commence any Action or suit before any court of competent jurisdiction or other Governmental Entity that seeks to restrain or prohibit the consummation of the Transactions or impose material damages or penalties in connection therewith. No Legal Proceeding relating to the Transactions shall be pending, unless the Parties agree that such Legal Proceeding does not constitute a material obstacle to the consummation of the Transactions in accordance with the terms hereof.

   8.6   Consents of Certain Third-Parties to Assumed Contracts.  Buyer shall have obtained written consents from all applicable third-parties to the assignment of those Assumed Contracts identified on Schedule 3.3(m).

   8.7   Title Insurance Policies.  Title Company shall be prepared (subject to payment of the premiums and title, survey, search and related costs and fees required to be paid by Buyer) to issue title insurance policies in accordance with this Agreement dated the day of Closing, in the full amount of the Valuation (or such other reasonable amount as determined by Buyer), at regular rates, showing fee simple title to the Owned Real Property, and leasehold title to any ground leases that are included among the Leased Real Property, in the name of Buyer (or its assignee or designee hereunder) subject only to the Permitted Exceptions.

   8.8   Indebtedness.  Except for those Assumed Liabilities, all Indebtedness and all Encumbrances created by or in connection with such Indebtedness, shall have been satisfied, discharged and terminated in full prior to Closing.

8.9    Material Adverse Development.    There shall have been no Material Adverse Development.

8.10    Fair Market Value Report.    The unadjusted Purchase Price shall be equal to or greater than the lower limit of the Valuation.

8.11    Exhibits and Schedules.    It is not a condition precedent for this Agreement to be binding upon the Parties that all Exhibits and disclosure schedules required under this Agreement be attached on the Execution Date.  The Parties agree that from time to time prior to the Closing, the Parties may provide, supplement or amend the information contained in the disclosure schedules.  Notwithstanding the foregoing, all Exhibits and disclosure schedules required under this Agreement shall be complete and otherwise in final form acceptable to the Parties and shall be attached to this Agreement at Closing.

8.12    Closing Deliveries.    Sellers shall have delivered (or be ready, willing and able to deliver at Closing) to Buyer all agreements and documents required to be delivered to Buyer at the Closing under Section 3.3.

## ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Sellers:

9.1    Compliance With Covenants.    All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been performed and complied with in all material respects.

9.2    Representations and Warranties.    All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate as of the date of this Agreement and as of the time of the Closing as if then made, except if the subject matter of such inaccuracy is, or would reasonably be expected to result in, a Material Adverse Development. Each of the representations and warranties in this Agreement that contains an express materiality qualification, shall have been accurate in all respects as of the date of this Agreement, and shall be accurate in all respects as of the time of the Closing as if then made.

9.3    Approvals and Permits.    Sellers shall have obtained documentation or other evidence that the Parties have:

(a)    received a letter from the AG and a court order from the Orphans' Court indicating that they have no objection to the Transaction pursuant to the AG and Orphans' Court Approval Process;

(b)    received all Approvals that are required to: (i) consummate the Transactions and (ii) operate the Facilities and the Purchased Assets in the same manner as currently operated by Sellers, in each case without any conditions that are unacceptable to Buyer in its sole discretion; and

(c)    received all required Permits and Environmental Permits from all Governmental Entities whose approval is required to consummate the Transactions and for Buyer to operate the Facilities and Purchased Assets in the same manner as currently operated by Sellers, or with respect to any such Permits and/or Environmental Permits that are not possible to obtain prior to Closing, Buyer

and Sellers shall have received assurances, reasonably satisfactory to Buyer, that such Permits and/or Environmental Permits shall be obtained promptly after Closing and retroactive to the Closing Date, in each case without any conditions that are unacceptable to Buyer in its sole discretion.

9.4     Action/Proceeding/Litigation.   No Governmental Entity shall have issued an Order restraining or prohibiting the Transactions; no Governmental Entity shall have commenced or threatened in writing to commence any action or suit before any court of competent jurisdiction or other Governmental Entity that seeks to restrain or prohibit the consummation of the Transactions or impose material damages or penalties in connection therewith. No Legal Proceeding relating to the Transactions shall be pending, unless the Parties agree that such Legal Proceeding does not constitute a material obstacle to the consummation of the Transactions in accordance with the terms hereof.

9.5     Exhibits and Schedules.   It is not a condition precedent for this Agreement to be binding upon the Parties that all Exhibits and disclosure schedules required under this Agreement be attached on the Execution Date.  The Parties agree that from time to time prior to the Closing, the Parties may provide, supplement or amend the information contained in the disclosure schedules.  Notwithstanding the foregoing, all Exhibits and disclosure schedules required under this Agreement shall be complete and otherwise in final form acceptable to the Parties and shall be attached to this Agreement at Closing.

9.6     Closing Deliveries.   Buyer shall have delivered (or be ready, willing and able to deliver at Closing) to Sellers all agreements and documents required to be delivered to Sellers at the Closing under Section 3.4.

9.7     Environmental Due Diligence.   Buyer shall have delivered to Sellers a copy of the final report issued by an environmental consultant in connection with a Phase I environmental survey of the Real Property (the "Phase I Report").

## ARTICLE 10
## TERMINATION

10.1     Termination.   Notwithstanding anything in this Agreement to the contrary, this Agreement may not be terminated, except prior to the Closing as follows:

(a)     by mutual consent in writing of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by either Buyer, on the one hand, or Sellers, on the other hand, if any permanent injunction, order, decree or ruling of any court or other Governmental Entity of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the Transactions shall have been issued and become final and non-appealable;

(c)     by either Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 10.1(c) shall not be available to any Party whose breach or failure to perform any material covenant or obligation under this Agreement has been the primary cause or primarily resulted in the failure of the Closing to have occurred on or before the Outside Date;

(d)     by Buyer pursuant to Section 11.1(d);

(e)     by Buyer, if there has been a violation or breach in any material respect of any representation, warranty, covenant or agreement of Sellers set forth in this Agreement, which violation

or breach would cause any of the conditions set forth in Article 8 not to be satisfied, and such violation or breach has not been waived by Buyer or cured by Sellers, as the case may be, within twenty (20) Business Days after notice thereof is given by Buyer (it being understood that, for purposes of determining the accuracy of such representations and warranties as of the date of this Agreement or as of any subsequent date, any supplement or amendment to the disclosure schedules made or purported to have been made after the date of this Agreement shall be disregarded);

(f)    by Buyer, immediately by written notice to Sellers if the unadjusted Purchase Price is less than the lower limit of the Valuation;

(g)    by Buyer, immediately by written notice to Sellers if any event occurs or fact or condition exists which makes it impossible for Sellers to satisfy, or causes Sellers to be unable to satisfy, one or more conditions to the obligations of Buyer to consummate the Transactions as set forth in Article 8 prior to the Outside Date; provided, however, that such date may be extended by Sellers for up to six (6) months if Sellers are taking diligent steps to resolve any such outstanding conditions; provided, further, that, notwithstanding the foregoing, the right to terminate this Agreement under this Section 10.1(g) shall not be available to Buyer if Buyer's actions or failure to act under this Agreement shall have been a primary cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date and such action or failure to act constitutes a breach of this Agreement;

(h)    by Sellers, immediately by written notice to Buyer if any event occurs or fact or condition exists which makes it impossible for Buyer to satisfy, or causes Buyer to be unable to satisfy, one or more conditions to the obligation of Sellers to consummate the Transactions as set forth in Article 9 prior to the Outside Date; provided, however, that such date may be extended by Buyer for up to six (6) months if Buyer is taking diligent steps to resolve any such outstanding conditions; provided, further, that, notwithstanding the foregoing, the right to terminate this Agreement under this Section 10.1(h) shall not be available to Sellers if Sellers' actions or failure to act under this Agreement shall have been a primary cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date and such action or failure to act constitutes a breach of this Agreement; and

(i)    by Sellers, immediately by written notice to Buyer, upon the termination of the Interim Management Agreement pursuant to Section 10.2(e) of the Interim Management Agreement including the cure provision therein.

10.2    Effect of Termination.  If this Agreement is terminated pursuant to Section 10.1, then all further obligations of the Parties under this Agreement shall terminate without further liability of any Party to another; provided, however, that (i) the obligations of the Parties contained in Section 12.13 (Public Statements) and Article 15 shall survive any such termination, and (ii) a termination under Section 10.1 shall not relieve any Party of any liability for a breach of, or for any misrepresentation under this Agreement, or be deemed to constitute a waiver of any available remedy (including specific performance, if available) for any such breach or misrepresentation.

