## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## LONDON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Americore Holdings, LLC, *et al.*,[1] | ) | Case No. 19-61608-grs |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | Honorable Gregory R. Schaaf |
|  | ) |  |

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION UNDER 11 U.S.C.  §§ 105, 361, 362, 363 AND 364, RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND RULE 4001-2 OF THE LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF KENTUCKY FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO THE POSTPETITION LENDER, (III) AUTHORIZING  THE DEBTORS TO ENTER INTO AGREEMENTS WITH JMB CAPITAL PARTNERS LENDING, LLC; (IV) AUTHORIZING USE OF THE DIP LENDER CASH COLLATERAL; AND (V) SCHEDULING A FINAL HEARING TO CONSIDER THE DEBTORS' USE OF CASH COLLATERAL AND <u>POSTPETITION FINANCING</u>**

Americore Holdings, LLC and its above-captioned affiliated debtors and debtors in

possession (collectively, the "<u>Debtors</u>"), by and through counsel, hereby submit this motion (the

"<u>Motion</u>"), by and through counsel, for entry of an order (the "<u>Financing Order</u>") pursuant to

sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and

Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Eastern District of

---

[1]     The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

Kentucky (the "Local Rules"), (i) authorizing the Debtors to obtain postpetition financing on an interim basis, (ii) granting adequate protection to the Debtors' prepetition secured lenders, (iii) granting superpriority administrative expense claims and liens to the postpetition lender, (iv) authorizing the Debtors to enter into agreements with JMB Capital Partners Lending, LLC; (v) authorizing the Debtors' use of DIP lender cash collateral; and (vi) scheduling a final hearing to consider the Debtors' use of cash collateral and postpetition financing.  In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Grant White In Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"). In further support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## Background

**A.      General Background**

2.      On December 31, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court").  The Debtors continue to manage and operate their business as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  To date, the Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these chapter 11 bankruptcy cases (the "Chapter 11 Cases").  No trustee or examiner has been appointed in the Chapter 11 Cases.

3.      The Debtors operate a number of healthcare facilities throughout the United States.  As set forth in the First Day Declaration, the Debtors' pre-Petition Date efforts to restructure have been unsuccessful.  Despite the Debtors' best efforts to avoid the necessity of filing the Chapter 11 Cases, the Debtors faced an immediate liquidity crisis due to litigation and collections efforts that necessitated the commencement of the Chapter 11 Cases.  The Debtors intend to use the remedies available to them under the Bankruptcy Code to sell certain assets and/or reorganize around their better-performing businesses with the support of the Debtors' key creditor constituencies.

4.      Additional information about the Debtors' businesses, their capital structure and the circumstances leading to the Chapter 11 Cases is contained in the First Day Declaration, which is incorporated herein by reference.

**B.      The Debtors' Secured Debt**

### i.      *Americore*

5.      Founder and CEO, Grant White, founded Americore Holdings, LLC, Americore Health, LLC and Americore Health Enterprises, LLC (collectively, "Americore") in February of 2017 as a healthcare company focused on saving and revitalizing rural communities through the acquisition and management of rural hospitals across the United States.  Americore entities serve as parent and holding companies for each of the Debtors' healthcare businesses.

### ii.      *Ellwood Medical Center*

6.      In February, 2017, the Debtors formed Ellwood Medical Center, LLC, Ellwood Medical Center Real Estate, LLC and Ellwood Medical Center Operations, LLC as indirect subsidiaries of Americore Health, LLC.  Ellwood Medical Center, LLC is effectively a holding company which merely owns the equity interests in Ellwood Medical Center Real Estate, LLC

and Ellwood Medical Center Operations, LLC, its subsidiaries.  Together, these entities own and operate a rural hospital in Ellwood City, PA.

7.    Ellwood Medical Center Real Estate, LLC is a property owning company which owns the real property where the hospital is located, and which also leases out certain medical offices and out-patient services.  An appraisal dated May 25, 2018 for Ellwood Medical Center Real Estate, LLC's real property is attached the First Day Declaration as Exhibit B.  That appraisal values the real property at $22,500,000.  Ellwood Medical Center Real Estate, LLC has two secured creditors with mortgages on its real property.  The first-priority mortgage holder is Penn Med, LLC with a claim in the alleged amount of $5,257,049.00 (the "Penn Med Claim"). The Penn Med Claim is allegedly comprised of $4,500,000 in principal, a $500,000 "bonus payment," $11,249 in late fees, $225,800 in interest, and $20,000 in attorneys' fees.  Penn Med, LLC alleges that Americore Health, LLC and Ellwood Medical Center, LLC are guarantors for the Penn Med Claim.  On November 12, 2019, Penn Med, LLC filed a confession of judgment with the Lawrence County Court of Common Pleas, Pennsylvania in the case pending as *Penn Med LLC v. Americore Health, LLC*, Case No. 11166-19.

8.    Pelorus Equity Group, Inc. serves as broker for lenders to Ellwood Medical Center Real Estate, LLC under the terms of a Secured Note dated November 29, 2018 in the amount of $2,500,000.  The obligations under this Secured Note are secured by a second priority mortgage on Ellwood Medical Center Real Estate, LLC's real estate.

9.    Ellwood Medical Center Operations, LLC is the entity which operated the hospital prior to its' shutting down primary operations.  Among Ellwood Medical Center Operations, LLC's creditors are: Utica Leaseco, LLC its primary equipment lessor; App Group

International and Hop Capital, LLC secured creditors with liens on all assets[2]; and trade payables.

### iii.    Izard County Medical Center

10.    Established in 1952, Izard County Medical Center is a critical access hospital located in Calico Rock, Arkansas.  The hospital offers in-patient, out-patient, laboratory, radiology, physical therapy services, and a 24-7 emergency room.  In July, 2017, Americore Health, LLC acquired Izard County Medical Center, LLC.

11.    Izard County Medical Center, LLC operates the hospital and leases it from Calico Rock Med LLC.  Calico Rock Med LLC alleges that Izard County Medical Center, LLC is in default of its lease and that it owes in excess of $300,000.  Among Izard County Medical Center, LLC's creditors are: App Group International and Hop Capital, LLC, with liens on all assets,[3] and trade payables.

### iv.    St. Alexius Hospital

12.    On September 5, 2018, Promise Healthcare Group, LLC and certain of its affiliates including Success Healthcare 2, LLC, St. Alexius Properties, LLC, and St. Alexius Hospital Corporation #1 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware and commenced the cases pending as *In re Promise Healthcare Group, LLC et al.*, Chapter 11 Case No. 18-12491-CSS.

13.    On January 8, 2019, the United States Bankruptcy Court for the District of Delaware entered an order authorizing the sale of the equity interests in Success Healthcare 2,

---

[2]        The Debtors believe that App Group International and Hop Capital, LLC have actually had their claims satisfied, yet their UCC-1 financing statements have not yet been released.
[3]        Again, the Debtors believe that App Group International and Hop Capital, LLC have actually had their claims satisfied, yet their UCC-1 financing statements have not yet been released.

