UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

In re:

Americore Holdings, LLC, et. al.                **AFFIDAVIT**

Debtors.

BEFORE ME, the undersigned authority, personally appeared MICHAEL E. LEWITT, who upon being duly sworn, deposes and says:

A. Introduction

1. I am over the age of 18 years, sui juris, and have personal knowledge of the facts set forth herein.

2. I am a member in good standing of the New York State Bar. I am an experienced corporate, tax and securities law attorney as well as a long-time investor in public and private equity, options and debt markets. During my investment career, I have been involved in lending billions of dollars to companies with below investment grade ratings such as the Debtor in this action.

3. I am the Manager of the General Partner of The Third Friday Total Return Fund, L.P. ("Third Friday"), Debtor's largest and most senior secured lender. Americore Holdings and affiliates currently owe Third Friday approximately $25 million, all of which is secured as described below.

4. I am submitting this affidavit in support of Third Friday's motion to remove Grant White as Chief Executive Officer of Debtor. As Debtor's senior lender, I have worked closely with Mr. White over the last 18 months and believe he is unfit to manage Debtor's business. He

1

not only lacks adequate knowledge of the hospital and healthcare business, but he conducts business in a highly unethical manner in which he consistently breaches contracts, violates loan agreements, deliberately misleads lenders, vendors and employees, and consistently acts in a manner that damages the reputation and prospects of Debtor. Debtor's business will be irreparably harmed if he is permitted to continue to play any role in the management of this company.

B. Third Friday's Loans to Debtor

5. The Third Friday Total Return Fund, L.P. is the largest lender to Debtor. Under the Loan and Security Agreement dated as of January 12, 2018 by and between Third Friday and Americore Health, LLC ("Americore Health") (the "Americore Health Loan Agreement"), Third Friday was granted a senior secured lien in all of the assets of Americore Health including but not limited to the following: (i) accounts, including accounts receivable; (ii) documents;, (iii) chattel paper (including Electronic Chattel Paper): (iv) Deposit Accounts, Security Accounts, Commodities Accounts and all deposits therein or credited thereto; (v) General Intangibles (including Payment Intangibles and Software); (vi) Goods (including Equipment Inventory and all attachments thereto); (vii) Instruments; (viii) Investment Property and Real Property; (ix) Letters of Credit and Letter of Credit Rights; (xi) copyrights (whether registered or unregistered and all registrations and applications therefor, patents and patent applications (including al reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof, trademarks (and all goodwill associated with such trademarks), trade names and service marks (including all registrations and applications of any of the foregoing); (xii) money, rights to payment of money, insurance claims and proceeds, and (xiii) all additions and accessions to, substitutions for and replacements, products and proceeds of the foregoing and all of such Borrower's books and record relating to any of the foregoing and to Borrower's business. A Form UCC1 was filed

in the State of Delaware on January 12, 2018 with respect to this security interest that is attached hereto as Exhibit 1.

6. Pursuant to a Loan Agreement and Security Agreement dated as of May 1, 2018 by and between Third Friday and Americore Holdings, LLC ("Americore Holdings") (the "Americore Holdings Loan Agreement"), Third Friday was granted a senior secured lien in all of the assets of Americore Holdings including but not limited to the following: (i) accounts, including accounts receivable; (ii) documents;, (iii) chattel paper (including Electronic Chattel Paper): (iv) Deposit Accounts, Security Accounts, Commodities Accounts and all deposits therein or credited thereto; (v) General Intangibles (including Payment Intangibles and Software); (vi) Goods (including Equipment Inventory and all attachments thereto); (vii) Instruments; (viii) Investment Property; (ix) Letters of Credit and Letter of Credit Rights; (xi) copyrights (whether registered or unregistered and all registrations and applications therefor, patents and patent applications (including al reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof, trademarks (and all goodwill associated with such trademarks), trade names and service marks (including all registrations and applications of any of the foregoing); (xii) money, rights to payment of money, insurance claims and proceeds, and (xiii) all additions and accessions to, substitutions for and replacements, products and proceeds of the foregoing and all of such Borrower's books and record relating to any of the foregoing and to Borrower's business. A Form UCC1 was filed in the State of Delaware on June 4, 2018 with respect to this security interest that is attached hereto as Exhibit 2. The Americore Health Loan Agreement and Americore Holdings Loan Agreement are attached hereto as Exhibit 3.

