# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICORE HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19–61608-grs |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Honorable Gregory R. Schaaf |

## NOTICE OF PATIENT CARE OMBUDSMAN'S INITIAL REPORT

**PLEASE TAKE NOTICE** that on January 21, 2020, Suzanne Koenig was appointed as the Patient Care Ombudsman ("**Ombudsman**") in the above-captioned Chapter 11 cases by the Office of the United States Trustee, pursuant to the Order of the United States Bankruptcy Court for the Eastern District of Kentucky dated December 31, 2019.

**PLEASE TAKE FURTHER NOTICE** that attached to this Notice is the Ombudsman's initial written report as required by 11 U.S.C. § 333 (the "**Report**").

**PLEASE TAKE FURTHER NOTICE** that a copy of the Report will be posted at each of St. Alexius Hospital and Izard County Medical Center, is available on the Court's website, and may be obtained free of charge by contacting:

Robyn Warren, Legal Assistant
SAUL EWING ARNSTEIN & LEHR LLP
Telephone: (302) 421-6839
Facsimile: (302) 421-6813
Email: robyn.warren@saul.com

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

36741417.1 03/21/2020

Dated: March 21, 2020  **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ John D. Demmy*
John D. Demmy (DE Bar No. 2802)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6848
Facsimile: (302) 421-5881
Email: john.demmy@saul.com

*Proposed Counsel for the Patient Care Ombudsman*

36741417.1 03/21/2020

## SUMMARY OF OMBUDSMAN'S MONITORING AND OBSERVATIONS

**A.    St. Alexius Hospital**

On the afternoon of March 13, 2020, the Ombudsman and her representative made an unannounced visit to St. Alexius Hospital ("Hospital") located at 3933 S. Broadway, St. Louis, MO.  The purpose of the visit was to observe the Hospital's implementation of the CDC and CMS-mandated policies and procedures of the Hospital Preparedness Assessment Tool for COVID-19.  The Ombudsman arrived to observe patient safety and readiness for the fast-moving COVID-19 virus.

The Ombudsman entered through the emergency department ("ED") and noted that no information had been posted about the COVID-19 Pandemic.  None of the ED staff performed a wellness screen nor did they discuss with the Ombudsman any restrictions related to the virus outbreak.  The Ombudsman did not observe any indication of preparation activities nor screening of visitors.

The Ombudsman's representative entered the Hospital through the main entrance.  The representative did not observe any screening of visitors entering the hospital.  The representative noted only one sign concerning the COVID-19 Pandemic and the corresponding CDC screening questions; the sign was an 8" x 10" paper sheet posted on a wall far from the front door.  The Ombudsman's representative walked through several areas of the Hospital for fifteen minutes and at no time did staff make an attempt to question or screen her according to CDC guidelines for visitors related to COVID 19 preparedness.  The Ombudsman's representative did not observe any indication that preparation or screening was being done by Hospital staff.

The Ombudsman arrived at the Hospital administration office to meet with officials and was informed that both the interim physician Chief Executive Officer (CEO) and the Chief

Medical Officer (CMO) were away on vacation. The Ombudsman was directed to the administrative conference room where she met with an accountant who had been retained by the Court-appointed Chapter 11 Trustee ("Trustee"). The accountant reported to the Ombudsman that he was not a clinical person, but he had not seen any screening activities when he arrived at the hospital earlier in the day. The accountant contacted some of his other colleagues also retained by the Trustee, one of whom was a clinical person. All were concerned about the lack of screening of visitors entering the hospital.

The Ombudsman requested a meeting with the person in charge of the hospital, the newly installed Chief Nursing Officer (CNO). The CNO stated that both the CEO and the CMO were away on vacation and that the CEO was available by phone. The Ombudsman inquired if there was another physician in-house to assist her with the preparation for the Pandemic. The CNO stated that no other physician was left in charge of the hospital and that she had been "left alone." The CNO informed the Ombudsman that the ED physician was present but as a contractor he was not involved in the daily operations of the Hospital.

The Ombudsman provided the Coronavirus Hospital Preparedness Assessment Tool to the CNO, who stated that she was aware of the virus and had received some information about it. The CNO said that she was putting plans in place as if there was a pandemic; the Ombudsman reminded her that there was in fact a pandemic. The Ombudsman informed the CNO that no screening activity had been observed at the main entrance nor the ED. The CNO responded that she had been having meetings with the staff and was putting systems in place. The CNO stated that the admission registrar was screening patients by asking them questions during the admission process. The CNO could not provide any meeting minutes or information regarding what was discussed, when the meetings were held, and no knowledge of who attended the

2

meetings. The CNO stated she would provide the Ombudsman with the Hospital's emergency plan regarding the COVID-19 virus.

