**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION**

---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
Americore Holdings, LLC, *et al.*,[1]                      :   Case No. 19-61608
                                                           :   (Jointly Administered)
            Debtors.                                       :
                                                           :   **Re: Docket No. 737**
---------------------------------------------------------- x

**OBJECTION OF THE THIRD FRIDAY TOTAL RETURN FUND, L.P. TO
THE CHAPTER 11 TRUSTEE'S MOTION TO APPROVE DESIGNATION
OF STALKING HORSE BIDDER (ST. ALEXIUS) AND BREAK-UP FEE IN
ACCORDANCE WITH APPROVED BID PROCEDURES AND SALE MOTION
AND REQUEST FOR HEARING ON JULY 16, 2020 AT 9:00 A.M. EASTERN**

The Third Friday Total Return Fund, L.P. ("Third Friday"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") to the *Chapter 11 Trustee's Motion to Approve Designation of Stalking Horse Bidder (St. Alexius) and Break-Up Fee in Accordance with Approved Bid Procedures and Sale Motion and Request for Hearing on July 16, 2020 at 9:00 A.M. Eastern* (ECF No. 737) (the "Motion").[2] In support of the Objection, Third Friday respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Healther Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation # 1 (2766).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

{2337/000/00502670}                         1

**PRELIMINARY STATEMENT**

1.  Third Friday is the Debtors' largest prepetition creditor who engaged with the Debtors pre-filing to provide the Debtors necessary financing in an attempt to help stave off a chapter 11 filing.

2.  Since the appointment of Carol L. Fox as the chapter 11 trustee (the "Trustee") in these chapter 11 cases, Third Friday has engaged in and continues to engage in discussions with the Trustee regarding its intent to assist the Trustee in her efforts to keep the Debtors' business operations afloat either through a chapter 11 plan of reorganization or a sale of the whole business as a going-concern, including the Debtors' operations at St. Alexius Hospital in St. Louis, Missouri; Ellwood City Medical Center in Ellwood City, Pennsylvania; and Izard County Medical Center in Izard County, Arkansas (the "Medical Facilities").

3.  As evidenced by the terms embodied in the *Joint Plan of Reorganization Proposed by Third Friday Total Return Fund, LLP* (ECF No. 639) (the "Third Friday Proposed Plan of Reorganization") and the accompanying *Disclosure Statement in Support of Plan of Reorganization Proposed by Third Friday Total Return Fund, LLP* (ECF No. 640), Third Friday has every intention to pursue the purchase of all the Medical Facilities, if appropriate; retain as many employees as possible and where appropriate re-staff certain vacancies; and provide unsecured creditors with the greatest possible recoveries. Specifically, the Third Friday Proposed Plan of Reorganization would result in, if approved, (i) all the Medical Facilities remaining open to serve their communities, the necessity of which has only been highlighted with the recent outbreak of a global pandemic; (ii) an investment of additional capital to improve and reopen, where applicable, the Debtors' business operations at these Medical Facilities; (iii) entry into a definitive management services agreement with a hospital management team, P3 Insights, with

over 60 years of combined experience in healthcare management and operations, to manage all three of the company's facilities; and (iv) provide a significantly higher recovery to the Debtors' unsecured creditors, not just the unsecured creditors of St. Alexius Properties, LLC, St. Alexius Hospital Corporation # 1, and Success Healthcare 2, LLC (the "St. Alexius Entities"), than would be provided if the Debtors' assets were sold to different parties through a sale under section 363 of the Bankruptcy Code or out-right liquidation.

