## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## LONDON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| **AMERICORE HOLDINGS, LLC,** *et al.*, | ) | |
| | ) | **Case No. 19-61608** |
| | ) | **Chapter 11** |
| Debtors. | ) | |
| | ) | |

## OBJECTION OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES TO CHAPTER 11 TRUSTEE'S AMENDED MOTION FOR ENTRY OF AN ORDER:  (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS (ST. ALEXIUS) IN ACCORDANCE WITH APPROVED BID PROCEDURES, AS MODIFIED; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN ACCORDANCE WITH THE BID PROCEDURES; AND (C) GRANTING RELATED RELIEF AND REQUEST FOR HEARING ON JULY 29, 2020 AT 9:00 A.M.

The United States Department of Health and Human Services ("DHHS"), by and through the United States Attorney, submits this objection to the pending motion to sell assets of St. Alexius Hospital ("St. Alexius") (ECF No. 744).   DHHS operates the Medicare program, the federal health insurance program for the elderly and disabled, through its component agency the Centers for Medicare & Medicaid Services ("CMS").  St. Alexius, which the Trustee proposes to sell, presently holds a Medicare provider agreement with DHHS, pursuant to which the hospital may receive Medicare payments for services rendered to Medicare beneficiaries.  Various papers filed by the Trustee may reflect ambiguity or confusion about the nature and terms of a Medicare provider agreement and of the assignment of a Medicare provider agreement in the context of sale of assets.  In the interest of addressing and correcting

any ambiguity or confusion, DHHS files this statement of the applicable law.[1]

## Introduction

A Medicare provider agreement is an agreement between DHHS and a hospital, for DHHS' purchase and payment of healthcare services for the beneficiaries of the Medicare program. The agreement is the legal basis for a potentially important source of revenue for a hospital. Medicare law has long recognized that a health care business should "expect no less than to be held to the most demanding standards in its quest for public funds" from the Medicare program. *See Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984). A provider that participates in the Medicare program has a "duty to familiarize itself" with the program's legal requirements, *id.* at 64, because the participant subscribes itself fully to those requirements when it chooses to do business with Medicare. Those legal requirements remain unchanged by bankruptcy. A debtor or a trustee "cannot possess any more than the debtor itself did outside of bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, -- U.S. --, 139 S.Ct. 1652, 1663 (2019). The law of

---

[1] The Trustee may also be proposing to treat St. Alexius' *Medicaid* Provider Agreement (which St. Alexius holds with the State of Missouri) in a problematic fashion. Although the Federal Government supplies a substantial share of the funding for Medicaid, each State Government actually administers the Medicaid program in its state. *See Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006) (describing Federal and State roles in Medicaid). Accordingly, to the extent the Trustee purports to transfer the *Medicaid* provider agreement, it is the State of Missouri that must receive notice and opportunity to respond.

bankruptcy "does not permit anything and everything that might advance" a debtor's or a trustee's goals. *Id.* at 1665.

The Trustee purports to transfer St. Alexius' Medicare provider agreement to the purchaser of the hospital "to the extent assignable or transferable." *See* ECF No. 744, at ⬜ 23. The Trustee does speak of the provider agreement being "assumed" and/or assigned." *See id*. But beyond this nod in the direction of applicable law, the Trustee appears to deviate from that applicable law. The Trustee appears to lump the Medicare provider agreement among the hospital's "licenses." *See id*. In the asset purchase agreement recently executed with the stalking horse bidder, the Trustee states an intent to ask DHHS for a statement that "no successor liability" will flow with an assignment of the Medicare provider agreement; or, in the event that such a statement is not obtained from DHHS, an intent to ask the Court to characterize the the assignment as a "license transfer." *See* ECF No. 737-1, at ⬜⬜ 1.4(k), 1.4(r), 4.5.[2]

The Trustee's characterizations are inconsistent with the applicable law of Medicare and the Medicare provider agreement.[3] For the following reasons, the motion should be denied, insofar as the motion disregards or attempts to alter the nature, terms, and obligations of the Medicare provider agreement.

