# EXHIBIT A

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**

**By and Among**

**CAROL L. FOX, as Chapter 11 Trustee of St. Alexius Properties, LLC,
St. Alexius Hospital Corporation # 1, and Success Healthcare 2, LLC,**

**and**

**SA HOSPITAL ACQUISITION GROUP LLC, by and or through its subsidiaries**

**(as "Purchaser")**

**Dated July 10, 2020**

# TABLE OF CONTENTS

4821-5743-0466.1

## INDEX OF SCHEDULES AND EXHIBITS

**Schedules**

|  | *Description* |
|---|---|
| Schedule 1.4(c) | Owned Real Property |
| Schedule 1.7(d) | Business Licenses |
| Schedule 1.7(e) | Assigned Contracts |
| Schedule 1.8(d) | Excluded Personal Property |
| Schedule 1.8(e) | Excluded Intellectual Property |
| Schedule 1.8(z) | Additional Excluded Assets |
| Schedule 1.9(e) | Additional Transferred Obligations |
| Schedule 1.11 | Evaluated Contracts |
| Schedule 2.3 | Broker and Finder Fees and Commissions (Seller) |
| Schedule 2.4 | Legal Proceedings (Seller) |
| Schedule 2.7 | No Violation (Seller) |
| Schedule 3.4 | No Violation (Purchaser) |
| Schedule 3.7 | Legal Proceedings (Purchaser) |
| Schedule 11.5 | Allocation of Purchase Price |

**Exhibits**

|  | *Description* | *Status* |
|---|---|---|
| Exhibit 1.2 | Escrow Agreement |  |
| Exhibit 1.4(a) | General Assignment, Bill of Sale and Assumption of Liabilities |  |
| Exhibit 1.4(b) | Assignment and Assumption of Real Estate Leases |  |
| Exhibit 1.4(c) | [TBD] Deeds |  |
| Exhibit 1.4(h) | Limited Power of Attorney for use of DEA and Other Registration Numbers, and DEA Order Forms |  |
| Exhibit 1.7 | Preliminary Title Report |  |

3

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of this __ day of _____ , 2020 (the "**Execution Date**"), by and among Carol L. Fox (the "**Seller**"), solely in her capacity as Chapter 11 Trustee of St. Alexius Properties, LLC ("**SAP**"), St. Alexius Hospital Corporation # 1 ("**SAHC**"), and Success Healthcare, LLC ("**SH2**"), and, together with SAP and SAHC, the "**Debtors**" and, each individually, a "**Debtor**") (Seller and Debtor may be referred to herein collectively as "Seller"); and SA HOSPITAL ACQUISITION GROUP, LLC, a Delaware Limited Liability Company, and or through its subsidiaries ("**Purchaser**").  Seller and Purchaser may be referred to herein collectively as the "**Parties**" and each individually, as a "**Party**".

## RECITALS

A.    SAHC engages in the business of delivering acute care services to the public through the acute care hospital known as St. Alexius Hospital (the "**Hospital**") and operates a school for the education and training of nursing students known as the Lutheran School of Nursing (the "**Nursing School**").  SAP owns and operates certain medical office buildings incident to the operation of the Hospital and Nursing School located at 3933 South Broadway, St. Louis, Missouri 63118 (the "**Broadway Property**") and 3535 South Jefferson Avenue, St. Louis, Missouri 63118 (the "**Jefferson Property**" and, together with the Broadway Property, the "**Properties**"), respectively.

B.    SAHC and SAP are wholly-owned subsidiaries of SH2, which, in turn, is a wholly-owned subsidiary of Americore Holdings, LLC ("**Americore**").

C.    On December 31, 2019 (the "**Petition Date**"), Americore and the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Kentucky (the "**Bankruptcy Court**")—thereby commencing the bankruptcy cases styled *In re Americore Holdings, LLC*, case no. 19-61608-grs (the "**Americore Chapter 11 Case**"), *In re Success Healthcare 2, LLC*, case no. 19-61609-grs (the "**SH2 Chapter 11 Case**"), *In re St. Alexius Hospital Corporation #1*, case no. 19-61610-grs (the "**SAHC Chapter 11 Case**"), and *In re St. Alexius Properties, LLC*, case no. 19-61611-grs (the "**SAP Chapter 11 Case**" and, together with the SH2 Chapter 11 Case and SAHC Chapter 11 Case, the "**Chapter 11 Cases**"). The Chapter 11 Cases are jointly administered under the Americore Chapter 11 Case.

D.    On February 20, 2020, the Bankruptcy Court entered the *Agreed Order Appointing Chapter 11 Trustee* (the "**Trustee Order**").  By and through the Trustee Order, the Bankruptcy Court ordered the Office of the United States Trustee (the "**U.S. Trustee**") to appoint a chapter 11 trustee pursuant to Section 1104 of the Bankruptcy Code.  On February 21, 2020, the U.S. Trustee appointed Seller as chapter 11 trustee of the Debtors in the Chapter 11 Cases.

E.    On April 24, 2020, Seller filed the *Trustee's Motion for Entry of an Order: (I) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets (St. Alexius), (II) Establishing Procedures for the Assumption and/or Assignment by the Trustee of Certain Executory Contracts and Unexpired Leases, (III) Approving the Form and Manner of Notice of Bidding Procedures, (IV) Setting Objection Deadlines, and (V) Granting*

4

*Related Relief* (the "**Bidding Procedures Motion**").  By and through the Bidding Procedures Motion, Seller sought approval of certain procedures for the sale of substantially all the Debtors' assets outside the ordinary course of business.  On May 12, 2020, the Bankruptcy Court entered an order granting the Bidding Procedures Motion (the "**Bidding Procedures Order**").[1]

F.      On or before July 10, 2020, the Sellers will notice the scheduled hearing before the Bankruptcy Court currently set for July 29th at 9:00 a.m. to approve and authorize the sale of the Assets free and clear of all liens, claims and encumbrances pursuant to the terms of this agreement and a sale order of the Bankruptcy Court, which sale order shall be in form and substance reasonably acceptable to the Purchaser ( the **"Sale Order"**).

G.      Subject to Bankruptcy Court approval of the transactions contemplated herein, Purchaser desires to purchase and acquire from Seller, and Seller desires to sell and assign to Purchaser (the "**Sale**"), the assets, rights and interests described in Section 1.7 below for the consideration and upon the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, which are hereby incorporated and made part of this Agreement, and the mutual promises and covenants contained in this Agreement, the receipt and sufficiency of such consideration are hereby acknowledged, and for their mutual reliance, the Parties hereto agree as follows:

## ARTICLE I
## SALE AND TRANSFER OF ASSETS;
## CONSIDERATION; CLOSING

1.1      Purchase Price.  Subject to the terms and conditions of this Agreement, the purchase price ("**Purchase Price**") for the Purchased Assets (defined below) shall consist of a cash payment computed as follows:

(a)      Cash payments to Seller of $17,000,000.00 minus (i) $1,000,000.00 received by Seller for 2020/2021 Residency Slots; minus (ii) assumption of Seller's accrued and other paid time off, not to exceed $500,000.00, as of the Closing, to be provided only with respect to Hired Employees  (as defined within this Agreement) in the form of credited vacation and PTO, subject to compliance with applicable laws and regulation; minus (iii) payment of Cure Costs associated with any Assigned Contracts and/or Assigned Leases and assumption of any assumed obligations as set forth herein (collectively, the "Cash Consideration"). The Purchase Price is exclusive of any additional fees, costs or expenses Purchaser is obligated to pay or reimburse under this Agreement.  Pursuant to Section 11.5(b),[2] the Purchase Price shall be allocated among the Purchased Assets as provided on

---

[1] Unless otherwise defined herein, any capitalized term shall have the meaning ascribed to such term in the Bidding Procedures Motion or, if not defined therein, under Section 101 of the Bankruptcy Code.

[2] Unless otherwise noted, any reference to "Section" or "Article" refer to the designated Section or Article of this Agreement.

Schedule 11.5. For avoidance of doubt, Purchaser is acquiring all assets, as set forth below, as it relates to both the Jefferson and Broadway campuses.

1.2     Deposit.  Not later than three (3) business days after the Execution Date, Purchaser shall pay an amount equal to  $1,000,000.00 the "**Deposit**"), by cashier's check or wire transfer to First American Title Insurance Company, National Commercial Services, 420 S Orange Avenue, Suite 250, Orlando, FL 32801, Attn: Rachael Yenque (the "**Escrow Agent**") pursuant to the Escrow Agreement attached hereto as Exhibit 1.2, as a deposit for the acquisition of the Purchased Assets.  Purchaser shall pay all fees of the Escrow Agent (the "**Escrow Fees**").  Purchaser's payment of the Escrow Fees shall be in addition to, and shall not be credited against or otherwise reduce, the Purchase Price.  The Deposit shall be non-refundable in all events, except in the event that the Closing does not occur due to Purchaser's or Seller's termination of the Agreement pursuant to Sections 9.1(a), (c), (d), (f), (g), (h), (i), or (j).  Upon Closing, the amount of the Deposit, less any unpaid amounts due and owing by Purchaser to Seller under this Agreement as of the Closing Date, shall be credited against the unpaid balance of the Purchase Price.

1.3     Closing Date.  The consummation of the Sale (the "**Closing**") shall take place at [LOCATION] within five (5) business days following the entry of an order of the Bankruptcy Court approving the Sale; *provided, however*, the date on which the Closing occurs (as the "**Closing Date**") shall occur not later than August 21, 2020, unless such deadline is extended by Seller, in her sole and absolute discretion and/or bankruptcy approval and has not been obtained. The Closing shall be deemed effective as of 12:01 a.m. Eastern time on the Closing Date (the "**Effective Time**").

1.4     Seller Deliverables at Closing.  At or before the Closing, Seller shall deliver to Escrow Agent the following, duly executed by Seller where appropriate:

(a)     a Bill of Sale substantially in the form of Exhibit 1.4.(a) attached hereto (the "**Bill of Sale"),** duly executed by Seller with respect to the Assets:

(b)     Assignment and Assumption of the Tenant Leases (the "**Tenant Lease Assignments**") in the form of Exhibit 1.4.(b) (if any), each duly executed by Seller (the "**Assigned Leases**");

(c)     Quitclaim Deeds in the form of Exhibit 1.4(c) attached hereto with respect to the real property listed in Schedule 1.4(c) together with all plant, buildings, structures, installments, improvements, fixtures, betterments, additions, and permits (the "**Owned Real Property**");

(d)     an Assignment of Purchased Contracts in the form of Exhibit 1.4(d) (the **"Contract Assignment").**

(e)     An Assignment of other Assumed Liabilities in the form of Exhibit 1.4(e) (the **"General Assignment"**)

(f)     the Interim Management Agreement, duly executed by Seller;

6

(g)    the Transition Services Agreement (the "**Transition Services Agreement**") in form attached hereto as Exhibit 1.4(g), duly executed by Seller.

(h)    a certified copy of the Sale Order (defined below);

(i)    evidence of payment or escrowing of all Cure Costs (defined below);

(j)    to the extent not previously delivered to Purchaser, any contracts, licenses and permits with respect to the Owned Real Property, if any, together with any property files and records material to the operation and maintenance of the Owned Real Property in the possession of Seller;

(k)    commercially reasonable evidence that Seller has no outstanding liabilities associated with Seller's Medicare Number with Center for Medicare and Medicaid Services ("**CMS**") and the Seller's Medicaid Number with the State of Missouri prior to closing or an order from the Bankruptcy Court finding that the Center for Medicare Services and Medicaid Numbers constitute a license transfer, however, nothing in this paragraph abrogates the Trustee's sole discretion, in her business judgment, as to whether to enter into a settlement agreement related to this paragraph with either the Buyer or CMS/State of Missouri;

(l)    favorable original certificates of good standing, or comparable status, of each Debtor, issued by the respective states of incorporation of each Debtor, dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

(m)    Limited Power of Attorney for use of DEA and Other Registration Numbers, and DEA Order Forms, in the form of Exhibit 1.4(h) attached hereto (the "**Power of Attorney**");

(n)    Certifications executed by Seller, pursuant to and in full compliance with Section 1445 of the Internal Revenue Code and the regulations issued thereunder, declaring that Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and Income Tax Regulations;

(o)    commercially reasonable evidence of the satisfaction and, if applicable, release of all Mandatory Payoff Liens, in the form of either an Order from Bankruptcy Court providing for the sale free and clear of all liens, claims, and encumbrances or UCC termination statements for any and all financing statements (which do not correspond to any Personal Property Lease) filed with respect to the Purchased Assets;

(p)    Titles to all motor vehicles included in the Purchased Assets, duly endorsed for transfer to Purchaser;

(q)    2019 Monthly Financial Statements;

(r)    Center for Medicare/Medicaid Services ("CMS") Statement on behalf of the Department of Health & Human Services ("**HHS**") and the State of Missouri that there is no successor liability related to the Provider Numbers, in the event that the CMS and Medicaid

7

Provider Numbers are not determined to be licenses by the Bankruptcy Court if such statement is provided as set forth within Section 4.5. ;

(s)       the Settlement Statement (defined below); and

(t)       any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary, or which First American Title Insurance Company (the "**Title Company**") requires to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

All closing documents required under Section 1.4 shall be delivered on a "As Is, Where Is" basis and without any representation or warranties (as provided in Section 1.12) and with no ongoing recourse to the Seller following the Closing Date, except for Seller's obligations to pay the Cure Costs, if any, which shall survive the Closing.

