UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-61608 |
| | ) | |
| AMERICORE HOLDINGS, LLC, *et al.*[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly administered |
| | ) | |

## <u>NOTICE OF RULE 2004 EXAMINATION</u>

PLEASE TAKE NOTICE that Carol L. Fox ("Ms. Fox" or "Trustee"), in her capacity as the Chapter 11 Trustee for AMERICORE HOLDINGS, LLC, and its affiliated debtors (collectively, the "Debtors"), by and through her undersigned counsel, shall examine Rebecca Seibert Haase, 4410 Carriage Trace Drive, St. Louis, Missouri 63128, under oath on **October 2, 2020, at 9:00 a.m.,** by video or internet conference, as designated by the Trustee, with the Trustee providing all necessary access information to the examinee and counsel for the examinee, if any, prior to such examination. The examination may continue from day to day until completed. If the examinee receives this notice less than fourteen (14) days prior to the scheduled examination date, the examination will be rescheduled upon timely request to a mutually agreeable time and date. The examination will be recorded stenographically by a court reporter.

PLEASE TAKE FURTHER NOTICE that the Trustee, in her capacity as Chapter 11 Trustee for the Debtors, requests that Rebecca Seibert Haase produce or deliver on or before **September 25, 2020, at 9:00 a.m.,** or on such other date and time as may be agreed upon, to the

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC(3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

offices of Baker & Hostetler LLP, Attention Deanna Lane, Paralegal, 200 S. Orange Avenue, Suite 2300, Orlando, Florida 32801, all of the documents as detailed on the Subpoena for Rule 2004 Examination attached hereto.[2]

The examination and request for production of documents is pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and that certain *Order Granting the Debtors and the Official Committee of Unsecured Creditors' Joint Motion for Order Establishing Procedures to Conduct Rule 2004 Examinations* [Doc. No. 259] (the "Procedures Order"). The scope of the examination and request for production of documents is as described in Rule 2004 of the Bankruptcy Rules. Pursuant to the Procedures Order, no further order shall be necessary. A Subpoena for Rule 2004 Examination compelling the attendance for examination and production of documents is attached hereto.

Respectfully submitted this 11th day of September, 2020.

/s/ Elizabeth A. Green
ELIZABETH A. GREEN (*admitted pro hac vice*)
Florida Bar No. 600547
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, Florida 32801
Telephone 407-649-4000
Facsimile 407-841-0168
egreen@bakerlaw.com
*Counsel to Chapter 11 Trustee*

---

[2] Please contact us to arrange for the electronic delivery of the requested documents or to obtain our Federal Express billing number for delivery of hard copies of the requested documents. Alternatively, we can provide you with a delivery point within 100 miles of the deponent's residence or place of employment. To make the foregoing arrangements, please email Deanna Lane at dlane@bakerlaw.com.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 11, 2020, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will provide a Notice of Electronic Filing and copy to all parties requesting such notice, and served the foregoing and attached Subpoena for Rule 2004 Examination on Rebecca Seibert Haase via email addressed to rebeccaseibert@gmail.com and via U.S. mail and certified mail (return receipt requested) to 4410 Carriage Trace Drive, St. Louis, Missouri 63128.

*/s/ Elizabeth A. Green*
ELIZABETH A. GREEN

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (12/15)

# UNITED STATES BANKRUPTCY COURT

Eastern District of Kentucky

In re AMERICORE HOLDINGS, LLC, et al.,

Debtor

Case No. 19-61608-grs

Chapter 11

## SUBPOENA FOR RULE 2004 EXAMINATION

To: Rebecca Seibert Haase, 4410 Carriage Trace Drive, St. Louis, Missouri 63128

*(Name of person to whom the subpoena is directed)*

[X] *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure. A copy of the court order authorizing the examination is attached.

| PLACE | DATE AND TIME |
|---|---|
| By video or Internet conference, as designated by the Trustee, with the Trustee providing all necessary access information to examinee and counsel for examinee, if any, prior to such examination. | October 2, 2020 at 9:00 a.m. ET |

The examination will be recorded by this method: Stenographically by a court reporter

[X] *Production:* You, or your representatives, must also bring with you to the examination the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
by September 25, 2020 at 9:00 a.m. ET, at Baker & Hostetler LLP, Attention Deanna Lane, Paralegal, 200 S. Orange Avenue, Suite 2300, Orlando, Florida 32801

