IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| AMERICORE HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19–61608-grs |
|  | ) |
| Debtors. | ) Jointly Administered |
|  | ) |
|  | ) Honorable Gregory R. Schaaf |

# NOTICE OF PATIENT CARE OMBUDSMAN'S FOURTH INTERIM REPORT

**PLEASE TAKE NOTICE** that on January 21, 2020, Suzanne Koenig was appointed as the Patient Care Ombudsman ("**Ombudsman**") in the above-captioned Chapter 11 cases by the Office of the United States Trustee, pursuant to the Order of the United States Bankruptcy Court for the Eastern District of Kentucky dated December 31, 2019.

**PLEASE TAKE FURTHER NOTICE** that attached to this Notice is the Ombudsman's fourth interim written report as required by 11 U.S.C. § 333 (the "**Report**").

**PLEASE TAKE FURTHER NOTICE** that a copy of the Report will be posted at each of St. Alexius Hospital and Izard County Medical Center, is available on the Court's website, and may be obtained free of charge by contacting:

Robyn Warren, Legal Assistant
SAUL EWING ARNSTEIN & LEHR LLP
Telephone: (302) 421-6839
Facsimile: (302) 421-6813
Email: robyn.warren@saul.com

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

Dated: September 18, 2020           **SAUL EWING ARNSTEIN & LEHR LLP**

By: */s/ John D. Demmy*
John D. Demmy (DE Bar No. 2802)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6848
Facsimile: (302) 421-5881
Email: john.demmy@saul.com

*Counsel for the Patient Care Ombudsman*

# FOURTH INTERIM REPORT OF SUZANNE KOENIG AS THE PATIENT CARE OMBUDSMAN FOR THE PERIOD JULY 21, 2020 THROUGH SEPTEMBER 18, 2020

### SUMMARY OF OMBUDSMAN'S MONITORING AND OBSERVATIONS

**A.**     **St. Alexius Hospital**

The Patient Care Ombudsman ("Ombudsman") did not visit St. Alexius Hospital ("Hospital") during the period covered by this report, commencing July 20, 2020 and continuing through September 18, 2020 (the "Reporting Period"), due to COVID-19 precautions and in compliance with Centers for Disease Control ("CDC") guidance. The Ombudsman maintained frequent communications with Carol Fox, the Court appointed Chapter 11 Trustee (the "Trustee"), and the Hospital's Chief Nursing Officer ("CNO") and Director of Quality and Risk Management ("DQR") through telephone calls, text messages and e-mail. The Hospital had no sentinel events or major patient incidents during this period.

**1.**     **Hospital Staffing**

The Hospital currently has thirty-one (31) open nursing positions. Approximately fifty percent of these positions (15) have been vacant since 2018-2019, and the remainder (16) became open in 2020. The open position situation has left the Hospital dependent upon staffing service agencies to provide required nursing staff. Currently, the Hospital has nineteen (19) open patient care technician ("PCT") positions. Approximately fifty percent of these (10) were vacant in 2018-2019 while the remaining nine became open in 2020.

The Hospital has maintained substantial compliance in nursing coverage as a result of decreased patient volume and capped unit census. The Hospital has very few qualified applicants for nursing positions, which the CNO attributes to the Hospital's bankruptcy status. The Hospital is utilizing agency personnel to supplement staffing in medical and intensive care units and is

offering bonus pay to incentivize staff to cover open shifts. All nursing employees previously on leave related to COVID-19 status or a suspected or confirmed positive test result for COVID-19 for themselves or a family member have returned to duty. Based on the Hospital's continuing efforts at ensuring adequate coverage for staffing needs in light of the patient census at the Hospital, the Ombudsman had no concerns regarding adequate staffing.

2. **Emergency Department ("ED")**

The ED saw 845 patients during the month of July 2020, with sixty (60) of those patients having a primary complaint resulting in a "psychiatric evaluation." The ED saw 776 patients during the month of August 2020 and forty-nine (49) of those patients had a primary complaint resulting in a "psychiatric evaluation." Although complete information for the portion of September covered by this report is not yet available to the Ombudsman, based on communications with Hospital staff it appears that the ED usage for such period is consistent with the usage in July and August, 2020.

