UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 19-61608-grs |
| AMERICORE HOLDINGS, LLC et al.[1], | CHAPTER 11 |
| DEBTORS. | JOINTLY ADMINISTERED |

**OBJECTION TO CHAPTER 11 TRUSTEE'S
EMERGENCY MOTION TO ENFORCE SALE ORDER**

SA Hospital Acquisition Group LLC ("Purchaser"), files this objection ("Objection") to

*Chapter 11 Trustee's Emergency Motion to Enforce Sale Order* (ECF# 947)("Emergency

Motion").

## I.    INTRODUCTION

The Trustee's motion to compel purports to cast the blame for not closing on the Purchaser.

In reality, the failure to close results from the confusion created by a myriad of material issues

arising affecting the operations and very existence of the hospital since July of this year.  Some of

these issues were unanticipated by either Purchaser or the Trustee (e.g., a State Survey of the

hospital resulting in significant deficiencies being identified, the ever-changing guidance from the

Federal government on the use of funds provided under the CARES Act), while others were known

to the Trustee and only identified by the Purchaser late in the process (e.g., the hospital's on-going

participation in litigation against the Missouri Department of Social Services relating to

Disproportionate Share Hospital ("DSH") payments, the impending reduction in reimbursement

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC(3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766).

for hospital-based nursing schools, the risk of the School of Nursing losing its license/accreditation). Regardless of the circumstance and its potential impact on the continued viability of the hospital, Purchaser has continued to work with Trustee to resolve these issues and bring this transaction to a closing. Even now, the Purchaser and the Trustee continue to work finalizing agreements essential to the closing of the transaction and Seller's disclosure schedules to be attached to the Asset Purchase Agreement at closing.

Yet now, despite the unprecedented level of unexpected issues that have arisen, the Purchaser's efforts to work with the Trustee to resolve those issues and the continued efforts of both parties to complete the documentation needed to close the transaction, when faced with one final issue to resolve, the Trustee cries "foul" and attempts to invoke the terms of the Modified Asset Purchase Agreement ("APA") alleging a breach by the Purchaser in an effort to use the authority of the Court to resolve this last issue. All of this while ignoring the fact that the vary delays cited by the Trustee as the basis of her claim have also caused the Purchaser significant damages. As a result, the pending Motion should be denied. Alternatively, there are factual disputes and this matter should be set on for an evidentiary hearing so that that Purchaser has a reasonable amount of time to prepare for and present testimony.

Subject to a quick turn of remaining documents, including a mutually agreeable Transition Services Agreement ("TSA") and complete APA exhibits and schedules, parties would be in a position to close this transaction within five (5) business days (necessary for the release and flow of funds), provided the CARES Act and nursing school issues are resolved.

## II.     BASIS FOR OBJECTION

### A.     Material Reasons for Delay and related Non-Disclosures

#### 1.     CMS Survey Beginning on August 17, 2020

Initially, closing was set for August.  However, due to complaints of the Trustee's hospital employees made to the state of Missouri and CMS related to the management and condition of the hospital, the State of Missouri surveyed the hospital for several days beginning on August 17, 2020 and again on September 3.  The state issued its findings on September 21, 2020, which included the following statement:

> Based upon observation, interview, record review and policy review, the Governing Body failed to ensure the CEO was responsible for management of the entire hospital including accountability of the effective oversight of Staff.

These complaints resulted in two immediate jeopardy actions being filed which could have resulted in the loss of the hospital's provider number and its ability to function as a hospital.  The Purchaser marshalled its resources and worked with the Trustee including bringing to the attention of the Trustee new management at the hospital which she brought on board.  The Purchaser also assisted the Trustee in developing a Plan of Correction.  A clean bill of health was only issued on November 30, 2020 (Letter Attached as Exhibit A), and which in turn was only provided to the Purchaser within the last 48 hours.  The receipt of this letter is important to closing.