## ARTICLE 11
### PERMITTED EXCEPTIONS, TITLE INSURANCE & TAXES

11.1    Title to Property.

(a)    Within five (5) Business Days after the execution and delivery of this Agreement, Buyer shall order, from the Title Company a title insurance report and commitment for a title insurance policy with respect to the interests in the Owned Real Property to be conveyed by Sellers to Buyer hereunder, which policy shall be in the form currently used by reputable title insurers in the

Commonwealth of Pennsylvania (such report and such commitment issued by the Title Company in connection with this Agreement being referred to herein as the "Commitment"), and Buyer shall promptly furnish to Sellers a copy thereof, together with copies of all Exceptions listed thereon. If the Commitment discloses any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Owned Real Property (collectively, "Exceptions") that is not a Permitted Exception and to which Buyer objects (the "Non-Permitted Exceptions"), then Buyer shall, within ten (10) business days after Buyer's receipt of the Commitment and the Survey, give a notice (a "Title Notice") to Sellers first containing such Non-Permitted Exceptions, as applicable, which notice shall identify such Non-Permitted Exceptions, provided, however, notwithstanding anything herein to the contrary, (i) any and all monetary liens, including all mortgages and security interests securing any obligations of Sellers (or any predecessor-in-interest to Sellers), all mechanics' liens recorded against the Owned Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Owned Real Property and all Real Estate Taxes (other than Real Estate Taxes that constitute Permitted Exceptions), and (ii) any and all tenancies (except those set forth on Schedule 4.14(c)(i)), shall be deemed to be and shall constitute Non-Permitted Exceptions for all purposes and while Buyer shall not be obligated to deliver a Title Notice with respect thereto in order for same to constitute Non-Permitted Exceptions, the Title Notice shall include all objectionable Non-Permitted Exceptions. Any Exceptions disclosed in the Commitment or any Survey that are (A) not included in a Title Notice timely given in accordance with the preceding sentence and (B) not deemed Non-Permitted Exceptions in accordance with the preceding sentence shall be deemed Permitted Exceptions.

(b)     Within ten (10) Business Days after the execution and delivery of the Agreement, Buyer shall obtain, at Buyer's expense, a survey certified to Buyer (and such other persons or entities as Buyer may designate) as having been made in compliance with 2016 ALTA/ACSM Land Title Surveys Standards, or currently promulgated version thereof, including at a minimum, Table A Items 1, 3, 4, 6(b), 7(a), 8, 9, 10(a) and 16 (the "Survey") for the Owned Real Property. Buyer shall have ten (10) business days after receipt of the Survey to provide written notice to Seller of any Survey objections, including but not limited to matters not reflected in the Permitted Exceptions ("Survey Defects"). As a condition precedent to Buyer's obligation to close this transaction, the Survey shall be free of all Survey Defects that could reasonably be expected to have a material adverse effect on the Buyer's ability to use the Owned Real Property for its current use (the "Material Survey Defects"). All Material Survey Defects which are not cured shall be Non-Permitted Exceptions. Seller, at Seller's sole expense, shall have until ten (10) business days after receipt of Buyer's notice of Survey Defects to remove, cure or correct such Survey Defects and give notice and evidence thereof to Buyer. If Seller is able to cure such matters within such time period, then Buyer shall proceed in accordance with the provisions of this Agreement. If Seller fails to have the Material Survey Defects cured within such time period, Buyer may elect by written notice to Seller given prior to Closing to terminate this Agreement, and this Agreement shall become null and void without further action of either party and neither party shall have any further rights or duties hereunder.

(c)     Sellers shall, at or prior to Closing, (i) remove or cause the Title Company to insure over, only if approved by Buyer, the following Exceptions ("Mandatory Removal Exceptions"): (A) any and all monetary liens, including all mortgages and security interests securing any obligations of Sellers (or any predecessor-in-interest to Sellers), all judgments against Sellers (or any predecessor-in-interest to Sellers), all mechanics' liens recorded against the Owned Real Property and all Real Estate Taxes (other than Real Estate Taxes that constitute Permitted Exceptions), (B) any and all tenancies (except those set forth on Schedule 4.14(c)(i)), and (C) without limitation of the Mandatory Removal Exceptions described in preceding clauses (A) and (B), any and all of the Non-Permitted Exceptions that Sellers willfully placed of record or consented to be placed of record after the effective date of Sellers' Title Report, and (ii) remove or cause the Title Company to insure over, only if approved by the Buyer,

any and all other Non-Permitted Exceptions. Sellers shall have the right to adjourn the Closing Date from time to time, up to sixty (60) days in the aggregate, for the purpose of removing/eliminating or causing the Title Company to insure over, only if approved by the Buyer, Non-Permitted Exceptions.

(d)     Sellers shall, at or prior to the Closing, remove any Non-Permitted Exceptions that are not Mandatory Removal Exceptions and which, in the aggregate, may be removed by Sellers expending ████ or less. If there exist Non-Permitted Exceptions that are not Mandatory Removal Exceptions and which in the aggregate exceed ████ in amount or value, and Sellers elect not to remove Non-Permitted Exceptions that are not Mandatory Removal Exceptions such that the remaining Non-Permitted Exceptions that are not Mandatory Removal Exceptions exceed ████ in the aggregate, then Sellers shall notify Buyer of such election within twenty (20) Business Days of Sellers' receipt of the Title Notice disclosing such Non-Permitted Exceptions. Failure of Sellers to send notice of such election within such twenty (20) Business Day period shall be deemed an election by Sellers not to remove the Non-Permitted Exceptions that are not Mandatory Removal Exceptions. Buyer may elect, within ten (10) Business Days after the later of (i) receipt of such notice from Sellers to Buyer that Sellers have elected not to remove any Non-Permitted Exceptions which are not Mandatory Removal Exceptions (ii) or the twenty (20) Business Day period if no notice is sent, to either (i) not consummate the Transactions, in which event this Agreement shall be terminated and of no further force and effect, and none of the Parties shall have any rights or obligations to the other hereunder (except for those rights and obligations that are expressly stated herein to the survive the termination of this Agreement), or (ii) consummate the Transactions subject to such Non-Permitted Exceptions which are not Mandatory Removal Exceptions and proceed to Closing with an abatement of the Capital Commitment in the amount of the cost to cure the Non-Permitted Exceptions that are not Mandatory Removal Exceptions, but in no event more than ████. Failure of Buyer to send notice of the election available to it pursuant to the preceding sentence within such ten (10) Business Day period shall be deemed an election by Buyer to close under clause (ii) of the preceding sentence.

(e)     Notwithstanding anything herein to the contrary, (i) if the Commitment discloses judgments, bankruptcies or other returns against other persons or entities having names the same as or similar to that of Sellers, then Sellers, on request and to the extent applicable, shall deliver to the Title Company affidavits (in a form reasonably requested by the Title Company) to the effect that such judgments, bankruptcies or other returns are not against Sellers and (ii) if reasonably required by the Title Company, Sellers agree to execute, acknowledge and deliver such other standard and customary owner's title affidavits at Closing.

11.2     Permitted Exceptions. "Permitted Exceptions" means: (a) building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations; (b) such other matters with respect to which Buyer expressly has agreed to take pursuant to the provisions of this Agreement; (c) real property taxes, water rates and charges, sewer taxes and rents, business improvement district charges and similar items with respect to the Real Property (collectively, "Real Estate Taxes"), not yet due and payable; (d) rights of Tenants under Leases; (e) any Exceptions disclosed in the Commitments or any Survey that are not Non-Permitted Exceptions and deemed Permitted Exceptions pursuant to Section 11.1(a); and (f) rights of licensors under licenses of assets licensed to Sellers set forth in any of the Assumed Contracts and under licenses of Off-the-Shelf Software.

11.3     Transfer Taxes.

(a)     Transfer Taxes incurred in connection with this Agreement shall be the responsibility of Buyer, provided, however, that the Parties shall use commercially reasonable efforts to effect the transfer of the Facilities and the Purchased Assets in a manner that minimizes the total amount of Transfer Taxes incurred in connection with this Agreement, taking into account the effect of any

exemption from such Transfer Taxes available to Sellers by virtue of ECH's status as a tax-exempt organization. The Party that has the primary obligation under applicable Law to file any Tax Return that is required to be filed in respect of any Transfer Taxes shall prepare and file such return after providing the other Party the opportunity to review and approve the return, which approval shall not be unreasonably withheld, conditioned or delayed. The Parties agree to cooperate with each other in connection with the preparation and filing of any such Transfer Tax Returns, in obtaining all available exemptions from such Transfer Taxes, and in timely providing each other with resale certificates or other documents necessary to satisfy any such exemptions.