LLC to Americore Holdings, LLC.  As a result, Americore Holdings, LLC is the direct owner of

the equity interests of Success Healthcare, 2, LLC.  Success Healthcare 2, LLC is in turn a

holding company for St. Alexius Properties, LLC, which owns the real estate on which the St.

Alexius Hospital, medical office building and nursing school are located, and St. Alexius

Hospital Corporation #1, which owns and operates the hospital and nursing school.  The hospital

and nursing school are located in St. Louis, MO.

14.      St. Alexius Properties, LLC ("St. Alexius Properties") is a property owning

company.  St. Alexius Properties owns the real property on which the hospital, medical office

building, and nursing school operated by St. Alexius Hospital Corporation #1 are located.  This

real property of St. Alexius Properties (the "St. Alexius Real Property") consists of 22 parcels

(each, a "Parcel"), which are often categorized into two "campuses."  The "Broadway Campus,"

located at 3933 S. Broadway, Saint Louis, MO 63118, consists of Parcels 1 through 16.  The

"Jefferson Campus," located at 3535 S. Jefferson Avenue, Saint Louis, MO 63118, consists of

Parcels 17-22.  Appraisals dated July 17, 2018 for the Broadway Campus and the Jefferson

Campus value the St. Alexius Real Property at $43,000,000.

15.      St. Alexius Properties has two secured creditors with prepetition mortgages on the

St. Alexius Real Property (collectively, with any other property owned by St. Alexius Properties,

the "St. Alexius Properties Prepetition Collateral").  Pelorus Equity Group, Inc.[4] ("Pelorus")

holds a claim in the alleged principal amount of $6,300,000 (the "Pelorus Secured Claim"),

which is secured by a first-priority mortgage as to certain of the Parcels, and a second-priority

---

[4]      Pelorus acts as agent with respect to the Pelorus Secured Claim and related liens for BQR Capital, LLC; Titan Loan Servicing, LLC; Pelorus Fund, LLC; George McNee Jr., Trustee of the McNee Family Trust dated January 17, 2008; Nancy S. Koven, Trustee of the Koven Omens Trust dated June 26, 2015; and Ronald Litz and Gloria Litz, Trustees of the Restated Revocable Living Trust of Ronald Litz and Gloria Litz dated December 11, 2007.

mortgage as to the remaining Parcels.  Toby Mug Financing, LLC ("Toby Mug" and, collectively with Pelorus, the "St. Alexius Properties Prepetition Secured Parties") holds a claim in the alleged principal amount of $1,250,000 (the "Toby Mug Secured Claim"), which is secured by a first-priority mortgage as to the Parcels on which Pelorus holds a second-priority mortgage, and a second-priority mortgage as to the remaining Parcels on which Pelorus hold a first-priority mortgage.

16.    Specifically, the prepetition liens on the St. Alexius Prepetition Collateral (the "St. Alexius Properties Prepetition Secured Parties Liens") include: (i) a first-priority mortgage lien held by Pelorus on Parcels 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, and 22; (ii) a second-priority mortgage lien held by Pelorus on Parcels 1, 2, 3, 3A, 4, and 17; (iii) a first-priority mortgage lien held by Toby Mug on Parcels 1, 2, 3, 3A, 4, and 17; and (iv) a second-priority mortgage lien held by Toby Mug on Parcels 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, and 22.

17.    To the extent that Toby Mug and Pelorus hold valid mortgages on the St. Alexius Real Property, the St. Alexius Real Property provides Toby Mug and Pelorus with a substantial equity cushion in excess of the Toby Mug Secured Claim and the Pelorus Secured Claim, respectively.

18.    The following entities assert liens on St. Alexius Hospital Corporation #1's assets:

  i.    HMFCH Inc., asserting a security interest in inventory, A/R/, and equipment;

  ii.    Smart Business, asserting a security interest in assets, including A/R, inventory, equipment, and intangibles;

  iii.    Corporation Services Company, as representative of unknown entity, asserting a security interest in all assets; and

iv.    CT Corporation Systems, as representative of unknown entity, asserting a security interest in all assets.

19.    In addition, certain of St. Alexius Hospital Corporation #1's trade creditors that have sold or leased equipment to this Debtor and certain banks that have financed its acquisition of that equipment hold claims against St. Alexius Hospital Corporation #1 that are secured by the equipment.

### v.    *Pineville Medical Center*

20.    The Debtors have sold their hospital operations related to Pineville Medical Center, LLC – which formerly operated a community hospital in Pineville, KY.  Nevertheless, Pineville Medical Center, LLC still owns accounts receivable which it intends to collect on, and it is a defendant related to significant litigation claims, including claims asserted by the Commonwealth of Kentucky for penalties related to unpaid payroll and for tax claims.  Cardinal Health may hold a lien on certain of Pineville Medical Center, LLC's assets.

### C.    The Cash Collateral and the Postpetition Financing

21.    As set forth above, certain creditors (the "Secured Creditors") have claims against each Ellwood Medical Center Operations, LLC, Izard County Medical Center, LLC, and St. Alexius Hospital Corporation #1 (collectively, the "Operating Debtors") which may secured by certain of each such Debtors' personal property assets (the "Prepetition Personal Property Collateral").  Substantially all of the Operating Debtors' cash and cash equivalents, including without limitation, all cash and other amounts on deposit or maintained by the Operating Debtors in any account or accounts with the Operating Debtors' banks, and any cash proceeds of the disposition of any Prepetition Personal Property Collateral, constitute proceeds of the Prepetition

Personal Property Collateral and, therefore, are cash collateral of the Secured Creditors within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

22.     On January 7, 2020, the Debtors filed the *Motion of the Debtors and Debtors in Possession Under 11 U.S.C. §§105, 361, 362, and 363, Rule 4001 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Kentucky for Entry of an Order (I) Authorizing the Debtors' Use of Cash Collateral on an Interim Basis, (II) Granting Adequate Protection to the Debtors' Prepetition Secured Creditors, and (III) Scheduling a Further Interim Hearing to Consider the Debtors' Use of Cash Collateral* [Docket No. 35] (the "Cash Collateral Motion").  On January 9, 2020, the Court entered an *Interim Order* [Docket No. 65] (the "Existing Cash Collateral Order") granting the Cash Collateral Motion and authorizing the use of the Cash Collateral of the Operating Debtors on an interim basis.  For the avoidance of doubt, other than the DIP Lender Cash Collateral (defined below), the Cash Collateral for which the Debtors seek continued authority to use by this Motion is limited to cash collateral of the Operating Debtors.  The Debtors intend to continue their interim use of Cash Collateral on the same terms set forth in the Existing Cash Collateral Order and as set forth in the revised Budgets, except as modified herein or by the terms of DIP Loan Agreement or the Financing Order.