7. Third Friday has extended additional financial support to Debtor as well. In April 2019, Third Friday provided a guarantee of collection to Pelorus Equities with respect to the

3

$6,300,000 loan Pelorus extended with respect to Debtor's acquisition of St. Alexius Hospital. Third Friday extended a $1.75 million loan to complete that acquisition as well. Third Friday guaranteed other obligations of Debtor including a $394,500 loan from Titan Funding, LLC and payments to Cardinal Health to purchase supplies for St. Alexius Hospital immediately after its acquisition by Debtor. Third Friday did not ask for and did not receive any additional compensation for providing these guarantees. It did so in its capacity as Debtor's senior lender and significant shareholder in support of the company's mission to provide quality healthcare to the patients in the communities it serves.

8. Unlike other lenders to Americore Holdings and Americore Health, Third Friday also agreed to accept payment of interest in kind instead of cash interest payments with respect to most of the interest owed to it with respect to its loans in order to provide Debtor with the flexibility needed to manage and grow its business.

9. In addition, to remove any doubt about the secured status of its loans, Third Friday filed UCC1s in Missouri on December 10, 2019 on St. Alexius Properties, LLC and on St. Alexius Hospital Corporation #1 on December 16, 2019. See Exhibit 4. At the time these UCC1s were filed, Third Friday knew Americore Holdings and Americore Health and St. Alexius Hospital to be solvent with substantial assets in excess of their liabilities. In fact, at that time St. Alexius was in the process of billing and collection approximately $115 million of accounts receivable from Medicare, Medicaid and HMOs for services provided before September 1, 2019 in addition to billing for its current services and waiting to bill another $8 million of laboratory services, $5 million of professional fees for uncredentialed physicians and other fees.

C. Third Friday's Forbearance Agreements

10. When it became apparent in late 2018 that Debtor would be unable to repay or refinance its loans to Third Friday when due, Debtor and Third Friday entered into the first of several forbearance agreements in December 2018. The first forbearance agreement was dated as of December 31, 2018 and provided for, among other things, Third Friday to receive a 10% ownership interest in Americore Holdings, a restructuring consultant to begin working at the company to assist Mr. White, and Third Friday to be provided with regular, detailed financial updates on the company. The First Amended Forbearance Agreement was entered into as of May 16, 2019. The Second Amended Forbearance Agreement was entered into as of July 1, 2019 and provided for Third Friday's ownership interest in Americore Holdings to increase to 35% where it stands today. The Third Amended Forbearance Agreement was entered into as of September 1, 2019 and re-affirmed the previous forbearance agreements, including the Second Amended Forbearance Agreement's grant to Third Friday of a 35% ownership interest in Americore Holdings. The Third Amended Forbearance Agreement also provided Third Friday, in addition to its pre-existing security interest in all of Americore Holdings' and Americore Health's assets, with a first lien security interest in Bank Account #1523-2252-5329 at U.S. Bank, 721 Locust Avenue, St. Louis, Missouri 63101 where Debtor is obligated to deposit all payments received from all sources with respect to services provided to patients at St. Alexius Hospital before September 1, 2019. At the expected collection rate of at least 30% of billings, these payments are expected to significantly exceed the full amount of Third Friday's loan. These Forbearance Agreements are attached hereto as Exhibit 5.

11. On December 24, 2019, Third Friday delivered to Debtor a Notice of Default citing four specific Events of Default: (i) Section 5(g) of the Americore Health Loan Agreement and Americore Holdings Loan Agreement (prohibiting Borrower from granting any, lien, security interest or other encumbrance on the Collateral other than those granted to Borrower); (ii) Section 1(b)(ix) of the First

5

Forbearance Agreement (defaults by Borrower on other company obligations); (iii) Section 3(m) of the First Forbearance Agreement (failure of Borrower to deliver to Lender subordination agreements from all other secured lenders of Borrower); and (iv) Section 6 of the Third Amended Forbearance Agreement (failure to pay Lender amounts collected on pre-9/1/19 accounts receivable). The Notice of Default specifically noted that these were not the only Events of Default committed by Debtor. The Notice of Default is attached hereto as Exhibit 6.