### 1. Review of Key Hospital Staff

**Director of Infection Control:** The Ombudsman requested a meeting with the nurse supervising this department but was informed that she was away on vacation at the time of the Ombudsman's visit.

Director of Quality: The Ombudsman requested a meeting with the department director and was informed that the position is currently vacant, but interviews have been held with several potential candidates.

Director of Purchasing: The Ombudsman and the Trustee's contract accountant met with the person in charge of the Hospital's procurement of medical supplies and personal protection equipment (PPE). The procurement staff member reported that the Hospital had an ample supply of the PPE and medical supplies and that he had several vendors that he could reach out to if necessary. Currently the hospital remains on a "cash-on-delivery" basis with some of their vendors. He stated that key hospital leaders were having daily meetings regarding needs and/or problems related to the bankruptcy but that the meetings had been discontinued when the new CNO was installed.

**Emergency Department**: The Ombudsman requested a meeting with the manager and was informed that the physician, a member of the contracted physician group, and the ED charge nurse were not available to talk to the Ombudsman due to the patient needs in the ED.

**Director of Laboratory Services** : The Ombudsman met with the director of the laboratory. The director informed the Ombudsman of the actions taken in her department and said she was not involved in preparations for COVID-19 for other areas of the hospital. The

director stated that if the ED received a patient displaying COVID-19 symptoms, they were to contact her for direction. The director reported that she had been assured by her resource laboratory that a test kit was available for those patients requiring ED physician-recommended testing. The Ombudsman inquired if the director had attended any formal planning meeting instituted by Hospital administration and she reported that she had not. The Ombudsman inquired if staff had been educated recently on the proper use of PPE. The director stated that they had been trained how to properly don PPE in the past but could not recall the exact date. She stated it was around the time of the Ebola concern a year or so ago.

**Pharmacy Director**: He was not present during the visit but was not on leave. The CNO and the director of purchasing both confirmed that the hospital had adequate medications including intravenous fluids and medications, and supplies.

## 2.  COVID-19 Response Plan Review

The CNO returned for a second meeting and brought several documents as follows:

- Document 1 was a four-page publication titled "Coronavirus (COVID-19) (High-virulence infectious disease)."
- Document 2 was a one-page document titled "ED Foreign Travel Screening Precaution."
- Document 3 was a one-page titled "COVID-19" from the Missouri State Public Health Laboratory.
- Document 4 was a twenty-one-page publication titled "Coronavirus Information from the Missouri Department of Health & Senior Services, Bureau of Communicable Disease Control & Prevention."

Based upon the observations of the Ombudsman and her representative, it was evident that the Hospital did not have a formal plan in place to address the COVID-19 pandemic. The specific deficiencies and observations noted include:

4

- No indication of a formal program of education for the staff;

- The CNO could not provide any information to indicate that the hospital was developing a program to address the COVID-19 pandemic and there was no indication of physician involvement to develop a plan to address the COVID-19 pandemic;

- The CNO appeared to be more of a clinician leading the nursing department but lacked the requisite skills to develop and implement an emergency plan appropriate for the COVID-19 pandemic; and

- Absence of a working policy or guideline for the implementation of an emergency plan.

The Ombudsman reported her findings to the Trustee, and the Trustee announced that a physician needed to be in charge of the hospital readiness along with the clinical administrative team overseeing the process. The Ombudsman was informed that the Trustee subsequently made contact with the CEO to discuss her concerns about the lack of a physician's presence especially in view of the COVID-19 pandemic. The Ombudsman was informed that while neither the CEO nor CMO returned to the Hospital, the CEO did obtain the services of a physician on staff with sufficient expertise to oversee the Hospital while the executive staff remained absent from the facility. The Trustee retained the services of a clinical consultant to work with the physician and the CNO to implement the CDC's program to establish the Hospital's COVID-19 plan.