4.  The deadline to bid on the assets owned by Ellwood Medical Center, LLC; Ellwood Medical Center Real Estate, LLC; and Ellwood Medical Center Operations, LLC (collectively, the "Ellwood Entities") expired on July 13, 2020 at 5:00 p.m. (EST). The Trustee has extended Third Friday's bid deadline to July 15, 2020 at 5:00 p.m. (EST). To the best of Third Friday's knowledge, there is no other entity that is willing to bid on these assets in conjunction with the assets owned by the St. Alexius Entities. Third Friday has every intention to purchase the assets owned by the Ellwood Entities provided that Third Friday is chosen as the winning bidder on the assets owned by the St. Alexius Entities. Third Friday is unwilling to purchase the Ellwood Entities without also purchasing the St. Alexius Entities because the Ellwood Entities and St. Alexius Entities are both integral parts of Americore Holdings, LLC's ("Americore") ability to operate as a going-concern. The successful purchase of the assets owned by the St. Alexius Entities is necessary to help fund, operate, recapitalize and revamp the business operations of the Ellwood Entities on a go-forward basis as contemplated under Third Friday's business plan for Americore. Third Friday is prepared to commit the necessary capital to reopen Ellwood City Medical Center as part of its overall plan for Americore. Otherwise, Third Friday would have to seriously consider foregoing purchasing the Ellwood Entities, leading to a potential liquidation of the Ellwood

Entities resulting in a permanent loss of jobs in the community and deprivation of necessary health services to the community as well.

5. Prior to the filing of the Motion, the Trustee never provided Third Friday with the opportunity to present a higher and better offer. Third Friday only obtained on July 6, 2020 the financial information necessary to (i) submit such a bid and (ii) demonstrate the financial wherewithal to fund the Third Friday Proposed Plan of Reorganization it filed with this Court on June 10, 2020. Third Friday has now provided the Trustee with evidence of its financial wherewithal to fund the Restructuring Plan. Third Friday is prepared, able, and willing to submit a stalking horse bid on higher and better terms, with no break-up fee and higher cash purchase price, than those provided in the Asset Purchase Agreement attached as Exhibit A to the Motion.

6. Third Friday contends that approval of the relief sought in the Motion is not in the best interest of the Debtors' estate as it inherently seeks to sell the Debtors' assets piecemeal, and the filing of the Motion is effectively forcing the hands of estate creditors to accept a lower recovery in these chapter 11 cases.

## OBJECTION

7. The Motion seeks, among other things, to approve (i) the Trustee's designation of SA Hospital Acquisition Group, LLC ("SA Hospital Acquisition") as the stalking horse bidder and (ii) approve the Proposed Stalking Horse Bidder's break-up fee pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and the *Order Granting Trustee's Motion for Entry of an Order: (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets (St. Alexius), (II) Establishing Procedures for the Assumption and/or Assignment by the Trustee of Certain Executory Contracts and Unexpired Leases, (III) Approving the Form and Manner of Notice of Bidding Procedures, (IV) Setting*

*Objection Deadlines, and (V) Granting Related Relief* (ECF No. 541) (the "St. Alexius Bid Procedures Order"). Given the size of the Proposed Break-Up Fee (see Section II below for defined term) and the fact that Third Friday is wanting, willing, and able to enter into an asset purchase agreement on substantially the same terms contemplated under the Asset Purchase Agreement, subject to no break-up fee and higher cash purchase price, the Motion should be denied.

I. **The Trustee Has Failed to Exercise Sound Business Judgment**

8. Generally, courts hold that sales pursuant to section 363(b) of the Bankruptcy Code are subject to a debtor's or trustee's sound business judgment. *See, e.g.*, *In re FirstEnergy Solutions Corp.*, 591 B.R. 688, 694 (Bankr. N.D. Oh. 2018) (stating the business judgment rule in the context of 363 sales); *see also ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 603 (5th Cir. 2011) (finding that the approval of break-up fees in advance of an auction must be based on a "compelling and sound business justification); *In re JW Resources, Inc.*, 536 B.R. 193, 197 (Bankr. E.D. Ky. 2015) (finding that the Debtors negotiated break-up fee was based on sound business judgment). The Trustee's business judgment, however, "is not a license to rely on pretextual justifications that fail to withstand scrutiny." *In re FirstEnergy Solutions Corp.*, 591 B.R. at 694. Moreover, the Trustee bears the burden of establishing by a preponderance of the evidence that she exercised sound business judgment. *Id.* at 695 (providing the standard of proof). By a preponderance of the evidence, the Court should be satisfied that the terms of the current Asset Purchase Agreement will maximize value received by the estate through the auction process. *See, e.g.*, *In re Family Christian,* LLC, 533 B.R. 600, 621–22 (Bankr. W.D. Mich. 2015) ("The [] [Trustee], in conducting the sale process, ha[][s] a fiduciary duty to maximize the value of [] [the Debtors'] estate[]."); *In re Engman*, 395 B.R. 610, 626 (Bankr. W.D. Mich. 2008) ("[T]here is