---

[2] The Trustee's Amended Motion also indicates an intent to supplement further "with the proposed terms and conditions of the proposed sale" prior to the Sale Hearing currently scheduled for July 29, 2020. *See* ECF No. 744, at ⬜ 20.

[3] A license to operate a hospital is a creature of state law and regulation.

## The nature and purpose of the Medicare program

1.      Medicare is a program of the Social Security Act, at Title XVIII, codified at 42 U.S.C. §§ 1395 *et seq.*  It is an enormous national health insurance program that processes over a billion claims for payment each year.  *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1156 (9th Cir. 2012) (citation omitted).  Medicare is a "phenomenally regulated system."  *In the Matter of Visiting Nurse Ass'n of Tampa Bay, Inc.*, 121 B.R. 114, 119 (Bankr. M.D. Fla. 1990); *see Shalala v. Ill. Council on Long Term Care, Inc.,* 529 U.S. 1, 13 (2000) (describing Medicare as "a massive, complex health . . . program . . . embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations . . .")

2.      A hospital may seek to participate in the Medicare program, in order to receive Medicare payments as business revenues, for services that the hospital renders to the elderly and disabled persons whom Medicare insures.  These elderly and disabled persons are the intended beneficiaries of the program.  *See Baylor Univ. Med. Clinic v. Heckler*, 758  F.2d 1052, 1059 (5th Cir. 1985) (purpose of Medicare is "to recompense the aged and disabled for their medical expenses").  The courts have long recognized that healthcare businesses are merely incidental beneficiaries of governmental healthcare payment programs.  *See, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, -- U.S. --, 135 S.Ct. 1378, 1387 (2015); *Dialysis Ctrs., Ltd. v. Schweiker*, 657 F.2d 135, 138 (7th Cir. 1981).  The healthcare business that chooses

4

to participate in Medicare does so with "no guarantee of solvency" or of any desired

outcome.  *See Livingston Care Ctr., Inc.. v. U.S.*, 934 F.2d 719, 720-21 (6th Cir. 1991).

### The nature of the Medicare provider agreement

3.     A Medicare provider agreement is a unique agreement entered into

between a healthcare business and the Secretary of DHHS.  42 U.S.C. § 1395cc.

Without a valid Medicare provider agreement, a business cannot seek Medicare

payments for services it renders to Medicare beneficiaries.  42 U.S.C. § 1395f(a).  The

Medicare provider agreement comprehensively incorporates among its governing

terms the entire set of applicable Medicare statutory and regulatory provisions.  *See*,

*e.g.*, *In re Neumann*, 55 B.R. 702, 705 (S.D.N.Y. 1985); *In re Monsour Med. Ctr.*, 11

B.R. 1014, 1018 (W.D. Penn. 1981); *In re St. John's Home Health Agency, Inc.*, 173

B.R. 238, 247 (Bankr. S.D. Fla. 1994).

4.     In choosing to enter into a Medicare provider agreement with DHHS, a

health care business subscribes itself fully to the applicable law of Medicare.  The

provider agreement is the basis of the legal relationship between DHHS and the

business.[4]  The business agrees to maintain compliance with Medicare's health and

safety requirements for a provider of the applicable type (*e.g.*, hospital, hospice,

---

[4]  The Trustee also speaks of "provider numbers."  *See*, *e.g.,* ECF No. 744, at ☐ 23.  A
Medicare "provider number" is an administrative identifier associated with a
particular Medicare provider agreement between DHHS and a provider.  A Medicare
provider number has no independent legal significance.

nursing home, *etc.*) and to adhere to the myriad terms, conditions, and criteria that govern proper Medicare billing.  In return, DHHS agrees to pay the business for certain healthcare services delivered to the Medicare program's beneficiaries, with payments made in accordance with the terms of Medicare law.[5]

### The nature of the payment system under a Medicare provider agreement

5.      The Medicare payments that are issued to a provider under a Medicare provider agreement are well-recognized as a single, ongoing transaction of up-front, estimated amounts that remain subject to later accounting and adjustment.  *E.g.*, *U.S. v. Consumer Health Servs. of America*, 108 F.3d 390, 394-96 (D.C. Cir. 1997). The payment provision of the Medicare statute, at 42 U.S.C. § 1395g(a), calls for "necessary adjustments on account of previously made overpayments and underpayments" when determining the amount of payment presently due.  This provision is critical.  Section 1395g(a) defines the Medicare program's substantive payment liability to a provider.  *Consumer Health Servs.*, 108 F.3d at 394-95.  It