1.5       <u>Purchaser Deliverables at Closing</u>.  At or before the Closing, unless otherwise provided in this Section 1.5, Purchaser shall deliver to Escrow Agent the following, duly executed by Purchaser where appropriate:

(a)       not later than one (1) business day before Closing, payment of the Cash Consideration  subject to holdbacks as set forth within Section 1.1  and credits or plus payments to Sellers of all amounts as provided under Section 1.6 which funds shall be paid via cashier's check or wire transfer to Escrow Agent per instructions provided by Seller;

(b)       a certificate of any officer or authorized agent of Purchaser certifying to Seller (a) compliance with Purchaser's covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, and (c) that all of the conditions contained in Article VII have been satisfied except those, if any, waived in writing by Purchaser;

(c)       a duly executed certificate of an officer of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Execution Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement on behalf of the Purchaser and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions with respect to Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

(d)       favorable original certificate of good standing, or comparable status, of Purchaser, issued by the [_____] Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

(e)       the Bills of Sale, executed by Purchaser;

(f)       the Real Estate Assignments, executed by Purchaser;

8

(g)      the Transfer Agreement, duly executed by Purchaser;

(h)      copies of all third party consents, if any, obtained by Purchaser in connection with the assumption and assignment to Purchaser of the Assigned Contracts;

(i)      the Power of Attorney, executed by Purchaser; and

(j)      Certifications executed by Seller, pursuant to and in full compliance with Section 1445 of the Internal Revenue Code and the regulations issued thereunder, declaring that Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and Income Tax Regulations;

(k)      the Settlement Statement; and

(l)      any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary, or which the Title Company requires to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6      Proration and Utilities. All items of income and expense listed below with respect to the Purchased Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

(a)      To the extent not otherwise prorated or provided for pursuant to this Agreement, at Closing, or as promptly as possible following the Closing, Purchaser and Seller shall prorate (as of the Effective Time), if applicable, real estate and personal property lease payments, real estate and personal property taxes, assessments and other similar charges against real estate (including any penalties and interest associated therewith), plus all other expenses which are normally prorated upon the sale of assets of a going concern. As to power and utility charges, "final readings" as of the Effective Time (or if not feasible, as of the calendar day immediately prior to the Effective Time) shall be ordered from the utilities; the cost of obtaining such "final readings," if any, to be paid for by Purchaser. If the actual ad valorem tax bills have not been issued for the year or tax period in which the Closing occurs, then such proration shall be based on such ad valorem taxes billed for the prior year or tax period and, after the ad valorem tax bills for the year or tax period of Closing are received by either Purchaser or Seller, Purchaser and Seller shall adjust such proration, and any amount then owing shall be paid within twenty (20) business days of demand by the party entitled thereto.

(b)      Seller shall pay (a) the fees of any counsel representing it in connection with this transaction and (b) any transfer tax, documentary stamp tax or similar tax which becomes payable by reason of the transfer of the Owned Real Property. Purchaser shall pay (x) the fees of any counsel representing Purchaser in connection with this transaction; (y) premium for any title insurance policy and the costs of any endorsements thereto; and (z) any escrow fees incurred in the course of the transaction contemplated by this Agreement. Unless otherwise reimbursable or separately treated under the terms of this Agreement, all other costs and expenses incident to this transaction and the Closing shall be paid by the Party incurring same.

(c)     Rent and all other income and revenues from the Owned Real Property (the "**Rental Revenues**") which have been collected by Seller as of the Closing Date shall be prorated. Purchaser will own and have the right to collect the Rental Revenues attributable to the period beginning on the Closing Date. All Rental Revenues attributable to the period prior to the Closing Date will remain the property of Seller, and Seller will be entitled to collect same for its own account prior to Closing, but not after; *provided, however*, that Purchaser will pay to Seller any such amounts actually received by Purchaser. Purchaser shall use commercially reasonable efforts during the six (6) month period immediately following Closing to collect and promptly remit to Seller rents or other amounts due Seller for the period prior to Closing. This provision shall survive the Closing of this Contract for a period of six (6) months.

(c)     No later than five (5) business days prior to the Closing, the Seller shall cause the Title Company to prepare and provide to Purchaser a draft settlement statement reflecting adjustments, prorations and credits provided for in this Agreement, including this Section 1.6 (the "**Settlement Statement**"). The parties shall confer in good faith to finalize such draft Settlement Statement and upon being finalized, shall be executed and delivered by the parties at (or prior to) Closing. The executed Settlement Statement shall be binding and conclusive, subject to manifest error. Any errors in the Settlement Statement shall be corrected within six (6) months following Closing.

(d)     Except as otherwise provided or limited by the provisions of this Section 1.6, this Section 1.6 shall survive Closing.

1.7     Transfer of Purchased Assets.  For avoidance of doubt, Purchaser is acquiring all assets, as set forth below, as it relates to both the Jefferson and Broadway campuses. Subject to Bankruptcy Court approval of this Agreement, satisfaction of any applicable provisions of the Bankruptcy Code, and the terms and conditions of this Agreement, on the Closing Date, Seller shall assign, transfer, convey and deliver to Purchaser, free and clear of all liens and encumbrances, other than Permitted Exceptions (defined below), and Purchaser shall acquire, all of Seller's right, title and interest in and to only the following assets and properties, as such assets and properties shall exist on the Closing Date, such transfer being deemed to be effective at the Effective Time (collectively, the "**Purchased Assets**"):

(a)     all of the real property that is described in Schedule 1.4(c) (i.e., the Owned Real Property) owned by Debtors, including, without limitation, all improvements, fixtures and construction in progress located thereon, and all rights, privileges and easements appurtenant to any of the foregoing;

(b)     all of the tangible personal property owned by Debtors, or any of them, and currently located at the Owned Real Property, including all inventories and supplies, equipment (including all medical equipment, computers and other data processing equipment and related software), furniture, fixtures, machinery, vehicles, office furnishings, and leasehold improvements (collectively, the "**Personal Property**"),  together with any express or implied warranty (if any) by the manufacturers or sellers of any item or component part thereof to the extent transferable and all maintenance records and other documents relating thereto, excluding any Personal Property described in Schedule 1.8(d);

(c)    all of the intangible personal property owned by Debtors, or any of them, including, without limitation, registered and unregistered trademarks, copyrights, and good will (collectively, the "**Intellectual Property**"), excluding any Intellectual Property described in Schedule 1.8(e);

(d)    all of Debtors' rights, to the extent assignable or transferable, to all licenses, provider numbers, Medicare and Medicaid provider agreements, permits, approvals, applications, certificates of need, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Seller with respect to the operation, development or expansion of the Healthcare Businesses (collectively, the "**Licenses**"), including, without limitation, the Licenses described in Schedule 1.7(d), except if the Purchaser elects, in its sole discretion, not to assume a License or have it assigned, other than the Medicare and Medicaid Provider Agreements, by written notice to Seller prior to Closing.

(e)    all of Seller's interest in, and all of Seller's obligations due under from and after the Effective Time, to the extent assignable or transferrable, all contracts and agreements (including, but not limited to, purchase orders) that have been designated by Purchaser as an Assigned Contract, pursuant to Section 1.11 and appearing on Schedule 1.7(e);

(I)    all leasehold interests in and to any real property that is leased by Debtors, of any of them, as a tenant, including, without limitation, the leases described in Schedule 1.7(e);

(II)    all of Debtors' interest, to the extent assignable or transferable, in and to all regulatory and/or statutorily compliant real property leases under which Debtors are the landlord, including, without limitation, that have been designated by Purchaser as an Assigned Lease as described in  in Schedule 1.7(e);

(III)    all of Debtors' interest, to the extent assignable or transferable, in and to all personal property leases, including, without limitation, the leases described in Schedule 1.7(e);

(IV)    all of Debtors' interest, to the extent assignable or transferable, in and to any other contracts and agreements described in Schedule 1.7(e); and

(V)    to the extent assignable or transferable, all rights in all warranties of any manufacturer or vendor in connection with the Personal Property;

(f)    all of Seller's interest in, from and after the Licensure Date, to the extent assignable or transferable, the Hospital's Medicare Provider Agreement (and provider number) and the Hospital's Medicaid Provider Agreement (and provider number) (collectively, the **Medicare/Medicaid Agreements"**);

(g)    all of Seller's interest in, and all of Seller's obligations due under from and after the Licensure Date, to the extent assignable or transferrable, in  and to any of the Hospital's managed care, pre-paid, capitated or other health plan agreements (collectively the "**Managed**

11

**Care Agreements"**) that have been designated by Purchaser as an Assigned Contract pursuant to Section 1.11 (to the extent so designated, the **"Transferred Managed Care Agreements");**

(h)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial, and office supplies and other disposables and consumables (i) located at the Hospital or (ii) used in operation of the Hospital (the **"Inventory)** except as set forth in Section 1.8;

(i)    to the extent assignable or transferable, all rights in all warranties (including warranties of any manufacturer or vendor) of any manufacturer or vendor in connection with the Assets (including the personal Property) in favor of the Hospital or Seller;

(j)    to the extent assignable or transferrable, all of the following that are not proprietary to Seller: intellectual property, operating manuals, files, and computer software with respect to the operations of the Hospital, including, without limitation, all patient records, medical records, employee records, billing records, financial records, equipment records, construction plans and specifications and medical and administrative libraries;

(k)    to the extent assignable or transferrable (and if leased, to the extent the associated lease is transferred hereunder), including any assignment which is made effective pursuant to the Sale Order where the consent of a third party is required pursuant to the terms of an applicable agreement but not obtained, all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment and all associated documentation owned, leased or licensed by Seller and used by Seller with respect to the operations of the Hospital;

(l)    All CARES Act and any other special relief program funding related to COVID 19 received by the Hospital received post closing;

(m)    All accounts and interest thereupon, notes and interest thereupon and other receivables of Such Seller, including, without limitation, accounts, notes and other amounts receivable, disproportionate share payments and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables and Seller Cost Report Settlements related thereto, in each case arising from the rendering of services or provisions of good, products or supplies to inpatients and outpatients at the Hospital of such Seller, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Such Seller prior to the Effective Time, whether payable by Medicare, Medicaid, or any other payor (including an insurance company) or any healthcare provider or network or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "**Accounts Receivable"**);

(n)    All rights, claims and causes of action of such Seller to the extent related to an/or to the extent arising out of the Accounts Receivable acquired by Purchaser at the closing;

(o)    All regulatory settlements, rebates, adjustments, refunds or group appeals, including without limitation, pursuant to all cost reports filed by Seller for payment or

12

reimbursement for government payment programs and other payors with respect to periods after the signing date;

(p)    All transferrable unclaimed property of any Person in Seller's possession as of the closing date, including, without limitation, property of which is subject to applicable escheat laws;

(q)    All rights, title and interest in and to the name "St. Alexius Hospital" and the "Lutheran School of Nursing" including any associated Hospital trademarks, service marks, registrations, registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know-how trade secrets and the names associated with St. Alexius Hospital together with all rights to sue and recover damages for infringement, dilution, misappropriation or other conflict associated with any of the foregoing at the closing;

(r)    All goodwill of the Hospital evidenced by the Assets;

(s)    To the extent transferrable or assignable, Seller's right or interest in the telephone and facsimile numbers used with respect to the operations of the Hospital;

(t)    To the extent assignable or transferable, Seller's lock box account(s) associated with Medicare or Medicaid fee for service receivables (the **"Lockboxes"**) on or after the Licensure Date;

(u)    all of Debtors' rights and obligations under any 2020/2021 Residency CAP Affiliation Agreement, 2020/2021 Master Agreement for Shared Rotational Arrangements, all existing provider agreements, and all other executory contracts and agreements identified by Seller or Debtors as essential to the continued operation of the Debtors, Hospital or Nursing School; and

(v)    all of Debtor's rights and obligations as pertains to Lutheran School of Nursing;

(w)    other than Utility Deposits, all prepaid rentals, deposits, prepayments and similar amounts relating to the Assigned Contracts, which were made with respect to the operation of the Hospital or Nursing School (the "**Prepaids**");

(x)    to the extent assignable or transferable, any other assets owned by Sellers which are not specifically described above in this Section 1.7 that are used primarily in the operation of the Hospital.