### SEE ATTACHED SCHEDULE A

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: September 11, 2020

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Carol Fox, Trustee          , who issues or requests this subpoena, are:

Elizabeth A. Green, Esq., Baker & Hostetler, LLP, 200 S. Orange Avenue, Suite 2300, Orlando, Florida 32801
(407) 649-4000, egreen@bakerlaw.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**PROOF OF SERVICE**

**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

[X] I served the subpoena by delivering a copy to the named person as follows: <u>via US mail & certified mail (return receipt requested)</u>
_____<u>to: Rebecca Seibert Haase, 4410 Carriage Trace Drive, St. Louis, Missouri 63128</u>
_____ on *(date)* <u>September 11, 2020</u> ; or

[ ] I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true and correct.

Date: September  11, 2020

_____
*Server's signature*

Elizabeth A. Green, Esquire
_____
*Printed name and title*

Baker & Hostetler, LLP
200 S. Orange Avenue, Suite 2300
Orlando, Florida 32801
_____
*Server's address*

Additional information concerning attempted service, etc.:

B2540 (Form 2540 – Subpoena for Rule 2004 Examination) (Part 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

## **SCHEDULE A**

## DEFINITIONS

As used in this request, the following words shall have their common meanings and shall include the meanings indicated:

**"Chapter 11 Cases"** shall mean the chapter 11 bankruptcy cases pending in the United States Bankruptcy Court for the Eastern District of Kentucky and identified as follows: (i) *In re Pineville Medical Center, LLC*, case no. 19-61605-grs; (ii) *In re Americore Health Enterprises, LLC*, case no. 19-61606-grs; (iii) *In re Americore Health, LLC*, case no. 19-61607-grs; (iv) *In re Success Healthcare 2, LLC*, case no. 19-61609-grs; (v) *In re St. Alexius Hospital Corporation #1*, case no. 19-61610-grs; (vi) *In re St. Alexius Properties, LLC*, case no. 19-61611-grs; (vii) *In re Izard County Medical Center, LLC*, case no. 19-61612-grs; (viii) *In re Ellwood Medical Center, LLC*, case no. 19-61613-grs; (ix) *In re Ellwood Medical Center Real Estate, LLC*, case no. 19-61614-grs; and (x) *In re Ellwood Medical Center Operations, LLC*, case no. 16-61615-grs.

**"Communications"** shall include any correspondence, oral or written statement, dialogue, colloquy, discussion or conversation and, also, means any transfer of thoughts or ideas between persons by means of Documents and includes any transfer of data from one location to another by electronic or similar means.

**"Concerning"** shall mean, directly or indirectly, concerning, regarding, relating to, referring to, reflecting, mentioning, describing, pertaining to, and/or arising out of or in connection with or in any way legally, logically, or factually being connected with the matter discussed.

**"Debtors"** shall mean Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success

5

Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation # 1 (2766), as the Debtors (or, when any of the foregoing entities is referred to individually, "**Debtor**") in the Chapter 11 Cases and shall include shall include their owners, officers, directors, shareholders, managers, members, employees, agents, representatives, attorneys, accountants, affiliates, subsidiaries, predecessors, successors and/or assigns, and their owners, officers, directors, shareholders, managers, members, employees, agents, representatives, attorneys, accountants, affiliates, subsidiaries, predecessors, successors and/or assigns.  Without limiting the foregoing, "Debtors" shall also include the Trustee, solely in her capacity as Chapter 11 Trustee for the Debtors in the Chapter 11 Cases.

"**Documents**" shall mean the original or copies of any tangible written, typed, printed or other form of recorded or graphic matter of every kind or description, however produced or reproduced, whether mechanically or electronically recorded or stored, draft, final, original, reproduction, signed or unsigned, regardless of whether approved, signed, sent, received, redrafted, or executed, and whether handwritten, typed, printed, photostated, duplicated, carbon or otherwise copied or produced in any other manner whatsoever. Without limiting the generality of the foregoing, "Documents" shall include applications, notices, correspondence (including email, electronic message, text messages, instant messages, direct messages, and any other form of electronic communication, letters, telegrams, telexes, and mailgrams), communications, memoranda (including inter-office and intra-office memoranda, memoranda for files, memoranda of telephone or other conversations, including meetings, invoices, reports, receipts and statements of account, ledgers, notes or notations), notes or memorandum attached to or to be read with any Document, booklets, books, drawings, graphs, charts, photographs, phone records, electronic tapes, discs or other recordings, computer programs, printouts, data cards, studies, analysis and

6

other data compilations from which information can be obtained. Copies of Documents, which are not identical duplications of the originals or that contain additions to or deletions from the originals or copies of the originals if the originals are not available, shall be considered to be separate documents.