3. **Emergency Department Complaints**

The Hospital has received complaints from the Joint Commission on Hospital Accreditation (the "Joint Commission") during the Reporting Period with the ED the focus of the complaints. The source of the complaints appears to be the Missouri State Department of Health, Hospital staff and physicians.

With respect to the first complaint, on August 17, 2020, the Missouri State Department of Health Surveyors ("MSDHS") arrived at the Hospital to investigate an anonymous complaint regarding nursing care specific to a patient elopement. A patient with autism/psychological disorder presented to the emergency department with complaints of psychological disorder. According to a phone interview with the DQR, the patient left the Hospital three times with Hospital staff unaware of the departures until after it was discovered the patient was absent. On

2

one of those occasions, the patient had the awareness to go to the patient's parent's house to spend the night. The MSDHS surveyors visited the Hospital on several separate occasions during a three-week period and reviewed the ED policies on resident's rights and governing body responsibilities. The MSDHS surveyors cited the Hospital with an Immediate Jeopardy deficiency regarding care and safety of patients. . Hospital staff immediately developed and implemented an abatement plan that addressed care standards; the plan was accepted by the MSDHS surveyors. Hospital staff are currently working on a plan of correction to address the safety of patients experiencing psychological disorder. The Ombudsman had several conversations with the Trustee and the DQR regarding the circumstances and procedures put in place to prevent these types of incidents from recurring in the future.

On the second complaint, the DQR informed the CNO that on July 24, 2020, he had received a complaint from the Joint Commission on the provision of personal care in the ED. The CNO completed an incident investigation that noted a few different occasions where patients with psychiatric diagnoses were being kept in a room in the ED for days without privacy between the males and females and with no opportunity to shower. Systems subsequently have been put into place for privacy during showering and personal care. Patients are to be taken to the sixth-floor shower room to be showered. Provisions are in place for privacy between males and females during their stay in the ED. No further complaints have been received. According to Hospital administrative and ED staff, the problem has been resolved.

   4.     **Incident Report**

The DQR received notification of an incident that occurred on September 4, 2020 in the geropsychiatric unit on the previous day. The patient was found unresponsive and a code was called. The patient was transferred to the Hospital's intensive care unit ("ICU"). The admission

3

orders for the patient entering the ICU stated, "cardiac arrest." Following admission, the patient coded again shortly thereafter and subsequently expired. The DQR investigated and discovered there was a period of thirty-four minutes during which the patient had not been observed. It was during this time period that the patient became unresponsive. The patient care technician observed that the patient's door was closed.

The care requirement is that patients are to be observed every fifteen minutes. Statements were obtained from employees working the shift and from the patient care technician who found the patient. The patient's child was the legal guardian and was at bedside in the ICU at the time of passing. After the first code and intervention, the child wanted the patient to pass peacefully, suggesting that Hospital staff was not notified of the patient's condition just before expiration. The Ombudsman reviewed the findings with the DQR and these findings were submitted to the Hospital committee responsible for review and risk management.

5. **Physician Coverage Concerns**

A physician reported concerns to the Ombudsman about adequate physician support during simultaneous "Code Blue" situations in the Hospital. The physician gave examples to indicate that the current physician support system was inadequate. These concerns were brought to the attention of the DQR. A defined on-call physician back-up system is currently being developed with the assistance of the Trustee. The call system must be approved by all of the physicians on the list. This system will provide for a physician to be called in whenever such situations occur.

6. **Surgical Support Team Availability**

On July 2, 2020 a patient was transferred to the ED from an urgent care facility with signs and symptoms consistent with acute appendicitis. The ED physician contacted the on-call general surgeon, who stated that he would be available to perform an appendectomy at 7:30 AM. The

patient was accepted in the ED. The nursing supervisor later informed the ED physician that the surgical team was not available and would not be available until July 6, 2020. According to the ED physician, the patient had to be transferred to a Hospital that could provide the surgery.