#### 2.     State of Missouri CMS Issue and later arising DSH Issue

At about the time of the initial sale hearing in July, the Court was advised that the Department of Health and Human Services ("DHHS") was expected to agree to satisfactory language limiting successor liability claims against the Buyer.  Similar protection was also sought from the state of Missouri, which was not as easily forthcoming.  Finally, shortly prior to the Court's entry of the sale Order on November 12, 2020, the State of Missouri agreed to language

deemed by the Purchaser to be satisfactory to limit liability for issues which it was aware of through its due diligence, which was included in the Sale Order.

At the time the State of Missouri language was included in the Sale Order and submitted to the Court, the Purchaser was not aware of State of Missouri DSH calculations of which the Trustee was provided notice in August, 2020. This notice stated a potential of an $8 million recoupment for miscalculated DSH payments. This was not provided to the Purchaser until November, and only came to light after independent investigation by the Purchaser's counsel. This liability had not been disclosed to the Purchaser. There were only two documents in the data room minimally related to this issue. One a 2019 order from the Missouri Administrative Hearing Commission for a joint status report on litigation involving 16 companion cases (without any substantive detail), and another is a notice of withdrawal of counsel. As a result of the Purchaser's counsel independent investigation, he asked the Trustee's counsel on November 13 for the name of the attorney handling the litigation on behalf of the Estate, and for permission to contact the attorney, which permission was granted on November 16, with contact occurring on November

At this time Purchaser's counsel learned of the potential $8 million repayment obligation. After several discussions with the Trustee's counsel by the Purchaser's counsel, she was advised on November 27 that the Purchaser would not close until this issue was resolved. Meanwhile, there were ongoing negotiations with the State of Missouri to agree to some clarifying language to bring before this Court to resolve this issue. The comfort e-mail attached to the Trustee's Motion dated November 25, 2020 was a helpful first step, but the Purchaser insisted that this be followed by satisfactory language to include in a clarification Order to be sought from this Court. This clarifying language, which is subject to agreement of the State, the Trustee, the Purchaser and the Purchaser's lender, has informally been agreed to within the past week or two.

4

3.      **Recently Disclosed School of Nursing Review, Plan of Correction and Accreditation Problems**

Just this week the Purchaser was advised of a potential liability and issues with the School of Nursing being acquired as part of the acquisition from the Trustee.   The Trustee received notice of a change to reimbursement schedule for the School on September 28, 2020.  This is a material matter, yet the Purchaser was not made aware of this until November 27, 2020.  The Trustee had not provided notice of this to the Purchaser nor was it in the data room.

And, for the first time, the Purchaser was just this week made aware that the School of Nursing (on the Jefferson Campus) was under review and had prepared a Plan of Correction.  A December 14, 2020 letter from the State of Missouri (Attached as Exhibit B) notes that the Plan of Correction was denied due to its failure to address deficiencies.  The School is under a moratorium on admissions.  As a result, there is a real risk that the School of Nursing will be shut down.  The fact there were ongoing issues with the School of Nursing and the recent letter represent another material non-disclosure, and an issue in need of immediate consideration and resolution.

4.      **CARES Act Issue**

As the Trustee notes in her Motion, and as the parties have previously advised the Court, the CARES Act guidance has been continually changing throughout the course of this sale.  The Trustee suggests that the use of the CARES Act Funds is entirely in her discretion and that she would have turned them back to the government, but for the Purchaser's desire that she spend those funds as intended by the government.  What the Trustee misses in this analysis is that there are several constituents of this bankruptcy Estate.  Not only the normal parties including creditors and equity holders, but when a hospital is being operated, the patients and the community served are also constituents.  As such, to the extent the Trustee has CARES Act Funds made available to serve the community in fending off the COVID-19 Pandemic, she is obligated to deploy those

5

funds for the benefit of the community.

While the Purchaser agreed to indemnify the Trustee with respect to certain risks of the Estate with respect to the potential return of money to the government of funds not properly used, this was not a carte-blanch indemnification.