(b)     Buyer and Sellers shall deliver to the Title Company the RE Tax Returns. If the procedures required by the state, county, or municipality require that any RE Tax Returns be filed, reviewed or approved prior to the Closing Date, Buyer and Sellers shall complete, sign and swear to the RE Tax Returns and deliver same to the Title Company for delivery to the appropriate authority sufficiently in advance of the Closing Date so as to permit the sale contemplated hereby to be consummated by the Closing Date. Buyer and Sellers shall cooperate in preparing the RE Tax Returns in a manner that maximizes the benefit of any exemption from or reduction of Tax available as a result of ECH's status as a tax-exempt organization.

11.4    Cooperation on Tax Matters. The Parties shall furnish or cause to be furnished to each other, as promptly as practicable following the request therefor, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for and defense of any Tax audit, for the preparation of any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters.

### ARTICLE 12
### ADDITIONAL COVENANTS

12.1    Noncompetition; Non-Solicitation. For a period of five (5) years after the Closing Date, Sellers shall not, directly or indirectly, and Sellers shall cause their Affiliates not to, in any capacity: (i) own, lease, manage, operate, control, participate in the management or control of, be employed by, or maintain or continue any interest whatsoever in any enterprise engaged in the business of providing healthcare goods or services, including hospitals and outpatient surgery or diagnostic facilities, within a 25 mile radius of any of the Facilities; (ii) employ, recruit or Solicit the employment of any Transferred Employee unless (x) such employee resigns voluntarily (without any solicitation from Sellers or any of its Affiliates), (y) Buyer consents in writing to such employment or solicitation, or (z) such employee is terminated by Buyer or its Affiliates after the Closing Date; (iii) Solicit, induce, cause or attempt to induce or cause any Person (including any physician employee or medical staff member) to replace or terminate any Contract for the provision or arrangement of health care services from a Facility with products or services of any other Person after the Closing Date; or (iv) Solicit, request, induce or cause any physician employee or medical staff member to terminate any Contract with or change practice patterns at the Facilities. For purposes of this Agreement, "Solicit" means any direct or indirect communication of any kind, regardless of who initiates it, that in any way invites, advises, encourages or requests any person to take or refrain from taking any action; provided, however, that the foregoing shall not apply, and the term "Solicit" in this Agreement shall not include solicitations made to the public or the industry generally through advertising or electronic listings which are not specifically targeted at an individual.

12.2    Confidentiality. All confidential information provided or made available by the Parties in connection with or under this Agreement shall be subject to the Confidentiality Agreement, and the

Confidentiality Agreement shall remain in full force and effect in accordance with its terms and shall survive the Closing.

12.3    Remedies.  In the event of a breach of Section 12.1 or Section 12.2 the Parties recognize that monetary damages shall be inadequate to compensate the non-breaching Party, and the non-breaching Party shall be entitled, without the posting of a bond or similar security, to an injunction restraining such breach, with the costs (including reasonable attorneys' fees) of successfully securing such injunction to be borne by the breaching Party.  Nothing contained herein shall be construed as prohibiting the non-breaching Party from pursuing any other remedy available to it for such breach or threatened breach as further governed by Section 13.2.  The Parties hereby acknowledge the necessity of protection described in Section 12.1 and Section 12.2 and that the nature and scope of such protection has been carefully considered by them.  The consideration and benefits provided for herein are deemed to be sufficient and adequate to compensate Sellers for agreeing to the restrictions contained in Section 12.1.  If any court determines that the forgoing restrictions are not reasonable, then such restrictions shall be modified, rewritten or interpreted to include as much of their nature and scope as will render them enforceable.

12.4    Assumed Contracts.  To the extent that any Assumed Contract is not capable of being assigned without the consent of a third party or if such assignment or attempted assignment would constitute a breach thereof or a violation of any Law (any such Assumed Contract being referred to herein as a "Nonassignable Contract"), nothing in this Agreement shall constitute an assignment or an attempted assignment thereof prior to the time at which all consents necessary for such assignment shall have been obtained.  Sellers shall use their best efforts to obtain the consent to the assignment of any Nonassignable Contracts, and Buyer shall reasonably cooperate with their efforts.  To the extent that any of the consents are not obtained, (a) Buyer shall not be required to close the Transactions if such consents pertain to any of the Assumed Contracts identified on Schedule 3.3(m), and (b) if Buyer nevertheless elects to close the Transactions, then to the extent requested by Buyer, Sellers shall, during the term of the affected Nonassignable Contract, use commercially reasonable efforts to (i) provide to Buyer the benefits under any such Nonassignable Contract, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyer, and (iii) enforce for the account of Buyer, any rights of Sellers under the affected Nonassignable Contract (including the right to elect to terminate such Nonassignable Contract in accordance with the terms thereof upon the direction of Buyer) and for the period that Buyer is receiving the benefit that would otherwise inure to Sellers under the Nonassignable Contract, Buyer will be responsible for the obligations under the Nonassignable Contract relating to such period.  Buyer shall cooperate with Sellers to enable Sellers to provide to Buyer the benefits contemplated by the immediately preceding sentence.

12.5    Medical Staff.  ████████████████████████████████████

12.6    Local Advisory Board.  At Closing, Buyer shall form a local advisory board comprised of (a) up to seven (7) members of the current Board of Directors of ECH, at the discretion of such Board of Directors, (b) medical staff members, (c) community leaders and (d) the Chief Executive Officer of ECH (the "Local Advisory Board").  The Local Advisory Board shall serve as an advisory committee to the Board of Managers of Buyer and make recommendations and suggestions with respect to strategic plans, policies and programs.

12.7    Additional Acts.

(a)    Generally.  From time to time after Closing, the Parties shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as any other Party

reasonably may request, to convey and transfer full right, title and interest to, vest in and place Buyer in legal and actual possession and benefit of, any and all of the Purchased Assets.

(b)    Accounts Receivable. Sellers shall provide Buyer with all information in their possession or under their control that is reasonably necessary to bill and collect Accounts Receivable. After the Closing, Sellers shall: (i) permit, and hereby authorize, Buyer to collect, in the name of Sellers, all Accounts Receivable constituting part of the Purchased Assets and to endorse with the name of the applicable Seller for deposit in Buyer's account any checks or drafts received in payment thereof and not cause any Accounts Receivable to be deposited in any account other than the Assumed Seller Bank Accounts; (ii) pay over, or cause to be paid over, to Buyer, without right of set-off, within three (3) Business Days of receipt (and until so paid, shall hold in trust for Buyer) all amounts received by Sellers and their Affiliates in respect of the Accounts Receivable; (iii) provide Buyer with all information available to permit Buyer to correctly apply such amounts; and (iv) reasonably cooperate with Buyer to cause all future payments and reimbursements to be paid directly to Buyer or its designee.

12.8    Sellers' Cost Reports. Sellers shall timely prepare and submit all Cost Reports relating to Sellers for cost report periods ending on or prior to the Closing Date or which are required as a result of the consummation of the Transactions, including terminating Cost Reports for the Government Reimbursement Programs ("Sellers' Cost Reports"). Such Sellers' Cost Reports shall be prepared in accordance with applicable Law. Upon reasonable advance notice, Buyer shall provide Sellers during normal business hours with the assistance of its personnel and access to such documents and information, as reasonably requested by Sellers to enable Sellers to timely prepare and file Sellers' Cost Reports. Buyer shall not be deemed to be the "preparer" of Sellers' Cost Reports as a result of such assistance. Sellers shall furnish to Buyer copies of Sellers' Cost Reports.

12.9    Post-Closing Access to Information. Buyer and Sellers acknowledge that, after the Closing, Buyer and Sellers may each need access to information, documents or computer data in the control or possession of the other concerning the Purchased Assets, Facilities or Assumed Liabilities for purposes of concluding the Transactions and for audits, investigations, compliance with governmental requirements, regulations and requests, and the prosecution or defense of third party claims. Accordingly, Buyer agrees that, at the sole cost and expense of Sellers, at Sellers' request, it will make available to Sellers and their agents, independent auditors and/or Governmental Entities such documents and information as may be available relating to the Purchased Assets, Facilities and Assumed Liabilities in respect of periods prior to Closing and will permit Sellers to make copies of such documents and information. Sellers agree that, at Buyer's request and sole cost and expense, Sellers will make available to Buyer and its agents, independent auditors and/or Governmental Entities such documents and information as may be in the possession of any Sellers or their Affiliates relating to the Purchased Assets, Facilities and Assumed Liabilities in respect of periods prior to the Closing and will permit Buyer to make copies of such documents and information. After the Closing Date, Buyer shall retain for a period consistent with Laws and Buyer's record-retention policies and practices, those records of Sellers delivered to Buyer.

12.10    Sellers' Remedial Actions. Sellers shall take any and all reasonable actions and shall cause their Employees, contractors and consultants, as applicable, to take any and all reasonable actions (including executing documents) necessary to effectuate the transfer of the Seller Intellectual Property to Buyer and, following the Closing, Sellers shall take any and all reasonable actions to allow Buyer to prosecute, maintain and defend the Seller Intellectual Property, other than with respect to the Intellectual Property described in Schedule 4.9(c).