23.     JMB Capital Partners Lending, LLC (the "DIP Lender") has agreed to provide postpetition financing to the Debtors (the "DIP Facility").  Specifically, as set forth in the Super-Priority Debtor-in-Possession Loan and Security Agreement, among the Debtors as Borrowers, the non-filing affiliates of the Debtors party thereto as guarantors, and the DIP Lender (the "DIP Loan Agreement" and, together with together with any ancillary, collateral or related documents and agreements, upon entry, the interim Financing Order and the final Financing Order, the "DIP

Loan Documents"), a copy of which is attached hereto as **Exhibit A**,[5] the DIP Lender has agreed

to provide additional credit to the Debtors under the DIP Loan Agreement in an amount up to

$5,000,000 during the pendency of the Chapter 11 Cases (of which (i) $1.5 million (the "Interim

Advance") shall be made available to the Debtors upon entry of an Order upon satisfaction or

waiver of the borrowing conditions set forth in the DIP Loan Documents and may be drawn in a

single draw on the Closing Date[6] and (ii) subject to entry of the final Financing Order, the

balance shall be made available to the Debtors as set forth in the DIP Loan Agreement and in

compliance with the Budget upon satisfaction or waiver of the borrowing conditions set forth in

the DIP Loan Agreement).  The DIP Lender has agreed to authorize the Debtors to use all

property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code, to

which the DIP Liens (defined below) shall attach (the "DIP Lender Cash Collateral").

24.     In exchange for the DIP Facility, the DIP Lender requires that the Debtors grant

the DIP Lender a superpriority administrative expense claim (the "DIP Superpriority Claims")

under section 364(c)(1) of the Bankruptcy Code in the amount of any funds advanced pursuant to

the DIP Loan Documents, together with interest thereon, at the times and in the amounts set forth

in the DIP Loan Documents and all Obligations as defined and provided for in the DIP Loan

Agreement (collectively, the "DIP Obligations").  Additionally, to secure the DIP Obligations,

the DIP Lender shall be granted automatically and properly perfected security interests in and

liens (collectively, the "DIP Liens") on all prepetition and postpetition real property and all

prepetition and postpetition tangible and intangible personal property of each Debtor

---

[5]     The Debtors and the DIP Lender reserve the right to modify and amend the DIP Loan Agreement up to the
time of the hearing on this Motion.

[6]     Capitalized terms used herein and not otherwise defined have the meanings given to them in the DIP Loan
Agreement.

(collectively, the "DIP Collateral").  The DIP Liens on the St. Alexius Real Property shall be

first-priority and senior to the St. Alexius Properties Prepetition Secured Parties Liens and any

other known or unknown asserted liens on the St. Alexius Real Property (for the avoidance of

doubt, the DIP Liens shall be priming, first priority liens on the St. Alexius Real Property).   The

DIP Liens on DIP collateral that is not otherwise subject to any Permitted Prior Lien (defined

below) shall be first-priority.  The DIP Liens shall otherwise be subordinate to the Permitted

Prior Liens, other than liens on the St. Alexius Real Property.

## **Relief Requested**

25.     By this Motion, the Debtors seek entry of the Financing Order which will: (i)

authorize the Debtors to obtain the DIP Facility on an interim basis; (ii) allow the DIP lender the

DIP Superpriority Claims and grant the DIP Lender the DIP Liens; (iii) provide adequate

protection to the St. Alexius Properties Prepetition Secured Parties; and (iv) set a hearing for a

final determination regarding the Debtors' use of Cash Collateral and the DIP Facility, and

prescribing the form and manner of notice thereof.

26.     Attached hereto as **Exhibit B** is a copy of the revised budgets setting forth the

Debtors' proposed use of Cash Collateral and proceeds of the DIP Facility (the "Budgets").  In

addition, the following chart contains a summary of the essential terms of the Debtors' use of the

DIP Facility including adequate protection provided to the St. Alexius Properties Prepetition

Secured Parties, together with references to the applicable sections of Bankruptcy Rules

4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2:

| **Borrowers**<br>*Bankruptcy Rule 4001(b)(1)(B)* | Americore Holdings, LLC; Americore Health, LLC; Americore Health Enterprises, LLC; Success Healthcare 2, LLC; St. Alexius Properties, LLC; St. Alexius Hospital Corporation #1; Ellwood Medical Center, LLC; Ellwood Medical Center Real Estate, LLC; Ellwood Medical Center Operations, LLC; |
| --- | --- |

| | |
|---|---|
| | and Izard County Medical Center, LLC; Pineville Medical Center, LLC |
| **Parties with an Interest in the St. Alexius Properties Prepetition Collateral** | Toby Mug Financing, LLC; Pelorus Equity Group, Inc. |
| **Postpetition Lender** *Bankruptcy Rule 4001(b)(1)(B)* | JMB Capital Partners Lending, LLC |
| **Amount of DIP Facility** *Local Rule 4001-2* | Up to $5,000,000; *See* also Budgets attached as **Exhibit B** |
| **Estimated Value of the Prepetition Personal Property Collateral** *Local Rule 4001-2* | Unknown |
| **Estimated Value of the St. Alexius Properties Prepetition Collateral** *Local Rule 4001-2* | $43,000,000 |
| **Termination Date for DIP Facility** *Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | **DIP Lender Cash Collateral.** Subject to the terms and conditions of the interim Financing Order and the other DIP Loan Documents, the Debtors are authorized to use DIP Lender Cash Collateral until the earlier of (a) the Maturity Date and (b) the date upon which the Debtors' right to use DIP Lender Cash Collateral is terminated under the interim Financing Order as a result of an Event of Default (as defined in the DIP Loan Agreement) which remains continuing and has not been waived by the DIP Lender. |
| **Purposes of the Use the DIP Facility** *Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | The Debtors are authorized to use the proceeds of the DIP Facility Loans to (a) fund the postpetition working capital needs of the Debtors during the pendency of the Chapter 11 Cases, (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the DIP Loan Documents, and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Loan Documents, including, but not limited to, the Budget and the interim Financing Order. Notwithstanding anything herein, the extensions of credit under the DIP Facility shall not constitute cash collateral of the St. Alexius Properties Prepetition Secured Parties or any person or entity holding a Permitted Prior Lien. |

| Interest Rate, Fees, Costs and Other Expenses Borne by Debtors<br>*Local Rule 4001-2* | **Interest Rate**:  The DIP Obligations under the DIP Facility shall bear interest at 12.0% per annum, payable monthly.<br><br>**Commitment Fee**: 3.0% of the facility amount, earned and payable in cash at time of commitment.<br><br>**Funding Fee**:  2.0% of the facility amount, earned and payable in cash at the time of funding.<br><br>**Exit Fee**: 5.0% of the facility amount, earned at time of commitment and payable upon any mandatory or voluntary prepayment, including payment at maturity.<br><br>**Stated Maturity Date**: June 30, 2020.<br><br>**Other**:  The DIP Facility includes covenants, conditions, fee/expense reimbursement and indemnity provisions that are customary for facilities of this kind. |
| **Adequate Protection for the St. Alexius Properties Prepetition Secured Parties**<br>*Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | **Adequate Protection Liens**.  The St. Alexius Properties Prepetition Secured Parties are granted (effective and perfected upon the date of the interim Financing Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the St. Alexius Properties Prepetition Collateral from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "St. Alexius Properties Secured Parties Adequate Protection Claim"), a valid, perfected replacement security interest in and lien upon any and all assets of the Debtors subject to the St. Alexius Properties Prepetition Secured Parties Liens, subordinate to (i) the DIP Liens and (ii) the Carve-Out (the "Adequate Protection Liens").<br><br>**507(b) Claim**.  St. Alexius Properties Prepetition Secured Parties are hereby granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of St. Alexius Properties Secured |