12. Third Friday issued the Notice of Default because Mr. White refused to honor Debtor's obligation to deposit collections from pre-9/1/19 services into the U.S. Bank account as expressly required by Section 6 of the Third Amended Forbearance Agreement. When it issued the Notice of Default, Third Friday informed Mr. White that it would not move forward with its remedies provided he not commit further breaches of this provision. Unfortunately, Mr. White immediately committed another such breach, compelling Third Friday, working with state and federal regulators, to seize control of St. Alexius Hospital's bank accounts to prevent Mr. White from further breaching his obligations to Third Friday as well as other creditors and further mismanaging the hospitals.

D. <u>Debtor's Breached Its Loan Agreements With Third Friday in Early 2018</u>

13. As noted above, the Notice of Default cited four different, non-exclusive Events of Default by Debtor. In July 2018, I learned that Debtor violated Section 5(g) of both the Americore Health Loan Agreement and Americore Holdings Loan Agreement, each of which states that "Borrower shall not grant any lien, security interest or other encumbrance on the Collateral other than those granted hereby." I learned that Debtor borrowed money under certain loan agreements known as "Merchant Agreements" ("MCAs") that required it to assign, sell and transfer all of its rights in its accounts receivable to other lenders who charged usurious interest rates. These MCAs required Debtor to grant lenders the right to withdraw funds directly from the bank accounts of Debtor's hospitals. These MCAs were taken by Debtor at the direction of Mr. White in his capacity as Debtor's Chief Executive Officer without the knowledge or consent of Third Friday beginning

6

in May 2018 during a period at the same time Mr. White was soliciting Third Friday for additional loans that were extended by Third Friday. Had Mr. White disclosed these MCAs to me at the time, Third Friday would not have extended further credit to Debtor.

14. Based on a lien search, Debtor began borrowing from EIN Cap Inc. and APP Group International, LLC on or around May 31, 2018; from GTR Source LLC and LEX Funding on or around June 8, 2018; and from Empire Funding and HOP Capital on or around June 13, 2018. It later borrowed from other similar lenders such as HighScore Capital, Smart Advance, BMF Funding, Slate, HMF, Complete Business, Union, Cardinal Funding, Argus and World Global. All of these lenders claim to purchase receivables but in actuality lend money at usurious rates that effectively exceed 200% per annum in violation of state usury laws.

15. Payments to these MCAs, which I estimate amounted to multiples of the principal amount and at least $15 million ($6.6 million alone from St. Alexius Hospital between April and December 2019), proved highly damaging to Debtors' business and were largely responsible for the closures of Pineville Medical Center and Ellwood City Medical Center and Debtor's failure to reopen Lee County Medical Center. A sample "Merchant Agreement" is attached hereto as Exhibit 7.

16. Based on an examination of the bank statements of St. Alexius Hospital I conducted in December 2019 and my discussions with Mr. White over the past 18 months, I am confident in stating that Debtor paid MCAs millions of dollars in excess of the principal amounts borrowed, depriving the hospitals of the funds required to pay employees, purchase supplies, and to provide patient care. My examination disclosed that MCAs were paid $6.6 million by St. Alexius Hospital between April 2019, when Debtor purchased the hospital, and December 2019 (and St. Alexius Hospital to my knowledge never borrowed money directly under any MCAs – the loans were taken

by the other hospitals owned by Debtor). In addition, I believe that Ellwood City Medical Center and Pineville Medical Center also paid millions of dollars more to MCAs than they borrowed, contributing to both hospitals' closures. I was also told by Mr. White in a text in December 2019 that Izard County Hospital was having $2,500 per day withdrawn directly from its bank accounts by MCAs, leading it to miss a quarterly rent payment late in 2019. These usurious loans, which were taken by Mr. White without Third Friday's knowledge or consent, are largely responsible for the financial difficulties of Debtor. Debtor would be significantly cash flow positive absent these loans.

E. Grant White's History of Mismanagement and Malfeasance

17. In addition to borrowing money at usurious rates, Mr. White committed many other acts of management malpractice at the helm of Debtor.