**3.    Update on COVID-19 Plan**

The clinical consultant retained by the Trustee reported that she has worked with the Hospital and the following guidelines have been implemented by St. Alexius in response to COVID-19 effective March 14, 2020:

- Screening for patients and visitors at all entry points, including immediate temperature readings, screening survey regarding risk, etc. The Hospital has reduced the number of entry points from three to two and has deactivated a "physician entry."

5

Thermometers are oral type; three digital thermometers are on order and are expected to arrive during the week of March 23, 2020;

- Screening for all employees during shift changes;
- Implemented triage protocols for potential need to segregate patients;
- Ongoing assessment of inventory for critical supplies. Direct communication with State authorities and Missouri Hospital Association (MHA) on availability of relief supplies;
- Refresher Personal Protective Equipment (PPE) training for all staff completed;
- Updated policies specific to COVID-19:
    - Occupational Health - Communicable Disease Pregnant;
    - Occupational Health - Communicable Disease Table;
    - Occupational Health - Communicable Disease;
    - Employee Infection Prevention;
    - Travel Exposure Screening Tool;
- Conducting recommended assessments for readiness during/post response via daily "COVID-19 Task Force Response Plan Call." This call is facilitated daily at 10:00 a.m. by the CEO and the doctor appointed by the CEO to oversee the COVID-19 Plan. This is a multi-functional task force including the CNO, human resources, and environmental services (EVS). This call has been ongoing since Monday, March 16, 2020.
- Ongoing assessment regarding staffing safety measures (i.e. self-quarantine after air travel; instructions not to report to work if they are symptomatic; ban on paid time off (PTO) for immediate time period; ban on non-essential work-related travel, etc.

The Hospital's preparedness plan for the COVID-19 appears to be appropriate and the Trustee's clinical consultant will give the Ombudsman weekly updates on the status of the plan.

**4.     Additional updates since March 10, 2020**

The Trustee informed the Ombudsman that the CEO returned to the hospital on March 19, 2020. Due to his foreign travel, the CEO placed himself into a self-quarantine after

6

conferring with the CMO. The Hospital and the clinical consultant are participating in phone calls with the Missouri Department of Health (MDOH) regarding the COVID-19 pandemic. The Hospital was requested to develop a business model to present to MDOH. This plan will be developed by the CMO and the CNO and the clinical consultant will assist them as needed. The clinical consultant will provide the Ombudsman with weekly updates.

5. **Regulatory issues**

The hospital had a visit from the Missouri Bureau of Hospital Standards in February 2020, and no citations were levied. However, they returned on March 3, 2020 and they issued a preliminary determination of Immediate Jeopardy (IJ) based on their findings. Two members of the Hospital's clinical staff failed to use proper Crisis Prevention Institute (CPI) techniques in a patient encounter and failed to call for the security officer in accordance with the Hospital's policies and protocols. The Hospital allowed the staff members to return to work without appropriate re-education or training in CPI de-escalation techniques. Hospital staff did not adequately investigate alleged patient abuse by failing to include key stakeholders in the investigation process.[2] The ability to organize one's thinking and to calmly respond are both effective de-escalation techniques that can avert a crisis.

6. **Hospital's response**

The Hospital immediately addressed the citations via a plan of correction to re-educate all staff who serve in direct patient care regarding patient rights, abuse and neglect. An independent third-party healthcare consultant group was retained to oversee the development and implementation of the plan of correction (POC) and to provide education and training to the staff on resident's rights and how to approach a combative patient by using the CPI techniques. The

---

[2] Reference: CPI technique: https://www.crisisprevention.com/Blog/CPI-s-Top-10-De-Escalation-Tips

Trustee contacted the Ombudsman to review the Plan of Correction for patient safety prior to submitting the response to the Missouri Bureau of Hospital Standards.

The two staff were suspended and eventually terminated from their positions. The CNO confirmed that all of the educational requirements had been completed. The IJ citations were abated and the hospital is awaiting information from the Missouri Bureau of Hospital Standards.

7. **<u>Closed record review</u>**

The Ombudsman reviewed the closed record of a patient that was treated in the ED. The patient is an elderly person who presented to the ED on February 28, 2020 with complaints of acute pain in the left hand and left shoulder, reportedly related to injury sustained twenty years ago. Vitals were within normal range. The patient was seen by the physician and diagnosed with possible rotator cuff injury. The patient was medicated with an intramuscular pain medication and an anti-inflammatory medication while in the ED. She was discharged with a prescription for Flexeril (muscle relaxer) and Ibuprofen (anti-inflammatory). Discharge instructions directed the patient to return home and to rest for the day and to return to the ED if symptoms worsened. The patient was instructed to follow up with the primary care physician and to see an orthopedic physician for an MRI. The care and the discharge orders met the clinical standard of practice.