more to court approval of a proposed Section 363(b) sale than just whether the trustee has brought to the table an offer that will meet the minimum that is required to satisfy his fiduciary responsibilities to the estate). Unequivocally, based on the Motion itself, the Trustee has failed to meet her burden by a preponderance of the evidence.

9.   The Motion asserts without support that the Trustee exercised sound business judgment in her decision to designate SA Hospital Acquisition as the Proposed Stalking Horse Bidder and in negotiating the Proposed Break-Up Fee because it is designed to maximize the value of the Debtors' assets; however, the Motion is devoid of any basis for making such an assertion. Third Friday fails to see how the Asset Purchase Agreement with the Proposed Stalking Horse Bidder provides any "design" that encourages a competitive bidding process that would culminate in the highest and best price for the Debtors' assets. Motion, at ¶15. This is particularly the case in view of the fact that the Proposed Break-Up Fee is unusually high for a transaction of this size and that Third Friday is willing to act as a stalking horse bidder on better terms, with no break-up fee, for the assets owned by the St. Alexius Entities. Furthermore, while the Trustee may rely on a line of cases that provides that courts find a sound business justification where there are financing contingencies that dictate the acceptance of a lower purchase price, this is not the sole criteria by which courts judge the sufficiency of the Trustee's business judgment. *See In re Family Christian, LLC*, 533 B.R. at 621–22 ("The Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing."). Based on the terms embodied in the Asset Purchase Agreement, it is unclear whether the stalking horse bid provided by SA Hospital Acquisition is subject to financing contingencies that would impede its ability to close. *See* Motion, Ex. A., Asset Purchase Agreement, §3.9 (providing that "Purchaser has provided Seller with sufficient evidence of

{2337/000/00502670}    6

Purchaser's financial capacity"). The Trustee should be required to present sufficient evidence on how SA Hospital Acquisition intends to fund the Purchase Price (*i.e.*, entirely through cash on hand, entirely through a loan from a third party, or a combination of the two). Further, there is no evidence that SA Hospital Acquisition is a suitable bidder. SA Hospital Acquisition is a shell company that was only formed in the State of Delaware on June 10, 2020. There is no submission of evidence regarding the identity of its owners, whether it has any relationship with other creditors whose rights to bid and prior actions in this case have been challenged by the Trustee and other interested parties, the source of its funding, its qualifications or ability to be licensed to own or manage a hospital, and other factors relevant to its suitability and wherewithal. The Trustee should be required to demonstrate that it evaluated all of these factors to satisfy the business judgment test.

10. The Trustee seems to be relying on this Court's recent decision in *In re JW Res., Inc.*, 536 B.R. 193 (Bankr. E.D. Ky. 2015) for her "sound business justification." In that case, this Court found based on the evidence that the debtors exercised sound business judgment because (i) the debtors' estate would benefit from having a stalking horse bidder; (ii) the stalking horse bidder was only one of two active parties pursuing the purchase of the debtors' assets with the ability to close on the proposed transaction on terms that would maximize value to the Debtors' estate; (iii) the due diligence conducted by the stalking horse bidder was beneficial to the auction process since it could be used to force other bidders to commit to a sale; and (iv) the unique facts and circumstances of the case. *See id.* at 196–97. Here, there is no showing that the evidence currently before this Court dictates a finding of a "sound business justification" given the unique facts and circumstances of these cases.