---

[5] As such, a Medicare provider agreement serves a function not unlike a provider agreement between any insurance plan and a healthcare business.  *See generally Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 214 (1979) (describing insurer's provider agreements as arrangements "for the purchase of goods and services" by the insurer from healthcare businesses); *Int'l Healthcare Mgt. v. Haw. Coal. for Health*, 332 F.3d 600, 602 n.2 (9th Cir. 2003) ("A participating provider agreement is a [healthcare business'] contract with a health plan.  It establishes the [healthcare business'] rights and responsibilities in providing medical services to insured patients.").

cannot be overridden. *In re S. Inst. for Treatment & Evaluation*, 217 B.R. 962, 966 (Bankr. S.D. Fla. 1998). Section 135g(a) is "the fundamental payment provision which underlies Medicare reimbursement[;] [t]here is no evading it or circumventing it under any authority or at any time." *In re Tri County Home Health Servs. Inc.*, 230 B.R. 106, 112 (Bankr. W.D. Tenn. 1999).

6.     Typically, the determination of a previous overpayment or underpayment occurs when the provider's required annual Medicare cost report is audited by DHHS (through its Medicare contractors). It is "inherent" in the nature of the Medicare payment system that these retrospective reviews and audits can reveal that an overpayment or an underpayment has occurred. *See Sims v. U.S. Dep't of Health & Human Servs. (In re TLC Hosps., Inc.)*, 224 F.3d 1008, 1014 (9th Cir. 2000).

7.     By the terms of Medicare law, overpayments must be accounted for in the course of calculating the amount of Medicare payment presently due. *See* 42 U.S.C. § 1395g(a). The process by which a Medicare overpayment gets accounted for is well-recognized as recoupment: the amount of the previous overpayment is withheld from the provider's current payments. The "overwhelming majority of district and bankruptcy courts nationwide which have ruled" on the matter have recognized this payment adjustment process as recoupment. *In re Holyoke Nursing Home, Inc.*, 372 F.3d 1, 4 (1st Cir. 2004); *see, e.g., Sims*, 224 F.3d 1008; *Consumer Health Servs.*, 108 F.3d 390; *S. Inst. for Treatment & Evaluation*, 217 B.R. 962; *Tri*

7

*County Home Health Servs.*, 230 B.R. 106; *St. John's Home Health*, 173 B.R. 238*;
Visiting Nurse Ass'n of Tampa Bay*, 121 B.R. 114; *also see In re Dt. Mem'l Hosp. of
SW N. Carolina, Inc.*, 297 B.R. 451 (Bankr. W.D.N.C. 2002) (Medicaid recoupment
case); *In re Ravenwood Healthcare, Inc.*, Case No. 02-5-9516, 2006 WL 4481985
(Bankr. Md. Oct. 12, 2006) (same).[6]

    8.    Until such time as a Medicare provider agreement is terminated, there
are outstanding obligations for both DHHS and for the provider to perform.  At any
given time, the provider is in the midst of a fiscal reporting period.  Within several
months of the close of that fiscal period, the provider is required to file a Medicare
cost report for that fiscal period.  DHHS, for its part, is obligated thereafter to audit
that Medicare cost report.

### The assignment of a Medicare provider agreement

---

[6] Medicare law contains its own comprehensive and exclusive remedial scheme for
adjudicating a provider's legal or factual challenges to Medicare determinations,
such as overpayment determinations.  There are, for example, specified processes by
which a provider may challenge a Medicare cost report determination, 42 U.S.C. §
1395oo; or may challenge a payment determination on an individual Medicare
claim, 42 U.S.C. § 1395ff; *etc.*  A challenge to a decision made by the Medicare
program must be made through the applicable administrative appeal process. *See S.
Rehab. Grp., P.L.L.C. v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 678 (6th
Cir. 2013).  Suits sounding in tort, contract, or other theories are not permitted. *See*
S. Rep. No. 404, 89th Cong., 1st Sess. 1965, 1965 USCCAN 1943, 1995 (June 30,
1965) (legislative history to Medicare statute, stating "It is intended that the
remedies provided by these review procedures shall be exclusive.").  (In a vast
national program of the size and scope of Medicare, with thousands of providers
seeking Medicare revenues, and with over a billion claims for Medicare payment
filed each year, Congress reasonably chose to standardize the rights, the recourse,
and the remedies that are available.)