As used herein, the term "**Permitted Exceptions**" means (i) the Transferred Obligations; (ii) liens for taxes not yet due and payable, subject to adjustment as provided in Section 1.6; (iii) zoning ordinances and other similar encumbrances affecting real property; and (iv) items appearing of record and identified in the pro forma policy related to the Owned Real Property prepared by Escrow Agent and attached hereto as <u>Exhibit 1.7</u>. For the avoidance of doubt, Seller, at its sole cost and expense, shall cause to be removed, at or prior to the Closing, any Schedule B exceptions appearing on the Title Commitment; *provided, however*, Seller's obligations with

13

respect to the foregoing shall be limited to the following: (x) delivery to the Escrow Agent of all items set forth in Section 1.4, including, but not limited to, a certified copy of the Sale Order, and (y) proration and payment of all real estate taxes and assessments in accordance with Section 1.6. Subject to Seller's satisfaction of the foregoing obligations, any and all Schedule B exceptions appearing on the Title Commitment remaining on the Closing Date shall constitute Permitted Exceptions.

      1.8    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in Section 1.7, Seller shall retain any and all interests, rights and other assets owned, directly or indirectly, by Debtors (or any of Debtors' affiliates) that do not constitute Purchased Assets (collectively, the "**Excluded Assets**"), including, without limitation, the following:

      (a)    cash, cash equivalents and short-term investments other than cash, cash equivalents and short-term investments titled in the name of the School of Nursing;

      (b)    all intercompany receivables of Debtors with any of Debtors' affiliates;

      (c)    all of the tangible personal property owned by Debtors, or any of them, and currently located at the Owned Real Property listed on <u>Schedule 1.8(d)</u>;

      (d)    all of the intangible personal property owned by Debtors, or any of them, listed on <u>Schedule 1.8(e)</u>;

      (e)    all benefit plans of Debtors and the assets of all benefit plans of Debtors and any asset that would revert to the employer upon the termination of any benefit plan of Debtors, including, without limitation, any assets representing a surplus or overfunding of any benefit plan of Debtors;

      (f)    all contracts that are not Assigned Contracts;

      (g)    the portions of Prepaids, and other assets disposed of, expended or canceled, as the case may be, by Seller or Debtors after the Execution Date and prior to the Effective Time in the ordinary course of business;

      (h)    assets owned by vendors of services or goods to the Hospital or Nursing School as set forth within Schedule 1.8(i);

      (i)    assets owned by any third party, including, without limitation, non-Seller affiliates of the Debtors unless material to the business of the hospital, and set forth within schedule 1.8(j).;

      (j)    all of Debtors' organizational or corporate record books, minute books and tax records;

      (k)    all deposits made with any entity that provides utilities to the Owned Real Property (the "**Utility Deposits**");

14

(l)    all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets and/or Excluded Liabilities;

(m)    all bank accounts of Debtors and Seller except as provided with Section 1.7;

(n)    all tax refunds and tax assets of Debtors, Debtors' bankruptcy estate, or Seller;

(o)    all insurance policies and contracts and coverages obtained by Debtors or Seller, or listing Debtors or Seller as an insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all rights to insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to (i) Purchased Assets prior to the Effective Time or (ii) Excluded Assets, whether prior to or after the Effective Time;

(p)    any rights or documents relating to any Excluded Liability or other Excluded Asset;

(q)    the rights of Debtors or Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(r)    all rights to confidentiality and privilege of Debtors or Seller as well as any writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(s)    any rights or remedies provided to Seller under this Agreement and each other document executed in connection with the Closing and the actions necessary to complete the Sale of the Purchased Assets pursuant to this Agreement;

(t)    all claims, counterclaims and causes of action of Debtors or Debtors' bankruptcy estate (including parties acting for or on behalf of Debtors' bankruptcy estates), including, without limitation, (i) causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code, (ii) any claims, counterclaims and causes of action under applicable non-bankruptcy law (including claims, counterclaims and causes of action against any health plan or other third party payors related to services provided prior to the Effective Time), and (iii) any rights to challenge liens asserted against property of the Debtors' bankruptcy estate (including, but not limited to, liens attaching to the Purchase Price paid to Seller), and the proceeds from any of the foregoing; and

(u)    any other assets identified in <u>Schedule 1.8(w)</u>.

For the avoidance of doubt, Purchaser is not acquiring any asset owned by any affiliate of Debtors unless specifically set forth within Section 1.9.

1.9    <u>Transferred Obligations</u>.    On and after the Closing Date, Purchaser shall be responsible for and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations (collectively, the "**Transferred Obligations**"):

15

(a)      the Assigned Contracts, subject to Seller's payment of the Cure Costs;

(b)      the Secured Interests of Toby Mug Financing, LLC, estimated to be $1,549,849.93;

(c)      the Assigned Leases, subject to Seller's payment of the Cure Costs;

(d)      all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Purchased Assets on or after the Effective Time;

(e)      all unpaid non-delinquent real and personal property taxes, if any, that are attributable to the Purchased Assets after the Effective Time, subject to the prorations provided in Section 1.6;

(f)      all liabilities and obligations relating to utilities being furnished to the Owned Real Property, subject to the prorations provided in Section 1.6;

(g)      any other obligations and liabilities identified in Schedule 1.9(e) and

(h)      any obligations or liabilities Purchaser may desire or need to assume in order to have Certifications/Licenses/ Permits identified on Schedule 1.7 reissued to Purchaser, as well as any liabilities or obligations associated with Seller's Medicare or Medicaid Provider Agreements, but only to the extent assumed by Purchaser and any Medicaid liabilities or obligations needed to support ongoing Disproportionate Share Medicaid Funding.

1.10    Excluded Liabilities.  Purchaser shall not assume or become responsible for any duties, obligations or liabilities of Seller that are not assumed by Purchaser pursuant to the terms of this Agreement, Assignments and the Bill of Sale.  And Seller shall remain fully and solely responsible for any of all Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, Assignments or Bill of Sale. Seller remains fully and completely responsible for any and all State and/or Federal Taxes of Seller at the time of closing. Purchaser is not assuming any liability associated with any and all State and/or Federal Taxes.  Purchaser is not assuming any liabilities of Debtors related to the Purchased Assets, or the operation of the Hospital or Nursing School, and to the maximum extent permitted by law, shall not be deemed a successor to Debtors or Seller, or Debtors' bankruptcy estates, by reason of any theory of law or equity with respect to any claims or liens against Debtors or the Purchased Assets, except for Permitted Exceptions (collectively, the "**Excluded Liabilities**").

1.11    Assumption and Assignment of Contracts and Leases.

(a)      Designation of Assigned Contracts.  Seller is party to certain contracts and unexpired leases, including executory contracts and unexpired leases subject to assumption and assignment to Purchaser under Section 365 of the Bankruptcy Code, which are identified in Schedule 1.11 (collectively, all such contracts and leases, the "**Evaluated Contracts**").  Subject to Bankruptcy Court approval, as necessary, Seller shall assume and assign to Purchaser the

16

Evaluated Contracts selected by Purchaser for assignment.  Purchaser shall notify Seller in writing of which Evaluated Contracts are to be assumed and assigned pursuant to this Agreement (collectively, the "**Assigned Contracts**") not later than 4:00 p.m. Eastern Time on July 22, 2020.  To the extent subject to Section 365 of the Bankruptcy Code, all Evaluated Contracts that are not designated as Assigned Contracts (collectively, the "**Rejected Contracts**") shall be rejected by Seller.  For the avoidance of doubt, Purchaser shall have no obligation or liability as it relates to any Rejected Contract. The Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders are entered assuming and assigning the respective assigned contracts or assigned leases applicable to such Seller to purchase and rejecting the rejected contracts.  With respect to each assigned lease, the Seller shall execute and deliver to Purchaser and Assignment and Assumption of Lease. Notwithstanding anything contrary set forth in this Agreement, the rejected contracts shall constitute part of the Excluded Assets pursuant to, and as defined, in this Agreement.

(b)    Cure Costs.  Subject to Bankruptcy Court authorization and available funds, on or about the Closing Date, Seller shall pay or escrow an amount equal to the Cure Costs to each counterparty to an Assigned Contract so that each such Assigned Contract may be assumed by Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code.  For purposes of this Agreement, "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Assigned Contract to Purchaser.  The obligation of Seller to pay the Cure Costs, if not fully paid as of the Closing Date, shall survive the Closing.  Seller may, in her discretion, discount the Purchase Price by the amount of any unpaid Cure Costs as of the Closing Date.  If the Seller so elects, Purchase shall assume all obligations for the payment of the unpaid Cure Costs and, notwithstanding any provisions to the contrary in this Agreement, Seller's failure to pay the subject Cure Costs shall not constitute a breach of or grounds to terminate this Agreement.

(c)    Consents.  Purchaser shall be entitled, but not obligated, to seek to obtain any consents required under the applicable contracts and leases in connection with Seller's assumption and/or assignment to Purchaser of the Assigned Contracts.  Seller shall not be obligated to undertake any efforts to assist Purchaser in obtaining any such consents.  Purchaser's failure to obtain any or all necessary consents as of the Closing Date shall not be a condition precedent to either Party's obligation to consummate the Closing and perform all transactions contemplated by this Agreement; *provided, however*, in the event such consent is not obtained, the subject contract or lease shall no longer be an Assigned Contract and shall constitute an Excluded Asset under the terms of this Agreement.

1.12    Disclaimer of Warranties; Release

(a)    THE PURCHASED ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLER AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER

17

REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE OWNED REAL PROPERTY, WITH NO WARRANTIES OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLER INCLUDED IN THE PURCHASED ASSETS AND THE TRANSFERRED OBLIGATIONS ARE BEING ACQUIRED OR RECEIVED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)     Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Purchase Price, the Purchased Assets, the Seller, the Debtors, the Hospital, the Nursing School, the businesses of the Hospital or Nursing School and their value and suitability for Purchaser's purposes and is relying solely on Purchaser's own examination, review and inspection of the Purchased Assets, Assigned Contracts, Transferred Obligations, and all other aspects of the transactions contemplated by this Agreement. Except with respect to any obligations of Seller to pay the Cure Costs, Purchaser hereby releases Seller, Debtors and their affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the businesses of the Hospital and Nursing School and the Purchased Assets, or their suitability for any purpose whatsoever.  Purchaser further acknowledges that the representations and warranties of Seller contained in Article II of this Agreement are the sole and exclusive representations and warranties made by Seller to Purchaser (including with respect to the Hospital, the Nursing School, the Purchased Assets, the Assigned Contracts, and the Transferred Obligations) and shall expire, and be of no further force or effect, at the Closing

1.13    Title and Survey.

(a)     Seller shall deliver to Purchaser, on the Effective Date, a copy of any existing owner's title insurance policy. Seller shall cause First American Title Insurance Company National Commercial Services, 420 S Orange Avenue, Suite 250, Orlando, FL 32801, Attn: Rachael Yenque (the "**Title Company**"), to issue to Purchaser, at Purchaser's expense, a fee owner's title insurance commitment (the "**Commitment**") in the amount of the portion of the Purchaser Price allocated to the Owned Real Property, together with any endorsements to be paid by Purchaser at Closing,.  The Commitment shall show Seller to be vested with insurable fee simple title to the Real Property, free and clear of all liens, encumbrances, covenants, conditions, restrictions, rights-of-way, easements and other matters affecting title, except the Permitted Exceptions.

(b)     Seller shall deliver to Purchaser, on the Effective Date, a copy of any existing survey it may have in its possession. Purchaser may order, at Purchaser's expense, a survey certified to Purchaser and Title Company (the "**Survey**").  If the Survey shall reflect any encroachments, overlaps, unrecorded easements or similar rights in third parties, or any other adverse matters not specifically provided for in this Agreement, then the same shall be deemed Title Defects.

18

(c)     Purchaser shall have until _____days (the "**Title Exam Period**") to examine the Commitment and the Survey for Title Defects (defined below).

(I)     If Purchaser finds title to be defective, Purchaser shall, no later than the end of such Title Exam Period, notify Seller in writing specifying the title defect(s) ("**Title Defect(s)**"). If Purchaser fails to give Seller written notice of any Title Defects before the expiration of the Title Exam Period, the defects (if any) shown in the Commitment or Survey to which objection has not been given shall be deemed to be waived as title objections to closing this transaction.

(II)     If Purchaser has given Seller timely written notice of Title Defect(s) and the Title Defect(s) render the title other than as represented or required in this Agreement, Seller may cause such Title Defect(s) to be cured by the Closing Date. Seller may (but shall not be required to) remove by payment, bonding, or bring suit to cure any Title Defect or to buy-out or settle any other claim or lien against the Property.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

2.1     <u>Authorization</u>. Subject to Bankruptcy Court approval and any necessary third party consents, Seller has all necessary power and authority to execute and enter into this Agreement and to carry out the transactions contemplated hereby.

2.2     <u>Binding Agreement</u>. This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect (including, without limitation, approval of the Agreement and Sale by the Bankruptcy Court) and (b) limitations on the enforcement of equitable remedies.

2.3     <u>Brokers and Finders</u>. Except as set forth on <u>Schedule 2.3</u>, neither Seller, Debtors nor any affiliates, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder. Purchaser shall have no obligation or liability with respect to any finder, broker or agent set forth on <u>Schedule 2.3</u>.