"**Documents**" shall also include all electronically stored information (hereinafter "ESI") including but not limited to computer generated information or data of any kind, stored in or on any storage media located on computers, file servers, disks, tape or other real or virtualized devices or media, including Digital Communications (e.g., e-mail, voice mail, instant messaging, text messaging, chats, tweets, blog posts, social media posts, comments, etc.), E-Mail Server Stores (e.g., Lotus Domino NSF or Microsoft Exchange, EDB), Word Processed Documents (e.g., Word or WordPerfect files and drafts), Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets), Accounting Application Data (e.g., QuickBooks, Money, Peachtree data), Image and Facsimile Files (e.g., .PDF, .TIFF, JPG, .GIF images), Sound Recordings (e.g., .WAV and .MP3 files), Video and Animation (e.g., .AVI and .MOV files), Databases (e.g., Access, Oracle, SQL Server data, SAP, other), Contact and Relationship Management Data (e.g., Outlook, ACT!), Calendar and Diary Application Data (e.g., Outlook PST, blog entries), Online Access Data (e.g., Temporary Internet Files, History, Cookies), Presentations (e.g., PowerPoint, Corel Presentations), Network Access and Server Activity Logs, Project Management Application Data, Computer Aided Design/Drawing Files; and Backup and Archival Files (e.g., Veritas, Zip, .GHO). Your search for ESI shall include all computer hard drives, floppy discs, compact discs, backup and archival tapes, removable media such as zip drives, password protected and encrypted files, databases, electronic calendars, personal digital assistants, mobile devices, smart phones, tablets, proprietary software and inactive or unused computer disc storage areas. The meaning of "Documents" shall be

construed as broadly as permitted by the Federal Rules of Civil Procedure, but is not intended and shall not be interpreted to expand upon or enlarge the responding party's obligations beyond that required by the Federal Rules of Civil Procedure.

**"Request"** or **"Requests"** means the Documents Requested as listed below.

**"Sale"** means the sale of certain assets of the Debtors in the Chapter 11 Cases to SA Hospital Acquisition Group LLC.

**"Trustee"** means Carol L. Fox, chapter 11 trustee for the Debtors in the Chapter 11 Cases, and includes GlassRatner Advisory & Capital Group LLC and B. Riley Financial, Inc., and any and all of their members, officers, directors, agents, employees, independent contractors, attorneys, professionals, representatives, affiliates and any other person or entity acting or purporting to act through or on behalf of any of them.

**"You"** and **"Your"** means Rebecca Seibert Haase, and includes any and all of your agents, employees, independent contractors, attorneys, representatives, and any other person or entity acting or purporting to act through or on behalf of you or your affiliates.

8

## **GENERAL INSTRUCTIONS**

As used herein, defined terms shall be ascribed the means specified herein, regardless of capitalization or emphasis, unless otherwise noted.  Any undefined terms shall be ascribed their plain and ordinary meaning and interpreted as broadly as possible so as not to exclude any information or documents otherwise within the scope of the Request.

As used herein, the conjunctions "and" and "or" shall be interpreted in each instance as meaning "and/or" so as to encompass the broader of the two possible constructions, and shall not be interpreted disjunctively so as to exclude any information or documents otherwise within the scope of any Request.

When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope of such Request any documents which might otherwise be construed to be outside the scope thereof.

Any pronouns used herein shall include and be read and applied as to encompass the alternative forms of the pronoun, whether masculine, feminine, neuter, singular or plural, and shall not be interpreted so as to exclude any information or documents otherwise within the scope of the Request.

If You assert that any document called for by a request is protected against disclosure on the grounds of the attorney work product doctrine or by the attorney-client privilege, or any other assertion of privilege, You must provide the following information with respect to such document:

1.    the name and capacity of the person or persons who prepared the documents;

2.    the name and capacity of all addressees or recipients of the original or copies thereof;

3.    the date, if any, borne by the document;

9

4.    a brief description of its subject matter and physical size of the document (e.g., number of pages, megabytes, etc.);

5.    the source of the factual information from which such document was prepared; and

6.    the nature of the privilege claimed.