This concern was sent to the DQR for follow-up. He informed the Ombudsman that the event was discussed with the Hospital's executive team and that changes were made. The Ombudsman has requested additional information to confirm the patient was transferred and to determine if any new policy regarding the surgery support team was implemented. That information has not yet been supplied to the Ombudsman.

7. **ED Patient with Possible COVID Admitted to Behavioral Unit**

A Hospital physician contacted the Ombudsman with a concern that patients suspected of having alleged infections of COVID-19 were being admitted directly to the behavioral health unit from the ED. The Ombudsman discussed this concern with the Trustee and the DQR. According to the DQR, the concerns were reviewed and addressed. Hospital policy is that patients are to be admitted directly to the medical unit until cleared if there is suspicion of a COVID-19 infection. This is the responsibility of ED physicians as they direct the care of the patient at the Hospital point of entry. Only after medical clearance can patients be admitted for psychiatric services. This policy has always been the standard.

8. **Employee Issues**

The Ombudsman was notified that two staff members had been in contact with others who had a high risk of having the COVID-19 virus. The human resources department and the CNO were informed about the two employees. The investigation revealed that the employees in question were not actually Hospital staff. One was a contracted employee and the other was a healthcare student. The investigation revealed that the Hospital was following CDC guidelines. The Hospital

5

reviewed and revised their policy with updated state and federal guidance on "employee returned to work" guidelines in regard to COVID-19.

B. **Izard County Medical Center**

The Ombudsman did not visit the Izard County Medical Center ("Medical Center") in Calico Rock, Arkansas during this reporting period due to COVID-19 precautions and in compliance with CDC guidance. The Ombudsman had frequent telephone and e-mail contact with the appropriate leaders at the Medical Center. The Medical Center had no sentinel events or major patient accidents during this period.

1. **Administration**

The Medical Center's Chief Executive Officer ("CEO") reports that key administrative positions remain unchanged from the previous report and that daily operations also have not changed. All departments are operating normally, and adequate supplies are available. Medical and pharmacy supplies are readily available throughout the hospital. The laboratory and X-ray services continue to operate and remain available to the community. The pharmacy is under the oversight of a licensed pharmacist who is on call after hours. The Medical Center's licensed nurses are able to access the pharmacy to obtain routine medications as needed.

2. **Clinical Update**

The CEO reports that no major changes have occurred with the nursing staff. Required educational programs are in place for the licensed staff and nursing assistants. Staffing levels are currently stable, and the Medical Center is not using agency staff. The nursing director reports that staff morale is stable and that there is minimal turnover in the department.

### 3. COVID-19 Update

The Medical Center reports zero positive COVID-19 tests in patients or staff. However, the CEO reports that cases in Izzard County are increasing daily. The county has twenty-five (25) residents that have tested positive and twenty-one (21) have recovered. There has been one death reported due to COVID-19. CDC guidelines are reviewed whenever changes are promulgated. Medical Center staff assigned to infection prevention and care review the CDC updates with the CEO. Educational information and policy adjustments are updated to reflect the revised CDC guidelines. All staff are informed of the changes and the importance of adapting the new guidelines into the daily routines. No staff have been quarantined due to COVID-19; if this becomes necessary however, it could create staffing issues. The CEO reports that the Medical Center has several nurses who work on an "as-needed" basis (PRN) and could assist if necessary.

### 4. Emergency Department

The Emergency Department ("Izard ED") saw 111 patients in July 2020 and 118 in August 2020. Staffing has been stable and physician coverage has been appropriate for patient census. Few patients have displayed symptoms of COVID-19 and all have tested negative. The Izard ED continues to enforce restrictions on visitors although parents are allowed to stay with their children if they are in the Izard ED.

## CONCLUSION

The Ombudsman has continued to stay in communication with the Trustee and staff at both the Hospital and the Medical Center with respect to patient care issues generally and on all areas of concern. The Ombudsman has not been advised of any significant concern that either has not been addressed appropriately by Hospital or Medical center personnel, as applicable, or is in the process of being addressed by the appropriate Hospital or Medical center personnel.

37484123.2 **09/18/2020**