Section 4.10 of the APA provides for the expenditure of the Unallocated Provide Relief Funds, believed to be from $10-12.5 million as of October 1, 2020. The Trustee agreed that prior to closing she would spend those funds "as permitted by the CARES act", with such expenditure also requiring the mutual agreement of the Purchaser. In other words, it was the Trustee's obligation to determine whether the usage of those funds were "as permitted by the CARES act". The Trustee had her own consultant advising on the use of those funds. To the extent the Purchaser agreed to certain purchases, it was of the understanding that the Trustee's consultant was signing off on the proper use of those funds. The Purchaser was very surprised to learn in November (See e-mail attached as Exhibit C) that the Trustee had in fact terminated the consultant on October 22, 2020 because she was obtaining the indemnification of the Purchaser to the extent the funds were not spent properly. To the extent the Purchaser approved use of those funds, it understood the Trustee's consultant had recommended the usage. While there was some disagreement on what was and was not proper usage—the Purchaser regularly considered the input of the Trustee and her consultant. And, in many instances the Purchaser has not ever approved the use of the funds as required by the APA.

The Trustee's spend of those funds after October 28, 2020, when the Guidance came down only allowing 20% of the cost of certain purchases of capital assets to a proper use of the funds, is especially troubling, given that the Trustee was no longer obtaining direction from her consultant on the proper use of those funds.

6

### B.      Delays in Document Turns

The Trustee asserts that the delay in this case is due to a lender being brought on board by the Purchaser to finance this transaction.  While financing was not a condition of closing (like it is often not a condition of closing for purchase of a residential home), this does not preclude the Purchaser from obtaining financing.  Irrespective of whether this transaction was being financed or not, it would not have closed by this time, due to the other issues outlined above.  The Trustee has long-known since early August that a lender was onboard, and has assisted with providing certain due diligence information as early as mid-August.  The lender is in a position to close when the Purchaser and the Trustee are.

Just by way of example, the timeline with respect to completion of the Transition Services Agreement ("TSA"), which is a critical document with respect to sale of health-care facilities, is as follows:

(a)      October 23 – Purchaser's counsel receive an e-mail from the Trustee providing a general list of transition services to be provided under the TSA based on her meeting with her staff.

(b)      November 12 (8:54 AM) – Purchaser's counsel provides a working draft of the TSA initially prepared in August to Trustee's counsel.  This draft of the TSA includes a blank exhibit for the list of transition services.

(c)      November 12 (2:40 PM) – Purchaser's counsel (Mr. Herring) provided a revised draft of the TSA to Purchaser and to Trustee's counsel.  Mr. Herring advised the recipients that the draft of the TSA includes a blank exhibit on which to list the transition services and asked the parties to help populate that exhibit.  Mr. Herring provided a list of potential transition services to help the parties identify potential transition services.

768457:1:LEXINGTON

(d)    November 17 – Mr. Herring received from Trustee's Counsel (Ms. Green) a revised draft of the working draft of the TSA sent by Purchaser's Counsel (Mr. Ramirez) to Ms. Green on the morning of November 12 (not the revised draft Mr. Herring sent in the afternoon of the November 12).  The revised draft still includes a blank exhibit for the list of transition services.

(e)    November 20 – Mr. Herring e-mails Ms. Green and Purchaser a revised draft of the TSA reflecting her proposed modification based on the draft sent by her on November 17.  The revised TSA still includes a blank exhibit for the list of transition services.

(f)    November 25 – Mr. Herring received from the Trustee a revised draft of the TSA with the proposed list of transition services, including references to both CARES Act expenditures and indemnification.

(g)    November 27 – Purchaser requests from Trustee that she provides a list of CARES Act expenditures to be attached to the TSA.

(h)    November 27 – Trustee provides list of CARES Act expenditures.

(i)    November 29 – Mr. Herring e-mails Ms. Green and Purchaser a revised draft of TSA in response to the draft received from the Trustee on November 27.