12.11    Use of Controlled Substances Permits. To the extent permitted by applicable law, Buyer shall have the right, for a period not to exceed one hundred twenty (120) days following the Closing Date,

to operate under the licenses and registrations of Sellers relating to controlled substances and the operations of pharmacies and laboratories, until Buyer is able to obtain such licenses and registrations for itself, pursuant to an agreement in the form annexed hereto as <u>Exhibit H</u> (the "<u>Limited Power of Attorney</u>"), which Sellers agree to execute and deliver at the Closing.

12.12   <u>Use of Names</u>. On or before the Closing Date, each Seller shall (a) amend its certificate of incorporation, bylaws and any other organizational documents and take all other actions necessary to change its name to one sufficiently dissimilar to such Seller's present name, in Buyer's judgment, to avoid confusion, and (b) take all actions reasonably requested by Buyer to enable Buyer to change its name to such Seller's present name. After the Closing, (x) Buyer shall continue to operate the Business using, to the extent practicable, the names of the Seller entities, including the present names of Sellers as immediately prior to Closing and (y) Sellers will not adopt any trademarks or service marks that are confusingly similar to the trademarks and service marks assigned hereunder. After the Closing Date, neither Sellers nor any of their Affiliates will challenge Buyer's use of, or the validity and enforceability of, any Intellectual Property assigned to Buyer hereunder.

12.13   <u>Public Statements</u>. Any public announcement, press release or similar publicity with respect to this Agreement or the Transactions will be issued, if at all, at such time and in such manner as the Parties mutually determine. Except with the prior consent of Buyer or as permitted by this Agreement, neither Sellers nor Buyer nor any of their Representatives shall disclose to any Person (a) the fact that any confidential information of Sellers has been disclosed to Buyer or its Representatives, that Buyer or its Representatives have inspected any portion of the such confidential information, that any confidential information of Buyer has been disclosed to Sellers or their Representatives or that Sellers or their Representatives have inspected any portion of such confidential information or (b) any information about the Transactions, including the status (or existence) of such discussions or negotiations, the execution of any documents (including this Agreement) or any of the terms of the Transactions or the related documents (including this Agreement). Sellers and Buyer will consult with each other concerning the means by which any Party's employees, customers, suppliers and others having dealings with any Party will be informed of the Transactions, and all Parties will have the right to be present for any such communication.

12.14   <u>Indigent Care</u>.



12.15   <u>Continuation of Services</u>.

12.16   <u>Misdirected Payments</u>. Sellers and Buyer covenant and agree to hold in trust and remit, within thirty (30) days of receipt, to the other any payments received that are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) the other. Additionally, in the event of a determination by any Government Reimbursement Program that payments to any of Sellers or the Facilities resulted in an overpayment or other determination that funds previously paid by any Government Reimbursement Program or third-party payor to any of Sellers or the Facilities must be repaid, Sellers shall be responsible for repayment of said monies (or defense of such actions) if such

overpayment or other repayment determination was for services rendered prior to the Effective Time, and Buyer shall be responsible for repayment of said monies (or defense of such actions) if such overpayment determined was for services rendered on or after the Effective Time.

## ARTICLE 13
## CERTAIN POST-CLOSING REMEDIES

13.1    <u>Survival of Representations and Warranties, and Covenants</u>. All representations and warranties of each of the Sellers and Buyer contained in this Agreement shall survive until the date that is the second (2nd) anniversary of the Closing Date (the "<u>Survival Date</u>"). Notwithstanding the foregoing, any covenants of any Party which by their terms are to be performed or observed on or following the Closing shall survive the Closing until fully performed or observed in accordance with their terms. Except as expressly provided in the immediately preceding sentence, (a) any claim for damages made hereunder before the Survival Date of such claim will not terminate before final determination and satisfaction of such claim, and (b) no claim for damages hereunder may be made after the expiration of the applicable Survival Date. Notwithstanding any provision to the contrary contained in this Agreement, for purposes of determining the amount of any Damage under Section 13.2, the parties' representations and warranties shall be read without giving effect to (i) the phrase "Material Adverse Development," "in all material respects," and similar phrases qualifying any representations or warranties, and (ii) any knowledge limitation or qualification contained in any representations or warranties.

13.2    <u>Remedies</u>.

(a)    <u>Indemnification of Buyer by Sellers</u>.

(i)    <u>Indemnification</u>.    Subject to and to the extent provided in this Section 13.2, if and to the extent Buyer or its Affiliates suffer any loss, Liability, claim, damage or expense (including costs of investigation and defense and reasonable attorneys' fees and expenses) (collectively, "<u>Damages</u>"), arising from or in connection with (A) any breach of or any inaccuracy in any of the representations and warranties made herein by Sellers or in any certificate delivered by or on behalf of the Sellers hereunder at or prior to the Closing; (B) any breach of or failure to perform any of the covenants or agreements made herein by Sellers; or (C) the Excluded Assets and Excluded Liabilities, then Sellers shall indemnify and hold harmless Buyer from, against and for such Damages.

(ii)    <u>Indemnification Limitation</u>. Sellers shall have no liability with respect to Damages unless and until the amount of such Damages exceed ▇▇▇▇▇▇ (the "<u>Basket</u>"), at which time, Sellers shall be responsible for such Damages in excess of the Basket.  The maximum aggregate liability of Sellers for Damages shall be an amount equal ▇▇▇▇▇▇ (the "<u>Limit</u>"). Additionally, in no event shall Sellers or any of their representatives be liable under this Agreement to Buyer or any third party and no claim shall be made under this Agreement:

(A)    unless notice thereof shall have been given by or on behalf of Buyer to Sellers in the manner provided in Section 13.2, unless failure to provide such notice in a timely manner does not materially prejudice Sellers' ability to defend their rights, mitigate damage or seek indemnification from a third party;

(B)    to the extent that any loss may be recovered under a policy of insurance of Sellers in force on the date of loss

(C)     to the extent that any loss resulted from the provision of management services under the Interim Management Agreement in which case such indemnification shall be governed by the Interim Management Agreement;

(D)     for Damages after the date that is the third (3rd) anniversary of the Closing Date, provided that any claim made hereunder on or before the third (3rd) anniversary of the Closing Date will not terminate before final determination and satisfaction of such claim and provided further that the limitations under this Section 13.2(a)(ii)(D) shall not apply to any claim for Damages related to Excluded Assets or Excluded Liabilities; and

(E)     for consequential, indirect, incidental, special, exemplary, or punitive damages arising out of, or relating to, and/or in connection with any breach of this Agreement (collectively, "Consequential Damages"), regardless of (I) whether such damages were foreseeable, (II) whether or not Buyer was advised of the possibility of such damages and (III) the legal or equitable theory of contract, tort, or otherwise upon which the claim is based; provided, however, the limitation contained in this Section 13.2(a)(ii)(E) shall not apply to the extent of any payments which Sellers are required to make to a third party (other than any third party which is an Affiliate of Sellers) which are in the nature of Consequential Damages.

Notwithstanding anything contained herein to the contrary, neither the Basket nor the Limit shall apply to any Damages related to any fraud or intentional misconduct in connection with this Agreement or the transactions contemplated herein.

(b)     Indemnification of Sellers by Buyer.

(i)     Indemnification.     Subject to and to the extent provided in this Section 13.2, if and to the extent Sellers or their Affiliates suffer any Damages, arising from or in connection with (A) any breach of or any inaccuracy in any of the representations and warranties made herein by Buyer or in any certificate delivered by or on behalf of the Buyer hereunder at or prior to the Closing; or (B) any breach of or failure to perform any of the covenants or agreements made herein by Buyer, then Buyer shall indemnify and hold harmless Sellers from, against and for such Damages.

(ii)     Indemnification Limitation. Buyer shall have no liability with respect to Damages unless and until the amount of such Damages exceeds the Basket in the aggregate, at which time, Buyer shall be responsible for such Damages in excess of the Basket. The maximum aggregate liability of Buyer for Damages shall be an amount equal to the Limit. Additionally, in no event shall Buyer or any of its representatives be liable under this Agreement to Sellers or any third party and no claim shall be made under this Agreement:

(A)     unless notice thereof shall have been given by or on behalf of Sellers to Buyer in the manner provided in Section 13.2, unless failure to provide such notice in a timely manner does not materially prejudice Buyer's ability to defend its rights, mitigate damage or seek indemnification from a third party;

(B)     to the extent that any loss may be recovered under a policy of insurance of Buyer in force on the date of loss;

(C)     to the extent that any loss resulted from the provision of management services under the Interim Management Agreement in which case, such indemnification shall be governed by the Interim Management Agreement;

(D) for Damages after the date that is the third $(3^{rd})$ anniversary of the Closing Date, provided that any claim made hereunder on or before the third $(3^{rd})$ anniversary of the Closing Date will not terminate before final determination and satisfaction of such claim; and

(E) for Consequential Damages, regardless of (I) whether such damages were foreseeable, (II) whether or not Sellers were advised of the possibility of such damages and (III) the legal or equitable theory of contract, tort, or otherwise upon which the claim is based; provided, however, the limitation contained in this Section 13.2(b)(ii)(E) shall not apply to the extent of any payments which Buyer is required to make to a third party (other than any third party which is an Affiliate of Buyer) which are in the nature of Consequential Damages.