| | |
|---|---|
| | Parties Adequate Protection Claim with, except as set forth in the interim Financing Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "St. Alexius Properties Secured Parties 507(b) Claim" and, collectively with the Adequate Protection Liens and the Debtors' obligation to provide any reporting provided to the DIP Lender under the DIP Loan Agreement, the "Adequate Protection Obligations"); which St. Alexius Properties Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral. The St. Alexius Properties Secured Parties 507(b) Claim shall be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims. The St. Alexius Properties Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the St. Alexius Properties Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all Commitments terminated.<br><br>**Equity Cushion**. The St. Alexius Properties Prepetition Secured Parties are further adequately protected by an equity cushion provided by the St. Alexius Properties Prepetition Collateral. |
| **DIP Superpriority Claims Allowed, and DIP Liens Granted, to the DIP Lender**<br>*Local Rule 4001-2* | **DIP Superpriority Claims**. In accordance with section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed the DIP Superpriority Claims against each Debtor and their estates with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final Order with respect to section 506(c) only), 507(a), 507(b), 726, 1113 and 1114) of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section |

1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to and subordinate to only the Carve-Out; provided, further that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and the estates and all DIP Collateral and all proceeds thereof, and (a) any and all avoidance power claims or causes of action under sections 544, 545, 547, 548 through 551 and 553(b) of the Bankruptcy Code (the "Avoidance Actions") and the proceeds thereof, (b) prepetition tort claims, including claims against the Debtors' (i) current and former directors and officers (if any), and (ii) prepetition lenders, and the proceeds thereof; and (c) any deposit in connection with a proposed Sale (whether terminated or otherwise) that becomes property of the Debtors' estates (a "Sale Deposit") subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections, if any, as may be approved by this Court.

**DIP Liens**.  Effective immediately as of the entry of the interim Financing Order, as security for the DIP Obligations, the DIP Lender is granted, the continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the Stated Maturity Date (i.e.June 30, 2020), by acceleration, or otherwise) of the DIP Obligations.  The term "DIP Collateral" means collectively all prepetition and postpetition real property and all prepetition and postpetition tangible and intangible personal property of each Borrower, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to all accounts, contracts rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit

| | |
|---|---|
| | accounts, documents, instruments, commercial tort claims, leases and leaseholds and rents, avoidance actions under section 549 and related recoveries under section 550 of the Bankruptcy Code, together with all proceeds of each of the following, including insurance proceeds (as each such term above is defined in the UCC, to the extent applicable), and, subject to Final Order, including the proceeds and recoveries from Avoidance Actions (the "<u>Avoidance Action Proceeds</u>").<br><br>Subject to the entry of the final Financing Order, to the fullest extent permitted by the Bankruptcy Code or applicable law, and except as otherwise set forth in the interim Financing Order, any provision of any lease other than a real property lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Lender in accordance with the terms of the interim Financing Order and the other DIP Loan Documents. |
| **Priority of DIP Liens.** | To secure the DIP Obligations, immediately upon and effective as of entry of the interim Financing Order, the DIP Lender, is hereby granted on a final basis, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows, in each case subject to the Carve-Out:<br>(i)       <u>Priming Liens</u>.  Pursuant to 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens and security interests in all DIP Collateral, regardless of where located, which senior priming liens and security interests in favor of the DIP Lender shall |

be senior to the St. Alexius Properties Prepetition Secured Parties Liens and any other liens on the St. Alexius Real Property (whether currently known or unknown), including any alleged liens asserted by The Third Friday Fund Total Return, L.P.  For the avoidance of doubt, the DIP Lender shall have a first priority senior priming lien and security interest in, among other things, (A) all of the assets of St. Alexius Properties, including but not limited to, the St. Alexius Real Property and St. Alexius Properties Prepetition Collateral, and (B) prepetition tort claims, including claims against the Debtors' (i) current and former directors and officers (if any), and (ii) prepetition lenders, and the proceeds thereof.

(ii)    Liens on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to any Permitted Prior Lien. As used herein, the term "Permitted Prior Lien" shall mean any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that (A)(i) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by Section 546(b) of the Bankruptcy Code), (ii) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are senior in priority to the DIP Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements; and (B) any valid Replacement Lien (as defined in the Existing Cash Collateral Order) granted in accordance with the terms of the Existing Cash Collateral Order, provided, however, that the DIP Liens shall have priority over (A) the St. Alexius Properties Prepetition Secured Parties Liens, and (B) any Replacement Liens (as defined in the Existing Cash Collateral Order) granted in favor of the St. Alexius Properties Prepetition Secured Parties in accordance with the terms of the Existing Cash Collateral Order; and

| | |
|---|---|
| | (iii)   <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (ii)) subordinate only to the Permitted Prior Liens.<br><br>Except as expressly set forth in the interim Financing Order, the DIP Liens and the DIP Superpriority Claims shall not be made junior to or *pari passu* with (1) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal or conversion of any of the Chapter 11 Cases or any successor cases, (2) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (3) any intercompany or affiliate lien or claim; and (4) subject to entry of the final Financing Order, any liens arising after the Petition Date excluding any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, or board for any liability of the Debtors. |
| **DIP Facility Termination Date**<br>*Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | The DIP Facility shall terminate on the earlier of (a) the Maturity Date and (b) the date upon which the DIP Facility is terminated hereunder as a result of an Event of Default (as defined in the DIP Loan Agreement) which remains continuing and has not been waived by the DIP Lender. |
| **Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(b)(1)(B)* | The automatic stay of section 362 of the Bankruptcy Code is hereby modified with respect to the Secured Creditors to the extent necessary to effectuate the provisions of any order authorizing the Debtors' use of Cash Collateral. |

27.    In addition, the Court has already granted the Debtors authority to use Cash

Collateral under the Existing Cash Collateral Order.  Relevant terms of that Existing Cash