18. In order to be able to bill Medicare and Medicaid for physicians' professional fees, hospitals must credential those physicians with these government agencies. This is a basic requirement known to anyone in the hospital business. Mr. White failed to credential the physicians at Ellwood City Medical Center since the beginning of 2019. This meant that the hospital was unable to bill Medicare and Medicaid for these physicians' professional fees, depriving the hospital of approximately $2,000,000 of much-needed funds for operations.

19. Mr. White also failed to credential the physicians at St. Alexius Hospital since Debtor acquired the facility in April 2019, depriving the hospital of $5,000,000 of much-needed funds for operations.

20. Mr. White failed to bill at least $8,000,000 of laboratory tests at St. Alexius Hospital for reasons that remain unexplained but appear to have something to do with his efforts

8

to set up a separate company that he would own to which these monies would be paid. See Paragraph 23 below.

21. Despite constant requests by Third Friday that he hire additional management talent, Mr. White failed to fill key positions at Debtor including a chief financial officer, chief operating officer, and chief legal officer despite the obvious need for all of these positions to be filled. As a result, Mr. White attempted to manage Debtor's three hospitals by himself despite having no background in healthcare and living in California, thousands of miles away from the facilities in Missouri, Arkansas, Kentucky and Pennsylvania. He also failed to fill key management roles at Ellwood City Medical Center and St. Alexius Hospital.

22. Mr. White repeatedly refused to provide Third Friday with the financial information required by the Forbearance Agreements despite constant requests for such information. When asked for this information, Mr. White admitted that the company lacked adequate financial systems and financial controls and that he was unable to produce such information but refused to take any measures to address the problem.

23. Mr. White does not understand healthcare billing and collections, which led Debtor to suffer serious revenue collection problems. Over the last 18 months. Mr. White hired and fired several healthcare billing companies. Mr. White finally hired LoneStar Services, managed by Brian Meredith, in August 2019. LoneStar is highly respected and made significant progress improving Debtor's billing and collections processes. Unfortunately, Mr. White constantly tried to undermine LoneStar's efforts by interfering with its work, badmouthing its efforts with St. Alexius's staff and Third Friday, and refusing to pay its invoices.

24. LoneStar continued working without compensation since the bankruptcy filing to insure that billing and collection continues without interruption. Unfortunately, on January 20.

2019, Mr. White appeared at St. Alexius Hospital and instructed Toni Knoche, Managing Director, Revenue Cycle, to disconnect LoneStar from the hospital's billing system. By doing this, Mr. White damaged Debtor's ability to bill and collect revenues, placing St. Alexius Hospital's ability to treat patients and deliver medical services in jeopardy.

25. Based on information I obtained through conversations with Americore employees and service providers, Mr. White set up a separate company to own the laboratory services business provided by Debtors' hospitals. Laboratory services are among the most profitable business owned by Debtor. Mr. White set up Americore Lab Services LLC, which he did not include in this bankruptcy case and which he owns 100% of, so that he can receive all revenues from laboratory testing performed by Debtor's hospital laboratories. He hired a separate billing company, Catalyst, to handle billing and collections for this business. Catalyst charges rates of 3.5% to 5.5%, far more than the rates charged by LoneStar. Catalyst has not received any payments thus far. The establishment of a separate company by Debtor to divert laboratory revenues is a direct breach of the Americore Holdings Loan Agreement and Americore Health Loan Agreement as well as the Forbearance Agreements.

26. Mr. White alienated every community in which Debtor operated. He was effectively chased out of Lee County, VA after failing to meet multiple commitments to reopen Lee County Medical Center. The Mayor of Pineville, KY was repeatedly quoted in the press accusing Mr. White of acting unethically and demanded his removal from the management of Pineville Medical Center, which was forced to close after missing multiple payrolls because Mr. White chose to pay his usurious lenders rather than employees. Mr. White developed a terrible reputation with local vendors and suppliers in each of the communities in which the company operated not simply because he refused to pay their bills but because he repeatedly lied to them

10

about these payments to the point where it became very difficult to get basic services provided to the facilities.

F. <u>Mr. White Is Under Investigation By Authorities In Several Jurisdictions</u>

27. During Debtor's tenure as owner of Ellwood City Medical Center under Mr. White's management since October 2017, the facility was cited for at least 40 violations of healthcare regulations by the Pennsylvania Department of Health.