The Ombudsman also reviewed the closed record of an elderly person admitted on February 14, 2020 to be evaluated for suicidal thoughts. The patient lives in a nursing home and had an altercation where the patient attempted to pull out a tracheotomy tube. The patient has a history of schizoaffective bipolar disorder and has been seen at the hospital in the past. The patient is wheelchair bound and has several medical issues including hypertension, respiratory failure, brain tumor and diabetes. The reasons for admission were behavior and suicidal

thoughts. The patient was alert and able to make their needs known during the evaluation in the ED. Based on patient history and current assessment, admitting diagnoses to the psych unit were schizoaffective disorder, bipolar type with depression and suicidal ideation. The patient was followed by a medical physician as well as the psychiatrist. Vital signs were normal for the patient. The patient received medication treatment and counseling during the stay. The patient responded to the treatment plan and was discharged back to the nursing home on February 18, 2020.

### Conclusion

After review and numerous updates provided by the Hospital, the Ombudsman had no significant concerns about the care and services that the ED patient referred to above received during the hospital stay and, subject to such review and updates, does not have any significant concerns with respect to the Hospital generally.

**B.    Izard County Medical Center**

Since the last report filed with the Court, the Ombudsman has been in frequent contact with the chief executive officer (CEO) of Izard County Medical Center ("Medical Center"). The Medical Center is located at 61 Grasse Street, Calico Rock, AR. The purpose of the communication was to discuss the Hospital's implementation of CDC guidelines regarding the COVID-19 pandemic. The CEO reported to the Ombudsman that she had no knowledge of any diagnoses of COVID-19 within Izard County. The CEO verified that she has received information from the Arkansas Department of Health and has participated in several phone conversations with officials from the department.

The Medical Center's Coronavirus Preparation Response Plan was sent to the Ombudsman on March 11, 2020 and the CEO reported that she had implemented the plan. The

key components of the plan included the CDC-recommended screening questions for patients presenting for care. The following questions will be asked by the triage nurse when checking in patients for treatment.

(1) Have they traveled to any country with widespread transmission of coronavirus?
(2) Have they been in close contact with someone who has been diagnosed with coronavirus?
(3) Do they have symptoms of fever, cough, shortness of breath?

If the patient answers yes to any of the above questions, the patient is immediately fitted with a mask and is isolated in a room with the door closed until further evaluation and screening can be done. The staff interacting with the patient are to wear personal protective equipment (PPE) and the number of staff interacting with the patient shall be kept to a minimum. The same triage questions are to be used for those patients transported by ambulance. If a patient is found to be a true coronavirus risk due to travel, exposure or symptoms, the nurse and the provider are to immediately contact the Arkansas Department of Health.

The persons of investigation form (PUI) shall be completed by the nurse and shall notify the infection control personnel. They also shall contact the Arkansas Department of Health's Outbreak Response Section when the PUI form for Novel Coronavirus is completed. The patient shall continue to be tested for other possible diagnoses such as influenza and is to remain in isolation. If possible, staff taking care of potentially infected persons should not be caring for other patients. A nurse shall stay in the room with the suspect patient and leave other staff to care for additional patients if possible.

Staff from all departments, including laboratory, radiology, and housekeeping must wear appropriate PPE. In order for this to happen, it must be communicated to other personnel in the Medical Center prior to their contact with the patient. If possible, a nurse or physician shall draw

or perform any laboratory samples to avoid unnecessary contact and possible exposure to more employees. The CEO reported that the ED has three PPE containers available and informed the staff that the appropriate use of PPE and hand washing is necessary. The Ombudsman received a memo sent out to patients presenting to the Rural Healthcare clinic to call ahead if they have symptoms of the coronavirus. Patients will be instructed to wait in their car until a private room can be made ready for them. Patients are instructed to go to the emergency room if they are having shortness of breath.

The Ombudsman reviewed the Response Plan against CDC guidelines and it appears that the Izard County Medical Center is in compliance with the guidelines. The Ombudsman informed the CEO to contact her immediately if they have a patient that tests positive for the COVID-19 virus.

### Conclusion

The Ombudsman did not observe any significant concerns with respect to the Medical Center.