11. First, it goes without saying that the Debtors' estate would benefit from having an initial bidder—not necessarily a stalking horse bidder—when there are two or more parties interested in buying the assets owned by the St. Alexius Entities. Given the unique facts and circumstances here, however, designating a stalking horse bidder is not necessary where there are only two parties actively seeking to purchase the same assets and the terms of the Asset Purchase Agreement could result in a chilling effect that may cause any potential third parties from partaking in the auction. Even if this Court finds that designating a stalking horse bidder is necessary, Third Friday is prepared to act as the stalking horse bidder on better terms, including no break-up fee, for the Debtors' that would not result in a chilling of the auction process. Such a bid could only be deemed a sound exercise of the Trustee's business judgment because it could result in a more lucrative purchase price.

12. Second, as in the *In re JW Res., Inc.* case, there are only two active purchasers that Third Friday is aware of for the purchase of the assets owned by the St. Alexius Entities—SA Hospital Acquisitions and Third Friday. Third Friday is empathetic to the fact that we are currently amid a global pandemic that negatively impacted the economy and, as a result, limited the pool of potential purchasers. The fact that we are amid a global pandemic, however, cannot be used as a pretextual justification for a sound business justification to designate any entity as the stalking horse bidder to expedite a sales process on terms that create an outsized 6.5% bid increment, if not more, for third-party bidders that does not maximize value to the Debtors' estate. Furthermore, Third Friday's understanding of the Debtors' business operations both pre- and post-petition makes clear that Third Friday has every intention of operating all of the Debtors' business operations on a go-forward basis. SA Hospital Acquisition's intent in purchasing the assets owned by the St. Alexius Entities is unclear. All that any one can take away from the Motion and Asset

Purchase Agreement is that SA Hospital Acquisition may have the ability to close on the proposed transaction and that it intends to operate the Medical Facilities for a short duration of time. *See* Motion, at ¶8 (providing that the "Purchaser has and will have immediately available funds in cash, which are sufficient to pay the Purchase Price to be paid at Closing"); Motion, Ex. A., Asset Purchase Agreement, § 4.7 ("From the approval of the Stalking Horse Bid through the date of the Sale Order and until the closing, Seller shall, with respect to the operation of the hospital . . . carry on Seller's operation of the hospital . . . ."). Based on confidential documents currently in the digital hands of the Trustee, Third Friday has demonstrated the financial wherewithal to close the proposed transaction. Further, Third Friday intends to operate all of the Debtors' business operations on a permanent basis. It is unclear how an exercise of sound business judgment by the Trustee could result in choosing an entity to act as a stalking horse bidder which, based on the extremely limited public information made available to all parties-in-interest, may or may not have the ability to close on the proposed transaction over an entity which not only will close on the proposed transaction but also has the intention and a plan in place to keep the Debtors' businesses operating as a going concern on a permanent basis.

13. The benefits of having a potential bidder that has the intention and a plan in place to continue operating the Debtors' businesses on a go-forward basis cannot be overstated. The Debtors are in the business of providing health care services to local communities that are essential to providing residents with lifesaving care and treatment. Moreover, operating the Debtors' businesses as a going concern also provides benefits to local businesses, trade vendors, service providers, and residents of the local communities who are either current employees or residents who need employment. The Medical Facilities are vital to the communities they serve. St. Alexius Hospital is located in a relatively poor, medically underserved minority community in St. Louis

whose residents desperately require access to high quality medical and psychological care. Ellwood City Medical Center is located in a small town and its closure last year led to significant job losses in the community and forced residents to travel long distances for medical care, including emergency medical care. Izard County Medical Center is a critical access facility located in a rural area in Arkansas whose closure would also require members of the community to travel long distances to seek medical care and emergency care. Third Friday, which originally invested approximately $18,000,000 in these facilities (which it is offering to forgive under the Third Friday Proposed Plan of Reorganization), is prepared to invest tens of millions of dollars more to ensure that all of these underserved communities are provided with the high quality healthcare they deserve and the jobs that go with them while also offering to repay the other creditors of Debtors.