**(whether in or out of bankruptcy)**

9.     A Medicare provider agreement is not something that can be sold.  *See* 42 C.F.R. § 424.550 (a provider is "prohibited from selling its Medicare billing number or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number").  Under the applicable law of Medicare, the one circumstance in which *a Medicare provider agreement may be assigned* is in the context of a change of ownership of a provider as a going concern.  In this one circumstance, a Medicare provider agreement may be assigned to a third party, subject to approval by DHHS.

10.    The governing regulation is 42 C.F.R. § 489.18.  An assignee takes assignment of the Medicare provider agreement "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued."  42 C.F.R. § 489.18(d).  With the assignment of a Medicare provider agreement, the new owner of the provider (and assignee of the provider agreement) "merely steps into the shoes of the prior owner."  *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40 (D.D.C. 2013) (citations omitted).[7]

---

[7] "Provider [of services]" is a Medicare statutory term, 42 U.S.C. 1395x(u), which refers to the Medicare-certified healthcare operation itself.  This statutory term does not refer to the corporation that may own the hospital now nor to the corporation(s) that may have owned the hospital previously.  Though the corporate ownership may change, the "provider" itself remains the same.  *Eagle Healthcare*, 969 F.Supp.2d 38 at 40; *see Delta Health Grp, Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207, 1210 (N.D. Fla. 2006) (though the provider may be sold to a new owner, "the actual *provider* itself remains the same") (emphasis in original).

11.     Accordingly, the Medicare provider agreement is assigned with all of its associated rights to payment, privileges, responsibilities, fiscal liabilities, and obligations intact and flowing to the assignee.  The provider agreement is assigned *in toto*.  In the oft-cited *U.S. v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir. 1994), the Fifth Circuit held that the applicable Medicare law "unambiguously" requires the assignee of the provider agreement to take liability for the Medicare overpayments that were made to the assignor.  *See also Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) (holding that assignee of Medicare provider agreement is liable for monetary penalty imposed by CMS under that provider agreement prior to the assignment); *Triad at Jeffersonville I v. Leavitt*, 563 F. Supp. 2d 1, 6 (D.D.C. 2008) (also discussing terms applicable to assignment of Medicare provider agreement).

12.     The upshot is this:  "If the new owner [of a provider] elects to take assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments" and all other associated liabilities.  *Official Comm. of Unsecured Creditors v. Chase Manhattan Bank (In re Charter Behavioral Health Sys., LLC),* 45 Fed. Appx. 150, 2002 WL 2004651, n.1 (3rd Cir. June 3, 2002).  It gets the rights and it gets the obligations.  Again, under the applicable law, the straightforward impact

of the assignment of a Medicare provider agreement is that the assignee "merely steps into the shoes" of the assignor. *Eagle Healthcare*, 969 F.Supp.2d at 40.

13.    The nature and extent of any property rights in bankruptcy are determined by the underlying substantive law. *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000); *Butner v. United States*, 440 U.S. 48, 55 (1979).  Bankruptcy does not alter the operation of Medicare law, the Medicare provider agreement, or the Medicare payment system.  A Medicare provider agreement in bankruptcy does not entail "any more [or less] than the debtor [had under the Medicare provider agreement] outside of bankruptcy." *See generally Mission Prod. Holdings*, 139 S.Ct. at 1663.