2.4     <u>Financial Statements</u>

(a)     Seller will provide to Purchaser (i) the unaudited balance sheets of the Seller as of June 30, 2020 and (ii) unaudited income statements of the Seller for the six-month period ending June 30, 2020 (iii) unaudited financial statements for the years 2019 and through June 30, 2020 (collectively, the "Historical Financial Statements");

(b)     The income statements contained in the Historical Financial Statements present, fairly in all material respects the results of the

19

operations of the Sellers as of and for the periods covered therein and the balance sheets contained in the Historical Financial Statements (i) are true, complete and correct in all material respects and (ii) present, fairly in all material respects the financial condition of the Seller as of the date indicated thereon.

2.5    Legal Proceedings.    Except as described on Schedule 2.4, or as filed in the Bankruptcy Court, to Seller's actual knowledge there are no claims, proceedings or investigations asserted against Debtors or Seller and pending or, to the best knowledge of Seller, threatened against Debtors or Seller before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would adversely affect Seller's ability to consummate the transactions contemplated hereby.

2.6    Condemnation.    To Seller's actual knowledge, no condemnation proceedings relating to the Owned Real Property are pending or, to Seller's knowledge, threatened, and Seller has not received written notice of any condemnation proceedings related to the Owned Real Property.

2.7    OFAC.    Seller represents and warrants that (a) Seller (i) is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "**List**"), (ii) is not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) is not an Embargoed Person (as hereinafter defined), (b) to Seller's actual knowledge, none of the funds or other assets of Seller or Debtors constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and (c) to Seller's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Debtors, or any of them (whether directly or indirectly). The term "Embargoed Person" means any person, entity or government subject to trade restrictions under United States law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

2.8    No Violations.    Except as set forth on Schedule 2.7, and other than any action or proceeding brought in the Bankruptcy Court, to Seller's actual knowledge, no Debtor has received any written notice from a governmental agency of any uncured violations of any federal, state, county or municipal law, ordinance, order, regulation or requirement affecting the Purchased Assets.

2.9    Tax Appeals.    To Seller's actual knowledge, no tax appeals initiated by any Debtor are pending or have been filed with respect to any of the Owned Real Property. Seller has not received from any governmental authority or other entity having authority to impose such assessments, any written notice of actual or threatened special assessments or reassessments of the Owned Real Property.

2.10     Seller's Knowledge.  Seller is a court-appointed fiduciary for Debtors and provides the foregoing representations and warranties solely in her capacity as Chapter 11 Trustee of the Debtors.  In providing the representations and warranties set forth in this Article II, Seller has relied upon the books and records, bankruptcy filings, and documentation created and maintained by the Debtors, as well as other disclosures, documentation and information provided by Debtors and individuals and entities associated or affiliated with Debtors.  Seller cannot warrant the accuracy or completeness of any such documentation, disclosures or information.  Purchaser acknowledges and agrees that Seller has not and is not obligated to independently research, confirm or verify the accuracy or completeness of any information or documentation forming the basis, in whole or in part, for any of the representations and warranties set forth in this Article II.  Any and all representations and warranties set forth in this Article II, as well as the exhibits and scheduled referenced in this Article II, are premised upon the actual knowledge or understanding of Seller as of the Execution Date.  No constructive or imputed knowledge shall be attributed to Seller, or any individual or entity acting for or on behalf of Seller, by virtue of any position held, relationship to any other individual or entity, or for any other reason.

2.11     Personnel.  Seller has provider Purchaser with a complete list of names, positions and current annual salaries or wage rates and scheduled bonus and the accrued paid time off pay of all employees of Seller, as of June 1, 2020, whether such employees are full time employees, part time employees, on short term or long term disability or on leave of absence pursuant to Seller's policies or applicable law (the **"Hospital Employees"**) and indicating whether the Hospital Employee is full time or part time.  Seller shall provide an updated list to Purchaser no later than five (5) Business Days before the date scheduled for the Closing.

2.12     Insurance.  Sellers have provided Purchaser with a list of all material insurance maintained by Seller with respect to the Assets and the Businesses, as of the Signing Date.

2.13     Accounts Receivable.  To the knowledge of Seller, all Accounts Receivable including in the Assets at Closing result from the bona fide provision of products or services in the ordinary course of business.  All proceeds of Sellers' Accounts Receivables are currently deposited either electronically or manually, into those bank accounts provided to Purchaser in Seller's electronic data room.

2.14     Payor Contracts.  To the knowledge of Sellers, and subject to Section 365 of the Bankruptcy Code, Seller has provided Purchaser with a complete list of all written contracts with private third party payors including insurance companies and HMO.  Seller has provided Purchaser with a true and correct copy of all material Payor Contracts known to the Seller.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents and warrants to Seller, as of the Execution Date and as of the Closing Date, as to the following:

3.1     Authorization.  Purchaser has full corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.  All corporate and other actions required to be

21

taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser. No corporate or other action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement, and all transactions contemplated hereby.  The person signing this Agreement on behalf of Purchaser is duly authorized to do so.

      3.2    <u>Binding Agreement</u>.  This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and (b) limitations on the enforcement of equitable remedies.

      3.3    <u>Organization and Good Standing</u>.  Purchaser is a Delaware Limited Liability Company  duly organized, validly existing and in good standing under the laws of the State of Delaware and is or will be duly authorized to transact business in the State of Missouri, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted, and as envisioned following the consummation of the transactions contemplated in this Agreement.

      3.4    <u>No Violation</u>.  Except as set forth in <u>Schedule 3.4</u>, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, or if any approval, consent or filing is required, such requirement has been fully satisfied and no further authorizations, contents or filings shall be required to consummate the transactions contemplated by this Agreement; (c) violate any law, rule, regulation or ordinance to which Purchaser is or may be subject; or (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

      3.5    <u>Brokers and Finders</u>.  Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

      3.6    <u>Representations of Sellers</u>.  Purchaser acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis without any representations or warranties, except as expressly provided herein (as more particularly described in Section 1.12), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made by or on behalf of Seller, other than as expressly set forth in this Agreement.

      3.7    <u>Legal Proceedings</u>.  Except as described on <u>Schedule 3.7</u>, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body

4821-5743-0466.1

(whether judicial, executive or administrative) in which an adverse determination would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8     No Knowledge of Seller's Breach.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any covenant, representation or warranty by Seller or of any condition or circumstance that would give Purchaser a right to terminate this Agreement.  If information comes to Purchaser's attention on or before the Closing Date (whether through Seller or otherwise and whether before or after the Execution Date) which indicates that Seller breached any of her covenants, representations, warranties or any other provision or condition under this Agreement, then, subject to Section 9.1(c), the effect shall be as if the covenants, representations and warranties or any other provision or condition of this Agreement had been modified in accordance with the actual state of facts existing prior to the Effective Time; *provided*, that Purchaser must promptly notify Seller if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to notify Seller shall constitute a waiver by Purchaser of Seller's breach, if any, of any covenant, representation or warranty or any other provision of this Agreement or any ancillary agreements entered into pursuant to this Agreement.

3.9     Ability to Perform.  Purchaser has and will have immediately available funds in cash, which are sufficient to pay the Purchase Price to be paid at Closing and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.  Purchaser has provided Seller with sufficient evidence of Purchaser's financial capacity.

3.10     Solvency.  Purchaser is solvent and Purchaser will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement.  For purposes hereof, the term "solvency" means that:  (a) the fair salable value of Purchaser's tangible assets is in excess of the total amount of its liabilities (including, for purposes of this definition, all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Purchaser is able to pay its debts or obligations in the ordinary course of business as they mature; and (c) Purchaser has capital sufficient to carry on its businesses and all businesses which it is about to engage.

3.11     Investigation.  As of the Closing Date, Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of Debtors for purposes of conducting a due diligence investigation of Debtors and the Purchased Assets.  Purchaser has completed all of its due diligence of Debtors and the Purchased Assets and this Agreement is not subject to any further due diligence of Debtors or the Purchased Assets, including, without limitation, the Hospital and Nursing School, by Purchaser.

3.12     OFAC.  Purchaser and, to Purchaser's actual knowledge, each person or entity owning an interest in Purchaser (i) is not currently identified on the Specially Designated Nationals

23

and Blocked Persons List maintained by the OFAC and/or on any other similar List, (ii) is not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) is not an "Embargoed Person", to Purchaser's actual knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Purchaser's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

3.13   Purchaser's Knowledge.   References in this Agreement to "Purchaser's knowledge" or "the knowledge of Purchaser" means the actual knowledge of the Chief Financial Officer of Purchaser, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

### ARTICLE IV
### COVENANTS OF SELLER

4.1   Access and Information; Inspections.

(a)   From the Execution Date through the date that is one (1) calendar day before the Closing Date, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours to Debtors' records and facilities to inspect the books, accounts, records and all other relevant documents and information with respect to the Purchased Assets and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information in Seller's possession as to the Purchased Assets as Purchaser or its representatives may from time to time reasonably request; *provided, however*, that Seller is not obligated to disclose information which is proprietary to Debtors and would not be essential to the purchase of the Purchased Assets by Purchaser; *provided, further*, that all disclosures of information shall be consistent with any confidentiality or non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller or her representatives. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of Debtors.

(b)   Notwithstanding anything contained herein, Seller shall not be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2   Consents.   Notwithstanding any provision to the contrary contained in this Agreement, Seller shall not be obligated to obtain the approval or consent to the assignment to Purchaser of any Assigned Contracts from any party to any of the Assigned Contracts if any such contract or lease states that it is not assignable without such party's consent.

24

4.3    <u>Seller's Efforts to Close</u>.  Seller shall use reasonable commercial efforts to satisfy all of the conditions precedent set forth in Article VI, Article VII, and Article VIII to her or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or materially influence the satisfaction of such conditions.

4.4    <u>Cost Reports</u>.  Within the time required by applicable law, Seller will prepare and file with respect to SAHC all cost reports relating to periods ending prior to the Closing Date, including terminating cost reports for Medicare and Medicaid. All amounts due to, or owed by, Seller for any such cost report settlements or adjustments will be for the account of Seller. Purchaser shall, within ten (10) business days after receipt of Seller's written request therefor, reimburse Seller for any cost report adjustments or other Medicare or Medicaid adjustments or payments paid to Purchaser after the Closing Date consisting of underpayments, adjustments or other amounts owed to Seller for any period prior to the Closing Date.  Purchaser, upon reasonable notice, during normal business hours will reasonably cooperate with Seller in regard to the preparation, filing, handling and appeals of the pre-Closing cost reports. Such cooperation shall include the providing of statistics and obtaining files and the coordination pursuant to adequate notice of Medicare and Medicaid exit conferences or meetings.

4.5    <u>Medicare and Medicaid Enrollment</u>.  Seller shall make commercially reasonable efforts to enter into settlement agreements with CMS with respect to the Medicare Provider Agreement and the Missouri Department of Social Services (**"MDSS"**), with respect to the Medicaid Provider Agreement and/or  its best efforts to obtain Bankruptcy Court rulings that the provider agreements for Medicare and Medicaid may be transferred as licenses without the consent of CMS or MDHSS, as applicable, and without successor liability, to enable such agreements to be assigned to Purchaser.  To that end, Seller shall: (i) file a motion to assign the Medicare and Medicaid provider agreements as a license; (ii) diligently prosecute the motion to its conclusion; and (iii) negotiate with the appropriate parties to obtain the assignment.  Seller shall not be required to prosecute an appeal of a negative bankruptcy court decision.  Between the closing date and the Licensure Date, Purchaser may bill and collect for patient services under Seller's health plan agreements.

4.6    <u>Medicare and Medicaid Transition Billing</u>.

(a)    Prior to Purchaser's receipt of its "tie-in" notice or a new Medicare provider agreement, Seller agrees that Purchaser may bill for its services performed on and after the Closing Date under Seller's NPI and CCN, *provided that* Purchaser shall indemnify and hold harmless Seller against all claims asserted by any Government Authority based on Purchaser's use of Seller's Provider Agreements or Seller's CCNs and all Losses of Seller arising out of or in connection with Purchaser's use of Seller's CCN.

(b)    Prior to the approval of Purchaser's Medicaid enrollment, Seller agrees that Purchaser may bill for its services performed on and after the Closing under Seller's Medicaid number, *provided that* Purchaser shall indemnify and hold harmless Seller against all  claims asserted by any governmental authority based on Purchaser's use of Seller's Medicaid number, and all Losses of Seller arising out of or in connection with Purchaser's use of Seller's Medicaid number.