You must produce all documents within your possession, care, custody or control that are responsive to any of these requests. A document is deemed within your care, custody or control if you have the right or ability to secure the document or a copy thereof from any other person having physical possession thereof.

All documents produced pursuant hereto are to be produced as they are kept in the usual course of business and shall be organized and labeled (without permanently marking the item produced) so as to correspond with the categories of each numbered request hereof.

Production of electronically stored information ("ESI") or any electronically stored data shall be in native format or another electronic format that does not diminish the accessibility or searchability of the information.

Each hard copy document is to be produced, with all non-identical copies and drafts thereof, in its entirety, without alteration, abbreviation or reduction and shall be produced either in the manner they are kept in the usual course of business or organized to correspond with the Request to which they are responsive. If any document is produced in redacted form, state with particularity the reason(s) it was not produced in full and describe generally those portions of the Document that are not being produced

All documents that respond, in whole or in part, to any part or clause of any paragraph of these requests shall be produced in their entirety, including all attachments and enclosures. Only one copy need be produced of documents that are responsive to more than one request or are

10

identical except for the person to whom it is addressed if you indicate the entities to whom such documents were distributed. Documents that in their original condition were stapled, clipped, or otherwise fastened together shall be produced in such form. Please place the documents called for by each paragraph in a separate file folder or other enclosure marked with respondents' name and the request to which such documents respond, and if any document is responsive to more than one request, indicate each request to which it responds.

If you at any time had possession, custody or control of a document called for under these requests and if such document has been lost, destroyed, purged, or is not presently in Your possession, custody or control, You shall describe the document, the date of its loss, destruction, purge, or separation from possession, custody or control and the circumstances surrounding its loss, destruction, purge, or separation from possession, custody or control.

Unless stated otherwise, the time period for the request is from December 31, 2019 to the present.

## **DOCUMENTS REQUESTED**

1.      All Communications and Documents between you and any account or email address(es) with the domains of @agracapital.com, @glassratner.com, @bakerlaw.com, @hhs.gov, @oig.hhs.gov, @usdoj.gov, @matrv.com, or @brileyfin.com.

2.      All Communications and Documents between you and St. Alexius Anonymous, including, without limitation, Communications to or from, or copying, the email address alexiusanonymous@gmail.com.

3.      All Communications and Documents between you and Sonny Sagger, M.D., including, without limitation, Communications to or from, or copying, the email addresses sonny@dhwstl.com, sonny.saggar@sahstl.com, or ssaggar@westernhc.com.

4.      All Communications and Documents between you and Jose Alvarez, M.D., including, without limitation Communications to or from, or copying, the email address alvarezj249@gmail.com.

5.      All Communications and Documents between you and Lyndon Hohenkirk, M.D., including, without limitation Communications to or from, or copying, the email address babydoc14@hotmail.com.

6.      All Communications and Documents between you and Alma Navato, M.D., including, without limitation Communications to or from, or copying, the email address almanavato@aol.com.

7.      All Communications and Documents between you and Cary Hall, M.D., including, without limitation Communications to or from, or copying, the email address caryhallmd@gmail.com.

8.      All Communications and Documents between you and Faris Al-Gebory, M.D., including, without limitation Communications to or from, or copying, the email address algeboryfaris@yahoo.com.

9.      All Communications and Documents between you and Sana Ullah, M.D., including, without limitation Communications to or from, or copying, the email address sullah15@yahoo.com.

10.     All Communications and Documents between you and Denise R. Travis, including, without limitation Communications to or from, or copying, the email address travdee45@yahoo.com.

11.     All Communications and Documents between you and Pamela J. Delaney, including, without limitation Communications to or from, or copying, the email address

pamwiemann@gmail.com.

12.    All Communications and Documents between you and Tremayne A. Jackson, including, without limitation Communications to or from, or copying, the email address tremayneajackson@gmail.com.

13.    All Communications and Documents between you and Sheila J. Shanklin, including, without limitation Communications to or from, or copying, the email address msshanks@aol.com.

14.    All Communications and Documents between you and Jennifer A. Presson, including, without limitation Communications to or from, or copying, the email address callthern@yahoo.com.

15.    All Communications and Documents between you and Christina Tanner, including, without limitation Communications to or from, or copying, the email address c_tanner90@yahoo.com.