(j)    December 9 – Mr. Herring receives a revised draft of the TSA from Trustee's counsel Mr. Parrish.

(k)    December 11 – Mr. Herring e-mails Mr. Parrish a revised draft of the TSA in response to his December 9 draft.

(l)    As of Today – Mr. Herring is awaiting Mr. Parrish's response to the revised draft of the TSA sent to him on December 11.

768457:1:LEXINGTON

In addition, the schedules to the APA, most of which require disclosures by the Trustee, are still not completed either. The Purchaser received the first draft of the schedules from the Trustee's counsel on September 22, 2020, which had been first requested on August 5, 2020. The schedules were short of content, with, for example, "None" referenced on Schedule 2.5 dealing with litigation and Schedule 2.8 dealing with regulatory issues. The Trustee's counsel and the Purchaser's counsel worked together during the last part of October prior to signing the APA to complete the schedules. Even then, many were blank and are to this day being worked on between Trustee's counsel and Purchaser's counsel to finalize.

None of the above history with respect to the completion of the closing documents is meant to cast dispersions, as counsel are working together to complete them. The reality is that this takes time, and it has taken a lot of time due in large part to the material issues arising explained throughout this Objection.

### C.      Forfeiture of Deposit and Damages is Not Warranted

For the reasons outlined above, the Purchaser has not breached the APA. The primary delay in this transaction is due to the issues, surprises, lack of disclosures and matters driven and controlled by the Trustee, or at a minimum the delay can be shared in some portion by both parties, with a bit of the blame on the federal government and its continuing issuance of new Guidance. For these reasons, forfeiture of the deposit would not only be a draconian remedy, but an unwarranted one, because breach of the APA is not the Purchaser's fault.

Similarly, damages are not warranted either. In addition, there is no evidence that any delay in the closing has cost the Estate money. The Purchaser understands that the hospital operated with a positive EBIDTA in November of approximately $500,000 and that the census continues to improve, suggesting greater EBITDA in December. It remains to be proven that that St. Alexius is losing money. Moreover, if it is or were, any loses may be covered by available

CARES Act funds, as has been the case up to this point in time.

**D.      Resolution and Closing Timing**

The Purchaser requests that its indemnification obligation be reduced to the extent of the Trustee's expenditures that cannot be defended with a good faith argument that they are proper expenditures under the current Guidance with respect to the proper use of those funds.  The Estate should escrow some of the proceeds from this sale (after paying the secured creditors) for use in paying back such founds ultimately determined to not have been properly expended.

The Estate should also escrow some of the closing funds to work through the recent issues related to the School of Nursing.

Once there is resolution on the above two issues, the handful of remaining documents are agreed to and turned, and a clarification Order is signed by this court addressing the DSH issue and the non-controversial issue allowing "Purchaser" as defined in the APA to also be "an affiliate," the Purchaser and its lender are prepared to close within 5 business days.  This will allow payment of the secured creditors, transition of the property, and the ability to sort through the escrow issues in due course.

Wherefore, Purchaser respectfully requests that this Court deny the Emergency Motion, or in the alternative, set the matter for a full evidentiary hearing.

Respectfully submitted,


James A. Lodoen, Esq.
Spencer Fane LLP
100 South 5th Street, Suite 2500
Minneapolis, MN  55402-1234
Phone:  612-268-7039
Fax:  612-268-7001
E-Mail: jlodoen@spencerfane.com

and

*/s/ Chrisandrea L. Turner*
Chrisandrea L. Turner
STITES & HARBISON, PLLC
250 West Main Street
Suite 2300
Lexington, KY 40507
Telephone: (859) 226-2300
E-Mail address: clturner@stites.com

COUNSEL FOR SA HOSPITAL
ACQUISITION GROUP LLC


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 16, 2020, I electronically filed the foregoing with

the Clerk of Court by using the Court's CM/ECF system, which will provide a Notice of Electronic

Filing and copy to all parties requesting such notice.