Notwithstanding anything contained herein to the contrary, neither the Basket nor the Limit shall apply to any Damages related to any fraud or intentional misconduct in connection with this Agreement or the transactions contemplated herein.

(c) Procedure for Indemnification - Non Third-Party Claims. Whenever any claim shall arise for indemnification hereunder not involving a demand, claim, action or proceeding made or brought by a third party, including without limitation a government agency (a "Proceeding"), the indemnified party shall notify the indemnifying party promptly after such indemnified party has actual knowledge of the facts constituting the basis for such claim. The notice to the indemnifying party (the "Claims Notice") shall specify, if known, the amount or an estimate of the amount of the liability arising therefrom.

(d) Procedure for Indemnification - Third-Party Claims.

(i) Promptly after receipt by an indemnified party of notice of the commencement of any Proceeding by a third party, such indemnified party will, if a claim is to be made against an indemnifying party pursuant to this Section 13.2, give a Claims Notice to the indemnifying party of the commencement of the Proceeding, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to the indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnified party's failure to provide such Claims Notice.

(ii) If any Proceeding is brought against an indemnified party and such indemnified party gives a Claims Notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the Proceeding involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (A) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (B) the indemnifying party fails to provide reasonable assurances to the indemnified party of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding), to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 13.2 for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (I) it will be conclusively established for purposes of this Agreement that the claims made in the Proceeding are within the scope of and subject to indemnification in accordance with this Section 13.2; and (II) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (x) there is no finding or admission of any violation of Law or any violation of the rights of any person

and no effect on any other claims that may be made against the indemnified party; (y) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (z) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If the Claims Notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten (10) days after the Claims Notice is provided, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(iii)    Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its Affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise or settle such Proceeding, but the indemnifying party will not be bound by the determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld). If the indemnifying party does not assume the defense of any claim or litigation, any indemnified party may defend against such claim or litigation in such manner as it may deem appropriate, including the settlement of such claim or litigation, after giving notice of the same to the indemnifying party, on such terms as the indemnified party may deem appropriate.    The indemnifying party will promptly reimburse the indemnified party in accordance with the provisions hereof.

(e)    Payment. All indemnification hereunder shall be effected by payment of cash or delivery of immediately available funds to an account designated by the indemnified party in the amount of the indemnification liability. Any undisputed indemnification payments shall be made within ten (10) days of the date on which the amount of a Damage is identified in writing to the indemnifying party. If the indemnified party is entitled to recover any sum (whether by payment, discount, credit or otherwise) from any third party in respect of any matter for which a claim of indemnity could be made against the indemnifying party hereunder, the indemnified party shall use its reasonable endeavors to recover such sum from such third party and any sum recovered will reduce the amount of the indemnification claim. If the indemnifying party pays to the indemnified party an amount in respect of a claim, and the indemnified party subsequently recovers from a third party a sum which is referable to that claim, the indemnified party shall forthwith repay to indemnifying party so much of the amount paid by it as does not exceed the sum recovered from the third party less all reasonable costs, charges and expenses incurred by the indemnified party in obtaining payment in respect of that claim and in recovering that sum from the third party.

(f)    Exclusive Remedy. From and after the Closing, other than claims for fraud or intentional misconduct, any claim arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement or any Damages or injury alleged to be suffered by any Party as a result of the actions or failure to act by any other Party shall, unless otherwise specifically stated in this Agreement, be governed solely and exclusively by the provisions of this Section 13.2.

## ARTICLE 14
## INTERIM MANAGEMENT SERVICES

14.1    Interim Management Services. Recognizing that the consummation of the Transaction may take upwards of one (1) year from the Execution Date to Closing as a result of certain diligence, regulatory, and contractual requirements, Sellers and Buyer have entered into that certain Interim

Management Agreement, dated as of even date herewith (the "Interim Management Agreement"), attached hereto as Exhibit J, in order to immediately take advantage of Buyer's expertise in hospital management to forestall any further financial decline of Sellers and continue to maintain a viable hospital for the citizens of Lawrence County, Pennsylvania and the surrounding region. The Interim Management Agreement shall terminate automatically upon the Closing of the Transaction. Notwithstanding anything herein to the contrary, any action taken by any Seller at the request of Buyer, shall not constitute or result in a breach of any provision of this Agreement, and Buyer shall be responsible for any and all liabilities incurred as a result of such action.

## ARTICLE 15
## GENERAL

15.1    Choice of Law; Dispute Resolution.

(a)    Choice of Law. The Parties agree that this Agreement shall be governed by and construed in accordance with the Laws of the Commonwealth of Pennsylvania, without giving effect to any choice or conflict of law provision or rule thereof that would require the application of any other law.

(b)    Dispute Resolution. All disputes, controversies or claims that may arise among the Parties, including any dispute, controversy or claim arising out of this Agreement, or any other relevant document, or the breach, termination or invalidity thereof (a "Dispute"), shall be settled solely and finally pursuant to the procedures set forth in this Section 15.1.

(i)    The Parties shall attempt in good faith to resolve any Dispute of whatever nature arising between the Parties, promptly by negotiation (including at least one in person meeting). If the Dispute has not been resolved within thirty (30) days after delivery of a notice of a Dispute by one Party to the other Party, any of such Parties may initiate appropriate legal action.

(c)    EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

15.2    Specific Performance. Notwithstanding anything to the contrary contained herein, each Party acknowledges and agrees that the non-breaching Parties would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by a Party could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which the non-breaching Parties may be entitled, at law or in equity, they shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

15.3    Benefit; Assignment. No Party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other Parties, except that Buyer may assign any of its rights and delegate any of its obligations under this Agreement to any Affiliate of Buyer and Buyer may collaterally assign their rights hereunder to any financial institutions and noteholders (and any agent or trustee acting on its behalf) providing financing to Buyer and its Affiliates. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure

to the benefit of the successors and permitted assigns of the Parties. At the request of Buyer, Sellers shall, and shall cause their Affiliates owning any portion of the Purchased Assets to, transfer the Purchased Assets and the Assumed Liabilities to one or more direct or indirect wholly-owned subsidiaries of Buyer ("Buyer Entities") as Buyer may designate prior to Closing. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties and Buyer Entities any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 15.3.

15.4    Cost of Transaction. Whether or not the Transactions shall be consummated and except as otherwise provided herein, the Parties agree as follows:

(a)    Except as provided otherwise elsewhere herein, Sellers will pay the fees, expenses and disbursements of Sellers and their Representatives incurred in connection with the subject matter hereof and any amendments hereto.

(b)    Except as provided otherwise elsewhere herein, Buyer shall pay the fees, expenses and disbursements of Buyer and its Representatives incurred in connection with the subject matter hereof and any amendments hereto.

(c)    Buyer shall be responsible for and pay any fees, expenses or costs pertaining to any inspections, studies, test, review and analyses of the Purchased Assets.

15.5    No Third-Party Beneficiaries. The terms and provisions of this Agreement are intended solely for the benefit of Buyer, Sellers and Buyer Entities and their respective permitted successors or assigns, and it is not the intention of the Parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other Person.

15.6    Waiver. Except where a specific period for action or inaction is provided herein, neither the failure nor any delay on the part of any Party hereto in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any Party hereto of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege. The failure of a Party hereto to exercise any right conferred herein within the time required shall cause such right to terminate with respect to the transaction or circumstances giving rise to such right, but not to any such right arising as a result of any other transactions or circumstances.