Collateral Order – which is not up for hearing with this Motion – but which are relevant

background are as follows:

| | |
|---|---|
| **Parties with an Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)* | Utica Leaseco, LLC; App Group International; Hop Capital, LLC; HMFCH Inc.; Smart Business; Corporation Services Company, as representative of unknown entity; CT Corporation Systems, as representative of unknown entity; Dell Financial Services LLC; Republic Bank and Med One Capital Funding, LLC; Aire Liquide Healthcare America Corporation; Gibbs Technology Leasing – HG1, LLC |
| **Purposes of the Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | <u>**Cash Collateral**</u>.  The Debtors are authorized to use the Cash Collateral until the Cash Collateral Termination Date only for working capital, general corporate purposes, administrative costs and expenses of the Debtors in the ordinary course of business, and for purposes of the administration of the Chapter 11 Cases, in each case, subject to the Budgets and the terms and conditions of the Financing Order.  The Debtors' use of Cash Collateral and other cash and cash equivalents shall be consistent with the types of expenses set forth in the Budgets.  The  Secured Creditors shall have no obligation with respect to the Debtors' use of Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with the Budgets or to pay (directly or indirectly from the Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Budgets. |
| **Adequate Protection for Secured Creditors**<br>*Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | <u>**Replacement Liens**</u>. The Secured Creditors may be entitled to adequate protection of their respective interests in the Cash Collateral, for any diminution in value of the Cash Collateral from the Debtors' use thereof.  As adequate protection for the Debtors' use of Cash |

| | Collateral, the Operating Debtors shall grant any Secured Creditor with a valid interest in the Cash Collateral a replacement lien (the "Replacement Liens") on and in all property, owned, acquired, or generated postpetition by the Operating Debtors and their continued operations to the same extent and priority and of the same kind and nature such Secured Creditor had prior to the commencement of the Chapter 11 Cases; provided, however, that (i) the Replacement Liens shall only be granted to such Secured Creditors to the extent of the diminution in the value of their interests in the Cash Collateral, (ii) the Replacement Liens shall not attach to any real property of the Debtors which serves as collateral for any creditor, the Avoidance Actions (defined below) or their proceeds, (iii) the Replacement Liens shall be subordinate to the Carve-Out (defined below), and (iv) any Replacement Liens granted by in favor of the St. Alexius Properties Prepetition Secured Parties under the Existing Cash Collateral Order shall be subordinate to the DIP Liens. |
|---|---|
| **Termination Date for Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2* | **Cash Collateral**.  The Debtors' right to use Cash Collateral shall terminate upon (i) the entry of an order dismissing or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (ii) determining that any of the Debtors is in default of its obligations under the interim Financing Order or a future order authorizing the continued use of Cash Collateral. |

28.     Additional terms of the Debtors' proposed use the DIP Facility are included in the DIP Loan Agreement attached hereto as **Exhibit A** and the proposed form of interim Financing Order filed herewith.

## Basis for Relief Requested

**A.     The DIP Facility Should Be Approved.**

29.     The Debtors have been in negotiations with JMB Capital Partners Lending, LLC concerning the DIP Facility since the commencement of the Chapter 11 Cases.  The Debtors require immediate postpetition financing in order to continue to operate their businesses as a going concern while funding efforts to reorganize for the benefit of their bankruptcy estates. Given the emergency nature of the filing of the Chapter 11 Cases, the Debtors' current financial condition, and the course of discussions with various potential postpetition lenders, the Debtors maintain that the DIP Lender is not only the most logical choice, but practically speaking, the only choice at this juncture, to provide the Debtors with debtor in possession financing.

30.     The DIP Loan Agreement has been negotiated in good faith and at arm's length by and among the Debtors and the DIP Lender.  The Debtors submit that the terms thereof, the use of DIP Lender Cash Collateral, and all other financial accommodations provided under the DIP Loan Agreement and the Financing Order are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties.  The Debtors have, in their business judgment, determined that entering into the DIP Loan Agreement will give the Debtors the financing needed to operate their businesses with minimum interruption or disruption to their operations and thus preserve the going concern value of the Debtors' bankruptcy estates. In addition, the Debtors have, in their business judgment, determined that the DIP Facility provides the Debtors with the greatest degree of flexibility to implement its restructuring strategy.

31.     As described above, the Debtors' restructuring efforts hinge upon its continued use of Cash Collateral under the Existing Cash Collateral Order as well as obtaining access to the DIP Facility.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit

in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of

business, and (c) obtaining credit with specialized priority or on a secured basis.  If a debtor in

possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of

the Bankruptcy Code, a court may authorize such debtor to obtain credit or incur debt that is

entitled to superpriority administrative expense status and/or secured by a senior lien on

unencumbered property, a junior lien on encumbered property or a combination of the foregoing.

In addition, pursuant to § 364(d), absent consent from affected secured parties, a court may

authorize postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a

"priming" lien) when a debtor cannot obtain credit elsewhere and the interests of existing

lienholders are adequately protected.

32.    Section 364(c) of the Bankruptcy Code authorizes a debtor in possession to

obtain postpetition credit:

> If the trustee [or debtor in possession] is unable to obtain unsecured
> credit allowable under section 503(b)(l) of this title as an
> administrative expense, the court, after notice and a hearing, may
> authorize the obtaining of credit or the incurring of debt-
>
> (1)      with priority over any or all administrative expenses of the
> kind specified in section 503(b) or 507(b) of this title;
>
> (2)      secured by a lien on property of the estate that is not
> otherwise subject to a lien; or
>
> (3)      secured by a junior lien on property of the estate that is
> subject to a lien.

11 U.S.C. § 364(c).

33.    Courts have articulated a three-part test to determine whether a debtor in

possession is entitled to financing under section 364(c) of the Bankruptcy Code: whether

(a) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by

allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *See, e.g., In re Aqua Assocs.,* 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Ames Dep 't Stores. Inc.,* 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re Crouse Group. Inc.,* 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

   i.    **Section 364(c)'s Requirements for Post-Petition Credit Are Satisfied**.

   34.    Here, the Debtors would not be able to obtain postpetition credit if such credit were not secured. Specifically, the Debtors believe that given their financial circumstances that the DIP Lender is the only party that will provide it financing at this critical juncture, and the DIP Lender will not provide financing to the Debtors, other than on a secured basis and accompanied by the DIP Superpriority Claims. Accordingly, "credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Federal Say, and Loan Ass 'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); In *re Sky Valley,* Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where there are few lenders likely to be able and/or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."), *aff'd sub nom.*, *Anchor Say. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Hubbard Power & Light,* 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (holding that debtor was entitled to relief under section 364(c) after providing evidence that only one entity of

several solicited would provide the debtor with post-petition financing upon the condition of superpriority for such loans).

35.     Without the DIP Facility, the Debtors will not be able to assure the continued operation of their businesses and healthcare facilities in a manner that will avoid irreparable harm to the Debtors, their bankruptcy estates, and their healthcare patients. The ability of the Debtors to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the incurrence of new indebtedness and other financial accommodations are necessary to the confidence of the Debtors' vendors and suppliers of other goods and services, to their patients and employees and to the preservation and maintenance of the going concern value of the Debtors' bankruptcy estates. In fact, it is likely that if the Debtors are not permitted to use Cash Collateral and obtain the DIP Facility they will need to cease operations, lay-off their employees, and transfer their patients to other healthcare providers. For these reasons, the DIP Facility is critical to the Debtors' operations and necessary to preserve the assets of the Debtors' estates for the benefit of their creditors.