28. Mr. White is currently under civil investigation by the Pennsylvania Attorney General (a year after the Lawrence County, PA District Attorney initiated a criminal fraud investigation of Mr. White for financial malfeasance) for failing to meet the commitments he made when Debtor bought Ellwood City Medical Center in 2017, which was closed by the Pennsylvania Department of Health in November 2019 due to patient safety violations and multiple missed payrolls resulting from Mr. White's decision to pay millions of dollars to usurious lenders rather than paying salaries and other essential hospital expenses. The State of Pennsylvania is investigating Mr. White for failing to pay salaries, payroll taxes, pension contributions and other broken commitments. The Federal Bureau of Investigation raided the facility on January 31, 2020 and carted off a large number of documents. The Department of Justice previously served a subpoena on Mr. White for documents with respect to this facility.

29. Debtor owes approximately $7,000,000 in payroll taxes across St. Alexius Hospital, Ellwood City Medical Center and Pineville Medical Center. This means that in addition to failing to pay the company's portion of these payroll taxes, Mr. White directed Debtor to withhold federal, state and local taxes (and unemployment insurance premiums) deducted from employees' paychecks and then failed to pay these funds to the United States and state governments as required

by law. I am sure I don't need to tell the court that this is a serious violation of the law that Third Friday urged Mr. White to correct immediately upon learning of it.

30.  I believe Mr. White is being investigated by Canadian authorities with respect to his tenure as Chief Executive Officer of Quantum International Income Corp, Toronto, Ontario, Canada. According to press reports, this company raised $4 million from investors in an escrow account and these funds were unavailable to repay investors when they were due to be returned to them. It was reported that Mr. White withdrew the funds and they remain unaccounted for. Mr. White was fired by the company on December 28, 2015 for "improperly seeking to borrow money from a hedge fund" according to court documents.

G.  Grant White's Failed Attempts to Refinance Americore Debt

31.  Over the past 12 months, Mr. White squandered approximately $500,000 on so-called "commitment fees" paid to non-institutional lenders who provided non-binding commitments to refinance Debtor's outstanding debt. Mr. White, who claims to be an experienced investment banker, failed to realize that these so-called commitments were non-binding and their providers were in many cases illegitimate or in some cases outright frauds. It appears that Mr. White made little or no effort to check out the bona fides of any of these lenders, resulting in one failed financing after another.

32.  In the most egregious case, Mr. White paid more than $200,000 to a company called Rapid Access run by an individual purporting to call himself Sean Daniels. Mr. White never performed a background check on Mr. Daniels to determine if he or his firm were legitimate. When I was informed about this loan, I hired an investigator to perform a background check and quickly learned that the office address listed for Rapid Access in Houston, Texas was fake and that there was no such individual named Sean Daniels. The New York State identification card

12

provided by Mr. Daniels was forged and a letter he provided on Suntrust Bank letterhead (which included an inexplicable notation at the bottom saying it was copied to the "Senate Banking Committee") was also obviously forged. Mr. White could have easily learned this information had he performed a modicum of due diligence, saving Debtor over $200,000 in payments for commitment fees including a $105,000 insurance payment to protect the lender who didn't exist (requests for bogus insurance payments are common in financial frauds of this type).

33.    Another refinancing attempt by Mr. White raises questions about his judgment and motives. Over the last several months, Mr. White told me he was working with a group in Canada on an "indemnity bond" that would purportedly lend $20 million to St. Alexius Properties LLC based on St. Alexius Hospital's future cash flows. He sent me copies of several voice messages allegedly updating him on the progress of this financing. I found this proposition to be highly dubious in general and especially in view of Mr. White's previous failure to close any financing of any kind other than the St. Alexius acquisition which relied on Third Friday and his inability to produce financial statements for St. Alexius without the assistance of my firm. The so-called commitment letter for this "indemnity bond" financing, dated November 14, 2019, confirmed my doubts (it is attached as Exhibit 8). The first thing I noticed is that the letterhead of the so-called "Trust Company," UK Alliance Company, shows the same California address as a WeWork address to which Mr. White paid $383,000 from the St. Alexius Hospital bank accounts between June and December 2019 – 1590 Rosencrans Avenue, Manhattan Beach, CA 90266 (I reviewed those bank accounts personally and added up these payments myself). The second thing I noticed is that this so-called commitment requires St. Alexius Properties, LLC to make a deposit into a trust account of 4.7% of the amount of the loan ($940,000) plus $25,000 for attorneys' fees and an additional $16,600 for other closing costs (another $41,600). While the $940,000 is allegedly