14. Lastly, there is no showing that the due diligence performed by SA Hospital Acquisition was beneficial to the auction process or could be used to force other bidders to commit to a sale. *See* Motion, at ¶17 (providing that SA Acquisition Holdings' Asset Purchase Agreement creates a framework for a competing bidder that creates value). Even before the outset of the Debtors' chapter 11 cases, Third Friday conducted its own due diligence, contemplated the terms of its own version of an asset purchase agreement and go-forward business plan for the Debtors' business operations, and engaged and continues to engage in constant communication through its professionals with the Trustee regarding the purchase of the Debtors' assets. Third Friday fails to see how designating SA Hospital Acquisition as the Proposed Stalking Horse Bidder and agreeing to the Proposed Break-Up Fee to facilitate the filing of the Asset Purchase Agreement provides any value to the only other active purchaser of the Debtors' assets, Third Friday. In the alternative, assuming that a third-party bidder comes in at the last second hoping to participate in the auction process, one value that can be taken away with certainty is that they would have to pay

{2337/000/00502670}    10

approximately $1,100,000 more in cash (see Section II below) to meaningfully engage in the auction process that would not be paid to the estate. Further, the value of due diligence performed by the Proposed Stalking Horse Bidder that could benefit other potential third-party purchasers is unknown. The only insight a potential third-party purchaser could gain based on the terms of the Motion and Asset Purchase Agreement is that some due diligence may have occurred. Evidence of the quality and usefulness of due diligence performed by the Proposed Stalking Horse Bidder and confidence in the Proposed Stalking Horse Bidder's performance of due diligence should be the criteria by which value should be judged—not wholly conclusory statements backed by no evidence. In contrast, to date, Third Friday has spent hundreds of thousands of dollars performing the necessary due diligence to purchase the assets owned by the St. Alexius entities as well as the company's other facilities.

15. For all of these stated reasons, the Trustee fails to justify a sound business decision in designating SA Hospital Acquisitions as the Proposed Stalking Horse Bidder on the terms set forth under the Asset Purchase Agreement.

## II. The Proposed Break-Up Fee Should Not Be Approved

16. In addition to seeking to designate the Proposed Stalking Horse Bidder on terms unfavorable to the auction process, the Motion seeks approval of bid protections consisting of (i) a termination payment in an amount equal to $510,000 (the "Termination Fee");[3] and (ii) an expense reimbursement of up to $500,000 for SA Hospital Acquisition's out-of-pocket expenses related to

---

[3] Although the Motion itself provides that the Proposed Break-Up Fee consists of a Termination Fee of $465,000 or 3% of the net cash consideration component of the Purchase Price, the Asset Purchase Agreement attached as Exhibit A to the Motion provides that the Termination Fee is $510,000 or 3.2%. *Compare* Motion, at ¶11, *with* Motion, Exhibit A, Asset Purchase Agreement, §9.3. The Termination Fee of $510,000 is the appropriate number to use in calculating the total value of the Proposed Break-Up Fee. *See* Motion, at ¶11 n.2 ("This is a summary of the material terms of the Break-Up Fee and is qualified entirely by the APA itself. *To the extent of any conflict between the summary and the APA, the APA governs*.") (emphasis added).

the proposed transaction in the event the Asset Purchase Agreement is terminated in favor of an alternative transaction (the "Expense Reimbursement").  *See* Motion, Ex. A, Asset Purchase Agreement, §9.3.