14.    The Medicare provider agreement has long been recognized as due the treatment of an executory contract in bankruptcy.  *See*, *e.g.*, *Monsour Med. Ctr.*, 11 B.R. at 1018 (dismissing attempt to characterize the Medicare provider agreement as something other than an executory contract as mere "interesting reading . . . that . . . in no way reflects the reality of the relationship" between DHHS and the hospital); *In re Santiago*, 563 B.R. 457, 474 (Bankr. D.P.R. 2017) (citation omitted) (majority of courts "considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract"); *In re Heffernan Mem'l Hosp.*, 192 B.R. 228, 231 n.4 (Bankr. S.D. Cal. 1996); *St. John's Home Health*, 173 B.R. at 242 n.1; *In re Tidewater Mem'l Hosp., Inc.*, 106

B.R. 876, 880 (Bankr. E.D. Va. 1989); *In re Provident Hosp. & Training Ass'n*, Case

No. 87 B 11069, 1987 WL 383355, at *2 (Bankr. N.D. Ill. Sept. 16, 1987).

15.    The application of section 365 to Medicare provider agreements is

appropriate because it does not undermine the fundamental principle and purpose of

the Medicare statute, namely providing healthcare to the elderly while protecting the

public fisc. *See In re Vitalsigns Homecare, Inc.,* 396 B.R. 232, 240-41 (Bankr. D. Mass.

2008).  Requiring the provider agreement to be assumed pursuant to section 365 prior

to the assignment of that agreement to a third-party assignee harmonizes the

Medicare statute and the Bankruptcy Code. *Id.* "'[W]hen two statutes are capable of

co-existence, it is the duty of the courts, absent a clearly expressed congressional

intention to the contrary, to regard each as effective. The courts are not at liberty to

pick and choose among congressional enactments.'" *Id.* at 240 (quoting *Morton v.*

*Mancari*, 417 U.S. 535, 551 (1974)).  Moreover, applying section 365 to the Medicare

provider agreement is also consistent with the Medicare statute because assumption

and assignment do not strip away Medicare obligations and liabilities from the

provider agreement in the way a section 363(f) sale would allegedly do.

16.    Accordingly, the appropriate authorization for the transfer of a Medicare

provider agreement from a debtor to the transferee who becomes the owner and

operator of the provider is an authorization of the debtor's assumption and

assignment of the provider agreement pursuant to 11 U.S.C. § 365.[8]   In other words, one takes the provider agreement on its own terms, or one does not take it at all. *What matters most, however, is that the terms of the Medicare provider agreement are those terms set forth in Medicare law*, which entails, *inter alia*, Medicare's complex reimbursement system of upfront estimated payments and ongoing reviews and adjustments, outlined *supra.*  As one bankruptcy court put it succinctly:

> [T]o the extent Debtor assumes and assigns its Medicare provider agreements to [the purchaser of Debtor's hospital], such assumption and assignment *shall be fully consistent with and subject to applicable laws and regulations governing Medicare provider agreements.*

*In re Barnwell County Hosp., Inc.*, 491 B.R. 408, 419 (Bankr. D.S.C. 2013) (all emphasis added).

17.   Courts and debtors have treated provider agreements as executory contracts, allowing them to be assumed and assigned under section 365, because if they are not treated as executory contracts, a debtor has no property interest in the provider agreement that could be sold under section 363.[9]

---

[8]  An executory contract may only be assumed and/or assigned *as is.  See City of Covington v. Covington Landing P'ship*, 71 F.3d 1221, 1226 (6th Cir. 1995) (neither debtor nor court may excise obligations).

[9]   In the takings context, numerous appellate courts, including the Sixth Circuit, have held that a Medicare provider has no property interest in continued Medicare participation.  "[B]ecause health care providers 'are not the intended beneficiaries of the federal health care programs . . . they therefore do not have a property interest in continued participation or reimbursement.'" *Shah v. Azar*, 920 F.3d 987, 997-98 (5th Cir. 2019) (quoting *Parrino v. Price*, 869 F.3d 392, 398 (6th Cir. 2017)); *Erickson v. U.S. ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir.