4821-5743-0466.1

4.7    <u>Hospital Operations.</u>   From the approval of the Stalking Horse Bid through the date of the Sale Order and until the closing, Seller shall, with respect to the operation of the hospital, use commercially reasonable efforts to:

4.7.1    without regard to negative financial impact or any Material Adverse Effect, carry on Seller's operation of the hospital consistent with past practice but subject to the Bankruptcy Case and Seller's obligations and actions in connection therewith;

4.7.2    without regard to Material Adverse Effect, maintain in effect the insurance coverages with respect to the assets;

4.7.3    without regard to Material Adverse Effect, perform Seller's material obligations under all Assigned Contracts with respect to the Assets in compliance with the Bankruptcy Code;

4.7.4    maintain the assets in materially the same condition as at present, ordinary wear and tear expected;

4.7.5    perform its obligations under all contracts with respect to the Assets in compliance with the Bankruptcy Code;

4.7.6    following entry of the Sale Order, permit and allow reasonable access by Purchaser and its representatives to the facility  for inspection and to provide offers of post-closing employment to any of Seller's personnel and to establish relationships with physicians, medical staff and others having business relations with Seller, provided, that such actions by Purchaser do not unreasonably interfere with Seller's operations of the Hospital.

4.7.7     timely file or cause to be filed all material, reports, notices, and tax returns required to be filed and pay all required taxes as they come due;

4.7.8    without regard to Material Adverse Effect, maintain all existing material approvals, permits and environmental permits relating the hospital;

4.7.9    have oversight and weekly reports, including in person meetings, with the Trustee and any other individuals Purchaser deems necessary to consummate the transaction.

4821-5743-0466.1

4.8     Bankruptcy Court Matters.

(a)          As soon as reasonably practical following execution of this Agreement, Seller shall file a Motion to Approve Purchaser as Stalking Horse Bidder and Approve Bid Protections ("**Bid Protection Motion**").

(b)          Seller agrees to the following documents, and any amendments, modifications, and/or supplements thereto, shall be in form and substance reasonably acceptable to Purchaser:

(i)     the Sale Order and any Related Orders; and

(iii)   the Contracts Assumption Motion and the Contracts Assumption Order.

4.9     Post-Closing Deliverables.  The parties understand that certain documents will not be finalized and/or completed prior to the anticipated closing date.  Seller agrees to commercially reasonable efforts to provide to Purchaser the following documents post-closing as critical to the continued operations of the hospital:

4.9.1   2019 Cost Report

4.9.2   2019 City, State and Federal Tax Returns

## ARTICLE V
## COVENANTS OF PURCHASER

5.1     Purchaser's Efforts to Close.  Purchaser shall use reasonable commercial efforts to satisfy all of the conditions precedent set forth in Article VII and Article VIII to its or Seller's obligations under this Agreement, to the extent that Purchaser's action or inaction can control or materially influence the satisfaction of such conditions. Prior to consummation of the transactions contemplated herein, Purchaser shall be permitted to communicate and meet with (a) counterparties to the agreements and contracts of hospitals, including those included in the Assumed Obligations, regarding the terms and conditions under which they may be assumed and assigned to Purchaser; (b) applicable government and regulatory authorities regarding prospective compliance with regulatory requirements and related issues, so long as, in the case of each, such communications do not interfere, with the operations of the Hospital or the conduct of the Bankruptcy Case, notice is provided to Seller as to any communications or meetings with any governmental authority in advance, and Seller is afforded the opportunity to attend all such meetings and participate in all such calls.

5.2     Required Governmental Approvals.  Between the Effective Date and the Closing Date, Purchaser will: (i) use its commercially reasonable efforts to obtain, as promptly as practicable, all material governmental authorizations required of Purchaser to consummate the transactions contemplated hereby; (ii) provide such other information and communications to governmental entities as such governmental entities may reasonably request; and (iii) reasonably cooperate with Seller in Seller's obtaining, as soon as practicable, all material governmental

27

authorizations required of Seller to consummate the transactions contemplated hereby.  Without limiting the generality of the undertakings pursuant to this Section 5.2, Purchaser shall take, or cause to be taken, all actions and do, or cause to be done, all things necessary to obtain approval for the transactions contemplated by this Agreement by any governmental entity, which actions and things shall include Purchaser's agreement to: (i) sell or otherwise dispose of specific assets or categories of assets or businesses now owned or hereafter acquired by Purchaser; (ii) terminate any existing relationships and contractual rights and obligations; and (iii) amend or terminate existing licenses or other intellectual property agreements and enter into such new licenses or other intellectual property agreements; and Purchaser shall take promptly, in the event that any permanent or preliminary injunction or other order is entered or becomes reasonably foreseeable to be entered in any proceeding that would make the transactions contemplated hereby in accordance with the terms of this Agreement unlawful, any and all steps necessary to vacate, modify or suspend such injunction or order so as to permit such consummation.  Purchaser shall not, and shall cause its affiliates not to, acquire or agree to acquire, by merging with or into or consolidating with, or by purchasing a portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets or equity interests, if the entering into of a definitive agreement relating to, or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consents of any governmental entity necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period; (ii) increase the risk of any governmental entity seeking or entering an order prohibiting the consummation of the transactions contemplated by this Agreement; (iii) increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated by this Agreement.

5.3     Certain Employee Matters.

(a)     Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) who, immediately prior to the Effective Time are: (i) employees in good standing or (ii) employed by another Seller or affiliate in good standing and are listed on Schedule 5.3 (collectively, the "**Hospital Employees**").  Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "**Hired Employees**." All employees who are Hired Employees shall cease to be employees of Sellers or its affiliates as of the Closing Date.

(b)     After the Closing Date, Purchaser's human resources department will give reasonable assistance to Sellers and their affiliates with respect to Sellers' and Sellers' affiliates' post-Closing administration of Sellers' and Sellers' affiliates' pre-Closing employee benefit plans for the Hospital Employees.  Within five (5) days after the Closing Date, Purchaser shall provide to Sellers a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

(c)      The provisions of this Section are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

5.4    Excluded Assets.  As soon as practicable after the Closing Date, Purchaser shall deliver to Seller or Seller's designee any Excluded Assets found at the Owned Real Property on and after the Effective Time, without imposing any charge on Seller for Purchaser's storage, holding, or delivery of same on and after the Effective Time.

5.5    Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Purchased Assets are located and all other similar laws applicable to bulk sales and transfers.

5.6    Inspection; Repair and Restoration; Insurance.  From the Effective Date through the date that is one (1) calendar day before the Closing Date, Purchaser may conduct any inspections, investigations and reviews in a manner that does not damage the Owned Real Property or interfere unreasonably with the operations of the Hospital or Nursing School, upon at least twenty-four (24) hours' prior notice to Seller, which notice may be given telephonically to _____ at _____ or via email at _____. Purchaser and its agents and representatives shall not permit any liens to attach to the Owned Real Property by reason of the exercise of its rights hereunder, and shall promptly repair any damage that occurs as a result of any inspections, investigations and reviews and shall promptly restore the Owned Real Property to its prior condition following completion of such inspection, investigation or review.  Such repairs and restoration shall be performed at Purchaser's sole expense.  Purchaser shall at all times indemnify, save harmless and defend Seller from and against any and all claims, liabilities, loss, costs, damage and expenses (including reasonable attorneys' fees whether incurred at or before the trial level or in any appellate or bankruptcy proceedings or any proceeding to determine the amount of such fees) which Seller or the Owner Real Property may suffer, sustain or incur by reason of any act or omission of Purchaser or any employee, agent or independent contractor of Purchaser on the Owner Real Property or in connection with such investigations, including, without limitation, any damage to any part of the Owner Real Property, or injury to any person or damage to or destruction of other real or personal property, and including the filing or enforcement of any construction or other statutory or common law lien or claim against the Owner Real Property, or any part thereof; provided, that, in no event shall Purchaser have any liability hereunder (i) relating to the negligence or willful misconduct of Seller, any tenant or any of their respective agents, employees or representatives, (ii) for any incidental, consequential, indirect, punitive, special or exemplary damages or (iii) with respect to the mere discovery of any hazardous or toxic substances at the Property. This duty of Purchaser to indemnify, defend and hold harmless the Seller shall survive Closing or earlier termination of this Agreement for a period of one (1) year. Purchaser shall at all times, from the Effective Date through the Effective Time, maintain in full force and effect insurance against loss or liability in connection with bodily injury, death, or property damage or destruction, occurring on or about the Owned Real Property under one or more policies of commercial general liability insurance.  Each policy shall be written on an occurrence

29

basis, shall contain coverage at least as broad as that provided under the then-most current Insurance Services Office (ISO) commercial general liability insurance form which provides the broadest coverage, and shall contain a broad form contractual liability endorsement. The insurance coverage shall be in the amounts of not less than One Million Dollars ($1,000,000) per occurrence limit and a Four Million Dollar ($4,000,000) umbrella insurance policy. The insurance policies shall name Seller and any other party reasonably designated by Seller as additional insureds, and such policies shall indicate that they shall not be terminated or modified in any way that would materially decrease the protection afforded Seller under this Agreement without thirty (30) days' advance notice to Seller. Prior to commencing its inspection, Purchaser shall deliver to Seller a certificate of insurance evidencing the insurance coverages required by this Section.

      5.7            Transfer, Preservation and Access to Records After the Closing.

      (a)     After the Closing, Purchaser shall, in the ordinary course of business and to the extent as required by Applicable Law, keep and preserve in their original form the (i) medical and clinical records of patients as of and prior to the Closing that have been transferred to Purchaser and (ii) the student records related to the nursing school. For purposes of this Agreement, the term "records" includes all documents, electronic data and other compilations of information in any form. Purchaser acknowledges that as a result of entering into this Agreement it will gain access to patient, student and other information which is subject to rules and regulations regarding confidentiality. Purchaser agrees to abide by any such rules and regulations relating to the confidential information it acquires. Purchaser agrees to maintain the patient records of Seller it receives in accordance with Applicable Law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. §1395(v)(l)(i)), the privacy and security requirements of the Administrative Simplification subtitle of HIPAA and applicable state requirements with respect to medical privacy and requirements of relevant insurance carriers.

      (b)     Upon reasonable notice, during normal business hours, at no out-of-pocket cost or expense to Purchaser, Purchaser will afford to the representatives of Seller access to and copies of the patient records and nursing school records (collectively "**Facility Records**") to the extent they relate to any period prior to Closing for any reasonable purpose. In addition, Seller shall be entitled, at Seller's sole cost and expense, to copy and/or remove any such Facility Records or copies thereof, for any reasonable purpose including purposes of billing or pending or threatened litigation. Any original Facility Record so removed shall be promptly returned to Purchaser following its use by Seller. Any access granted to Seller in this Agreement shall be upon the condition that any such access not materially interfere with the normal business operations of Purchaser.

      (c)     Purchaser shall make the Facility Records of patients and students available to such patients and students in accordance with applicable law, and to the extent compliant therewith, Purchaser's policies and procedures. To the extent permitted by applicable law, Purchaser shall have the right to charge patients and students for copies of their Facility Records.

      5.8.   Misdirected Payments. Seller covenants and agrees and Purchaser covenants and agrees, to remit to the other, with reasonable promptness, any payments received, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) the other.

5.9     Payments on Transition Patient Receivables. To appropriately allocate payments received by Purchaser with respect to services rendered and medicine, drugs and supplies provided by the Purchaser ("**Transition Patients Services**") provided to patients admitted prior to the Closing but not discharged as of the Closing ("**Transition Patients**"), Purchaser shall prepare and bill claims (the accounts receivable resulting from such claims, the "**Transition Patient Receivables**") for the Transition Patients following their discharge. If Purchaser receives any payments on any Transition Patient Receivable, Purchaser will pay Seller an amount equal to (i) the payments (including deposits, deductibles and co-payments paid, whether received by Purchaser or Seller or their Affiliates) with respect to the applicable Transition Patient Receivable multiplied by a fraction, the numerator of which shall be the total charges for the Transition Patients Services provided to the applicable Transition Patient prior to the Closing, and the denominator of which shall be the sum of the total charges of the Transition Patients Services provided to the applicable Transition Patient prior to and after the Closing (including charges for medicine, drugs and supplies), minus (ii) any deposits, deductibles or co-payments paid by the applicable Transition Patient prior to the Closing and included in the Excluded Assets. If Seller receives any payments on any Transition Patient Receivable, Seller will pay Purchaser an amount equal to the payments (including deposits, deductibles and co-payments paid, whether received by Purchaser, Seller or their Affiliates) with respect to the applicable Transition Patient Receivable multiplied by a fraction, the numerator of which shall be the total charges for the Transition Patients Services provided to the applicable Transition Patient following the Closing, and the denominator of which shall be the sum of the total charges of the Transition Patients Services provided to the applicable Transition Patient prior to and after the Closing (including charges for medicine, drugs and supplies). Notwithstanding the foregoing, to the extent a third party payor requires or permits the parties to submit split bills for Transition Patients (i.e., a bill for the portion of the Transition Patients Services provided prior to the Closing and a separate bill for the portion of the Transition Patients Services provided after the Closing), (i) the foregoing provisions shall not apply to billing and collection for such Transition Patients Services, (ii) Seller will be responsible for billing and collection for all such pre-Closing Transition Patients Services (and the accounts receivable for such Transition Patients Services will be an Excluded Assets), and (iii) Purchaser will be responsible for billing and collection for all such post-Closing Transition Patients Services (and the accounts receivable for such Transition Patients Services will belong to Purchaser).