16.    All Communications and Documents between you and Jennifer Williams, including, without limitation Communications to or from, or copying, the email address jennwilliams227@gmail.com.

17.    All Communications and Documents between you and Angela Watson, including, without limitation Communications to or from, or copying, the email address aw627787@yahoo.com.

18.    All Communications and Documents between you and James "Brandon" Huff, including, without limitation Communications to or from, or copying, the email address brandonhuff21@outlook.com.

19.    All Communications and Documents between you and Daniel Cassilas, including,

without limitation Communications to or from, or copying, the email address dcasillas81@gmail.com.

20.    All Communications and Documents between you and Karen E. Smith, including, without limitation Communications to or from, or copying, the email address memekes14@gmail.com.

21.    All Communications and Documents between you and Johnita Henry.

22.    All Communications and Documents between you and Johnita Hennery.

23.    All Communications and Documents between you and Alexander B. Alford, including, without limitation Communications to or from, or copying, the email address alexalford44@gmail.com.

24.    All Communications and Documents between you and Tonya Y. Montgomery, including, without limitation Communications to or from, or copying, the email address mookiek869@gmail.com.

25.    All Communications and Documents between you and Mekayi L. White, including, without limitation Communications to or from, or copying, the email address whitemekayi9@gmail.com.

26.    All Communications and Documents from you, or on your behalf or at your direction, to the email address SAH.All.Users@sahstl.com.

27.    All Communications and Documents, including, without limitation, text messages, between you and any other individual or entity Concerning (i) the Chapter 11 Cases, (ii) the Sale, (iii) AGRA Capital Advisors, (iv) SA Hospital Acquisition Group LLC, (v) the Coronavirus Aid, Relief, and Economic Security (CARES) Act, as it pertains to the Debtors or the Trustee, (vi) "stimulus money," as it pertains to the Debtors or the Trustee, (vii) "stimulus funds," as it pertains

14

to the Debtors or the Trustee, (viii) the Paycheck Protection Program, as it pertains to the Debtors

or the Trustee, (ix) the U.S. Department of Health and Human Services (HHS), including any

division thereof, (x) the U.S. Department of Justice, including any division thereof, as it pertains

to the Debtors or the Trustee, (xi) the Trustee, (xii) GlassRatner Advisory & Capital Group LLC,

(xiii) B. Riley Financial, Inc. or its affiliates, including, without limitation, B. Riley Advisory

Services, (xiv) BakerHostetler LLP, (xv) SLGH Holdings LLC, or (xvi) St. Alexius Anonymous.

28.     All Communications and Documents identifying the addressees and recipients of

the email attached hereto as **Exhibit 1**, including, without limitation, the names and email

addresses of the addressees and recipients.

**<u>Exhibit 1</u>**

---------- Forwarded message ---------
From: **Anonymous Anonymous** <alexiusanonymous@gmail.com>
Date: Thu, Jul 9, 2020 at 9:55 AM
Subject: St. Alexius Hospital's misappropriation of stimulus money intended for the poor in St. Louis?
To:


Looks like the bankruptcy trustee is not parting with the stimulus money received by a safety net hospital.


St. Alexius received $16.4 million in covid virus relief funds. St. Alexius received $5.1 million in PPP funds. St. Alexius received $2.5 million as lease payment for its residency slots.


And yet, all of that money is miraculously in jeopardy. See the full court filing of this screenshot, attached to this email.

. Alexius Bid Procedures Order (the "Bid Procedures").

4.    In accordance with the Bid Procedures, the Trustee provides notice that SA Hospital
Acquisition has been selected as the stalking horse bidder in connection with the proposed sale of
certain assets of St. Alexius.

5.    The bid submitted by SA Hospital Acquisition seeks to acquire substantially all of
the real and personal property associated with the Broadway and Jefferson Campuses owned by
St. Alexius, but specifically excludes all cash on hand at closing and the rights to $2.5 million in
proceeds from the residency sharing agreement entered into by St. Alexius and SSM Health St.
Mary's Hospital and SSM Health St. Louis University Hospital (the "Residency Sharing
Agreement") to the extent such funds are not already received by St. Alexius prior to closing.