*/s/ Chrisandrea L. Turner*
COUNSEL FOR SA HOSPITAL
ACQUISITION GROUP LLC

768457:1:LEXINGTON

# EXHIBIT A

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
CMS Kansas City601 East 12th Street, Room 355
Kansas City, Missouri 64106



**CENTRAL MOUNTAIN DIVISION OF SURVEY & OPERATIONS GROUP**

November 30, 2020

Tom Saggio, Director of Quality and Risk Management
St. Alexius Hospital
3933 S. Broadway
St. Louis, Missouri 63118

CMS Certification # 26-0210

Dear Mr. Saggio:

Missouri State survey agency surveyors conducted a revisit survey at St. Alexius Hospital of all applicable Federal hospital regulations to determine if the hospital was again in compliance with all Federal Conditions of Participation. The revisit survey concluded on November 17, 2020. Thank you for the cooperation of you and your staff.

Surveyors identified that the hospital is now in compliance with all Conditions of Participation. Therefore, we are rescinding our decision to terminate the hospital from participation in the Medicare program. In addition, we have determined that the hospital may again be deemed to meet Federal hospital regulations through its accreditation by the Joint Commission.

As directed by our procedures, we are copying your accrediting organization and the State survey agency with this letter. If you have any questions regarding this correspondence, please contact me at julie.metz@cms.hhs.gov.

Sincerely,

Julie A.
Metz -S

Digitally signed by Julie
A. Metz -S
Date: 2020.11.30
09:33:21 -06'00'

Julie Metz, Nurse Consultant
Survey & Operations Group
CMS Kansas City

CC:
MDHSS
JC

**EXHIBIT A**

# EXHIBIT B

Michael L. Parson
Governor
State of Missouri

Sarah Ledgerwood, Interim Division Director
DIVISION OF PROFESSIONAL REGISTRATION

Missouri Department of
Commerce & Insurance
Chlora Lindley-Myers, Director

**MISSOURI STATE BOARD OF NURSING**
P.O. Box 656, Jefferson City, MO 65102-0656
800-735-2966 TTY Relay Missouri | 800-735-2466 Voice Relay Missouri

Lori Scheidt, MBA-HCM | Executive Director
nursing@pr.mo.gov | pr.mo.gov/nursing
573-751-0681 | 573-751-0075 FAX

Lutheran School of Nursing
Christi Coleman
600 Washington Ave, 15th Floor
St. Louis, MO 63101

December 14, 2020

Dear Ms. Coleman:

This letter is in regard to the Lutheran School of Nursing – Diploma in Nursing Program US17309200.

A hearing was held by the Missouri State Board of Nursing on December 10, 2020 to review your Plan of Correction. The Missouri State Board of Nursing (Board) rejected the 2020 Plan of Correction due to insufficient evidence that program operation is sustainable. The current Plan of Correction does not fully address program deficiencies. An additional copy of the September 2019 site visit report is available upon request which provides a detailed outline of the deficiencies.

Pursuant to 20 CSR 2200-2.010 (7) (A) the moratorium on admissions remains in place until lifted by the Board upon proof submitted to the Board that the program has cured any deficiencies in the instructional quality and integrity of the program.

Pursuant to 20 CSR 2200-2.010 (6) (B), (D) the program remains on conditional approval status until such time as the deficiencies are corrected to the satisfaction of the Board or the Board's approval is withdrawn pursuant to section 335.071.3., RSMo, for noncompliance with minimum standards.

You may submit a revised Plan of Correction. It must include a narrative of how deficiencies have been addressed, evidence of the narratives and resources that have been put in place to sustain program operation. The deadline for submission of a revised Plan of Correction and evidence is Friday, January 29, 2021. The site visit planned for spring 2020 was deferred to allow your program to submit the Plan of Correction. It will now be conducted prior to the Board's review of additional documentation. Please contact this office at your earliest convenience to schedule the site visit.