15.7    Notices. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party (i) when delivered or sent if delivered in person or sent by facsimile transmission (provided confirmation of facsimile transmission is obtained), (ii) on the fifth (5th) Business Day after dispatch by registered or certified mail, (iii) on the next Business Day if transmitted by national overnight courier, in each case to the following addresses and marked to the attention of the person (by name or title) designated below (or to such other address as a Party may designate by notice to the other Parties):

> If to Sellers:              Ellwood City Hospital
>                             724 Pershing Street
>                             Ellwood City, Pennsylvania 16117
>                             Attention: President and CEO
>                             Facsimile: 724-752-0966

| with a copy to: (which copy shall not constitute notice) | Waller Lansden Dortch & Davis, LLP |
|---|---|

with a copy to:
(which copy shall
not constitute
notice)

Waller Lansden Dortch & Davis, LLP
511 Union Street, STE 2700
Nashville, Tennessee 37219
Attention: W. Kenneth Marlow, Esq.
Facsimile: 615-244-6804

If to Buyer:

Ellwood Medical Center, LLC
501 SE 2nd Street, #901
Fort Lauderdale, Florida 33301
Attention: Grant White

with a copy to:
(which copy shall
not constitute
notice)

Hogan Marren Babbo & Rose, Ltd.
321 North Clark Street, STE 1301
Chicago, Illinois 60654
Attention: Christopher B. Anderson, Esq.
Facsimile: 312-946-9818

15.8   Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that transactions contemplated hereby are fulfilled to the extent possible.

15.9   Divisions and Headings of this Agreement.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

15.10   No Inferences.  Each Party has participated in the drafting of this Agreement, which each Party acknowledges is the result of extensive negotiations between the Parties.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision.

15.11   Tax and Regulatory Advice and Reliance.   Except as expressly provided in this Agreement, none of the Parties (nor any of the Parties' respective counsel, accountants or other representatives) has made or is making any representations to any other Party (or to any other Party's, counsel, accountants or other representatives) concerning the consequences of the Transactions under applicable Laws (including applicable tax Laws and any Medical Reimbursement Program Laws), and each Party has relied solely upon the advice of its own employees or of representatives engaged by such Party and not on any such advice provided by any other Party.

15.12   Entire Agreement; Amendment.   This Agreement and the Confidentiality Agreement supersede all previous Contracts and constitute the entire agreement of whatsoever kind or nature existing between or among the Parties representing the within subject matter, and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect.  This Agreement

may not be amended, supplemented or otherwise modified except by a written agreement executed by the Party to be charged with the amendment.

15.13    Execution of this Agreement.  This Agreement may be executed in multiple counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  A signature delivered by facsimile or PDF will be sufficient for all purposes among the Parties.

15.14    Ellwood City Hospital Foundation.  Each Party hereto acknowledges and agrees that Ellwood City Hospital Foundation, a Pennsylvania nonprofit corporation, is not a party to this Agreement nor a third-party beneficiary under this Agreement, and as such, its assets are not subject to this Agreement and it shall not be held liable for any obligations or liabilities of any kind whatsoever of any Party hereunder.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, all as of the date and year first above written.

BUYER:

AMERICORE HEALTH, LLC

By: _____
Name: Grant White
Title: President

ELLWOOD MEDICAL CENTER, LLC

By: _____
Name: Grant White
Title: President

SELLERS:

ELLWOOD CITY HOSPITAL

By: _____
Name: CHRISTY SPOA
Title: CHAIRMAN

ELLWOOD CITY HEALTH ORGANIZATION, INC.

By: _____
Name: CHRISTY SPOA
Title: CHAIRMAN

OUTREACH CARE GROUP, INC.

By: _____
Name: CHRISTY SPOA
Title: CHAIRMAN

APPLE OCCUPATIONAL HEALTH SERVICES, INC.

By: _____
Name: CHRISTY SPOA
Title: CHAIRMAN

[Signature Page to Asset Purchase Agreement]

Annex A

Definitions

"24/7" has the meaning set forth in Section 12.15.

"Accounts Receivable" means all accounts and notes receivable, pledges and grants receivable, unbilled invoices, rights to settlement and positive and negative retroactive adjustments, if any, for open cost reporting periods, other rights to receive payment for goods and services provided by Sellers in connection with the Business, whether recorded or unrecorded, including any amounts due from patients, Private Health Plans, Governmental Entities and Government Reimbursement Programs or any other source.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person; and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by appointment of trustees, directors, and/or officers, by Contract or otherwise.

"AG" means the Pennsylvania Attorney General.

"AG and Orphans' Court Approval Process" has the meaning set forth in Section 6.5(b).

"Agreement" has the meaning set forth in the Preamble and shall include all Exhibits and disclosure schedules attached or delivered with respect hereto or expressly incorporated herein by reference.

"Allocation" has the meaning set forth in Section 2.8.

"Ancillary Agreements" means, as to any Party hereto, all of the documents and instruments required to be executed pursuant to this Agreement by such Party in connection with this Agreement or the transactions contemplated hereby.

"Antitrust Laws" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the Sherman Act, the Clayton Act, the Federal Trade Commission Act and any other United States federal or Pennsylvania Law, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"AOHS" has the meaning set forth in the Preamble.

"Approval" means any approval, authorization, certificate of need, exemption, consent, clearance, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Entity, but excludes Environmental Permits.

"Architectural Plans" means site plans, architectural renderings, blueprints, plans and specifications, engineering plans, as-built drawings, floor plans and other similar plans or diagrams, if any, held or used by Sellers in connection with the Business.

"Assumed Contracts" has the meaning set forth in Section 2.1(f).

"Assumed Leases" has the meaning set forth in Section 2.1(f).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Provider Agreements" has the meaning set forth in Section 2.1(f).

"Assumed Seller Bank Accounts" has the meaning set forth in Section 2.1(x).

"Assumed Seller Plans" has the meaning set forth in Section 2.1(x).

"Audited Balance Sheet" has the meaning set forth in Section 4.7.

"Basket" has the meaning set forth in Section 13.2(a)(ii).

"Buildings and Systems" has the meaning set forth in Section 4.14(d).

"Business" means the business, operation or ownership of the Facilities and the Purchased Assets.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in Pennsylvania are authorized or required by Law to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Entities" has the meaning set forth in Section 15.3.

"Buyer's Knowledge" (and similar expressions) means the actual knowledge of Grant White and Travis Roderick, after making diligent inquiry of those employees of Buyer with principal day-to-day operational responsibility with respect to a particular matter.

"Capital Commitment" has the meaning set forth in Section 2.6.

"Capital Commitment Amount" has the meaning set forth in Section 2.6.

"Capital Lease Obligations" means those capital lease obligations of Sellers, including those described in Schedule 4.7(d).

"Claims Notice" has the meaning set forth in Section 13.2(c).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"CMS" means the Centers for Medicare & Medicaid Services.

"COBRA" has the meaning set forth in Section 7.2(e).

"Code" means the Internal Revenue Code of 1986 and the rules and regulations promulgated thereunder.

"Commitment" has the meaning set forth in Section 11.1(a).

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of May 23, 2016, between ECH and CQA Holdings, LLC.

"Consequential Damages" has the meaning set forth in Section 13.2(a)(ii)(E).

"Contract" means any written or oral contract, commitment, instrument, license, lease, agreement, arrangement or understanding, including renewals, extensions, assignments and amendments made in accordance therewith.

"Controlled Group" has the meaning set forth in Section 4.17(c).

"Cost Reports" means all cost and other reports related to a Facility filed pursuant to the requirements of the Government Reimbursement Programs for cost-based payments or reimbursement due to or claimed by Sellers from the Government Reimbursement Programs or their MACs (or other fiscal intermediaries), including all appeals and appeal rights.

"Damages" has the meaning set forth in Section 13.2(a)(i).

"Deed" means a deed in the form of Exhibit A.

"Dispute" has the meaning set forth in Section 15.1(b).

"DOH" means the Pennsylvania Department of Health.

"ECH" has the meaning set forth in the Preamble.

"ECHO" has the meaning set forth in the Preamble.

"Effective Time" has the meaning set forth in Section 3.2.

"Employee List" has the meaning set forth in Section 4.18(a).

"Employees" means all individuals who are employed by Sellers in the conduct of the Business together with individuals who are hired in respect of the conduct of the Business after the date hereof and prior to the Closing.

"Employment Loss" means (i) an employment termination, other than a discharge for cause, voluntary departure or retirement, (ii) a layoff exceeding six (6) months or (iii) a reduction in hours of work of more than 50%.

"Encumbrance" means any claim, charge, easement, encumbrance, liability, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Law, equity or otherwise.

"Environmental, Health and Safety Liabilities" means any claim (including for personal injury), demand, assessment, Encumbrance, investigation, action or cause of action, complaint, citation, directive, information request or notice of potential violation or potential responsibility issued by a Governmental Entity, Legal Proceedings, damages (including punitive and consequential damages, property damage and natural resources damages), obligations (including Remediation obligations, or financial responsibility therefor, pursuant to any Environmental Laws), losses, penalties, fines, liabilities, encumbrances, liens, violations, costs and expenses (including attorneys and consultants fees and Remediation costs): (a) which are incurred as a result of (i) the existence or alleged existence of Hazardous Material in, on, over, under, at or emanating from any Facility, Real Property or Former Real Property, (ii) Hazardous Activity or

(iii) the violation or alleged violation of any Environmental Laws or Occupational Safety and Health Laws; or (b) which arise under the Environmental Laws or Occupational Safety and Health Laws.