36.     Furthermore, the Debtors submit that this Court should defer to the Debtors' business judgment which led the Debtors to determine that the terms of the DIP Facility are reasonable under the circumstances and should be approved by this Court. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod.* Co., 47 B.R. 444, 449 (D. Cob. 1985) ("Business judgments should be left to the boardroom and not to this Court."); *In re Lifeguard Indus.. Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Hamilton Square Assoc.,* No. 91-14720S, 1992 WL 98294, at *1 (Bankr. E.D. Pa. May 5 1992) (holding that a

"debtor in possession's business judgment must be accepted if reasonable."). As one court

has noted, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and

increase its costs, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

Accordingly, the DIP Facility should be authorized pursuant to section 364(c)(1) of the

Bankruptcy Code generally and to the extent that it requires the provision of the DIP Liens

and the DIP Superpriority Claims.

    **ii.**    **The Requirements for a Priming Lien Under Section 364(d) Are Also Satisfied.**

    37.    Section 364(d) provides:

> The court, after notice and a hearing, may authorize the obtaining of
> credit or the incurring of debt secured by a senior or equal lien on
> property of the estate that is subject to a lien only if-
>
> > (1) the trustee [or debtor in possession] is unable to obtain such
> > credit otherwise; and
>
> > (2) there is adequate protection of the interest of the lien on the
> > property of the estate on which such senior or equal lien is proposed to
> > be granted.

11 U.S.C. § 364(d).

    38.    Hence, absent consent, in order to obtain a "priming lien," a debtor must establish

that (i) there was no other alternative to the proposed DIP facility, and (ii) the interests of the

senior lien holders being "primed" will be adequately protected in the face of the proposed loan.

*In re First South Sav. Ass'n.*, 820 F.2d 700 (5th Cir. 1987); *In re W&W Protection Agency, Inc.*,

200 B.R. 615, 623 (Bankr. S.D. Ohio 1996); *In re Levitt & Sons, LLC*, 384 B.R. 630, 640-41

(Bankr. S.D. Fla. 2008).

39.     As set forth above, the Debtors meet the first prong of section 364(d) of the

Bankruptcy Code, as there are no available alternate funding sources for debtor in possession

financing more favorable than those proposed herein.  Further, to the extent that the DIP Liens

shall prime the St. Alexius Properties Prepetition Secured Parties Liens, the priming of the

interests of the St. Alexius Properties Prepetition Secured Parties is a requirement for the DIP

Loan Agreement.

40.     As to the second prong of section 364(d) of the Bankruptcy Code, "the

determination of adequate protection involves a careful balancing of all relevant factors

including the value of the collateral, the likelihood it will depreciate over time, the debtor's

prospects for a successful reorganization, the debtor's performance under the plan, the balance of

hardships between the parties, and whether the creditor's property interest is being unduly

jeopardized."  *In re Brown*, 1998 U.S. Dist. LEXIS 16436, *14 (E.D. Pa. Oct. 15, 1998).

Notwithstanding this holistic approach, "the existence of equity above the secured party's

interest which provides an 'equity cushion' to the secured party may … provide adequate

protection."  *In re Dunes Casino Hotel*, 69 B.R. 784, 794 (Bankr. D.N.J. 1986).  Indeed, "[i]n

some cases, the [equity] cushion alone is adequate to guarantee a party will receive the

'indubitable equivalent' of its interest in the property as permitted by 11 U.S.C. § 361(3)."  *In re

Packard Square LLC*, 574 B.R. 107, 121 (Bankr. E.D. Mich. 2017) (quoting *In re Schaller*, 27

B.R. 959, 962 (W.D. Wis. 1983)).  An equity cushion "will shield [the secured creditor's]

interest from loss due to any decrease in the value of the property."  *Id*. (citing *In re Mellor*, 734

F.2d 1396, 1400 (9th Cir. 1984)).  "Case law has almost uniformly held that an equity cushion of

20% or more constitutes adequate protection."  *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D.

Ill. 1987) (collecting cases).

41.     Here, the interests of the St. Alexius Properties Prepetition Secured Parties in the

St. Alexius Properties Prepetition Collateral are adequately protected by significant equity

cushion, even after the addition of the priming DIP Liens, and such interests will not be unduly

jeopardized.  As set forth above and in the First Day Declaration, the St. Alexius Real Property

on which priming DIP Liens will be granted has recently been appraised at $43,000,000.  Thus,

both the Toby Mug Secured Claim, in the amount of $1,250,000, and the Pelorus Secured Claim,

in the amount of $6,300,000, are well "in the money," as the value of the St. Alexius Real

Property is roughly $35,500,000 greater than such secured claims combined.  Even after the

addition of the priming DIP Liens in the amount of up to $5,000,000 plus other DIP Obligations,

the St. Alexius Real Property will provide the St. Alexius Properties Prepetition Secured Parties

with an equity cushion of roughly $30,000,000, or over 397% percent of the combined value of

their secured claims.

42.     Further, any decrease in the amount of this substantial equity cushion will be

offset by the Adequate Protection Liens and the St. Alexius Properties Secured Parties 507(b)

Claim granted to the St. Alexius Properties Prepetition Secured Parties.  Between the Adequate

Protection Obligations and their equity cushion, the St. Alexius Properties Prepetition Secured

Parties are adequately protected.  What is more, with the use of Cash Collateral and the DIP

Facility, the Debtors' prospects for a successful reorganization through asset sales and/or a

chapter 11 plan of reorganization are strong, and the value of the St. Alexius Real Property is

unlikely to substantially depreciate during the pendency of the Chapter 11 Cases.  Indeed, the

proposed DIP Facility will maximize the value of the Debtors' bankruptcy estates for the benefit

of all creditors without jeopardizing the interests of the St. Alexius Properties Prepetition

Secured Parties in the St. Alexius Properties Prepetition Collateral, let alone "unduly"

jeopardizing the same.  Accordingly, the DIP Facility should be authorized pursuant to section 364(d) of the Bankruptcy Code to the extent that it requires the provision of DIP Liens that will prime the St. Alexius Properties Prepetition Secured Parties Liens

**B.      The St. Alexius Properties Prepetition Secured Parties Should be Provided Adequate Protection.**

43.      Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which may include additional or replacement liens, periodic cash payments, and other forms of relief.  *See* 11 U.S.C. § 361(1).  What constitutes adequate protection must be decided on a case-by-case basis.  *See, e.g. MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985).

44.      The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See, e.g., In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value of which he bargained pre-bankruptcy") (internal citations omitted). Allowing the use of cash collateral is essential to preserve or enhance a debtor's ability to remain a going-concern. *See In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984).  The grant of a replacement lien provides ample adequate protection of a secure creditor's interest in cash collateral.  *O'Connor*, 808 F.2d at 1397.