13

refundable, so was the more than $200,000 paid to Rapid Access that has yet to be recovered by Debtor. Finally, the commitment expired 72 hours after it was signed without further notice to St. Alexius Properties, who could resubmit a new loan request one year later, rendering the entire exercise moot since Debtor had no way of obtaining the $940,000 required to make the deposit. This transaction bears many similarities to the numerous other financings attempted by Mr. White that required commitment fees to be paid that were never recovered by Debtor. I believe Mr. White paid the $41,600 to this lender with nothing to show in return. Mr. White was still working on this transaction after Debtor filed for bankruptcy.

34. While other prospective lenders were not necessarily outright frauds, they never came close to completing a financing despite being paid upfront fees. These firms included Alpha Rock Asset Management, TCA Global Credit Master Fund (a well-publicized fraud that recently announced it is shutting down), CMBC Market, Baytrust Capital Corp., American National Financial Group, Inc., Commercial Funding & Asset Acquisition LLC, Joint Venture Capital, LLC, Izabiti Financial Consultant, Healthcare Receivables Funding, LLC, Liberty Commercial Finance LLC, and Saxon Spencer Capital. Mr. White was consistently reluctant to send me copies of their so-called commitment letters with good reason. When he finally sent them to me, it was immediately obvious that they were commitments to do nothing and that these lenders would never perform.

35. While Mr. White was working with these non-institutional lenders, my colleagues and I were working with half a dozen institutional firms to try to arrange financing for Debtor. Unfortunately, I encountered several problems. First, Mr. White could not produce financial statements for the company, leading me and my colleagues to produce our own financial statements that delayed the process (we now have accurate though unaudited financial statements);

second, prospective lenders repeatedly stated that Mr. White's background checks raised serious doubts about his credibility, honesty and reputation; and third, we learned that Pelorus Equities was running around Wall Street trying to sell its loan and badmouthing Americore and Mr. White in the process while falsely telling people that Third Friday's loan was in default (Third Friday had not declared a default at the time). In particular, concerns were raised about Mr. White's conduct in Canada and his history of managing hospitals that closed in Virginia, Kentucky and most recently Pennsylvania and Mr. White's personal financial situation that includes an arrest for passing a bad check in in Broward County, Florida on 12/28/16 (the Broward County District Attorney declined prosecution on July 16, 2017). In addition, Mr. White's home in Fort Lauderdale was also in foreclosure and he has a long list of liens against him, rendering him unable to obtain personal credit. As a result, I was told that Debtor could only raise financing backed by Third Friday using as collateral the more than $100 million of accounts receivable from Medicare, Medicaid and large HMOs at St. Alexius Hospital and only if we could make assurances that Mr. White would not have access to these funds.

G. Third Friday Has a Credible Plan to Restructure Debtor

36. Third Friday has consistently demonstrated its willingness to delay repayment of its debt and to provide other financial support to Debtor in the form of financial guarantees in order to support Debtor. It has done so while asking Mr. White to meet his obligations under the Americore Holdings Loan Agreement, Americore Health Loan Agreement and the Forbearance Agreements and urging him to stop borrowing from and paying usurious lenders, to hire additional management at Debtor's hospitals, to institute adequate financial systems and controls, to improve billing and collections, to credential physicians, and to meet the other commitments he made to vendors, suppliers, employees, patients and communities. Unfortunately, all of these

recommendations fell on deaf ears. As a lender, Third Friday's ability to influence Mr. White's actions were limited without enforcing its remedies

37. Contrary to Mr. White's false claims in the affidavit he submitted to this Court that Third Friday exercised control over Debtor, I can assure this Court that had Third Friday been in control, millions of dollars never would have been diverted from Medicare and Medicaid accounts to pay usurious lenders because such loans never would have been taken in the first place; all payrolls and payroll taxes would have been paid; Ellwood City Medical Center and Pineville Medical Center would still be open and serving their communities; and all of the other commitments made by Debtor to vendors, suppliers and employees would have been met. It is Mr. White who breached his obligations to every counterparty to whom he owed a duty.