17.    Taking both the Termination Fee and Expense Reimbursement together (collectively, the "Proposed Break-Up Fee"), the Trustee seeks to give SA Hospital Acquisition bid protections that amount to **6.5%** of the $15,500,000 cash portion of the Purchase Price which is unreasonable for a transaction of this size.[4]  The unreasonably high Proposed Break-Up Fee will chill third party bidding by placing SA Hospital Acquisition in a uniquely advantageous position and amounts to nothing more than an outsized bid increment that benefits SA Hospital Acquisition at the expense of the estates.  *See, e.g.*, *In re JW Resources, Inc.*, 536 B.R. 193, 196 (Bankr. E.D. Ky. 2015) (finding that a break-up fee is not appropriate where it will not provide a benefit to the proposed auction) (quoting *In re Fin. News Network, Inc.*, 1991 WL 127524, at *1 n.5 (Bankr. S.D.N.Y. May 10, 1991), *aff'd*, 134 B.R. 737 (S.D.N.Y. 1991), *aff'd*, 980 F.2d 165 (2d Cir. 1992)); *In re Hupp Industries, Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Oh. 1992) ("[A] potential harm which follows an imprudent allowance of a break-up fee results in a lesser spirited auction process and may preclude further bidding in instances where the fee is so large that it makes competitive bidding too costly.").

---

[4] Courts generally find bid protections of 1-4% of the purchase price reasonable.  *See, e.g.*, *Suitable Technologies, Inc.*, Case No. 20-10432 (MFW) (Bankr. D. Del. Apr. 20, 2020) (permitting Debtor to agree to bid protections in any Stalking Horse APA provided that in the aggregate, any Break-Up Fee be limited to 2% and any Expense Reimbursement be limited to 1% of the Stalking Horse Purchase Price); *In re Hospital Acquisition LLC, et al*, Case No. 19-10998 (BLS) (Bankr. D. Del. Jun. 27, 2019) (limiting break-up fees to an amount no greater than 3% and expense reimbursement to $250,000); *In re JW Resources, Inc.*, 536 B.R. 193, 195 (Bankr. E.D. Ky. 2015) (noting that break-up fees in the range of 1-2% of the purchase price is often approved) (quoting *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 138 n.6 (Bankr. N.D. Ind. 1997)); *In re Sea Island Co.*, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% break-up fee); *Farmers & Merchants State Bank v. Direct Scaffold Services, Co., LLC*, 2009 WL 3673052, at *4 (M.D. Tenn. Oct. 30, 2009) (approving a break-up fee of 2%); *In re Hupp Industries, Inc.*, 140 B.R. 191, 193 (Bankr. N.D. Oh. 1992) ("Except in extremely large transactions, break-up fees ranging from one to two percent of the purchase price have been authorized by some courts."); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 625 (S.D.N.Y. 1987) (approving 2% break-up fee).

18. Accordingly, given the unreasonably high dollar amount contemplated by the Proposed Break-Up Fee, the Court should deny the Proposed Break-Up Fee as unreasonable and an unjustified exercise of the Trustee's business judgment.

## CONCLUSION

19. For the reasons stated forth herein, the Motion should be denied in its entirety and the Trustee should not be permitted to (i) designate SA Acquisition Holdings as the Proposed Stalking Horse Bidder and (ii) enter into the Proposed Break-Up Fee pursuant to the St. Alexius Bid Procedures Order or section 105 or 363 of the Bankruptcy Code.

*[Remainder of page left intentionally blank.]*

**WHEREFORE**, Third Friday respectfully requests that the Court deny the Motion in its entirety, and enter such other and further relief as the Court deems just and proper.

Dated: July 15, 2020

        **SHRAIBERG, LANDAU & PAGE, P.A.**
        Attorneys for The Third Friday Total Return Fund, LLP
        2385 NW Executive Center Drive, Suite 300
        Boca Raton, Florida 33431
        Telephone: 561-443-0800
        Facsimile: 561-998-0047
        Email: bss@slp.law

        By: */s/ Bradley Shraiberg*
            Bradley S. Shraiberg
            Fla. Bar No. 121622

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on this the 15th day of July, 2020.

        */s/ Bradley Shraiberg*
          Bradley S. Shraiberg