13

18.     Now, Medicare law does not require that a purchaser of a healthcare business must take assignment of the seller's existing Medicare provider agreement. *See Vernon Home Health*, 21 F.3d at 696.  In the alternative, the new operator may simply choose not to do business with the Medicare program at all, because doing business with Medicare is a purely voluntary choice.  Or, as another alternative, the new operator may choose to seek entering into a new provider agreement with DHHS. Under this last alternative, the new operator must first obtain approval by DHHS: the new operator must demonstrate and establish to the satisfaction of DHHS that the healthcare operation meets all the applicable current criteria for approval .  This process necessarily takes some time, for which no Medicare payments may ever be sought for services rendered to Medicare patients during that time.  However, the trade-off is that if a new provider agreement is sought and entered into, the new operator will not be liable for the previous overpayments (or any other incidents) of the previous operator's Medicare provider agreement.    These, then, are the various alternatives that any prospective purchaser must weigh and consider, regardless whether it is considering the purchase of a hospital through bankruptcy or outside of bankruptcy:  Do I want to take assignment of the seller's existing Medicare provider agreement, which means taking it as it is?  Do I choose not to do business with Medicare at all?  Or, will I seek to enter into a new provider agreement with DHHS?

---

1995); *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986); *Cervoni v. Sec'y of Health, Ed. & Welfare*, 581 F.2d 1010, 1018-19 (1st Cir. 1978).

19.    To the extent that the pending motion seeks to sell St. Alexius as a going concern, and to the extent that the purchaser of those assets does indeed want to take assignment of St. Alexius' Medicare provider agreement with DHHS, *the assignment of the Medicare provider agreement must comport fully with Medicare law.* The provider agreement may only be assigned on its own terms.   Section 365 of the Bankruptcy Code substantially echoes this outcome, but it is the applicable law of Medicare that most fundamentally drives the process.   Neither a debtor, trustee, or any prospective purchaser of assets may alter, re-define, or limit the obligations that may exist under a particular Medicare provider agreement to suit his own preferences or wishes.

### Recoupment is not extinguishable by a sale

20.    Even if one were to find reason not to characterize the Medicare provider agreement as an executory contract, the legal reality remains that the recoupment of Medicare overpayments, which is a fundamental and intrinsic element of the Medicare reimbursement system, cannot be expunged.   The payment adjustment process created by 42 U.S.C. § 1395g(a), which requires taking account of a previous overpayment in calculating the amount of payment due, is *the vehicle by which federal law defines the Medicare program's substantive legal liability* for making payment.

21.    The common law doctrine of recoupment lends further legal support. The purpose of recoupment is simply to reach a proper determination as to what a

payer owes. *See Reiter v. Cooper*, 507 U.S. 258, 265 n.2 (1993) (citing Collier on Bankruptcy). Funds that are subject to recoupment are not the debtor's property. *In the Matter of U.S. Abatement Corp.*, 79 F.3d 393, 398 (5th Cir. 1996); *In re Madigan*, 270 B.R. 749, 754 (9th BAP 2001). Furthermore, recoupment is not a "claim" or an "interest." *Brown v. Gen. Motors Corp.*, 152 B.R. 935, 938 (W.D. Wis. 1993); *In re Bram*, 179 B.R. 824, 827 (Bankr. E.D. Tex. 1995); *In re ABCO Indus., Inc.*, 270 B.R. 58, 63 (Bankr. N.D. Tex. 2001). To the contrary, recoupment operates as a defense to another entity's claim for payment. *In re Seko Inv., Inc.*, 156 F.3d 1005, 1009 (9th Cir. 1997); *In re Jones*, 289 B.R. 188, 191 (Bankr. M.D. Fla. 2002); *In re Denby Stores, Inc.*, 86 B.R. 768, 781 (Bankr. S.D.N.Y. 1988). Accordingly, recoupment is not subject to limitation under bankruptcy law. Indeed, the Bankruptcy Code does not even address recoupment at all. *United Structures v. G.R.G. Eng'g*, SE, 9 F.3d 996, 999 (1st Cir. 1993). The automatic stay does not apply to recoupment. *E.g.*, *In re Malinowski*, 156 F.3d 131, 133 (2nd Cir. 1998). Nor is recoupment subject to the discharge injunction. *E.g.*, *In re Beaumont*, 586 F.2d 776, 781 (10th Cir. 2009); *In re Fischbach*, 464 B.R. 258 (Bankr. D.S.C. 2012), *aff'd* Civil Action No. 1:12-cv-00513-JMC, 2013 WL 1194850 (D.S.C. Mar. 22, 2013); *In re Delicruz*, 300 B.R. 669, 681 (Bankr. E.D. Mich. 2003).