5.9.1 Governmental Approvals

(a)     Best Efforts.  Purchaser (a) shall use its best efforts to secure, as promptly as possible after the entry of the Sale Order, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled, and (b) will provide such other information and communications to governmental and regulatory authorities as Sellers or such authorities may reasonably request.   Purchaser will provider Sellers periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses.  Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Licensure Date.  Purchaser shall promptly, not later than thirty (30) days business days after the entry of the Sale Order or sooner if required by

applicable governmental or regulatory authorities, file all applications, licensing packages and prerequisite to obtaining the material licenses, permits and authorizations as set forth herein. Purchaser acknowledges that Sellers may independently contact governmental and regulatory authorities as part of this process.

(b)     <u>Change of Ownership Applications</u>.  Purchaser shall, promptly, but no later than ten (10) business days after the entry of the Sale Order, or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other documents with all applicable governmental and regulatory authorities which are necessary for the operation of a hospital and the consummation of the transactions hereunder, including the hospital license change of ownership application with the State of Missouri, the hospital pharmacy change of ownership application, and the Medicare and Medicaid change-of-ownership applications (collectively defined herein as the "**CHOWS**").

## ARTICLE VI
## BANKRUPTCY COURT APPROVAL

6.1     <u>Bankruptcy Court Approval</u>.  The Parties acknowledge and agree that this Agreement and the consumption of the transactions contemplated under this Agreement are subject to approval of the Bankruptcy Court and the consideration by the Seller, in the exercise of her fiduciary duties, of higher or better competing bids in respect of all or any part of the Purchased Assets, whether individually or in combination with other assets of the debtors or otherwise, in accordance with the Bidding Procedures Order (each a  "**Competing Bid**").  If Purchaser is selected as the Winning Bidder or Back-up Bidder (defined below), Seller shall request entry of an order approving the Sale (the "**Sale Order**") in a form reasonably acceptable to Purchaser; *provided, however*, that the Parties acknowledge that the Bankruptcy Court may amend or modify the precise terms of the proposed Sale Order and, unless such amendments or modifications materially alter the transactions contemplated by this Agreement, the Parties shall be obligated to Close such transactions pursuant to the terms of this Agreement, as altered by the Sale Order.   For purposes of this Agreement, the Sale Order shall authorize the sale of the Assets pursuant to Section 363(b) of the Bankruptcy Code (including Seller's assumption and assignment to Purchaser of the Assigned Contracts) on the terms and conditions set forth herein, free and clear of all liens and encumbrances other than Permitted Exceptions) and Excluded Liabilities. If there are no Competing Bids, or Purchaser is selected as the Winning Bidder, Seller shall request that the Bankruptcy Court incorporate a good faith finding with respect to the Purchaser into the Sale Order pursuant to Section 365(m) of the Bankruptcy Code.

<u>Auction</u>.  In the event of the submission of one or more Competing Bids, the Seller shall conduct an auction (the "**Auction**") in accordance with the terms of the Bidding Procedure Motion and Bidding Procedure Order.  Purchaser agrees to participate in any Auction.  This Agreement shall constitute Purchaser's opening bid for the Purchased Assets on the terms provided herein. Seller conducting an Auction for any or all of the Purchased Assets shall not constitute a breach or default of this Agreement or basis for terminating the Agreement.  At the conclusion of the Auction, Seller shall select the highest and best offer as the winning bid (the "**Winning Bid**" and, the associated party, the "**Winning Bidder**"). Provided Purchaser is selected as the winning bidder in respect of the Assets at the auction, if any, undertaken in accordance with the Bidding Procedures Order (the **"Auction"**), or if no Competing Bid (as defined below) is submitted with

respect to the Assets that constitute a Qualified Bid (as defined in the Bidding Procedures Order), Seller shall seek entry of the Sale Order and any other orders to close the sale of the Assets (any such orders, **"Related Orders"**) by the Bankruptcy Court in accordance with the terms and conditions of the Bidding Procedures Order.  In the event that the Sale Order or any Related Orders are appealed, Seller shall use commercially reasonable efforts to defend such appeal.

6.2     Back-up Bidder.  At the conclusion of the Auction, Seller may select one or more back-up bids (each a "**Back-up Bid**" and, the associated party, a "**Back-up Bidder**").  Purchaser agrees to serve as a Back-up Bidder on the terms set forth herein, as modified by any higher or better bid made by Purchaser during the Auction.  In no event shall Purchaser's Back-up Bid be less advantageous or beneficial to Seller than the terms of this Agreement.  If Purchaser is designated as a Back-up Bidder, (a) notwithstanding anything to the contrary in Article IX or any other provision of this Agreement, (i) Seller shall retain the Deposit, (ii) any deadlines to Close shall be vacated, and (iii) and Purchaser's rights to terminate this Agreement, if any, shall be suspended pending consummation of the transaction(s) contemplated by the Winning Bid, and (b) in the event the Winning Bidder fails to consummate any transaction(s) contemplated by the Winning Bid, Purchaser may be designated the Winning Bidder and, if so designated, shall be obligated to consummate the transactions herein contemplated on the terms set forth in the Purchaser's Back-up Bid within ten (10) business days of being so designated.

6.3     Appeal of Sale Order.  In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay as well as written notice of any motion or application filed in connection with any appeal. Seller shall, in consultation with the Purchaser, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against any appeal of the Sale Order; *provided, however*, Purchaser shall be responsible for paying any and all fees, costs or expenses, including, without limitation, attorneys' fees and costs, incurred by the Seller in connection with any appeal or other proceeding challenging the Sale commenced following entry of the Sale Order.

6.4     Provided Purchaser is selected as the winning bidder at the Auction, if any, or if no Competing Bid is submitted with respect to the Assets, Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of Cure Costs (the **"Contracts Assumption Motion"**) which Contracts Assumption Motion and any form or order approving such Contracts Assumption Motion (which for the avoidance of doubt, may be the Sale Order), shall be in form and substance reasonably acceptable to Purchaser ( the **"Contracts Assumption Order"**).

## ARTICLE VII
## SELLER'S CONDITIONS PRECEDENT

7.1     Execution and Delivery.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered under the terms of this Agreement.

7.2     Authorization.  The Bankruptcy Court shall have approved the Agreement, and transactions contemplated by this Agreement, without material modifications, unless expressly agreed to by the Parties or part of Purchaser's Winning Bid following the Auction, through the

33

entry of the Sale Order and no temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the contemplated transactions shall have been issued by any court of competent jurisdiction or any other governmental body and remain in effect on the Closing Date.

7.3    <u>Covenant Performance</u>.  Purchaser shall have performed or complied with each and all of its obligations, covenants, agreements and conditions required to be performed or complied with by it in all material respects on or prior to the Closing Date.

7.4    <u>Representations and Warranties</u>.  All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date (subject to appropriate modifications permitted under this Agreement and except as would not be materially adverse to Seller).

# ARTICLE VIII
# PURCHASER'S CONDITIONS PRECEDENT

8.1    <u>Execution and Delivery</u>.  Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered under the terms of this Agreement.

8.2    <u>Authorization</u>.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and remain in effect on the Closing Date.

8.3    <u>Covenant Performance</u>.  Seller shall have performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller in all material respects on or prior to the Closing Date; *provided, however*, that this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the manner in which such obligations, covenants, agreements and conditions have not been performed would be materially adverse to Purchaser.

8.4    <u>Bankruptcy Court Approval</u>.

(a)    <u>Entry of Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, the form and substance of which shall be reasonably acceptable to the Purchaser, approving this Agreement and the consummation of the transactions contemplated by this Agreement pursuant to Sections 363 and 365 of the Bankruptcy Code.

(b)    <u>Enforceability of Sale Order</u>.  On the Closing Date, the Sale Order shall (1) be in full force and effect, (2) not have been voided, reserved or vacated or subject to a stay, (3) not have been materially amended, modified or supplemented in any way without Purchaser's prior written consent, and (4) be a Final Order, unless otherwise agreed by the Parties as part of an expedited closing.  For purposes of this Agreement, a "**Final Order**" means an order of the Bankruptcy Court as to which no appeal or notice of appeal has been timely filed as of the Closing

Date, or, if any of the foregoing has been timely filed, no stay pending appeal has been granted; as to which the time for challenging the Sale Order has expired; and as to which no stay is in effect.

(c)    On the Closing Date, the objection deadline shall have passed for all counterparties to Assigned Contracts to object to the assumption and/or assignment of such Assigned Contracts, including with respect to the Cure Costs contained in the respective cure notice, unless the deadline is extended as a result of a modification of the scope of Assigned Contracts to be assumed by Purchaser pursuant to the terms of this Agreement or the Bidding Procedure Order.

8.5    <u>Title Policy.</u>  The Title Company shall have committed to issue, as of the Closing, an ALTA owner's policy of title insurance in the form of the pro forma attached hereto as Exhibit 8.5 (the **Title Policy''**).  Purchaser acknowledges that a Title Policy consistent with 3.6 hereof shall be satisfactory to it.

8.6    <u>Representations and Warranties.</u>   All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date (subject to appropriate modifications permitted under this Agreement and would not materially adverse to Purchaser).

## ARTICLE IX
## TERMINATION

9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to Closing under any of the following circumstances:

(a)    by the mutual written consent of the Parties;

(b)    by Seller if Purchaser has committed a material breach of this Agreement, which material breach is adverse to Seller, and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within ten (10) business days after Seller provides Purchaser written notice of such breach;

(c)    by Purchaser if Seller has committed a material breach of this Agreement, which material breach is materially adverse to Purchaser, and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within ten (10) business days after Purchaser provides Seller of a written notice of such breach; *provided, however*, Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 9.1(c) if Purchaser is also in material breach of this Agreement;

(d)    by Seller if satisfaction of any such condition in Article VII is or becomes impossible and Seller has not waived such condition in writing, or the satisfaction of such condition would require Seller to breach or result in Seller breaching her fiduciary duties or applicable law;

(e)    by Purchaser if satisfaction of any such condition in Article VIII is or becomes impossible and Purchaser has not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than

35

(i) Purchaser's failure to comply with its obligations under the Agreement or (ii) Seller's failure to provide any delivery required on the Closing Date as a result of Purchaser being unwilling or unable to close the transaction on the Closing Date);

(f)     by either Party if the Bankruptcy Court fails to approve the Sale of the Purchased Assets to Purchaser in accordance with the terms of this Agreement or any subsequent agreement between the Parties, subject to non-material modification, or enters an order precluding the consummation of the transactions contemplated hereunder; *provided, however*, that the inability to assume or assign to Purchaser any Assigned Contracts due to the failure to obtain any necessary consents shall not constitute a basis to terminate the Agreement;

(g)     Subject to Article VI, by either Party if Seller designates an individual or entity other than Purchaser as the Winning Bidder;

(h)     by either Party if the Closing has not occurred on or before July 31, 2020, unless the Closing is rescheduled to a later date pursuant to this Agreement; *provided, however*, neither Party may terminate pursuant to this provision if the failure to close by the Closing Date is the result of the Party's failure to comply with its obligations under this Agreement;

(i)     by either Party upon consummation of a transaction involving any of the Purchased Assets to an individual or entity other than the Purchaser, unless the Purchaser expressly approves such transaction; or

(j)     by Purchaser if (i) prior to the Closing Date, one or more of the Chapter 11 Cases is converted to a case under Chapter 7 of the Bankruptcy Code or dismissed or (ii) the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to any material Purchased Asset.

9.2     <u>Effect of Termination</u>.  With the exception of the Parties' rights and obligations under Section 9.3 and Article XI, if this Agreement is terminated in accordance with the provisions of Section 9.1, all further obligations of the Parties under this Agreement shall terminate immediately.  Such termination shall not affect or abrogate the ability of the Parties to exercise any rights or assert any claims or causes of action under Article XI, including in the event of termination under Sections 9.1(b) or 9.1(c).  Each Party acknowledges and agrees that the agreements contained in this Section 9.2 are integral to the transactions contemplated by this Agreement, that this Section 9.2 shall survive (without alteration) any termination under Section 9.1, and the Parties would not have entered into this Agreement without the provisions of this Section 9.2.