6.    The bid submitted by SA Hospital Acquisition is for a total gross purchase price of
$18,549,849.93. The bid includes a $17 million cash purchase price less: (i) $1 million deduction
for post-closing revenue from the Residency Sharing Agreement; and (ii) $500,000 credit for the
2020 pro rata paid time off (PTO) obligations of St. Alexius. The bid requires a total of $15.5

The Federal Bankruptcy Court Trustee has an opportunity to prevent misappropriation of
COVID Relief Funding for a Safety Net Hospital Serving A Poor Community and finally allow
for reputable ownership and operations ...........or alternatively it could be "business as usual",
neglecting the community and the hospital while paying investors, creditors, investment
bankers, accountants(themselves) and lawyers.

Greater awareness of this situation by the community may encourage the Trustee to clarify the
requirement that relief funding can only be used for the correct purpose, as required by the
U.S. Department of Health & Human Services (HHS) and as such WILL REMAIN WITH THE
HOSPITAL. Such a clarification would prevent future "leech ownership" as has been the case
for almost two decades.

St. Alexius Hospital on Friday June 12th 2020, received just under $16.5 million in virus relief
funds, it was revealed in court documents.

The distribution is from the federal CARES Act, part of $10 billion that went to Missouri
"safety net" hospitals, or those that provide care to individuals regardless of their ability to
pay.

From the HHS webpage, *"HHS is allocating this $10 billion in provider relief funds to safety
net hospitals. This funding recognizes that there are a number of acute care and children's
"safety net" hospitals that disproportionately care for vulnerable populations and those
without insurance coverage. Many of these facilities operate at low or negative profit
margins, and thus are at greater risk of closure as a result of reduced volumes attributable
to the coronavirus. This Provider Relief Fund distribution provides targeted funding to*

*hospitals that disproportionately provide care to the most vulnerable, and are themselves more vulnerable to the financial impacts of the coronavirus."*

As you can see from the HHS webpage (hhs.gov/coronavirus/cares-act-provider-relief-fund/general-information), the HHS distributed approximately $15 billion to eligible providers (meaning hospitals) that participate in state Medicaid and CHIP programs and have not received a payment from the Provider Relief Fund General Distribution and $10 billion to eligible safety net hospitals.

| Allocation for Safety Net Hospitals | $10 billion | Eligible safety net hospitals |
|---|---|---|

On  the HHS website, a formula is given to calculate the amount of allocation for each Safety Net Hospital, and is shown here:

| Allocation for Safety Net Hospitals<br><br>Hospitals with Medicare Disproportionate Payment Percentage (DPP) of 20.2% or greater, average uncompensated care per bed of $25,000 or more, and profitability of 3% or less | Payment Allocation per Hospital = (Hospital's Facility Score* / Cumulative Facility Scores across All Safety Net Hospitals) x $10 Billion<br><br>*Facility Score = Number of facility beds x DPP |
|---|---|

Of note, the HHS webpage importantly and specifically states that ***"Recipients/providers must submit documents sufficient to ensure that these funds were used for healthcare-related expenses or lost revenue attributable to the coronavirus."***

In addition, St. Alexius, a 190-bed facility located in south St. Louis, received $5.1 million in Paycheck Protection Program funding, also from the CARES Act.

The money infusion comes as the facility seeks a sale in bankruptcy court, when the hospital's parent company, Americore, in December filed Chapter 11.

A bankruptcy court judge appointed Carol Fox in February to oversee operations as Trustee, in an auction that was set to end on June 29th. But after the sudden arrival of relief funds from the HHS, Fox, through an attorney, said in a surprise court filing on Wednesday June 17th, that she would likely seek to delay a June 29 deadline for bids. As of right now, the deadline for bids is July 24 and the auction is on July 28.

The official reasoning Fox offered for this delay is because she has been in discussions with numerous prospective buyers for St. Alexius and two other Americore facilities, in Pennsylvania and Arkansas. Is one of the unofficial reasons that Fox's firm, Glass Ratner, has been exploring ways to retain as much of that money as they can get away with?

The receipt of the provider relief funds *"created a material change that required additional evaluation by (Fox) and her team prior to the selection of a* stalking horse bid," her filing said.

Is the major reason why AGRA Capital was nominated to be the stalking horse bidder was because they allegedly conspired with the Trustee's investment bank (B. Riley, which happens to own Glass Ratner) to allow the Trustee team to simply take the HHS relief funds (leaving zero for the hospital operations and the community)? No explanation has yet been provided by B. Riley (in or out of court filings) for the way all that money was to be appropriated. Apparently there are 22 prospective bidders out there - and the BEST one chosen by the Trustee was a vulture capitalist (AGRA CAPITAL ADVISORS)?