You provided a letter from Veterans Services USA indicating that they intend to purchase St. Alexis Hospital and operate Lutheran School of Nursing. If a change in institutional sponsorship occurs, you need to follow rule 20 CSR 2200-2.030 (1), (2), (3), (4) for submission of required documentation for a change in sponsorship. Proposed program changes that

**EXHIBIT B**

Michael L. Parson
Governor
State of Missouri

Sarah Ledgerwood, Interim Division Director
DIVISION OF PROFESSIONAL REGISTRATION

Missouri Department of
Commerce & Insurance
Chlora Lindley-Myers, Director

**MISSOURI STATE BOARD OF NURSING**
P.O. Box 656, Jefferson City, MO 65102-0656
800-735-2966 TTY Relay Missouri | 800-735-2466 Voice Relay Missouri

Lori Scheidt, MBA-HCM | Executive Director
nursing@pr.mo.gov | pr.mo.gov/nursing
573-751-0681 | 573-751-0075 FAX

affect the criteria included in 20 CSR 2200-2.010 (4) (A) 1.-4 and shall be approved by the Board prior to implementation. The required change in sponsorship form is accessible on the Board's website at https://pr.mo.gov/boards/nursing/Change_in_Sponsorship_375-0207.pdf. In review of the letter from Veteran Services USA and testimony at the December 10, 2020 hearing, it is our understanding that Veterans Services USA would like to keep all current faculty, the curriculum and essentially Lutheran School of Nursing as it exists. If Veterans Services USA does purchase the program, all deficiencies identified with Lutheran School of Nursing must be addressed. Those deficiencies are not eliminated with a new owner.

Lutheran School of Nursing has the option to voluntarily close the current program. If that would occur, then Veterans Services USA would not have to address the Lutheran School of Nursing deficiencies and could, instead, petition the Board for establishment of a new nursing program. I refer you to rule 20 CSR 2200-2.020 (2) which states the procedure for reopening of a program is the same as for initial approval in 20 CSR 2200-2.010 (4) (A).

Please do not hesitate to contact our office for questions or concerns. You may reach this office by phone at 573-573-0080 or by e-mail at sarah.barickman@pr.mo.gov or bibi.schultz@pr.mo.gov.

Sincerely,

*Ingeborg D. Schultz*

_____

Ingeborg D. Schultz, RN MSN CNE
Director of Education

Cc:  Raishelle Willis, Lutheran School of Nursing

**EXHIBIT B**

| Michael L. Parson | | Missouri Department of |
|---|---|---|
| Governor | Sarah Ledgerwood, Interim Division Director | Commerce & Insurance |
| State of Missouri | DIVISION OF PROFESSIONAL REGISTRATION | Chlora Lindley-Myers, Director |

**MISSOURI STATE BOARD OF NURSING**
P.O. Box 656, Jefferson City, MO 65102-0656
800-735-2966 TTY Relay Missouri | 800-735-2466 Voice Relay Missouri

Lori Scheidt, MBA-HCM | Executive Director
nursing@pr.mo.gov | pr.mo.gov/nursing
573-751-0681 | 573-751-0075 FAX

**EXHIBIT B**

# Exhibit C

**Lodoen, Jim**

| | |
|---|---|
| **From:** | Troy Schell <troy.schell@schell-law.com> |
| **Sent:** | Tuesday, December 15, 2020 5:36 PM |
| **To:** | Lodoen, Jim; Herring, Donn |
| **Subject:** | [EXTERNAL] FW: St. Alexius: Transition Services Agreement |
| **Attachments:** | Approved PRF Expenditures.xlsx; Fwd: St. Alexius: Proposed COVID-19 Expenditures |

**[Warning] This E-mail came from an External sender. Please do not open links or attachments unless you are sure it is trusted.**

**From:** Carol Fox <cfox@brileyfin.com>
**Sent:** Saturday, November 28, 2020 5:59 AM
**To:** Troy Schell <troy.schell@schell-law.com>
**Cc:** Ben Klein <bklein@mtsconsulting.com>; Jeff Ahlholm <jeff@agracapital.com>
**Subject:** RE: St. Alexius: Transition Services Agreement