"Environmental Law" means any applicable Law (including any judgment or administrative interpretations, guidance, directives, policy statements or opinions) of any Governmental Entity relating to injury to, or the pollution or protection of, human health and safety (to the extent relating to exposure to Hazardous Materials) or the environment.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Escrow Account" has the meaning set forth in Section 3.5.

"Escrow Agent" means U.S. Bank, NA.

"Exceptions" has the meaning set forth in Section 11.1(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(d).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Seller Bank Accounts" has the meaning set forth in Section 2.2(k).

"Excluded Seller Plans" has the meaning set forth in Section 2.2(e).

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Facilities" means the Hospital and all nursing homes, diagnostic, surgical and/or treatment facilities, medical office buildings, pharmacies, physician practice sites and/or other health care service and educational sites or facilities, and related health care business in Lawrence County, Pennsylvania and surrounding communities, each of which listed on Exhibit K, as well as the businesses conducted therein or thereby.

"Financial Statements" has the meaning set forth in Section 4.7(a).

"FIRPTA Certificate" means a certificate required by United States Treasury Department Regulation Section 1.1445-2, to the effect that each of Seller is not a foreign person (as defined in the Code), which would subject Buyer to the withholding provisions of Section 1445 of the Code.

"Former Real Property" means any Real Property formerly owned, leased or operated by any of Sellers or any of their predecessors-in-interest.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Government Reimbursement Programs" means the Medicare program, the Pennsylvania Medicaid program, the federal TRICARE program, and any other similar or successor federal or state healthcare payment programs with or sponsored by a Governmental Entity.

"Governmental Entity" means any government or any administrative agency or authority, bureau, board, directorate, commission, court, department, office, political subdivision, tribunal, recovery audit contractor or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Hazardous Activity" means the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, storage, transfer, transportation, disposal, treatment, use or Remediation of Hazardous Material or Release in, on, under, about or from any of the Facilities or any off-site disposal facilities.

"Hazardous Materials" means: (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; (vi) any "asbestos-containing materials;" and (vii) greenhouse gases.

"Healthcare Regulatory Consents" means in respect of Sellers or Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Entity as shall be required to be obtained and such notifications to any Governmental Entity as shall be required to be given by such Party in order for it to consummate the Transactions in compliance with all applicable Laws relating to health care or healthcare services of any kind and shall include obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits from, or notices to the DOH CMS, and the AG, the Orphans' Court and the public in accordance with the AG and Orphans' Court Approval Process.

"Hospital" means the hospital known as The Ellwood City Hospital.

"Immigration Act" means the Immigration and Nationality Act of 1952, as amended, and the Immigration Reform and Control Act of 1986.

"Improvements" has the meaning set forth in Section 4.14(a)(i).

"Indebtedness" means all Liabilities of any Seller to any Person for borrowed money, including any loan or credit agreement, notes payable, Capital Lease Obligations, guaranties, letters of credit and similar arrangements, and including all interest, fees, penalties, charges or other amounts thereon.

"Intellectual Property" means any trademarks, trade names, service marks, logos and other source identifiers and all applications, registrations and renewals in connection therewith; computer programs (in object code form and, as to software programs that are Seller Intellectual Property, the source code therefor); writings, copyrights, and works of authorship (whether or not copyrightable) and all applications, registrations and renewals in connection therewith; data, technology, trade secrets, designs, patents, innovations, discoveries, inventions and improvements (whether or not patentable) and all patent applications and patent disclosures, together with all reissuances, continuations, revisions, extensions and re-examinations thereof; and any other intellectual property.

"Interim Balance Sheet" has the meaning set forth in Section 4.7(a).

"Interim Balance Sheet Date" means December 31, 2016.

"Interim Financial Statements" has the meaning set forth in Section 4.7(a).

"Interim Management Agreement" has the meaning set forth in Section 14.1.

"Inventory" means all usable inventories of supplies, pharmaceuticals, food, janitorial and office supplies and other disposables and consumables located at the Facilities or held for use in the Business.

"IRS" means the United States Internal Revenue Service.

"Land" has the meaning set forth in Section 4.14(a).

"Landlord Estoppel" has the meaning set forth in Section 3.3(d).

"Law" means any federal, state, local, municipal, foreign or other law, common law, statute, ordinance, rule, regulation, requirement, interpretation, judgment, ruling, order or writ of any Governmental Entity, including Medical Reimbursement Program Laws, the Immigration Act and the Antitrust Laws.

"Leased Real Property" has the meaning set forth in Section 2.1(b).

"Leasehold Assignment" means an assignment and assumption of the Leased Real Property, in the form of Exhibit B.

"Leases" means any and all real property leases, subleases, tenancies, concessions, licenses, occupancy agreements or similar agreements (including any and all modifications, amendments, supplements extensions or renewals thereof) to which any Seller is a party with respect to the Facilities, and (subject to the terms of this Agreement) together with refundable deposits and prepaid rent, if any, relating to any of the foregoing.

"Legal Proceeding" means any action, suit, litigation, arbitration, proceeding or claim (whether at law or in equity) before a Governmental Entity or before any arbitrator or mediator or similar party, or any investigation, audit or review by any Governmental Entity.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto.

"Limit" has the meaning set forth in Section 13.2(a)(ii).

"Limited Power of Attorney" has the meaning set forth in Section 12.11.

"Local Advisory Board" has the meaning set forth in Section 12.6.

"MACs" means Medicare Administrative Contractors.

"Mandatory Removal Exceptions" has the meaning set forth in Section 11.1(c).

"Material Adverse Development" means any event, occurrence, condition or matter that has, or reasonably may be expected to have, a material adverse impact on (a) the business, operations, property, results of operations or financial condition of the Facilities and Purchased Assets, taken as a whole, including as a result of weather, flood or other natural disasters, whether or not covered by insurance, (b) the ability of Sellers to consummate the Transactions contemplated by, or to perform their obligations under, this Agreement, or (c) Buyer's ability to operate the Business after the Closing in substantially the same manner as Sellers operate the Business as of the date hereof, excluding (i) changes in the economy of the United States in general that do not have a disproportionate effect on Sellers or the Business, (ii)

changes in Law generally applicable to owners and operators of general acute care hospitals in the United States or in Pennsylvania if such change does not disproportionately affect Sellers or the Business, (iii) acts of war (whether or not declared), armed hostilities or terrorism; (iv) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (v) any changes in applicable Law or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof that does not have a disproportionate effect on the Business; (vi) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Sellers and the Business, and (vii) any natural or man-made disaster or acts of God.

"Material Contracts" has the meaning set forth in Section 4.12(a).

"Material Survey Defects" has the meaning set forth in Section 11.1(b).

"Medicaid" means the state health insurance program established under Title XIX of the Social Security Act.

"Medical Reimbursement Program Laws" means the Laws governing the Government Reimbursement Programs, including: 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a- 7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 et seq.); the False Statements Act (18 U.S.C. § 1001); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 et seq.); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and the corresponding fraud and abuse, false claims and anti self-referral Laws of any other Governmental Entity.

"Medicare" means the federal health insurance program for the aged and disabled established under Title XVIII of the Social Security Act.

"Multiemployer Plan" means a multiemployer plan within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA or Section 414(f)(1) of the Code.

"Non-Permitted Exceptions" has the meaning set forth in Section 11.1(a).

"Nonassignable Contract" has the meaning set forth in Section 12.4.

"Occupational Safety and Health Law" means any Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including OSHA, and any program, whether governmental or private (such as those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"OCG" has the meaning set forth in the Preamble.

"Off-the-Shelf Software" means off-the-shelf operating system, browser and common desktop or server-based office productivity computer software (word processing, spreadsheet, presentation and the like).

"Order" means any order, injunction, judgment, decree, directive, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Entity.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice.

"Orphans' Court" means the Pennsylvania Court of Common Pleas Orphans' Division.

"OSHA" means the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq.

"Outside Date" means ▮▮▮▮▮▮▮▮▮▮▮; provided, however, that Buyer, on the one hand, or the Sellers, on the other hand, shall have the right, exercisable upon prior written notice to such other Party, to extend the Outside Date by up to an additional ninety (90) days if the approvals under the AG and Orphans' Court Approval Process are pending as of the time of such exercise.

"Owned Real Property" has the meaning set forth in Section 2.1(a)

"Party" has the meaning set forth in the Preamble.