45.      Here, the St. Alexius Properties Prepetition Secured Parties Liens are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all the St. Alexius Properties Prepetition Collateral, in an amount equal to the aggregate diminution in value of the St. Alexius Properties Prepetition Secured Parties' interests in the St. Alexius Properties Prepetition Collateral from and after the Petition

Date, if any, for any reasons provided under the Bankruptcy Code.  The Debtors propose to provide the following to the St. Alexius Properties Prepetition Secured Parties, propose to grant the following as adequate protection for the amount of any diminution in the value of the St. Alexius Properties Prepetition Collateral (collectively, the "Adequate Protection Obligations"):

    i.   *Adequate Protection Liens.*  The St. Alexius Properties Prepetition Secured Parties should be granted (effective and perfected upon the date of the Interim Order and without the necessity of any mortgages, security agreements, pledge agreements, financing statement or other agreements), in the amount equal to the aggregate diminution in value of the interests in the St. Alexius Properties Prepetition Collateral from and after the Petition Date, if any, for any reasons provided under the Bankruptcy Code (the "St. Alexius Properties Secured Parties Adequate Protection Claim"), a valid, perfected replacement security interest in and lien upon any and all assets of the Debtors subject to the St. Alexius Properties Prepetition Secured Parties Liens, subordinate to (A) the DIP Liens and (B) the Carve-Out (the "Adequate Protection Liens").

    ii.   *507(b) Claim.*  St. Alexius Properties Prepetition Secured Parties should be granted, an allowed superpriority administrative expense claim as provided in section 507(b) of the Bankruptcy Code in the amount of St. Alexius Properties Secured Parties Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "St. Alexius Properties Secured Parties 507(b) Claim"); which the St. Alexius Properties Secured Parties 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral.

The St. Alexius Properties Secured Parties 507(b) Claim should be subject and subordinate only to the Carve-Out and the DIP Superpriority Claims. The St. Alexius Properties Prepetition Secured Parties should not receive or retain any payments, property or other amounts in respect of the St. Alexius Properties Secured Parties 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) have indefeasibly been paid in cash in full and all Commitments terminated.

iii.    *St. Alexius Properties Prepetition Secured Parties Information*. As additional adequate protection of the St. Alexius Properties Prepetition Secured Parties' security interests in the St. Alexius Properties Prepetition Collateral, the Debtors intend to contemporaneously provide the St. Alexius Properties Prepetition Secured Parties with any reporting provided to the DIP Lender under the DIP Loan Agreement.

46.    Collectively, this Adequate Protection Liens, St. Alexius Properties Secured Parties 507(b) Claim and the Debtors' reporting obligations are more than enough to adequately protect the St. Alexius Properties Secured Parties. The Debtors' appraisal for the St. Alexius Properties Collateral is $43,000,000, and the principal amount of the St. Alexis Properties Secured Parties' loans to the Debtors was just $7,550,000. Even if the amount of the St. Alexis Properties Secured Parties' is rounded up to $8,000,000 there is still an equity cushion according to the Debtors' appraisal of over 425%, and an equity cushion of just 20% has been found to be sufficient for adequate protection in other circumstances. *In re McKillips*, 81 B.R. at 458 (collecting cases). Put another way, if the actual value of the St. Alexius Properties Collateral were just one third of what is set forth in the Debtors' appraisal there would still be a significant

equity cushion above 20%.  This equity cushion alone is enough to provide adequate protection.

*See e.g.*, *In re Dunes Casino Hotel*, 69 B.R. at 794; *In re Packard Square LLC*, 574 B.R. at 121.

The St. Alexius Properties Secured Parties 507(b) Claim and the Debtors' reporting obligations

provide even further adequate protection.

**C.     Interim Use of the Cash Collateral and Approval of the DIP Facility Should Be
        Granted.**

47.     The Debtors bring this Motion to obtain authorization to enter into the DIP Facility

on an expedited basis due to the immediate and irreparable harm that would be suffered by the

Debtors' bankruptcy estates if the Debtors cannot use cash and obtain the postpetition financing

needed to sustain the Debtors' businesses as a going concern while the Debtors implement and

consummate the sale of certain assets and negotiate a chapter 11 plan of reorganization.  The

Debtors have an immediate need to obtain the DIP Facility to permit them, in addition to

financing the administration of the Chapter 11 Cases, to (a) operate the Debtors' businesses, (b)

maintain business relationships with vendors, suppliers and patients, (c) pay employee wages in

the ordinary course, (d) satisfy other working capital and operational needs, and (e) finance the

sale and reorganization processes, all of which are necessary to preserve the Debtors' going-

concern value.

48.     Without the use of Cash Collateral (which has already been approved on an

interim basis) and the DIP Facility the Debtors will not be able to meet their day-to-day

operational needs.  As described above, if it is unable to meet the day-to-day operational needs,

they would be forced to cease operations, lay-off their employees, and transfer their patients to

other healthcare providers.  Aside from these obviously dire results, if the Debtors cease

operations their going concern value would evaporate to the detriment of the Debtors'

bankruptcy estates and all key constituencies.  Therefore, the Debtors request approval of the

31

continued use of Cash Collateral and the DIP Facility on an expedited basis due to the immediate

and irreparable harm that would be suffered by the Debtors' bankruptcy estates if the Debtors

cannot obtain the financing needed to sustain the Debtors' businesses.

49.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors' requests for use of

Cash Collateral and approval of the DIP Facility may only be granted on an interim basis during

the 14-day period following the filing this Motion, and may only be authorized "to the extent

necessary to avoid immediate and irreparable harm to the estate."  Fed. R. Bankr. P. 4001(b)(2).

In examining requests under this rule, courts apply the same business judgment standard as is

applicable to other business decisions.  *See, e.g., Ames*, 115 B.R. at 38. After the 14-day period,

the rule does not limit the request to those amounts necessary to avoid immediate and irreparable

harm, and the debtor can borrow those amounts it views as prudent to the operation of its

business.  *Id.* at 36.

50.     The Debtors request that the Court conduct an expedited preliminary hearing on

the Motion and authorize the Debtors, from and after the entry of the Financing Order until a final

hearing, to continue to use Cash Collateral subject to the Existing Cash Collateral Order and to

obtain credit under the DIP Loan Agreement, which the Debtors shall use to, among other things,

provide working capital for the Debtors and pay expenses for the Chapter 11 Cases.  This

authority will allow the Debtors to maintain ongoing operations and avoid immediate and

irreparable harm and prejudice to their bankruptcy estates and all parties-in-interest pending the

conclusion of a final hearing.

51.     Absent this Court's approval of the interim relief sought in this Motion, the

Debtors face a substantial risk of severe disruption to their business operations and irreparable

damage to their relationships with patients and vendors—the result of which would be a

catastrophic erosion of the value of the Debtors' bankruptcy estates. Simply put, the relief sought herein will allow the Debtors to ensure that the Debtors' businesses continue to operate during the Chapter 11 Cases.

**D.**     **A Hearing to Grant the Relief Requested Herein On a Final Basis Should Be Scheduled.**

52.     The Debtors request that the Financing Order only be entered on an interim basis at this time. Accordingly, the Debtors request that by the Financing Order that the Court schedule a hearing at which the relief requested in this Motion will be considered on a final basis.