38. By the summer of 2019 it was obvious that Mr. White had to be removed from this company in order for the company to survive. At that point, Third Friday started working with federal and state regulators to implement a detailed plan to replace Mr. White and install a new management team to run the company.

39. Mr. White has no plan to operate this company going forward and lacks the ability to implement a plan. He has no management team, no financing or wherewithal to raise financing, no employee support, no creditor support, and strong opposition from regulators and local leaders. Leaving the company under his control endangers patient safety and the jobs of the hundreds of people still working at Debtor's hospitals. Every constituency will suffer if Mr. White continues to manage this company.

40. In contrast, Third Friday has a detailed and credible plan to provide operational and financial report to Debtor and to reopen Ellwood City Medical Center. This plan involves the following components:

16

(a) Engaging P3 Insights, an experienced and successful hospital management firm headed by Ken Smithmier, to manage Debtor and its hospitals. P3 Insights will bring experienced operating and financial management professionals with a successful history of operating hospitals in the United States and abroad to each of Debtor's hospitals to improve operations. Third Friday has already engaged P3 at its own expense.

(b) Engaging a major accounting firm to perform both a forensic and financial audit of Debtor and each of its hospitals back to inception of Debtor in 2017. Third Friday already started this work with a detailed review of St. Alexius Hospital's bank accounts and is prepared to devote its resources at no cost to Debtor to work with the accountants to quickly perform this work.

(c) Extending the current engagement of LoneStar Services to handle billing and collections for all of Debtor's hospitals, not only for services provided before 9/1/19 but for all post 9/1/19 services as well as credentialing all physicians at St. Alexius Hospital and Ellwood City Medical Center.

(d) Engaging attorneys in New York State and other jurisdictions to either negotiate or litigate with usurious lenders who Third Friday believes, based on its analysis, were already repaid in full and likely are subject to claw-backs of overpayments of interest and principal made by Mr. White.

(e) Meeting with regulators and officials in each of the local jurisdictions in which Debtor's hospitals operate to win back their confidence.

(f) Meeting with vendors and suppliers to work out payment plans and win back their confidence.

(g) Completing the following essential projects at St. Alexius Hospital: (1) completion of the UAW Drug Rehab Center; (2) completion of the laboratory testing business; (3) working with the Missouri Department of Education to insure the nursing school is in full compliance with all rules and regulation.

(h) Reopening Ellwood City Medical Center in cooperation with state and local officials in Pennsylvania. Based on information provided by LoneStar Services, we believe there is at least $10 million of accounts receivable that can be collected at this hospital, more than sufficient to fund reopening. These funds and other funds that have available will be used to address the issues raised in the Attorney General's lawsuit – paying past salaries and payroll taxes, funding the pension plan, and purchasing new equipment for the emergency room and other facilities. P3 Insights will install new management at the hospital and will hire new employees and determine which services are appropriate for this rural hospital, for example, a laboratory, pharmacy and behavioral health unit are likely essential to a successful operation.

(i) Third Friday will refinance the existing mortgage debt at Ellwood City Medical Center and St. Alexius Hospital and arrange for Debtor to repay their existing lenders. Refinancing discussions with institutional lenders are well advanced. With Mr. White no longer managing Debtor, these discussions can be rapidly concluded and these mortgages refinanced within 30-45 days. Third Friday was also in advanced discussions regarding accounts receivable financing that will provide Debtor with capital to manage its cash flow needs, repay overdue payroll taxes and other payables, and normalize business operations.

18

FURTHER AFFIANT SAYETH NAUGHT.

Dated this 22nd day of January 2020

_____
Michael E. Lewitt, as Affiant

Subscribed and sworn to before me this 22nd day of January 2020, by Michael E. Lewitt [✓] who is personally known to me or [ ] who has produced his Florida Driver's License as identification.

_____
NOTARY PUBLIC
Print Name: Ken Oates
My Commission Expires: 04/21/2020

KENNETH OATES
Notary Public - State of Florida
Commission # GG 325898
My Comm. Expires Apr 21, 2023