22.    Most importantly here: because recoupment is not a "claim" or an "interest," rights of recoupment cannot be extinguished by a sale in bankruptcy. *E.g.*, *In re Revel AC Inc.*, 909 F.3d 597, 603-04 (3rd Cir. 2018); *Folger Adams Sec., Inc. v.*

*DeMatteis/MacGregor JV*, 209 F.3d 252, 261 (3rd Cir. 2000); *Hispanic Indep. Television Sales, LLC v. Kaza Azteca America, Inc.,* No. 10 Civ 932, 2012 WL 1079959, at *5 (S.D.N.Y. Mar. 30, 2012).

23.     The pending motion errs in appearing to characterize a Medicare provider agreement or provider number as a "license," and in suggesting that the assignment of the same would be a "license transfer."  The nature and terms of a Medicare provider agreement and the assignment of a Medicare provider agreement are set forth plainly in Medicare law, as described above.

24.     Moreover, the Medicare regulations prohibit the sale of the right to bill the Medicare program.  *See* 42 C.F.R. § 424.550 ("prohibit[ing a provider] from selling its Medicare billing number or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number" except where there is a change of ownership in accordance with the terms of the Medicare regulations at 42 C.F.R. Part 489).  This defines the extent of the Debtor's interest, and bankruptcy does not create a greater property interest than a debtor had pre-petition.

25.     The pending motion errs in appearing to characterize a Medicare provider agreement or provider number as a "license," and in suggesting that the assignment of the same would be a "license transfer."  The nature and terms of a Medicare provider agreement and the assignment of a Medicare provider agreement are set forth plainly in Medicare law, as described above.  A license is simply a right to operate.  "A license is nothing but a promise by the issuing body not to interfere in

17

business conducted according to its terms." *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129 (7th Cir. 1995); *see, e.g., Perez v. Hosp. Damas, Inc.*, 769 F.2d 800, 801 (1st Cir. 2014) ("license listed Fundación Damas, Inc. as the entity authorized to operate the hospital"); *Ferguson v. Gatright*, 485 F.2d 504, 506 (4th Cir. 1973) (with revocation of driver's license, individual "loses simply his right to operate a motor vehicle on the public highways"); *Standard Acceptance Co. v. Lewis Cab Co.*, No. 92 C 7072, 1995 WL 534292, at *1 (N.D. Ill. Sept. 1, 1995) ("A Chicago taxicab license is, then, simply a right to operate a taxicab . . ."). Provider agreements do not permit, nor are they required for, a healthcare provider to operate. Instead, permission to operate as a healthcare provider is granted under licenses issued by state and local agencies. Medicare provider agreements merely facilitate a provider's provision of Medicare services to Medicare beneficiaries and federal government reimbursement for those services according to the law of the Medicare program.

26.    The bankruptcy estate generally includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1) (emphasis added). But Congress explained that "this paragraph . . . is not intended to expand the debtor's rights against others more than they exist at the commencement of the case."  H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-68 (1977); *see Mission Prod. Holdings*, 139 S. Ct. at 1663 ("[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy.").  A Medicare provider agreement cannot be recharacterized or redrawn to suit one's purposes.

18

## Conclusion

For the foregoing reasons, DHHS respectfully asserts that the pending motion (ECF No. 744), presently set for hearing on July 29, 2020, should be denied insofar as the motion purports to characterize or to transfer St. Alexius' Medicare provider agreement with DHHS in a manner that is inconsistent in any way with the governing law of Medicare.

Respectfully submitted,

ROBERT M. DUNCAN, JR.
UNITED STATES ATTORNEY

By: /s/ Callie R. Owen
    Callie R. Owen
    Assistant United States Attorney
    260 West Vine Street, Suite 300
    Lexington, Kentucky 40507-1671
    (859) 685-4901
    Callie.R.Owen@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed this document with the clerk of the court by using the CM/ECF system which caused electronic service on all persons receiving notice in this case on July 17, 2020.

<u>/s/ Callie R. Owen</u>
Callie R. Owen
Assistant United States Attorney