9.3     <u>Termination Payment</u>; Expense Reimbursement

(a)     In the event that a  Competing Bid is consummated, or this agreement is terminated for any reason after the Bidding Protection Order  approving this Section 9.3 has been entered other than a material breach of Purchaser, in consideration for the Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, and without the requirement of any notice or demand from Purchaser or any other application to or order of the Bankruptcy Court,

(ii) the Deposit shall be returned to Purchaser in accordance with the Bidding Procedures Order and (iii) Seller shall pay (or cause to be paid to) Purchaser, in accordance with the terms of the Bidding Procedures Order, (1) a termination payment solely in the event of a successful competing bid in an amount equal to Five Hundred and Ten Thousand Dollars ($510,000.00) (Three Percent (3%) of the cash consideration component of the Purchase Price (the **"Termination Payment"**) and (2) all reasonable out of pocket and documented fees and expenses (including reasonably attorneys' fees and expenses) incurred by Purchaser in connection with or related to Purchaser's evaluation, consideration, analysis, negotiation and documentation of this Agreement and the transactions contemplated hereby in an amount not to exceed $500,000.00 in the aggregative ( the **"Expense Reimbursement"** and together with the Termination Payment, the **"Stalking Horse Bidder Protections"**).  In the event that Seller becomes obligated under this Agreement to pay any or all of the Stalking Horse Bidder Protections, Seller shall pay such Stalking Horse Bidder Protections in immediately available funds to such account or accounts as may be specified in written notice by Purchaser.  The Stalking Horse Bidder Protections shall, upon approval of the Bid Protections Order, (a) constitute an allowed administrative expense claim of Seller's estates under sections 503(b) and 507 of the Bankruptcy Code and (b) notwithstanding the prior entry of any order of the Bankruptcy Court relating to the use of cash collateral, be paid on the second (2nd) business day following the consummation of a Competing Bid or termination of this Agreement under Section 9.1(a), (c),(d),(f), (g), (h),(i) or (j)( provided that the Termination Payment shall only be payable from the proceeds of a successful Competing Bid) if no material breach by Purchaser of this Agreement has occurred.  The Bid Protections Order shall provide for payment by Sellers of the Stalking Horse Bidder Protections as and when such amounts are due and payable hereunder.  Nothing in this section 9.3(a) shall relieve Purchaser or Seller of any liability for a breach of this Agreement prior to the date of termination.

(b)    Each of the parties acknowledges and agrees that the agreements contained in this Section 9.3 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, the other Parties would not enter into this Agreement.  Each of the the Parties further acknowledge that the payment by Seller of the Stalking Horse Bidder Protections is not a penalty, but rather liquidated damages in a reasonable amount that will compensate Purchaser, in the circumstances in which such Stalking Horse Bidder Protection is payable, for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision.  The obligation to pay the Stalking Horse Bidder Protections in accordance with the provisions of this agreement will (1) be binding upon and enforceable jointly and severally against each Seller immediately upon the Bankruptcy Court entering the Bidding Procedures Order and (2) survive the subsequent termination of this Agreement, solely to the extent permitted by applicable law.  The obligation to pay the Stalking Horse Bidder Protections as and when required, under this Agreement, are intended to be and upon entry of the Bid Protections Order are, binding upon (a) each Seller, (b) any successors or assigns of any Seller and (c) any trustee examiner or other representative of a Seller's estate (**"Successor"**) as if Successor were a Seller hereunder.

(c)    Deposit Upon Termination.  In the event of the termination of this Agreement pursuant to Sections 9.1(a), (c), (d), (f), (g), (h), (i), or (j) and subject to 9.3(a), Seller

37

shall return to Purchaser the Deposit within five (5) business days after the termination of the Agreement; *provided, however*, Seller may retain the Deposit if Purchaser is designated as the Back-up Bidder following any Auction.  In the event of the termination of this Agreement pursuant to Section 9.1(b), breach of this Agreement by Purchaser, or Purchaser's failure to close the transactions contemplated by this Agreement on the Closing Date, Purchaser shall be deemed to forfeit the Deposit, which amounts shall be applied to Seller's damages, if any, and shall not constitute liquidated damages.  The forfeiture of the Deposit pursuant to this Section 9.3(b) shall not affect, and Seller shall retain, all other rights, remedies, claims, counterclaims, and defenses Seller may possess as to Purchaser, including the right to seek equitable or injunctive relief.

## ARTICLE X
## POST-CLOSING MATTERS

10.1    Excluded Assets.  Any Excluded Asset (or proceeds thereof) (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the Parties' mutual written agreement, or (c) absent such agreement, as determined by adjudication by the Bankruptcy Court, which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, or such longer period as reasonably necessary, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to Seller without imposing any charge to Seller for Purchaser's transfer, storage, handling or holding of same on and after the Effective Time.  Purchaser shall not have the right to contest its obligation to transfer, assign and convey to Seller any Excluded Asset (or proceeds thereof) because of any outstanding claims, liabilities or obligations asserted by Purchaser against Seller or Debtors.  If Purchaser fails to remit any monies in accordance with the first sentence of this Section 10.1, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Sellers (the "**Excluded Asset Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of such withheld funds and all interest thereon is made to Seller.  Purchaser shall be liable and obligated to reimburse Seller for any and all fees, costs and expenses, including, without limitation, attorneys' fees and costs, incurred by Seller to enforce the provisions of this Section 10.1.

10.2    Access to Records.

(a)    Purchaser shall cooperate with Seller, her representatives, any of her affiliates or professionals, the Official Committee of the Unsecured Creditors of the Debtors, Debtors' estate representative(s) and any liquidating trustee of the Debtors' bankruptcy estates (collectively, the "**Seller Parties**") and their insurance carriers in connection with the administration of Debtors' bankruptcy estates, including, without limitation, in connection with all claims, actions, causes of action or audits relating to the Excluded Assets, Excluded Liabilities or pre-Closing operation of the Debtors, the Hospital, or Nursing School that any Seller Party may elect to pursue, dispute or defend, in respect of events occurring prior to the Effective Time with respect to the operation of the Debtors, the Hospital, or Nursing School.  Such cooperation shall include, without limitation, providing copies of any relevant documents and communications and making any employees of Purchaser available for interviews, depositions, hearings and trials and other assistance in connection with the administration of Debtors' bankruptcy estates, or the

38

bankruptcy estates of any affiliates of the Debtors, and such cooperation shall also include making all of Purchaser's employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees).

(b)     In connection with (i) the transition of the Purchased Assets pursuant to the transactions contemplated by this Agreement, (ii) Debtors' or Seller's rights to the Excluded Assets, (iii) any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding, and (iv) the Debtors' or Seller's obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Seller, or any representative, successor or affiliate of Seller, access during normal business hours to the Owned Real Property, Hospital, and Nursing School, and related books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Debtors as Seller, or any representative, successor or affiliate of Seller, may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of Purchaser.

(c)     To the maximum extent permitted by law, if Purchaser receives any requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including, without limitation, documents relating to the operations of any of the Debtors, the Hospital or the Nursing School prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Seller not later than three (3) business days after receipt of such request or demand and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.  Purchaser shall cooperate with and provide reasonable assistance to Seller in objecting to any such request or demand.

(d)     Notwithstanding anything to the contrary contained herein, Seller shall be permitted to make and retain a copy of any and all documents and communications of Debtors that may be relevant to the administration of Debtors' bankruptcy estates, including, without limitation, any electronically stored information.  Purchaser shall grant Seller, or any employee, agent, representative, successor or affiliate of Seller, reasonable access to the books and records of Debtors as well as any computers, servers, tangible storage devices, cloud-based storage accounts or servers, or any other media or medium for the storage of electronic information or data (collectively, "**ESI Devices**"), as well as any access and authorization necessary to make and retain copies of any of the foregoing and, to the extent contained on any ESI Device, copy or create an image of the ESI Devices, including any metadata.  To the extent Purchaser, following the Effective Time, utilizes any ESI Devices used by Debtors prior to the Closing Date, Purchaser agrees and consents to the copying or imaging of such ESI Devices in their entirety, including information related to Purchaser's operations following the Effective Time; *provided, however,* that Seller shall keep any information, documentation, communications, or data recovered from any ESI Devices exclusively related to Purchaser's operations for the period following the Effective Time confidential, unless the disclosure of such information is necessary for the administration of the Debtors' bankruptcy estates, including, without limitation, the sale, monetization or disposition of any Excluded Assets, the prosecution of any claims or causes of action that constitute Excluded Assets, the enforcement of this Agreement, the exercise or exploitation of any rights granted or retained under this Agreement, or as otherwise compelled pursuant to any requests for the production of document, subpoena or other court order.  Purchaser

acknowledges and agrees that Seller may require access to Debtors' books and records, documents, communications and ESI Devices following the Effective Time and such access may be required on an expedited basis in order to protect the interests of the Debtors' bankruptcy estates. Any request for access pursuant to this Section 10.2 may be made by electronic mail or overnight courier to the addresses provided for the delivery of notices to Purchaser under Section 13.6, below, which requests shall be deemed received and effective upon delivery. Purchaser shall respond to any written request for access made pursuant to this Section 10.2 not later than three (3) business days and provide access to the requested material not later than seven (7) business days following delivery of the subject request. In the event Purchaser fails to respond or provide access within the time required under this Section 10.2(d), Seller may move *ex parte*, in accordance with the applicable rules and procedures of the Bankruptcy Court, for an order compelling Purchaser to comply with the provisions of this Section 10.2 and awarding Seller reasonable fees and costs, including, without limitation, reasonable attorneys' fees and costs, incurred in connection with such proceedings.

(e)     Purchaser shall be responsible for the payment of, and Seller shall have no liability or responsibility for, any fees, costs or expenses, including, without limitation, attorneys' fees and costs, incurred by Purchaser in complying with its obligations under this Section 10.2.

10.3    <u>Turnover and Accounting of Post-Closing Receipts</u>.  The Parties shall reasonably cooperate to ensure that any and all payments that constitute "Excluded Assets" shall be paid to and received by Seller and any and all payments that constitute "Purchased Assets" transferred to Purchaser pursuant to Section 1.7 or that otherwise arise from services rendered by Purchaser on or after the Effective Time be paid to and received by Purchaser.  In the event that payments that constitute a Purchased Asset are deposited to a bank account of Seller, which is not automatically swept or transferred to Purchaser, Seller shall, within five (5) business days of notice of the receipt of such payments, turnover and pay Purchaser said funds.  In the event that payments that constitute an Excluded Asset are deposited to a bank account of Purchaser or otherwise received by Purchaser, Purchaser shall, within five (5) business days of notice of the receipt of funds representing any Excluded Assets, turnover and pay Seller such funds.  Each Party shall have the right, once every thirty (30) days, to request and receive records from the other Party reflecting any deposits into such Party's bank account(s) or otherwise received by such Party and, once every year, to audit by an independent and competent auditor, at the requesting Party's sole expense, of the bank records and remittance advices of the other Party.  If upon review of such records, a Party determines that there has either been an overpayment or an underpayment of funds due, the Party owing funds shall, within five (5) business days of receipt of a demand for an accounting and turnover of such funds, pay such funds to the Party entitled thereto or contest the assertion of any rights to such funds.  In the event of a dispute regarding the Parties' respective rights to any funds, the Parties shall present such dispute to the Bankruptcy Court pursuant to a motion to enforce this Agreement; each Party, to the extent necessary, waiving any rights or requirements under Rule 7001 of the Federal Rules of Bankruptcy Procedure for resolution of any such dispute pursuant to an adversary proceeding.  The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes regarding the Parties respective rights to funds under this Agreement or obligations to turnover any funds under this Section 10.3.

10.4    General Cooperation and Turnover Obligations.  The parties shall cooperate to ensure that any and all payments and/or property that constitute "Excluded Assets" shall be paid to and received by Sellers, with any payments that constitute "Assets" transferred to Purchaser pursuant to Section 1.7 or that otherwise arise from services rendered by Purchaser on or after the Closing Date be paid to and received by Purchaser.  In this regard, the parties shall, within five (5) business days of receipt, copy and send to the other party copies (either in hard copy or via electronic file) of all remittance advices for all deposits to all bank accounts, from whatever payor or source of funds, that are received for services rendered on and after the Effective Time.  In the event that payments that constitute a transferred Asset are deposited to a bank account of Sellers which is not automatically swept or transferred to Purchaser, then Sellers, within five (5) days of notice of the receipt of such payments shall turnover and pay Purchaser said funds.  In the event that a deposit representing payment of any Excluded Assets is received by Purchaser, then Purchaser, within five (5) days of notice of the receipt of funds representing any Excluded Assets, shall turnover and pay Sellers such funds.  Each party shall have the right, once a year, to audit by an independent and competent auditor, at the requesting party's sole expense, of the bank records and remittance advices of the other party.  Thereafter, upon the findings of the auditor that there has either been an overpayment or and underpayment of funds due, the party owning funds shall, within five (5) business days, make a payment of such funds to whom they are owed.

10.5    Closing of Financials.  Trustee shall cause to complete the standardized closing of Sellers' financial records through the date upon which all CHOWS have been approved ("**Licensure Date**") including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**").

10.6    Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Licensure Date shall maintain medical staff privileges at the Hospital as of the Licensure Date.  On and after the Licensure Date, the medical staff will be subject to the Hospital's Medical Staff Bylaws then currently in effect, provided that such Bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

## ARTICLE XI
## DEFAULT AND TAXES

11.1    Purchaser Default.  If Purchaser commits any material default under this Agreement prior to Closing, (a) Purchaser shall be deemed to forfeit the Deposit and (b) Seller shall be entitled to sue for damages or specific performance of the terms of this Agreement and recover any and all fees, costs and expenses, including, without limitation, any attorneys' fees and costs, incurred by Seller as a result of Purchaser's default.  The foregoing remedies are in addition to the right to terminate this Agreement under Section 9.1.  The termination of the Agreement pursuant to Section 9.1 shall not abrogate or limit the rights of Seller to retain the Deposit and sue for damages as provided in this Article XI.