- Is this amount of money considered a 'success fee' by the investment bank and the Trustee?

- Are they needing it more than the 50% uninsured patients that visit St. Alexius Hospital?

- Are they even allowed to take this covid relief money, intended for the poor and uninsured (not the wealthy bankers and accountants), according to HHS rules?

- Is a white collar crime in process, with everyone being distracted by the pandemic?

The Trustee has moved the schedule out in light of receipt of relief funds, but given that the HHS has decreed that the funds are to only be used for healthcare-related expenses or lost revenue attributable to the coronavirus, the very fact that the trustee extended the 363 auction process by over a month, is creating ethical and financial issues with an audit by the Office of The Inspector General (OIG) becoming ever more likely post-sale, unless the Trustee (Carol Fox, of Glass Ratner) makes an announcement in court motions that clarifies and reinforces the HHS rule about the use of relief funds.

It is especially concerning that the Trustee has announced to interested parties that *"Bidders must now reflect the $16.4 million in their bid structures"*, which seems to imply that the relief funds are possibly available for purposes outside the intended scope of HHS requirements.

Extending the sale has risked generating even more speculative buyers who, with short term financing, will pay back their funders/investors shortly after closing, using the "cash in hand at the hospital", essentially inappropriately and illegally using covid-safety net funding to acquire a hospital and then leaving nothing for the hospital and poor demographic it serves. The stalking horse bidder is a vulture capital firm known as AGRA Capital Advisors, which has left many hospitals and long term care facilities in its wake, after conducting corporate raids on assets, acquired for pennies on the dollar, and often from a bankruptcy situation. However, they have not won the auction yet. Instead, they are designed to "heat up" the auction by inviting bids from other corporate raiders.

In other words, the higher the bid, the worse it could be for the hospital's future, unless assurances can be made and enforced that the relief funds can not be used to pay off creditors, lenders, investors, or even administrators such as accountants, bankruptcy trustees,

investment bankers and lawyers. They can only be used for operational expenses or to supplant lost revenue attributable to coronavirus.

Although laws do exist which guide the fee schedules generated by such administrators in a public bidding process, it would be helpful for all interested parties, including the hospital and the community that it serves, to know the extent of such fees.

In contrast, a low nominal bid from a reputable healthcare nonprofit for example, won't result in that cash pile being used to pay investors, lenders, creditors, or administrators.

The HHS Relief Funds could have been used to improve hospital infrastructure and services, e.g. MRI, interventional Cath Lab, Mammography, more nursing staff, stabilizing the nursing school, to name just a few items on the wishlist. These things would dramatically improve the hospital as well as result in a stronger future for it and the local community. However, a low bid would risk not satisfying the secured creditors, and would probably not satisfy any of the unsecured creditors.

The Trustee's role, as directed by the federal bankruptcy judge, is to pay off as many creditors as possible, using the bid funding, and NOT to apply even one dollar of the hospital relief funding towards creditors/administrators. The relief funding is strictly intended for the community, by way of hospital operations as required by HHS.

Unless the Court and the Trustee require a statement from all bidders that these relief funds can only be used for hospital operations, and not for loan repayment, creditor satisfaction or administrative fees, the possibility remains that these relief funds:
1. Could illegally and inappropriately be used to pay off an investor/lender who advances funding to the bidder for the sole purpose of hospital acquisition, or
2. Could be used for the payment of any administrative services related to the bankruptcy proceedings, such as for accounting, legal or marketing purposes. Such billable work could continue under the guise of 'hospital operations'.

The focus should be on the 'BEST' component of 'the highest and best' offer, with regard to bidders, instead of the 'highest' component, which has typically been the case in bankruptcies. Neglecting to focus on the long-overdue need for reputable ownership and operations, will one again leave the hospital, the nursing school and the community in peril.


The goal of this email is to put a huge spotlight onto what's happening. We hope the bankruptcy trustee and her associates at the investment bank are working within what is legal, right and moral. We really hope they are.


--



**PLEASE NOTE:**

This anonymous email address has been started up by current/former employees of St. Alexius Hospital, friends and stakeholders in the community served by St. Alexius Hospital, and others who care about the future of St. Alexius Hospital. Our anonymity is intended to protect those who fear unlawful dismissal for speaking out. Nothing we say will be untruthful - it can all be verified.