Troy,

The following procedures were followed with respect to the expenditure of the CARES Act funds:

1.  In late September/early October, Greg Brentano and Anil Jain performed a capital needs assessment of the Hospital and provided COVID-19 justification for each capital expenditure (see Column M - Comments of the attached spreadsheet).
2.  I hired an external consultant healthcare consultant, Advis, who reviewed the justification included in Column M and provided guidance as to whether expenditures were eligible under the prevailing CARES Act guidance (see Column N – Advis Comments).
3.  All proposed capital expenditures and supporting documentation were reviewed and approved by Ben.  Camille Lockhart from BKD also reviewed the spreadsheets of the proposed expenditures but did not comment as to whether an expenditure was permissible under the CARES Act guidance.
4.  On 10/22/20, based on the attached indemnification email from Ben, we discontinued seeking Advis' guidance.  As a result, Advis did not review 15 expenditures totaling $986,167.

Please call me if you require further clarification.  I am available.

Carol



**Carol Fox**
Senior Managing Director

**Email:** cfox@brileyfin.com NEW
**Direct:** (954) 859-5075
**Mobile:** (954) 494-2856
VCard

www.brileyfin.com
NASDAQ: RILY



200 East Broward Blvd, Suite 1010
Fort Lauderdale, FL 33301

**EXHIBIT C**



**From:** Troy Schell <troy.schell@schell-law.com>
**Sent:** Saturday, November 28, 2020 8:23 AM
**To:** Carol Fox <cfox@brileyfin.com>
**Subject:** RE: St. Alexius: Transition Services Agreement

[EXTERNAL]
Good Morning Carol
The lender's regulatory counsel has provided some questions given the new Cares Act Guidance that came out as to whether a separate analysis has been completed as the justification/basis of the monies spent.

**From:** Carol Fox <cfox@brileyfin.com>
**Sent:** Friday, November 27, 2020 11:05 AM
**To:** Troy Schell <troy.schell@schell-law.com>
**Cc:** Elizabeth A. Green - Baker Hostetler (egreen@bakerlaw.com) <egreen@bakerlaw.com>; Jimmy D. Parrish (jparrish@bakerlaw.com) <jparrish@bakerlaw.com>; Wolin, Robert <RWolin@Bakerlaw.com>; Michael Thatcher <mthatcher@brileyfin.com>; Susan Smith <smsmith@brileyfin.com>; Donn Herring <dherring@spencerfane.com>; Andrew Ramirez (aramirez@spencerfane.com) <aramirez@spencerfane.com>; James Lodoen (jlodoen@spencerfane.com) <jlodoen@spencerfane.com>; Ben Klein <bklein@mtsconsulting.com>; Jeff Ahlholm <jeff@agracapital.com>
**Subject:** RE: St. Alexius: Transition Services Agreement

Troy,

Updating took a little longer than I anticipated.  Attached is the spreadsheet you requested.

Carol




www.brileyfin.com
NASDAQ: RILY

**Carol Fox**
Senior Managing Director

**Email:** cfox@brileyfin.com NEW
**Direct:** (954) 859-5075
**Mobile:** (954) 494-2856
VCard

200 East Broward Blvd, Suite 1010
Fort Lauderdale, FL 33301

**EXHIBIT C**



**From:** Carol Fox
**Sent:** Friday, November 27, 2020 12:40 PM
**To:** Troy Schell <troy.schell@schell-law.com>
**Cc:** Elizabeth A. Green - Baker Hostetler (egreen@bakerlaw.com) <egreen@bakerlaw.com>; Jimmy D. Parrish (jparrish@bakerlaw.com) <jparrish@bakerlaw.com>; Wolin, Robert <RWolin@Bakerlaw.com>; Michael Thatcher <mthatcher@brileyfin.com>; Susan Smith <smsmith@brileyfin.com>; Donn Herring <dherring@spencerfane.com>; Andrew Ramirez (aramirez@spencerfane.com) <aramirez@spencerfane.com>; James Lodoen (jlodoen@spencerfane.com) <jlodoen@spencerfane.com>; Ben Klein <bklein@mtsconsulting.com>; Jeff Ahlholm <jeff@agracapital.com>
**Subject:** RE: St. Alexius: Transition Services Agreement

Yes.  I need to update for the disbursements we made this week.  Will send in ~30 minutes.