"Permit" means any application, approval, license, identification number, permit, franchise, accreditation, registration, waiver or certificate of need of any kind, of any Governmental Entity, but excludes Environmental Permits.

"Permitted Exceptions" has the meaning set forth in Section 11.2.

"Person" means an association, a corporation, a limited liability company, an individual, a partnership, a limited liability partnership, a trust or any other entity or organization, including a Governmental Entity.

"Personal Property" has the meaning set forth in Section 2.1(c).

"Phase I Report" has the meaning set forth in Section 9.7.

"Private Health Plans" means insurers, third party payors, health maintenance organizations, preferred provider organizations, third party administrators for self-insured employers and similar arrangements, other than Government Reimbursement Programs, but including those situations where, pursuant to a contract with a Government Reimbursement Program, the Private Health Plan provides coverage under a managed care product to persons obtaining their Medicare, Medicaid, or similar benefits from the private health plan rather than directly from Medicare or Medicaid.

"Proceeding" has the meaning set forth in Section 13.2(c).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"RACs" means Recovery Audit Contractors.

"RE Tax Returns" means all Tax Returns, questionnaires, certificates, affidavits and other documents required in connection with the payment of any Transfer Taxes in respect of the Owned Real Property.

"Real Estate Taxes" has the meaning set forth in Section 11.2.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, containment, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure activity in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, shareholders, employees, consultants, agents, advisors and other representatives.

"Revenue Procedure" has the meaning set forth in Section 7.2(b).

"Seller" has the meaning set forth in the Preamble.

"Seller Intellectual Property" means Intellectual Property that is not Third Party Intellectual Property.

"Seller Plans" has the meaning set forth in Section 4.17(a).

"Sellers' Cost Reports" has the meaning set forth in Section 12.8.

"Sellers' Knowledge" (and similar expressions) means the actual knowledge of any member of Senior Management, after making diligent inquiry of those employees of any of Sellers with principal day-to-day operational responsibility with respect to a particular matter.

"Sellers' Review Period" has the meaning set forth in Section 2.8.

"Senior Management" means the Sellers' Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Medical Officer and Chief Nursing Officer.

"Solicit" has the meaning set forth in Section 12.1.

"Survey" has the meaning set forth in Section 11.1(b).

"Survey Defects" has the meaning set forth in Section 11.1(b).

"Survival Date" has the meaning set forth in Section 13.1.

"Tax" means (a) any tax assessed by any Governmental Entity, including any income tax, ad valorem tax, excise tax, escheat or unclaimed property liability, sales tax, use tax, capital tax, franchise tax, real or personal property tax, transfer tax, realty transfer tax, gross receipts tax, withholding tax, social security tax, payroll tax or employment tax, together with and including any and all interest, fines, penalties, assessments and additions to Tax resulting from, relating to or incurred in connection with any of those or any contest or dispute thereof and (b) any liability of any Person for the payment of the amounts described in clause (a) as a transferee, successor or pursuant to any contractual obligation or pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of state or local Law).

"Tax Return" means any report, statement, form, information return or other document supplied or required to be supplied to a Governmental Entity or any other Person in connection with Taxes, including any schedule or attachment thereto and any amendment thereof, and including any return required by an organization exempt from any Tax.

"Tenant Estoppel" has the meaning set forth in Section 3.3(c).

"Tenants" means tenants in occupancy of portions of the Real Property as of the Closing under the Assumed Leases.

"Third Party Intellectual Property" has the meaning set forth in Section 4.9(a).

"Title Company" means Core Title.

"Title Notice" has the meaning set forth in Section 11.1(a).

"Transaction" or "Transactions" means the purchase and sale of the Facilities and Purchased Assets, and consummation of the other transactions set forth herein or contemplated hereby.

"Transaction Documents" means this Agreement and the Ancillary Agreements.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest).

"Transferred Employees" has the meaning set forth in Section 7.1(a).

"TRICARE" means the Department of Defense's managed healthcare program for active duty military, active duty service families, retirees and their families and other beneficiaries.

"Valuation" has the meaning set forth in Section 2.5(b).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988 and the rules and regulations promulgated thereunder, and any local or state statute, rules or regulations providing for notice in the advance of or benefits of any kind as a result of employment termination or other employment loss, as defined in the WARN Act or by such local or state statutes.

## Exhibit A

### FORM OF DEED

See attached.

**Exhibit B**

FORM OF LEASEHOLD ASSIGNMENT AND ASSUMPTION AGREEMENTS

See attached.

## Exhibit C

### FORM OF TENANT ESTOPPEL

See attached.

**Exhibit D**

**FORM OF LANDLORD ESTOPPEL**

See attached.

## Exhibit E

### FORM OF BILL OF SALE

See attached.

## Exhibit F

### FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENTS

See attached.

## Exhibit G

### FORM OF FIRPTA CERTIFICATE

See attached.

## Exhibit H

### FORM OF LIMITED POWER OF ATTORNEY

See attached.

4836-3567-3658.23

**Exhibit I**

**FORM OF ESCROW AGREEMENT**

See attached.

## Exhibit J

### INTERIM MANAGEMENT AGREEMENT

See attached.

## Exhibit K

### SELLERS' FACILITIES

| | |
|---|---|
| Mary Evans Building | 724 Pershing Street Ellwood City PA |
| Ellwood City Hospital | 724 Pershing Street Ellwood City PA |
| Emergency, Laboratory, 1981 Addition | 724 Pershing Street Ellwood City PA |
| West Addition | 724 Pershing Street Ellwood City PA |
| Physical Therapy Addition | 724 Pershing Street Ellwood City PA |
| CT, Nuclear Medicine Addition | 724 Pershing Street Ellwood City PA |
| ECH- Annex Facility | 724 Pershing Street Ellwood City PA |
| North Addition Surgical Addition | 724 Pershing Street Ellwood City PA |
| Medical Arts Building | 304 Evans Drive Ellwood City PA |
| File Room Addition | 724 Pershing Street Ellwood City PA |
| Two Story Medical Surgical Addition | 724 Pershing Street Ellwood City PA |
| Physician/ Anethesiology Residence, House | 714 Pershing Street Ellwood City PA |
| Unnocupied Building, House | 732 Pershing Street Ellwood City PA |
| Residential Rental Property, House | 740 Pershing Street Ellwood City PA |
| Commercial Rental Property, House | 748 Pershing Street Ellwood City PA |
| Tree of Life Building, Home Health Agency | 404 Beatty Street Ellwood City PA |
| Zellenople Diagnostic Center | RD #2 241 Perry Highway Harmony PA |
| Apple Rehabilitation Services, Franklin Plaza | 273 State Route 288 Ellwood City PA |

## VERIFICATION

I, Eugene Herne, hereby state that I am an Attorney with the Pennsylvania Office of

Attorney General, Charitable Trusts and Organizations Section, and am authorized to make this

verification on behalf of the Plaintiff in the within action. I hereby verify that the facts set forth

in the foregoing Complaint are true and correct to the best of my knowledge or information and

belief.

I understand that the statements contained herein are subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: 12/23/19

EUGENE HERNE

15

## <u>VERIFICATION</u>

I, Taryn Liebtag, hereby state that I am an Agent with the Pennsylvania Office of Attorney General, Bureau of Consumer Protection, and am authorized to make this verification on behalf of the Plaintiff in the within action. I hereby verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge or information and belief.

I understand that the statements contained herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities.

Date: 12/23/19

TARYN LIEBTAG

16

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: Comm. of Pennsylvania

Signature: Eugene Herne

Name: Eugene Herne

Attorney No.: 82033

## CERTIFICATE OF SERVICE

I certify that on the 23rd day of December, 2019, service of the Petition to Enforce Asset Purchase Agreement and for Monetary Damages was made via certified mail, return receipt requested, and via regular mail on the following parties:

**Americore Health, LLC**
501 SE 2nd Street,
Apartment 901,
Fort Lauderdale, Florida 33301

AND ALSO SERVED AT:

1201 Orange Street,
Wilmington, Delaware, 19801

**Americore Health Solutions, LLC**
501 SE 2nd Street,
Apartment 901,
Fort Lauderdale, Florida 33301

AND ALSO SERVED AT:

1201 Orange Street,
Wilmington, Delaware, 19801

**Ellwood City Medical Center Operations, LLC,**
Corporation Trust Center,
1209 Orange Street,
Wilmington, Delaware 19801

**Ellwood City Medical Center, LLC**
724 Pershing Street,
Ellwood City, Pennsylvania 16117

**Grant White**
6857 Crest Road,
Rancho Palos Verdes, California 90275

AND ALSO SERVED AT:

501 SE 2ND Street
Fort Lauderdale, Florida 33301

By: _____
Eugene Herne
Senior Deputy Attorney General

18