**E.**     **The Replacement Liens, DIP Superpriority Claim, the DIP Liens, and the Adequate Protection Obligations Granted Herein Should be Subject to a Carve-Out for U.S. Trustee Fees and Professional Fees and Expenses.**

53.     Notwithstanding any provision of this Motion or the DIP Loan Agreement to the contrary, the Debtors seek to establish a carve-out for fees of the Clerk of the Court, U.S. Trustee fees and professional fees and expenses (the "Carve-Out") that is not subject to any prepetition liens, the Replacement Liens granted to Secured Creditors, the DIP Superpriority Claims and the DIP Liens granted to the DIP Lender, the Adequate Protection Obligations granted the St. Alexius Properties Prepetition Secured Parties, or any other protections granted to Secured Creditors, the DIP Lender, or the Alexius Properties Prepetition Secured Parties under the Existing Cash Collateral Order or Financing Order, on either an interim or a final basis. Specifically, the Carve-Out shall include: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) and section 3717 of title 31 of the United States Code; (ii) the reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; and (iii) the aggregate amount of unpaid fees and expenses of the Debtors' and the Committee (which order has not been reversed, vacated or

stayed unless such stay is no longer effective) under sections 327(a), 328 or 1103(a) of the

Bankruptcy Code (the "Case Professionals"), to the extent such fees and expenses are allowed

and payable pursuant to an order of the Court (which order has not been reversed, vacated or

stayed) ("Allowed Professional Fees"), and the reimbursement of out-of-pocket expenses

allowed by the Court and incurred by the members of the Committee in the performance of their

duties (but excluding fees and expenses of third party professionals employed by such members)

("Committee Expenses"), which amount under this clause (iii) shall not exceed the sum of: (x) an

aggregate amount per week limited to the amount set forth in the Budget for Allowed

Professional Fees and Committee Expenses incurred prior to the delivery of a Carve-Out Trigger

Notice provided (i) the Maturity Date has not occurred or (ii) Event of Default has not occurred

or continuing (the "Pre Carve-Out Notice Trigger Cap") *plus* (y) $75,000 for the Debtors'

Allowed Professional Fees incurred from and after the delivery of the Carve-Out Trigger Notice

(defined below) (the "Post Carve-Out Notice Cap" together, with the Pre Carve-Out Notice

Trigger Cap, the "Carve-Out Cap").  No portion of the Carve-Out or any DIP Lender Cash

Collateral may be used in violation of this Interim Order.  Nothing in this Interim Order or

otherwise shall be construed to increase the Carve-Out if actual (i) Allowed Professional Fees of

any Case Professional or (ii) Committee Expenses are higher in fact than Carve-Out Cap amount.

54.     As used herein, the term "Carve-Out Trigger Notice" means a written notice

provided by the DIP Lender to the Debtors, counsel to the Committee, and the U.S. Trustee that

the Post Carve-Out Notice Trigger Cap is invoked, which notice may be delivered following the

occurrence and during the continuance of an Event of Default and/or acceleration of the DIP

Obligations under the DIP Loan Documents.  Upon delivery of the Carve-Out Trigger Notice to

the Debtors (the "Termination Declaration Date"), the Debtors shall provide notice by email and

facsimile to all Case Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) within one (1) day after the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Case Professionals is subject to and limited by the Post Carve-Out Notice Trigger Cap.

55.     Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

56.     Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the other DIP Loan Documents, the Bankruptcy Code and applicable law.

57.     Nothing contained herein is intended to constitute, nor shall be construed as consent to the allowed of any Case Professional's fees, costs and expenses by any party and shall not affect the rights of the Debtors, the DIP Lender or any other party in interest to object to the allowance and/or payment of any such amounts incurred or requested.

### Modification of the Automatic Stay

58.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Loan Agreement requires a modification of the automatic stay to implement the terms of the DIP Loan Agreement.

59.     Stay modification provisions of this kind are ordinary and standard features of

postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are

reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain

unsecured credit allowable as an administrative expense under section 503(b)(1) of the

Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.

Nor have the Debtors been able to obtain debtor in possession financing on terms more favorable

than those proposed herein.  The terms and conditions of the DIP Facility, including the

modification of the automatic stay described above, are fair and reasonable, and were negotiated

extensively by well-represented parties in good faith and at arm's length.  In these circumstances,

and importantly, in light of the material benefits afforded to the Debtors by the DIP Facility, the

modification of the automatic stay is more than warranted.

## Reservation of Rights

60.     Nothing contained herein is intended or should be construed as an admission of

the validity of any claim against the Debtors, a waiver of the Debtors' or any other party's rights

to dispute any claim, or an approval or assumption of any agreement, contract, or lease under

section 365 of the Bankruptcy Code.  If this Court grants the relief sought herein, any payment

made pursuant to this Court's order is not intended and should not be construed as an admission

of the validity of any claim or a waiver of the Debtors' or any other party's rights to dispute such

claim subsequently.

## Notice

61.     Notice of this Motion has been given to: (i) the Debtors; (ii) the Office of the United

States Trustee for the Eastern District of Kentucky; (iii) the Debtors' 30 largest creditors on a

consolidated basis; and (iv) the Debtors' secured lenders; (v) applicable state tax authorities and

the Internal Revenue Service; (vi) any parties specifically affected by the Motion; and (vii) any other parties with counsel having filed an appearance in the Chapter 11 Cases.  Because of the exigencies of the circumstances and the irreparable harm to the Debtors that will ensue if the relief requested is not granted, the Debtors submit that no other notice need be given

62.     The Debtors are seeking by separate motion an expedited hearing on this Motion for 9:00 a.m. (Eastern) on January 17, 2020 before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Lexington, KY 40507 in the 2nd Floor Courtroom.

[*remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Financing Order: (i) authorizing the Debtors' continued use of Cash Collateral on an interim basis, (ii) granting the Secured Creditors adequate protection, (iii) authorizing the Debtors to obtain postpetition financing in the form of the DIP Facility on an interim basis, (iv) granting the DIP Superpriority Claims and the DIP Liens to the DIP Lender, (v) authorizing the Debtors to enter into agreements with JMB Capital Partners Lending, LLC; (vi) authorizing the Debtors' use of DIP Lender Cash Collateral; and (vii) scheduling a final hearing to consider the Debtors' use of Cash Collateral and the DIP Facility; and (viii) granting such other and further relief as the Bankruptcy Court deems just an proper.

Dated: January 16, 2020

Respectfully submitted,

*/s/ James R. Irving*
James R. Irving
April A. Wimberg
Christopher B. Madden
BINGHAM GREENEBAUM DOLL LLP
3500 PNC Tower
101 South Fifth Street
Louisville, Kentucky 40202
Telephone: (502) 587-3606
Facsimile:  (502) 587-3695
Email: jirving@bgdlegal.com
        awimberg@bgdlegal.com
        cmadden@bgdlegal.com

*Proposed Counsel to the Debtors*