11.2    Seller Default.  If Seller commits any material default under this Agreement prior to Closing, Purchaser shall be entitled to sue for damages or specific performance; *provided*, that

41

in no event shall Purchaser be entitled to damages in excess of the amount of the Deposit. The foregoing remedies are in addition to the right to terminate this Agreement under Section 9.1. The termination of the Agreement pursuant to Section 9.1 shall not abrogate or limit the rights of Purchaser to sue for damages pursuant and subject to the terms of this Section 11.2.

11.3    <u>No Recourse to Third Parties</u>.  Notwithstanding anything in Sections 11.1 or 11.2 to the contrary, all claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Parties to this Agreement.  No Person who is not a Party to this Agreement shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity Party against its owners or affiliates) for any obligations or liability arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution; and each Party hereto waives and releases all such liabilities, claims and obligations against any such Purchaser Party or Seller Party that is not a Party.

11.4    <u>Limitation of Seller's Liability</u>.  Seller is entering into this Agreement solely in her capacity as Chapter 11 Trustee of the Debtors.  Neither Seller, in her personal capacity or as Chapter 11 Trustee for non-Party affiliates of the Debtors, nor GlassRatner Advisory & Capital Group LLC shall be liable to Purchaser for any claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or any amounts or obligations due or owing to Purchaser by Seller, in her capacity as Chapter 11 Trustee of the Debtors, under this Agreement.

11.5    <u>Tax Matters; Allocation of Purchase Price</u>.

(a)    After the Effective Time, the Parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Seller or Debtors with respect to the operation of the Purchased Assets for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The Parties shall also make available to each other, to the extent reasonably required, and at the reasonable cost of the requesting Party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Seller reasonably may request in connection with the completion of any post-Closing audits of the Debtors' businesses or bankruptcy estates.

(b)    Solely for purposes of tax reporting and matters arising in the Chapter 11 Cases or related to the administration of Debtors' bankruptcy estates, including, without limitation, the treatment of claims purportedly secured by some or all of the Purchased Assets, <u>Schedule 11.5</u> sets forth the allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income tax purposes) among the Purchased

Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Allocation Schedule**"). The Allocation Schedule shall be final and binding upon Seller and Purchaser with respect to matters relating to required tax reporting by each Party. The Parties shall refrain from taking any position that is inconsistent with the Allocation Schedule with respect to tax reporting.

## ARTICLE XII
## RISK OF LOSS

12.1    <u>Assumption of Risk</u>.  Purchaser assumes any and all risks of loss or damage to the Purchased Assets as of the Effective Time.  Sections 12.2 and 12.3 govern the allocation of risk with respect to any event(s) of loss or damage to the Owned Real Property, or any portion thereof, and Personal Property occurring prior to the Effective Time.  Any event of loss or damage unknown to Seller as of or first discovered by the Parties, or either of them, following the Effective Time shall be deemed to occur after the Effective Time for purposes of this Article XII, regardless of whether the event of loss or damage relates to a condition in existence on or an event prior to the Effective Time.

12.2    <u>Minor Damage</u>.  In the event of loss or damage to the Owned Real Property, or any portion thereof, that is not "major" (as hereinafter defined in Section 12.4) or in the event of loss or damage to any Personal Property constituting a Purchased Asset, this Agreement shall remain in full force and effect provided Seller either (a) performs any necessary repair or (b) assigns to Purchaser all of Seller's or Debtors' right, title and interest to any claims and proceeds Seller or Debtors may have with respect to any casualty insurance policies or condemnation awards relating to the premises or property in question.  In the event that Seller elects to perform repairs upon the Owned Real Property or any Personal Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs, unless otherwise agreed by the Parties.  If Seller elects to assign a casualty claim to Purchaser, the Purchase Price shall be reduced by an amount equal to any unpaid deductible amount under any applicable insurance policy or uninsured amount.

12.3    <u>Major Damage</u>.  In the event of a "major" loss or damage to the Owned Real Property, or any portion thereof, Purchaser may terminate this Agreement by written notice to Seller, in which event the Deposit shall be returned to Purchaser.  Except for the return of the Deposit, Purchaser shall have no recourse, claims or causes of action against, or right to damages from, Seller or Debtors' bankruptcy estates in the event of termination of the Agreement due to "major" loss or damage.  If Purchaser elects to proceed with Closing, Seller shall (a) assign to Purchaser all of Seller's or Debtors' right, title and interest to any claims and proceeds Seller or Debtors may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question and (b) the Purchase Price shall be reduced by an amount equal to any unpaid deductible amount under any applicable insurance policy and any uninsured loss. Purchaser shall have no right to terminate the Agreement due to "major" loss or damage to any Purchased Asset other than the Owned Real Property, or any portion thereof.

12.4    <u>Definition of "Major" Loss or Damage</u>.  For purposes of Sections 12.2 and 12.3, "major" loss or damage refers to the following: (i) loss or damage to the Owned Real Property, or any portion thereof, such that the cost of repairing or restoring the premises in question to a

43

condition substantially identical to that of the premises in question as of the Execution Date would be, in the opinion of an architect selected by Seller and reasonably approved by Purchaser, equal to or greater than [DAMAGES AMOUNT ($_____)], and (ii) any loss equal to or greater than [DAMAGES AMOUNT ($_____)] due to a condemnation.  If Purchaser does not give notice to Seller of Purchaser's reasons for disapproving an architect within five (5) business days after receipt of notice of the proposed architect, Purchaser shall be deemed to have approved the architect selected by Seller.  Unless mutually agreed in writing by the Parties, the opinion of the architect selected pursuant to this Section 12.4 shall control the determination of whether any loss or damage qualifies as a "major" loss or damage for purposes of Sections 12.2 and 12.3.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    Further Assurances and Cooperation.  Each Party shall execute, acknowledge and deliver to the other Party any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by such Party at any time and shall take any and all other actions reasonably requested by such Party at any time for the purpose of obtaining Bankruptcy Court approval of this Agreement, consummating the transactions hereunder, and fulfilling such Party's obligations hereunder.   After consummation of the transactions contemplated in this Agreement, the Parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

13.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the Parties.  No Party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other Parties; *provided, however*, (a) Purchaser may assign this Agreement to an entity or entities controlling, controlled by or under common control with Purchaser (such entity, a "**Purchaser Assignee**") without the prior written consent of Seller, so long as the Purchaser Assignee assumes the obligations of Purchaser under and agrees to be bound by all terms of this Agreement, and (b) Purchaser may take title to some or all of the Purchased Assets through a Purchaser Assignee, so long as Purchaser notifies Seller of any intention to assign to or take title of any Purchased Assets through a Purchaser Assignee no less than three (3) business days prior to the Closing Date (including the name and signature block of the proposed transferee).  Purchaser's assignment of this Agreement or any of its rights or obligation hereunder shall not relieve Purchaser of its obligations under this Agreement prior to or following the Closing Date, unless expressly agreed in writing by Seller.

13.3    Governing Law; Venue.  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of  Missouri (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole forum for the adjudication of any matters arising under or in connection with the Agreement, the exclusive jurisdiction of the Bankruptcy Court.  The Parties hereby consent to the jurisdiction of the Bankruptcy Court and waive their right to challenge any proceeding involving or relating to

44

this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens and, to the extent necessary, consent to the Bankruptcy Court entering any final orders, judgments or decrees necessary to resolve any matter pending before the Bankruptcy Court arising out of or related to this Agreement or the transactions contemplated by this Agreement.

13.4    <u>Amendments</u>.    This Agreement may not be amended other than by written instrument signed by all of the Parties.

13.5    <u>Exhibits, Schedules and Disclosure Schedule</u>.    The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Execution Date until the Closing, the Parties agree that Seller may update the Disclosure Schedule, as necessary, upon written notice to Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule; *provided*, that the occurrence of a change to Seller's representations that is materially adverse to Purchaser shall constitute the nonfulfillment of the condition.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  The Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of this Agreement merely for convenience, and the disclosure of an item in one section of the Disclosure Schedule as an exception to a particular obligation, representation or warranty shall be deemed adequately disclosed as an exception with respect to all other obligations, representations or warranties, notwithstanding the presence or absence of an appropriate section of the Disclosure Schedule with respect to such other obligation, representations or warranties or an appropriate cross reference thereto.

13.6    <u>Notices</u>.    Any notice, demand, letter or other communication required, permitted, or desired to be given hereunder shall be delivered via (a) electronic mail and (b) personal delivery, overnight courier, or United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Seller: | Carol L. Fox, Chapter 11 Trustee |
| | 200 E. Broward Blvd., Ste. 1010 |
| | Fort Lauderdale, FL 33301 |
| | cfox@glassratner.com |
| | |
| With a copy to: | Elizabeth A. Green |
| | Tiffany Payne Geyer |
| | Jimmy D. Parrish |
| | BakerHostetler LLP |
| | 200 S. Orange Ave., Ste. 2300 |
| | Orlando, FL 32801-3432 |
| | egreen@bakerlaw.com |
| | tpaynegeyer@bakerlaw.com |
| | jparrish@bakerlaw.com |

45

|                      |                                      |
|----------------------|--------------------------------------|
| If to Purchaser:     | SA Hospital Acquisition Group, LLC   |
|                      | 269 West Bonita Avenue               |
|                      | Claremont, CA 91711                  |
| With a copy to:      | Troy A. Schell                       |
|                      | SCHELL NUELLE LLP                    |
|                      | 269 West Bonita                      |
|                      | Claremont, CA 91711                  |

The failure to deliver a copy of any notice, demand, letter or other communication upon the Party and, if any, the related "copy" recipient shall render the delivery ineffective.  Any Party may change, remove or replace any recipient designated under this Section 13.6 through the provision of written notice on the other Party in accordance with the provisions of this section, which notice shall be effective one (1) business day following receipt by the other Party.

13.7     Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

13.8     Joint Authorship.  This Agreement shall be construed according to its fair meaning and as if authored by all Parties hereto.

13.9     Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."  The words "herein," "hereof" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to a "party" means a Party to this Agreement and include references to such Party's successors and permitted assigns; and references to a "third party" means a person that is not a Party to this Agreement.

13.10     Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the Parties, nor shall they be deemed, to confer any benefit on any person not a Party to this Agreement.

13.11     Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each Party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including, without limitation, the disbursements

46

and fees of their respective attorneys, accountants, advisors, agents and other representatives, whether or not the transactions contemplated hereby are consummated.

13.12   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the Parties hereto.  The Parties agree that facsimile or electronic .PDF copies of signatures shall be deemed originals for all purposes hereof and that a Party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement.

13.13   <u>Entire Agreement</u>.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

13.14   <u>No Waiver</u>.  Any term, covenant or condition of this Agreement may be waived at any time by the Party which is entitled to the benefit thereof but only by a written notice signed by the Party expressly waiving such term or condition.  The subsequent acceptance of performance hereunder by a Party shall not be deemed to be a waiver of any preceding breach by any other Party of any term, covenant or condition of this Agreement, other than the failure of such other Party to perform the particular duties so accepted, regardless of the accepting Party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed (a) as a waiver of any other term, covenant or condition of this Agreement or (b) as a waiver of any subsequent breach of the same term, covenant or condition.

13.15   <u>Severability</u>.  With the exception of Sections _____ , if any term, provision, condition or covenant of this Agreement or the application thereof to any Party or circumstance is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of Seller or Purchaser under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance here from, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

13.16   <u>Time is of the Essence</u>.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

13.17   <u>Like Kind Exchange</u>. If either Seller or Purchaser wishes to enter into a like-kind exchange (either simultaneous with Closing or deferred) with respect to the Owned Real Property under Section 1031 of the Internal Revenue Code ("**Exchange**"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, including the execution of documents; provided

47

the cooperating party shall incur no liability or expense related to the Exchange. The exchanging Party shall be responsible for all agreements, documents and escrow instructions and no substitution of or assignment to another Party to effectuate such exchange shall release any other party from its obligations, warranties or obligations under this Agreement or from liability.

[<em>SIGNATURE PAGE TO FOLLOW</em>]

4821-5743-0466.1

IN WITNESS WHEREOF, this Agreement has been entered into as of this 10th day of July, 2020.

**PURCHASER:**

**SA Hospital Acquisition Group, LLC**

Signature: _____
Name: _____
Title: _____
Date: _____

**SELLER:**

**Carol L. Fox, as Chapter 11 Trustee of St. Alexius Properties, LLC, St. Alexius Hospital Corporation # 1, and Success Healthcare 2, LLC**

Signature: _____
Name:        Carol L. Fox
Title:         Chapter 11 Trustee of St. Alexius Properties, LLC, St. Alexius Hospital Corporation # 1, and Success Healthcare 2, LLC
Date: _____

49