**Carol Fox**
Senior Managing Director

**Email:** cfox@brileyfin.com NEW
**Direct:** (954) 859-5075
**Mobile:** (954) 494-2856
VCard

200 East Broward Blvd, Suite 1010
Fort Lauderdale, FL 33301



www.brileyfin.com
NASDAQ: RILY



**From:** Troy Schell <troy.schell@schell-law.com>
**Sent:** Friday, November 27, 2020 12:20 PM
**To:** Carol Fox <cfox@brileyfin.com>; Donn Herring <dherring@spencerfane.com>; Andrew Ramirez (aramirez@spencerfane.com) <aramirez@spencerfane.com>; James Lodoen (jlodoen@spencerfane.com) <jlodoen@spencerfane.com>; Ben Klein <bklein@mtsconsulting.com>; Jeff Ahlholm <jeff@agracapital.com>
**Cc:** Elizabeth A. Green - Baker Hostetler (egreen@bakerlaw.com) <egreen@bakerlaw.com>; Jimmy D. Parrish (jparrish@bakerlaw.com) <jparrish@bakerlaw.com>; Wolin, Robert <RWolin@Bakerlaw.com>; Michael Thatcher <mthatcher@brileyfin.com>; Susan Smith <smsmith@brileyfin.com>
**Subject:** RE: St. Alexius: Transition Services Agreement

[EXTERNAL]
Carol

**EXHIBIT C**

Can we get the COVID spreadsheet referenced within the TSA as an exhibit.   I have not seen.  Thanks

**From:** Carol Fox <cfox@brileyfin.com>
**Sent:** Wednesday, November 25, 2020 1:56 PM
**To:** Donn Herring <dherring@spencerfane.com>; Andrew Ramirez (aramirez@spencerfane.com)
<aramirez@spencerfane.com>; James Lodoen (jlodoen@spencerfane.com) <jlodoen@spencerfane.com>; Troy Schell
<troy.schell@schell-law.com>; Ben Klein <bklein@mtsconsulting.com>; Jeff Ahlholm <jeff@agracapital.com>
**Cc:** Elizabeth A. Green - Baker Hostetler (egreen@bakerlaw.com) <egreen@bakerlaw.com>; Jimmy D. Parrish
(jparrish@bakerlaw.com) <jparrish@bakerlaw.com>; Wolin, Robert <RWolin@Bakerlaw.com>; Michael Thatcher
<mthatcher@brileyfin.com>; Susan Smith <smsmith@brileyfin.com>
**Subject:** St. Alexius: Transition Services Agreement

All,

Attached for your review is the TSA with the Purchaser Services and Seller Services incorporated.  Please
make any changes in redline you deem appropriate.  Thank you.

Best regards,

Carol



**Carol Fox**
Senior Managing Director

**Email:** cfox@brileyfin.com NEW
**Direct:** (954) 859-5075
**Mobile:** (954) 494-2856
VCard

www.brileyfin.com
NASDAQ: RILY



200 East Broward Blvd, Suite 1010
Fort Lauderdale, FL 33301



---

PLEASE VISIT <https://brileyfin.com/disclosures/> FOR LEGAL DISCLOSURES.

---

PLEASE VISIT <https://brileyfin.com/disclosures/> FOR LEGAL DISCLOSURES.

---

PLEASE VISIT <https://brileyfin.com/disclosures/> FOR LEGAL DISCLOSURES.

4

**EXHIBIT C**