## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## LONDON DIVISION

```
------------------------------------------------------ x
                                                       :
In re:                                                 :      Chapter 11
                                                       :
Americore Holdings, LLC, et al.,[1]                    :      Case No. 19-61608
                                                       :      (Jointly Administered)
                     Debtors.                          :
                                                       :      Re: Docket No. 929
------------------------------------------------------ x
```

### EMERGENCY MOTION TO VACATE SALE ORDER

### **Expedited Hearing Requested**

**The current deadline for the Trustee and purchaser SA Hospital Acquisition Group, LLC to close on the sale of substantially all assets of Debtors St. Alexius Properties, LLC, St. Alexius Hospital Corporation #1, and Success Healthcare 2, LLC is December 31, 2020.** *See* **ECF No. 969. For the reasons set forth below, the Court should instead vacate the order approving such sale, and such relief is appropriate if granted before the sale is consummated.**

**Accordingly, Movant The Third Friday Total Return Fund, L.P. requests that the Court hear this Motion at the earliest available time prior to December 31, 2020.**

The Third Friday Total Return Fund, L.P. ("Third Friday"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 60(b), respectfully requests that the Court relieve Third Friday and all other parties from the Court's *Order (a) Approving Sale Free and*

---

[1] The Debtors in these chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Healther Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC (3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation # 1 (2766).

*Clear of All Liens, Claims, Interests, and Encumbrances, and (c) Granting Related Relief* [ECF No. 929] (the "Sale Order") by vacating the Sale Order, and additionally, either approving Third Friday as the purchaser of the subject assets, or setting up a procedure for a public sale of the assets. In support, Third Friday states as follows:

## FACTS

1.      On December 31, 2019 each of the above-captioned entities (together, the "Debtors") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* In February 2020, Carol Fox (the "Trustee") was appointed as chapter 11 trustee of the Debtors. ECF Nos. 258, 260 and 269.

2.      On July 13, 2020 the Trustee, acting solely in her capacity as the trustee for three of the Debtors—St. Alexius Properties, LLC ("SAP"), St. Alexius Hospital Corporation #1 ("SAHC") and Success Healthcare 2, LLC ("SH2") (together, the "Sellers")—filed a motion to establish auction procedures and sell substantially all assets of the Sellers (together, the "Assets") to a third-party (the "Sale Motion"), with SA Hospital Acquisition Group, LLC ("SA Acquisition") serving as a stalking horse bidder with a $17,000,000 cash bid[2] that contained no financing contingency in the relevant asset purchase agreement. ECF No. 744.

3.      On July 16, 2020, the Court entered its *Order Granting Chapter 11 Trustee's Motion to Approve Designation of Stalking Horse Bidder (St. Alexius) and Break-Up Fee in Accordance with Approved Bid Procedures, and Sale Motion, as Amended* [ECF No. 764] (the "Bid Procedures Order"), wherein the Court designated SA Acquisition as the stalking horse bidder and established a $510,000 breakup fee for the benefit of SA Acquisition.

4.      Pursuant to bid procedures utilized in the sale process, potential bidders were required to submit, to the Trustee by 5:00 p.m. ET on July 24, 2020, their bids to the Trustee, with

---

[2] In fact, the cash portion of the bid was only $15.5 million, not $17.0 million.

such bids containing: (a) an executed asset purchase agreement without contingencies such as financing or due diligence, (b) a cash deposit, and (c) reasonably satisfactory written evidence of the purchaser's ability to close and perform on the sale at a price equal to 125% of the bid amount if such purchaser is declared the winning bidder.  ECF No. 697-1 at pp. 2–4.

5.      On July 24, 2020, Third Friday complied with the bid procedures and submitted an asset purchase agreement substantially identical to that of SA Hospital Acquisition except for a cash purchase price of $18 million, *i.e.* $1 million higher than that of the stalking horse bid.  Also on July 24th, Third Friday submitted to the Trustee commitment letters from two third-party lenders, First Wall Street Capital, Inc. and Wasnhtons Corporation, demonstrating Third Friday's wherewithal to perform under the asset purchase agreement and close on a sale.

6.      On July 28, 2020, the Trustee conducted the auction of the Assets without deeming Third Friday a qualified bidder and determined that, based on Third Friday's non-qualified status, SA Acquisition's stalking horse bid was the highest and best offer.  The Trustee's determination that SA Acquisition's bid was the highest and best offer was "based on its financial ability to close the proposed sale and the absence of a financing contingency in the [asset purchase agreement]." Enforcement Motion at ECF No. 947, ¶ 1.

7.      On July 29 and 30, 2020, the Court considered the Sale Motion and subsequently entered the Sale Order, finding that the Trustee properly exercised her business judgment in determining that: (a) Third Friday did not submit a qualified bid; and (b) SA Acquisition's bid "constitutes the highest or otherwise best offer for the Purchased Assets [and] constitutes a valid and sound exercise of the Trustee's business judgment." Sale Order, ¶ 16.  Through the Sale Order, the Court approved the Trustee's Sale of the Assets to SA Acquisition via a modified asset purchase agreement. Sale Order, ¶¶ 27, 41-44.

8.      While purportedly a binding agreement, SA Acquisition's offer to purchase the Assets was in fact a highly conditional offer with material outstanding contingencies. In particular, the offer did not include an agreement by SA Acquisition to accept either federal or state Medicare recoupment liability. Recoupment liability is a gravamen of all Medicare contracts without which a healthcare facility cannot receive payments from Medicare. By refusing to accept such recoupment liability, SA Acquisition showed itself to be unqualified to own a facility such as St. Alexius Hospital which receives the vast majority of its revenues from Medicare. Upon information and belief, SA has still not agreed to accept State of Missouri Medicare recoupment liability and therefore is not a viable purchaser of this facility. The lack of agreement on this material issue rendered SA Acquisition's offer conditional and non-binding back in July.

9.      Further, there were other material points of disagreement between SA Acquisition and the Trustee that rendered their agreement far from a done deal. First, despite representing that it possessed the financial wherewithal to complete the purchase of SAHC, SA Acquisition disclosed to the Trustee in November 2020 that it lacked the wherewithal and required financing to complete the transaction. It then disclosed that it was unable to obtain financing due to concerns about liabilities related to the CARE Act funds received by SAHC. Second, SA Acquisition reneged on its agreement to indemnify the Trustee for up to $12 million of CARE Act liabilities and instead sought to reduce that indemnification commitment to $6 million. Third, SA Acquisition claimed that issues related to the Lutheran Nursing School – issues that were not new but were ongoing since late 2019 – were a problem and asked that $1.5 million (9.7%) of the purchase price be placed in escrow (this was subsequently lowered to $500,000 (3.33%) of the purchase price). Upon information and belief, SA Acquisition still lacks the financial wherewithal to complete the transaction due to ongoing financial problems at its nursing home businesses. SA

Acquisition is a financially distressed company that lacks the financial resources necessary to own and operate a hospital like St. Alexius.

10.      Despite its representations concerning its financial ability to close and the lack of a financing contingency, and despite a November 18, 2020 deadline to do so, SA Acquisition has failed to close on the sale of the Assets as set forth in the Trustee's subsequent motion filed on December 15, 2020 at ECF No. 947 (the "Enforcement Motion").    Furthermore, while SA Acquisition has attempted to excuse its failure to close, such failure is attributable to SA Acquisition's inability "to close without financing," the need of SA Acquisition's financing source to perform due diligence, Enforcement Motion, ¶ 26, and SA Acquisition's desire to renegotiate a lower purchase price for the Assets that is more favorable to SA Acquisition and less favorable to the bankruptcy estates. Enforcement Motion, ¶ 32.

11.      In contrast, Third Friday: (a) has subsequently obtained an unconditional financing commitment from a very large real estate company, Gamma Real Estate; (b) stands ready and willing to purchase the Assets via a stock sale for $17,000,000 in cash, a price that is 9.7% higher than SA Acquisition's bid before even taking into account SA Acquisition's demands to place $3.5 million (or 22.6%) of the purchase price in escrow, and with terms that are significantly more favorable to the bankruptcy estates than those set forth in SA Acquisition's modified asset purchase agreement; and (c) communicated this offer to the Trustee in writing on December 11, 2020.

12.      Since December 11, 2020 – more than three weeks ago –Third Friday provided the Trustee with additional written assurances confirming: (a) Gamma Real Estate's financial wherewithal, ability and willingness to close the transaction, and (b) Third Friday and Gamma Real Estate's agreement on all material terms of their loan agreement.   The only remaining

condition to closing their purchase is approval by this Court of a sale under Section 363 of the Bankruptcy Code.

13.     Further, the Trustee and Third Friday have negotiated the terms of a Stock Purchase Agreement pursuant to which Third Friday assumes (1) all federal and state Medicare recoupment and other liabilities in full, (2) all CARE Act and PPP liabilities in full, and (3) all other material liabilities from the Trustee and the bankruptcy estate.  A copy of the redlined Stock Purchase Agreement, incorporating comments from the Trustee, is attached hereto as **Exhibit A**.

14.     Third Friday's offer is significantly higher in price and superior in terms to SA Acquisition's which was from inception highly conditional and included material misrepresentations by SA and on which it has failed to close for five months despite being given every opportunity by the Trustee to do so.

## <u>ARGUMENT</u>

14.     Pursuant to Federal Rules of Civil Procedure 60(b)(2) and (3), the Court should vacate the Sale Order, thereby relieve all parties from the terms of the Sale Order and the modified asset purchase agreement approved therein governing the (unconsummated) sale of the Assets to SA Acquisition, and either approve Third Friday as the purchaser of the Assets pursuant to the terms of the above-referenced Stock Purchase Agreement, or set up a procedure for a public sale of the assets.

15.     Rule 60(b) states, in pertinent part, that:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

* * *

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); [and]

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party[.]

16.     Such a motion must be filed within a reasonable time, which "is before irrevocable acts have occurred and before other persons can be injured by the movant's inaction, thereby allowing the court to undo that which was done." *In re ClassicStar, LLC*, 2011 WL 2470500 at \*4 (Bankr. E.D. Ky. 2011).

17.     To succeed on the Rule 60(b)(2) newly-discovered-evidence basis, a party must show "(1) he exercised due diligence in obtaining the information; (2) the evidence is material and controlling; and (3) the information would have produced a different result if presented before the original judgment." *Id.* at \*6.  It was not until December 15, 2020 (past the time to move for Rule 59 reconsideration of the Sale Order), when the Trustee disclosed material facts through the Enforcement Motion, that Third Friday discovered (or could have discovered through reasonable due diligence) that SA Acquisition had *misrepresented* to the Trustee, the Court, and other interested parties that: (a) its bid for the Assets was in fact contingent on financing; and (b) SA Acquisition lacked the financial ability to close the transaction.  Moreover, such evidence of SA Acquisition's misrepresentations is material and controlling, as the Trustee's business judgment regarding SA Acquisition's bid was specifically premised on SA Acquisition's "financial ability to close the proposed sale and the absence of a financing contingency in the [asset purchase agreement]," Enforcement Motion, ¶ 1, and such newly discovered evidence of SA Acquisition's misrepresentations would have produced a different result, *i.e.*, the Trustee: (i) not moving to designate SA Acquisition as the stalking horse bidder; (ii) not deeming SA Acquisition to be qualified to purchase the assets; and (iii) not entering into an asset purchase agreement with SA Acquisition. *See* Enforcement Motion, ¶¶ 5, 13, 26, and 32; *see* Sale Order, ¶ 27.

18.     Separately, the new Stock Purchase Agreement offer tendered by Third Friday to the Trustee earlier this month, coupled with the unconditional financing commitment from Gamma Real Estate, demonstrates that Third Friday has put forward an offer that is higher and better than

its previous offer, and that is higher and better than the terms of SA Acquisition's (unconsummated) offer, and such new evidence would clearly have led to the Trustee designating Third Friday as a qualified bidder tendering the highest and best offer.

19.    Accordingly, cause exists under Rule 60(b)(2) to vacate the Sale Order.

20.    To succeed on the Rule 60(b)(3) fraud-misrepresentation-misconduct basis, a party "must show that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding." *In re ClassicStar, LLC*, 2011 WL 2470500 at *7 (Bankr. E.D. Ky. 2011). As set forth above, SA Acquisition made deliberate, material misrepresentations to the Trustee and the Court about SA Acquisition's financial ability to close and the lack of a financing contingency in its purchase offer. The motivation for SA Acquisition's conduct is clear: to get its foot in the door, obtain stalking horse/breakup fee protections, and then, once a sale to it was approved (with no backup bidders), "use its leverage to renegotiate a better and more advantageous deal for itself at the expense of the St. Alexius Bankruptcy Estates and their creditors." Enforcement Motion, ¶ 32. SA Acquisition's attempts to lower the purchase price by placing $3.5 million or 22.6% of the purchase price in escrow pending resolution of unresolved but longstanding liability issues abrogates the commitments it made to obtain its stalking horse status by submitting what was in fact a highly conditional bid for the Assets. SA Acquisition's misconduct adversely impacted the fairness of the Asset sale proceeding because the Trustee was misled into determining that the SA Acquisition bid was the highest and best offer for the Assets to the detriment of Third Friday and other potential bidders who acted properly, and such determination was accepted by the Court when it approved the sale in the Sale Order.

21.    Accordingly, cause exists under Rule 60(b)(3) to vacate the Sale Order, and doing so while the sale remains unconsummated is just and will not have an unwarranted, detrimental effect on anyone relying or acting in reliance on the Sale Order. In fact, the bankruptcy estates

will only benefit from such a decision.  Third Friday is ready, willing and able to close on a

purchase of the Assets at a higher price and on better terms through its proposed stock purchase

agreement, the Trustee will not be left holding unsaleable assets if the Sale Order is vacated, and

the Trustee is no longer bound to the modified asset purchase agreement or forced to litigate with

SA Acquisition over the terms of the same.  Finally, if it is able to purchase the Assets, Third

Friday is prepared to bid for the stock or assets of Izard County Medical Center and to consider

bids for other Debtors as well.

     **WHEREFORE**, Third Friday respectfully requests that the Court: (i) relieve it and all

other parties from the Court's Sale Order [ECF No. 929] by vacating the Sale Order pursuant to

Federal Rule of Civil Procedure 60(b); (ii) either approve the sale of the Assets to Third Friday or

set up a procedure for a public sale of the Assets; and (iii) grant such other relief as the Court

deems just and proper.

Dated: December 29, 2020

               **SHRAIBERG, LANDAU & PAGE, P.A.**
               Attorneys for The Third Friday Total Return Fund, L.P.
               2385 NW Executive Center Drive, Suite 300
               Boca Raton, Florida 33431
               Telephone: 561-443-0800
               Facsimile: 561-998-0047
               Email: bss@slp.law

               By: */s/ Bradley Shraiberg*_____
               Bradley S. Shraiberg
               Fla. Bar No. 121622

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via

Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case

on this the December 29, 2020.

*/s/ Bradley Shraiberg*
Bradley S. Shraiberg
Fla. Bar No. 121622

# EXHIBIT A

**STOCK AND MEMBERSHIP INTEREST PURCHASE AGREEMENT**

**By and Among**

**CAROL L. FOX, as Chapter 11 Trustee of Success Healthcare 2, LLC**

**(as "Seller")**

**and**

**The Third Friday Total Return Fund, L.P. or its assignee**

**(as "Purchaser")**

**Dated _____ _____, 2020**

# TABLE OF CONTENTS

[Subject to Updating]

**Page**

ARTICLE I SALE AND TRANSFER OF STOCK AND MEMBERSHIP INTERESTS;
CONSIDERATION AND CLOSING ................................................................ 23

1.1    Purchase and Sale ........................................................................ 23

1.2    Purchase Price .............................................................................. 23

1.3    Closing Date ................................................................................. 3

1.4    Seller Deliverables at Closing ..................................................... 3

1.5    Purchaser Deliverables at Closing .............................................. 4

1.6    [Proration and Utilities ................................................................ 5

1.7    Allocation of Purchase Price ....................................................... 6

1.8    Consents ....................................................................................... 6

1.81.9  Disclaimer of Warranties; Release ............................................ 6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF SELLER ...... 67

2.1    Authorization ............................................................................... 67

2.2    Binding Agreement ...................................................................... 67

2.3    Title to Stock and Membership Interests ..................................... 7

2.4    Existence and Good Standing ...................................................... 78

2.5    Power ........................................................................................... 78

2.6    Capitalization ............................................................................... 78

2.7    No Conflict ................................................................................... 89

2.8    No Consents .................................................................................. 89

2.9    Financial Statements .................................................................... 89

2.10   Legal Proceedings ........................................................................ 9

2.11   [Intentionally Omitted] ................................................................ 9

2.12   OFAC ........................................................................................... 910

2.13   No Violations ............................................................................... 910

2.14   [Intentionally Omitted] ................................................................ 910

2.15   [Intentionally Omitted] ................................................................ 910

2.16   [Intentionally Omitted] ................................................................ 910

2.17    Accounts Receivable ............................................................................. 10

2.18    Payor Contracts .................................................................................... 10

2.19    ~~COVID~~Provider Relief ~~Programs~~Funds. ................................................. 10

2.20    Paycheck Protection Program Loan. ..................................................... 10

2.21    No Undisclosed Liabilities ............................................................. ~~10~~11

2.212.22 ................................................................................................ Changes
         ~~10~~11

2.222.23 ......................................................................................... Material Contracts
         12

2.23    ~~Tangible~~ 2.24 Assets of Acquired Companies .................................. 14

2.242.25 ............................................................................................. Real Property
         15

2.252.26 ...................................................................................... Intellectual Property
         16

2.262.27 ............................................................................. Proceedings; and Judgments
         ~~18~~17

2.27    ~~Compliance with Laws~~ .......................................................................... ~~18~~

2.28    Permits ........................................................................................... ~~19~~18

2.29    Payor Participation ............................................................................... 19

2.30    Privacy and Security Compliance ......................................................... 20

2.31    Health Care Laws ................................................................................ 20

2.32    Certificates of Need ............................................................................. 22

2.33    Accreditation ...................................................................................... 22

2.34    Compliance Program ....................................................................... ~~23~~22

2.35    Medical Staff Matters ........................................................................... 23

2.36    Experimental Procedures .................................................................. ~~24~~23

2.37    Insurance ...................................................................................... ~~24~~23

2.38    Tax Matters ................................................................................... ~~24~~23

2.39    Environmental Matters ..................................................................... ~~25~~24

2.40    Employee Benefit Plans .................................................................... ~~26~~25

2.41    Employee Matters ........................................................................... ~~27~~26

2.42    Immigration Act ............................................................................. ~~28~~27

2.43    WARN Act .................................................................................... ~~28~~27

2.44    OSHA .............................................................................................. 28

2.45    Brokers and Finders ............................................................................ 28

~~1241~~29505.2

| 2.46 | Seller's Knowledge | ~~29~~28 |
|------|---------------------|---------|
| **ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER** | | ~~29~~28 |
| 3.1 | Authorization | ~~29~~28 |
| 3.2 | Binding Agreement | ~~29~~28 |
| 3.3 | Organization and Good Standing | 29 |
| 3.4 | No Violation | 29 |
| 3.5 | Legal Proceedings | ~~30~~29 |
| 3.6 | No knowledge of Seller's Breach | ~~30~~29 |
| 3.7 | Ability to Perform | ~~30~~29 |
| 3.8 | Solvency | ~~30~~29 |
| 3.9 | OFAC | ~~30~~29 |
| 3.10 | Brokers and Finders | ~~31~~30 |
| 3.11 | Representations of Seller | ~~31~~30 |
| ~~3.12~~ | ~~Purchaser's Knowledge~~ | ~~31~~ |
| **ARTICLE IV COVENANTS OF SELLER** | | ~~31~~30 |
| 4.1 | Access and Information; Inspections | ~~31~~30 |
| 4.2 | Seller's Efforts to Close | ~~31~~30 |
| 4.3 | Cost Reports | ~~32~~30 |
| 4.4 | Hospital Operations | ~~32~~31 |
| 4.5 | Bankruptcy Court Matters | ~~32~~31 |
| 4.6 | No Solicitation of Other Bids | ~~33~~32 |
| **ARTICLE V COVENANTS OF PURCHASER** | | ~~33~~32 |
| 5.1 | Purchaser's Efforts to Close | ~~33~~32 |
| 5.2 | Required Governmental Approvals | ~~34~~32 |
| 5.3 | Inspection; Repair and Restoration; Insurance | ~~34~~33 |
| 5.4 | Preservation and Access to Records After the Closing | ~~35~~34 |
| 5.5 | Misdirected Payments | ~~35~~34 |
| 5.6 | Governmental Approvals | ~~35~~34 |
| 5.7 | Notice of Changes | ~~36~~35 |
| **ARTICLE VI BANKRUPTCY COURT APPROVAL** | | ~~36~~35 |
| 6.1 | Bankruptcy Court Approval | ~~36~~35 |
| 6.2 | Appeal of Sale Order | ~~37~~36 |
| **ARTICLE VII SELLER'S CONDITIONS PRECEDENT** | | ~~37~~36 |
| 7.1 | Representations and Warranties | ~~37~~36 |

iii

124129505.2

| | | |
|---|---|---|
| 7.2 | Covenant Performance | ~~37~~36 |
| 7.3 | Execution and Delivery | ~~37~~36 |
| 7.4 | Authorization | ~~37~~36 |
| ARTICLE VIII PURCHASER'S CONDITIONS PRECEDENT | | ~~38~~37 |
| 8.1 | Representations and Warranties | ~~38~~37 |
| 8.2 | Covenant Performance | ~~38~~37 |
| 8.3 | Execution and Delivery | ~~38~~37 |
| 8.4 | Authorization | ~~38~~37 |
| 8.5 | Bankruptcy Court Approval | ~~38~~37 |
| ARTICLE IX TERMINATION | | ~~39~~38 |
| 9.1 | Termination | ~~39~~38 |
| 9.2 | Effect of Termination | ~~40~~39 |
| ARTICLE X POST-CLOSING MATTERS | | ~~40~~39 |
| 10.1 | Survival of Representations, Warranties and Covenants | ~~40~~39 |
| 10.2 | ~~Representations and Warranties Insurance~~ | ~~40~~ |
| ~~10.3~~ | Access to Records | ~~41~~40 |
| ~~10.4~~10.3 | Turnover and Accounting of Receipts | ~~42~~41 |
| ARTICLE XI DEFAULT AND ~~TAXES~~LIMITATION OF LIABILITY | | 42 |
| 11.1 | Purchaser Default | 42 |
| 11.2 | Seller Default | ~~43~~42 |
| 11.3 | No Recourse to Third Parties | ~~43~~42 |
| 11.4 | Limitation of Seller's Liability | ~~43~~42 |
| ~~11.5~~ | ~~Allocation of Purchase Price~~ | ~~43~~ |
| ARTICLE XII RISK OF LOSS | | ~~43~~42 |
| 12.1 | Assumption of Risk | ~~43~~42 |
| 12.2 | Minor Damage | 43 |
| 12.3 | Major Damage | ~~44~~43 |
| 12.4 | Definition of "Major" Loss or Damage | ~~44~~43 |
| ARTICLE XIII GENERAL PROVISIONS | | 44 |
| 13.1 | Further Assurances and Cooperation | 44 |
| 13.2 | Successors and Assigns | ~~45~~44 |
| 13.3 | Governing Law; Venue | ~~45~~44 |
| 13.4 | Amendments | ~~45~~44 |

~~124129505.2~~

13.5     Exhibits, Schedules and Disclosure Schedule ................................. 4544

13.6     Notices ................................................................................................. 45

13.7     Headings .............................................................................................. 46

13.8     Joint Authorship ................................................................................. 46

13.9     Gender and Number; Construction ..................................................... 4746

13.10    Third Party Beneficiary ....................................................................... 4746

13.11    Expenses and Attorneys' Fees ............................................................ 4746

13.12    Counterparts ........................................................................................ 4746

13.13    Entire Agreement ................................................................................. 4746

13.14    No Waiver ............................................................................................ 4746

13.15    Severability .......................................................................................... 47

13.16    Time is of the Essence ......................................................................... 4847

124129505.2

# INDEX OF SCHEDULES AND EXHIBITS

[To be Attached]

124129505.2

CF Draft  November 27December 18, 2020

**STOCK AND MEMBERSHIP INTEREST PURCHASE AGREEMENT**

This Stock and Membership Interest Purchase Agreement (this "**Agreement**") is made and entered into as of this ___ day of _____ 2020 (the "**Execution Date**") by and between Carol L. Fox ("**Carol Fox**"), solely in her capacity as Chapter 11 Trustee of Success Healthcare 2, LLC ("**SH2**" and, together with Carol Fox, "**Seller**") and The Third Friday Total Return Fund, L.P., a Delaware limited partnership, or its assignee ("**Purchaser**"). Seller and Purchaser may be referred to herein collectively as the "**Parties**" and each individually, as a "**Party**". Terms used in this Agreement shall be as defined in <u>Attachment 1</u> hereto or as defined elsewhere in this Agreement.

**RECITALS**

A.  SH2 owns all of the shares of capital stock of St. Alexius Hospital Corporation # 1, a Missouri corporation ("**SAHC**") and all of the membership interests of St. Alexius Properties, LLC, a Missouri limited liability company ("**SAP**").

B.  SAHC engages in the business of delivering acute care services to the public through the acute care hospital known as St. Alexius Hospital (the "**Hospital**") and operates a school for the education and training of nursing students known as the Lutheran School of Nursing (the "**Nursing School**").

C.  SAP owns and operates certain medical office buildings incident to the operation of the Hospital and Nursing School located at 3933 South Broadway, St. Louis, Missouri 63118 (the "**Broadway Property**") and 3535 South Jefferson Avenue, St. Louis, Missouri 63118 (the "**Jefferson Property**" and, together with the Broadway Property, the "**Properties**"), respectively.

D.  SAHC and SAP are wholly-owned subsidiaries of SH2 (SH2, SAHC and SAP being collectively called the "**Debtors**").

E.  SH2 is a wholly-owned subsidiary of Americore Holdings, LLC, a Delaware limited liability company ("**Americore**").

F.  On December 31, 2019 (the "**Petition Date**"), Americore and the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Kentucky (the "**Bankruptcy Court**")—thereby commencing the bankruptcy cases styled *In re Americore Holdings, LLC*, case no. 19-61608-grs (the "**Americore Chapter 11 Case**"), *In re Success Healthcare 2, LLC*, case no. 19-61609-grs (the "**SH2 Chapter 11 Case**"), *In re St. Alexius Hospital Corporation #1*, case no. 19-61610-grs (the "**SAHC Chapter 11 Case**"), and *In re St. Alexius Properties, LLC*, case no. 19-61611-grs (the "**SAP Chapter 11 Case**" and, collectively with the SH2 Chapter 11 Case and SAHC Chapter 11 Case, the " **Bankruptcy Case**"). The Bankruptcy Case is jointly administered under the Americore Chapter 11 Case.

G.  On February 20, 2020, the Bankruptcy Court entered the *Agreed Order Appointing Chapter 11 Trustee* (the "**Trustee Order**"). By and through the Trustee Order, the Bankruptcy Court ordered the Office of the United States Trustee (the "**U.S. Trustee**") to appoint a chapter 11 trustee pursuant to Section 1104 of the Bankruptcy Code. On February 21, 2020, the U.S. Trustee appointed Seller as chapter 11 trustee of the Debtors in the Bankruptcy Case.

H.  On April 24, 2020, Seller filed the Trustee's Motion for Entry of an Order: (1) Approving Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets (St. Alexius), (2) Establishing Procedures for the Assumption and/or Assignment by the Trustee of Certain Executory Contracts and Unexpired Leases, (3) Approving the Form and Manner of Notice of Bidding Procedures, (4) Setting Objection Deadlines, and (5) Granting Related Relief (the "**Bidding Procedures Motion**"). By and through the Bidding Procedures Motion, Seller sought approval of certain procedures for the sale of substantially all of the Debtors' assets outside the ordinary course of business. On May 12, 2020, the Bankruptcy Court entered an order granting the Bidding Procedures Motion (the "**Bidding Procedures Order**").[1]

I.  As of the Execution Date, no sale of ~~the~~ substantially all of the Debtors' assets has occurred~~.~~, and no agreement for the sale and purchase of all or any substantial portion of the assets of the SAHC or SAP or ownership interests in SAHC or SAP is in effect.[2]

J.  Subject to Bankruptcy Court approval of the transactions contemplated herein, Purchaser desires to purchase and acquire from Seller, and Seller desires to sell and assign to Purchaser (the "**Sale**"), 100% of the issued and outstanding shares of capital stock of SAHC (the "**Stock**") and 100% of the membership interests of SAP (the "**Membership Interests**") for the consideration and upon the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, which are hereby incorporated and made part of this Agreement, and the mutual promises and covenants contained in this Agreement, the receipt and sufficiency of such consideration are hereby acknowledged, and for their mutual reliance, the Parties hereto agree as follows:

## ARTICLE I
## SALE AND TRANSFER OF STOCK AND MEMBERSHIP INTERESTS; CONSIDERATION AND CLOSING

1.1  Purchase and Sale.  At the Closing, as defined below, subject to the terms and conditions of this Agreement, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Stock and the Membership Interests (collectively, the "**Purchased Interests**").

1.2  Purchase Price.  Subject to the terms and conditions of this Agreement, the purchase price for the Purchased Interests ~~(the "Purchase Price")~~ shall be Seventeen Million

---

[1] Unless otherwise defined herein, any capitalized term shall have the meaning ascribed to such term in the Bidding Procedures Motion or, if not defined therein, under Section 101 of the Bankruptcy Code.

[2] Third Friday needs assurances that there are no other sale contract outstanding regarding the Acquired Companies or their assets.

124129505.2

Dollars ($17,000,000.00) (the '~~Cash Consideration~~Purchase Price') payable by wire transfer of immediately available funds at the Closing: as follows:

(a)    the amount of [_____]Nine Million Eight Hundred Thousand Dollars ($_____9,800,000)(the '**Pelorus Amount**') to Pelorus Fund, LLC ('**Pelorus**') per wire transfer instructions provided by Pelorus to Purchaser;

(b)    the amount of [_____]One Million Five Hundred Thousand Dollars ($_____1,500,000)(the '**Toby Mug Amount**') to Toby MUG Financing, LLC ('**Toby Mug**') per wire transfer instructions provided by Toby Mug to Purchaser; and

(c)    the balance of the Purchase Price to Seller per wire transfer instructions provided by the Trustee to Purchaser.

The Purchase Price is exclusive of any additional fees, costs or expenses Purchaser is obligated to pay or reimburse under this Agreement.

1.3    Closing Date.  The consummation of the Sale (the '**Closing**') shall take place at [LOCATION] within ~~five (5)~~[_____] Business Days following the entry of ~~an order of the Bankruptcy  Court approving~~ the Sale Order, as defined below; *provided, however*, the date on which the Closing occurs (the '**Closing Date**') shall occur not later than ~~December 31~~January ____, ~~2020~~2021 (the '**Outside Date**') unless the Outside Date is extended by Carol Fox, in her sole and absolute discretion and/or Bankruptcy Court approval and has not been obtained. The Closing shall be deemed effective as of 12:00:01 A.M. Eastern Time on the Closing Date (the '**Effective Time**').

1.4    Seller Deliverables at Closing.  At or before the Closing, Seller shall deliver to the Title Company the following, duly executed by Seller where appropriate:

(a)    an Assignment Separate from Certificate, in the form of Exhibit 1.4(a) attached hereto (the '**Stock Assignment**'), duly executed by Seller, assigning to Purchaser the Stock;

(b)    the stock certificates representing the Stock;

(c)    an Assignment of Membership Interests, in the form of Exhibit 1.4(c) (the '**Membership Interests Assignment**'), duly executed by Seller, assigning to Purchaser the Membership Interests;

(d)    certified copy of the Sale Order (defined below);

(e)    original certificates of good standing, or comparable status, of each Debtor, issued by the State of Missouri, dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

(f)    certifications executed by Seller, pursuant to and in full compliance with Section 1445 of the Internal Revenue Code and the regulations issued thereunder, declaring that

3

Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code and Income Tax Regulations;

(g)    (i) payoff letter, in form and substance reasonably satisfactory to Purchaser, from Pelorus, setting forth the ~~aggregate amount~~Pelorus Amount to be paid to Pelorus at the Closing including principal, interest and other amounts, and providing wire transfer instructions for payment of such amount, and (ii) documentation, in form and substance reasonably satisfactory to Purchaser, for the complete termination and release of all Encumbrances in connection therewith;

(h)    (i) payoff letter, in form and substance reasonably satisfactory to Purchaser, from Toby Mug, setting forth the ~~aggregate amount~~Toby Mug Amount to be paid to Toby Mug at the Closing including principal, interest and other amounts, and providing wire transfer instructions for payment of such amount, and documentation, in form and substance reasonably satisfactory to Purchaser, for the complete termination and release of all Encumbrances in connection therewith;

(i)    commercially reasonable evidence of the satisfaction and release of the other Encumbrances described in Attachment 1.4(i), in the form of either an Order from Bankruptcy Court providing for the sale free and clear of all Encumbrances and UCC termination statements for any and all financing statements (which do not correspond to capital lease as to equipment) filed with respect to the Assets;

(j)    the Settlement Statement (defined below);

(k)    certificate of Carol Fox, as Trustee, certifying to Purchaser (i) material compliance with Seller's covenants set forth in this Agreement, and (ii) that all of the conditions contained in Article VII have been satisfied except those, if any, waived in writing by Carol Fox, as Trustee; and

(l)    any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary, or which First American Title Insurance Company (the "**Title Company**") requires to carry out the transactions contemplated by this Agreement and to comply with the terms hereof. ~~? does this apply to a stock sale~~[3]

1.5    Purchaser Deliverables at Closing.  At or before the Closing, unless otherwise provided in this Section 1.5, Purchaser shall deliver to the Title Company the following, duly executed by Purchaser where appropriate:

(a)    certificate of any officer or authorized agent of Purchaser certifying to Seller (a) compliance with Purchaser's covenants set forth in this Agreement, (b) that Purchaser has obtained all material licenses, permits, certificates of need and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement or that same have been waived in writing by Purchaser, and (c) that all of the conditions contained in Article VIII have been satisfied except those, if any, waived in writing by Purchaser;

---

[3] Third Friday's lender may want a title company to be involved.

124129505.2

(b)       duly executed certificate of an officer of Purchaser certifying to Seller (a) the incumbency of the officers of Purchaser on the Execution Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement on behalf of Purchaser and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions with respect to Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

(c)       favorable original certificate of good standing, or comparable status, of Purchaser, issued by the [_____]Delaware Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

(d)       the Stock Assignment, executed by Purchaser;

(e)       the Membership Interests Assignment, executed by Purchaser;

(f)       the Settlement Statement; and

(g)       any such other instruments, certificates, consents or other documents which Purchaser and Seller mutually deem reasonably necessary, or which the Title Company requires to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6       [Proration and Utilities.  All items of income and expense listed below with respect to the Purchased Interests shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

(a)       To the extent not otherwise prorated or provided for pursuant to this Agreement, at the Closing, or as promptly as possible following the Closing, Purchaser and Seller shall prorate (as of the Effective Time), if applicable, real estate and personal property taxes, assessments and other similar charges against real estate of SAHC and SAP (including any penalties and interest associated therewith), plus all other expenses which are normally prorated upon the sale of ownership interests in a going concern. As to power and utility charges, "final readings" as of the Effective Time (or if not feasible, as of the calendar day immediately prior to the Effective Time) shall be ordered from the utilities; the cost of obtaining such "final readings," if any, to be paid for by Purchaser. If the actual ad valorem tax bills have not been issued for the year or tax period in which the Closing occurs, then such prorationprorations shall be based on such ad valorem taxes billed for the prior year or tax period and, after the ad valorem tax bills for the year or tax period of Closing are received by either Purchaser or Seller, Purchaser and Seller shall adjust such proration, and any amount then owing shall be paid within twenty (20) Business Days of demand by the party entitled thereto.

(b)       Seller shall pay (i) the fees of any counsel representing it in connection with this transaction and (ii) any transfer tax, documentary stamp tax or similar tax which becomes payable by reason of the assignment or transfer of the Stock and Membership Interests.

(c)     Purchaser shall pay: (i) the fees of any counsel representing Purchaser in connection with this transaction; and (ii) any escrow fees incurred in the course of the transaction contemplated by this Agreement.

(d)     Unless otherwise reimbursable or separately treated under the terms of this Agreement, all other costs and expenses incident to this transaction and the Closing shall be paid by the Party incurring same.

(e)     No later than five (5) Business Days prior to the Closing Date, Seller shall cause the Title Company to prepare and provide to Purchaser a draft settlement statement reflecting adjustments, prorations and credits provided for in this Agreement, including this Section 1.6 (the "**Settlement Statement**"). The Parties shall confer in good faith to finalize such draft Settlement Statement and upon being finalized, shall be executed and delivered by the Parties at (or prior to) Closing. The executed Settlement Statement shall be binding and conclusive, subject to manifest error. Any errors in the Settlement Statement shall be corrected within six (6) months following the Closing.

(f)     Except as otherwise provided or limited by the provisions of this Section 1.6, this Section 1.6 shall survive the Closing.

1.7     Allocation of Purchase Price.  Attachment 1.7 sets forth the allocation of the Purchase Price among the Purchased ~~Interest~~Interests in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Allocation Schedule"). The Allocation Schedule shall be final and binding upon Seller and Purchaser with respect to matters relating to required tax reporting by each Party. The Parties shall refrain from taking any position that is inconsistent with the Allocation Schedule with respect to tax reporting.

1.8     Consents.  Purchaser shall be entitled, but not obligated, to seek to obtain any consents required under the applicable contracts and leases in connection with the transactions described in this Agreement. Seller shall not be obligated to undertake any efforts to assist Purchaser in obtaining any such consents. Purchaser's failure to obtain any or all necessary consents as of the Closing Date shall not be a condition precedent to either Party's obligation to consummate the Closing and perform all transactions contemplated by this Agreement.

1.9     Disclaimer of Warranties; Release.

(a)     THE PURCHASED INTERESTS WILL BE SOLD BY SELLER AND PURCHASED BY PURCHASER AT THE EFFECTIVE TIME, WITH NO REPRESENTATIONS OR WARRANTIES, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, ARE HEREBY EXPRESSLY DISCLAIMED.

(b)     Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Purchase Price, the Purchased Interests, Seller, the Debtors, the Hospital, the Nursing School, the businesses of the Hospital or the Nursing School and their value and suitability for Purchaser's purposes and, in addition to the

6

representations and warranties of Seller in Article II, is relying solely on Purchaser's own examination, review and inspection of the Purchased Interests and all other aspects of the transactions contemplated by this Agreement. Except as expressly provided in this Agreement, Purchaser hereby releases Seller and Seller's affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the businesses of the Hospital and the Nursing School and the Purchased Interests, or their suitability for any purpose whatsoever. Purchaser further acknowledges that the representations and warranties of Seller contained in Article II of this Agreement are the sole and exclusive representations and warranties made by Seller to Purchaser (including with respect to the Hospital, the Nursing School and the Purchased Interests). ~~Purchaser represents and warrants that it is not aware of any Seller representations or warranties set forth in Article II that are not true, complete and accurate.~~

## ARTICLE II
## REPRESENTATIONS ~~AND~~, WARRANTIES **AND COVENANTS** OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Seller hereby represents ~~and~~, warrants **and covenants** to Purchaser, as of the Execution Date and as of the Closing Date, as follows:

2.1   <u>Authorization</u>.  Subject to Bankruptcy Court approval and any necessary third party consents, Seller has all necessary power and authority to execute and enter into this Agreement and to carry out the transactions contemplated hereby.

2.2   <u>Binding Agreement</u>.  This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to the Enforceability Exceptions.  There are no agreements in effect with respect to the purchase or transfer of all or any substantial portion of the assets or Equity Securities of either of the Acquired Companies other than this Agreement.

2.3   <u>Title to Stock and Membership Interests</u>.

(a)   Seller (i) is the record and beneficial owner of the Stock and Membership Interests, (ii) has full power, right, and authority to (A) make and enter into this Agreement and (B) sell, assign, transfer and deliver the Stock and the Membership Interests to Purchaser and (iii) has good and valid title to the Stock and Membership Interests free and clear of all Encumbrances.

(b)   Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, Purchaser shall own all of the Stock and Membership Interests, free and clear of all Encumbrances.

(c)   The Stock constitutes 100% of the issued and outstanding shares of capital stock of SAHC.

(d)   The Membership Interests constitute 100% of the membership interests of SAP.

2.4    <u>Existence and Good Standing</u>.

(a)    SAHC is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Missouri and is duly authorized, qualified or licensed to do business as a foreign corporation in each of the jurisdictions set forth on <u>Schedule 2.4(a)</u>, which are the only jurisdictions in which SAHC is required to be so qualified.

(b)    SAP is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Missouri and is duly authorized, qualified or licensed to do business as a foreign limited liability company in each of the jurisdictions set forth on <u>Schedule 2.4(b)</u>, which are the only jurisdictions in which SAP is required to be so qualified.

(c)    True, correct and complete copies of the Governing Documents of SAHC and SAP are annexed to <u>Schedule 2.4(c)</u>.  Such Governing Documents have not been revoked or rescinded or further amended.

2.5    <u>Power</u>.  Each of SAHC and SAP has the necessary power and authority to (a) own, operate, and lease its properties and assets as and where currently owned, operated and leased and (b) carry on its business as currently conducted.

2.6    <u>Capitalization</u>.

(a)    The authorized Equity Securities of SAHC consist of ____ shares of outstanding common stock all of which (i) have been duly authorized and validly issued and are fully paid and non-assessable, (ii) have been issued in compliance with all applicable Laws, including securities Laws, and all applicable agreements, and (iii) are owned beneficially and of record by Seller, in all cases free and clear of any Encumbrances.  The Stock represents the only issued and outstanding Equity Securities of SAHC.

(b)    The authorized Equity Securities of SAP consist of ____ outstanding membership interests all of which (i) have been duly authorized and validly issued and are fully paid and non-assessable, (ii) have been issued in compliance with all applicable Laws, including securities Laws, and all applicable agreements, and (iii) are owned beneficially and of record by Seller, in all cases free and clear of any Encumbrances.  The Membership Interests represent the only issued and outstanding Equity Securities of SAP.

(c)    There are no outstanding options, warrants, rights, calls, subscriptions, claims of any character, agreements, obligations, convertible or exchangeable securities, or other commitments, contingent or otherwise, of any kind obligating either SAHC or SAP to issue, directly or indirectly, any additional Equity Securities.

(d)    No former equity owner of either Acquired Company or any of its predecessors, and no former holder of any right to acquire any interest in either Acquired Company or any of its predecessors (whether by warrant, option, convertible instrument, or otherwise) has any claim or right against such Acquired Company or Seller with respect to any Equity Securities of such Acquired Company.

124129505.2

(e)      There are no Contracts relating to the issuance, sale, transfer, or voting of any Equity Securities or other securities of SAHC or SAP.

(f)      Neither SAHC nor SAP has an ownership interest in any Entity or is a participant in any joint venture or partnership.

2.7      No Conflict.  Except as set forth on Schedule 2.7, neither the execution of this Agreement, nor the performance by Seller of its obligations hereunder, will : (a) result in the creation or imposition of any Encumbrance on the Stock or Membership Interests or the Assets of SAHC or SAP,; or b̶i̶n̶v̶a̶l̶i̶d̶a̶t̶e̶(b) invalidate or adversely affect any material Permit required for the conduct of the business of either SAHC or SAP.

2.8      No Consents.  Except as set forth on Schedule 2.8, no Consent of any Person or Governmental Authority is required to be obtained by Seller in connection with the execution and delivery by Seller of this Agreement, or the consummation of the transactions contemplated hereby.

2.9      Financial Statements.

(a)      Seller has provided to Purchaser (i) the unaudited balance sheets of SAHC as of November 30, 2020 (the "**Interim Balance Sheets**") and (ii) unaudited income statements of SAHC for the eleven-month period ending November 30, 2020, and (iii) unaudited financial statements for the years 2018 and 2019 (the items described in clauses (i), (ii) and (iii) being collectively called the "**Historical Financial Statements**").

(b)      Seller will promptly provide to Purchaser any balance sheets and income statements of SAHC prepared subsequent to November 30, 2020 and prior to the Closing Date (the "**Subsequent Financial Statements**").

(c)      (̶b̶)̶ Each of the income statements contained in the Historical Financial Statements (i) are true, complete and correct in all material respects and (ii) present, fairly in all material respects the results of the operations of SAHC as of and for the respective periods covered thereby to the best of Seller's knowledge.

(d)      (̶c̶)̶ To the best of Seller's knowledge E̶a̶c̶h̶, each of the balance sheets contained in the Historical Financial Statements (i) are true, complete and correct in all material respects and (ii) present, fairly in all material respects the financial condition of  SAHC as of the respective dates indicated thereon.

(e)      Each of the income statements contained in the Subsequent Financial Statements (i) will be true, complete and correct in all material respects and (ii) will present, fairly in all material respects the results of the operations of SAHC as of and for the respective periods covered thereby to the best of Seller's knowledge.

(f)      To the best of Seller's knowledge, each of the balance sheets contained in the Subsequent Financial Statements (i) will be true, complete and correct in all material respects and (ii) will present, fairly in all material respects the financial condition of  SAHC as of the respective dates indicated thereon.

9

2.10   Legal Proceedings.   Except as described on Schedule 2.10, or as filed in the Bankruptcy Court, to Seller's knowledge there are no Proceedings asserted or pending against Seller in which an adverse determination could reasonably be expected to adversely affect Seller's ability to consummate the transactions contemplated hereby.

2.11   [Intentionally Omitted].

2.12   OFAC.   None of Seller, SAHC and SAP: (a) is currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "List"); (b) is a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law, regulation or Executive Order of the President of the United States; or (c) is an Embargoed Person (as hereinafter defined).  To Seller's knowledge, none of the funds or other assets of Seller or either of the Acquired Companies constitutes property of, or is beneficially owned, directly or indirectly, by any Embargoed Person.  To Seller's knowledge, no Embargoed Person has any interest of any nature whatsoever in Seller or either of the Acquired Companies (whether directly or indirectly). The term "Embargoed Person" means any Person that is subject to trade restrictions under United States law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

2.13   No Violations.   Except as set forth on Schedule 2.13, and other than any Proceeding brought in the Bankruptcy Court, to Seller's knowledge, neither Seller nor either of the Acquired Companies has received any written notice from any Governmental Authority ~~on or after _____~~ since February 21, ~~20~~ 2019, of any uncured violations of any Law affecting Seller or either of the Acquired Companies which has not been heretofore corrected or otherwise resolved.

2.14   [Intentionally Omitted].

2.15   [Intentionally Omitted].

2.16   [Intentionally Omitted]

2.17   Accounts Receivable.   To the knowledge of Seller, all accounts receivable of SAHC result from the bona fide provision of products or services in the ordinary course of business.  All proceeds of ~~Accounts Receivable~~ accounts receivable are currently deposited either electronically or manually into these bank accounts provided to Purchaser in Seller's electronic data room with respect to SAHC and SAP (the "Data Room").

2.18   Payor Contracts.   To the knowledge of Seller, and subject to Section 365 of the Bankruptcy Code, Seller has provided Purchaser with a complete list of all material written contracts of SAHC with private third party payors including insurance companies and HMOs. Seller has provided to Purchaser ~~with~~ in the Data Room a true and correct copy of all material Payor Contracts known to Seller.

10

2.19     Provider Relief Funds. To the knowledge of Seller based on currently available guidance from the federal government: (a) neither Seller nor the Debtors have received any Provider Relief Funds under the CARES Act ('**Provider Relief Funds**') to which Seller or the Debtors were not entitled; and (b) Seller and Debtors have been honest and truthful in any filings made with or statements made to the federal government, or any department, agency, administration or other part thereof, in order to obtain or receive Provider Relief Funds. Seller has provided in the Data Room true, correct and complete copies all applications, correspondence and other written communications between the any department, agency, administration or other part of the federal government and Seller or SAHC pertaining to Provider Relief Funds or the CARES Act.

2.20     Paycheck Protection Program Loan. SAHC applied for and received a loan in the amount of Five Million One Hundred Five Thousand Nine Hundred Seventy and No/100 Dollars ($5,105,970.00) from U.S. Bank (the '**PPP Loan**') under the U.S. Small Business Administration's (the 'SBA') Paycheck Protection Program (the '**PPP**'). To the knowledge of Seller based on currently available guidance from the SBA: (a) neither Seller nor SAHC have received any funds through the PPP to which Seller or SAHC were not entitled; (b) Seller and SAHC have been honest and truthful in any filings made with or statements made to the SBA or U.S. Bank in order to obtain or receive funds through the PPP; and (c) Seller and/or Debtors have, or prior to the Closing Date will have, properly completed, signed and filed any and all applications and documentation necessary to seek forgiveness of all or part of the PPP Loan under the terms of the PPP. Seller has provided in the Data Room true, correct and complete copies all applications, correspondence and other written communications between the any department, agency, administration or other part of the federal government and Seller or SAHC, or between Seller or SAHC and its PPP Loan lender, pertaining to the PPP Loan.

2.21     No Undisclosed Liabilities.  To the best of Seller's knowledge Neither, neither of the Acquired Companies has any material Liabilities except for: (a) liabilities specifically listed in the liabilities column of the Interim Balance Sheets that have not been satisfied; (b) accounts payable of the Acquired Companies of the type that would be required to be reflected as current liabilities on a balance sheet prepared in accordance with GAAP incurred by the Acquired Companies in the Ordinary Course of Business since the date of the Interim Balance Sheets; (c) obligations under Contracts, none of which obligations results from, arises out of, relates to, is in the nature of, or was caused by, any breach of Contract, tort, infringement or violation of Law; and (ivd) liabilities expressly set forth on the bankruptcy schedules  none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of Contract, tort, infringement or violation of Law.

2.22     Changes.  Since  February 21, 2019,  each Acquired Company has been operated in the Ordinary Course of Business, and, to the best of Seller's knowledge, without limiting the generality of the foregoing, except as set forth in Schedule 2.212.22, there has not been:

> (a)     any Material Adverse Effect;

> (b)     any change, except in the Ordinary Course of Business, in the contingent obligations of either Acquired Company by way of guaranty, endorsement, indemnity, warranty or otherwise;

(c)    any material damage, destruction or loss, whether or not covered by insurance, to the tangible Assets of either Acquired Company;

(d)    any direct or indirect loans made by either Acquired Company to any Related Party of either Acquired Company;

(e)    any Indebtedness or other Liability incurred, assumed or guaranteed by either Acquired Company, except for any Indebtedness or other Liability of less than $25,000 individually or $50,000 in the aggregate or trade payables or similar liabilities incurred in the Ordinary Course of Business;

(f)    any amendment (whether or not in writing) to any Material Contract;

(g)    ~~(f)~~ any sale, lease, transfer or assignment by either Acquired Company of any of its assets, tangible or intangible, involving more than $20,000 in the aggregate, other than for a fair consideration in the Ordinary Course of Business;

(h)    ~~(g)~~ entry by either Acquired Company into any Contract (or series of Contracts) (i) involving more than $20,000 of expenditures, or (ii) outside of the Ordinary Course of Business;

(i)    any acceleration, termination or cancellation by any Person of a Contract (or series of related Contracts) to which either Acquired Company is or was bound involving annual payments to either Acquired Company in an aggregate amount in excess of $50,000, other than a Contract that expired pursuant to its terms;

(j)    ~~(h)~~ any termination, or failure to maintain, any insurance policy covering any of the Assets of either Acquired Company or the Business;

(k)    ~~(i)~~  any ceasing of the payment of either Acquired Company's accounts payable, or deviation from or material alteration to either Acquired Company's practices, policies or procedures in paying accounts payable; any commitment by either Acquired Company to make any capital expenditure (or series of related capital expenditures) involving more than $100,000 in the aggregate;

(l)    ~~(j)~~ any capital investment in, or any loan to, or any acquisition of the securities or assets of any other Person (or series of related capital investments, loans or acquisitions) by either Acquired Company;

(m)    ~~(k)~~ any material change by either Acquired Company in any of its payment policies with its landlords, vendors, suppliers or other creditors or any of its collection policies with respect to any payors;

(n)    ~~(l)~~ any cancellation, compromise, waiver or release by either Acquired Company of any right or claim (or series of related rights and claims) involving more than $20,000 in the aggregate;

124129505.2

(o)   (m) any adverse change that is material in the relationship of either Acquired Company with any medical facility that is a party to any Material Contract or any of its material suppliers or other material relationships;

(p)   (n) any acquisition, by merger or consolidation, or by purchase of a substantial portion of the assets or Equity Securities, or by any other manner, of any Person or any other acquisition of any assets except in the Ordinary Course of Business; or

(q)   (o) any change by either Acquired Company to its accounting methods or principles; or

(r)   (p) any Contract to which either Acquired Company is a party or commitment of either Acquired Company to do any of the foregoing.

2.23   Material Contracts

[4]

(a)   To the best of the Seller's knowledge, Schedule 2.222.23 sets forth an accurate and complete list of the following Contracts, whether or not written, to which either Acquired Company is a party or the properties, rights or Assets of either Acquired Company are bound (each, a "**Material Contract**" and collectively, the "**Material Contracts**"):

(i)   any Contract pursuant to which either Acquired Company is obligated or entitled to provide hospital or medical services, management services or similar services to any hospital, medical facility, physician group or otherwise;

(ii)   any Contract pursuant to which either Acquired Company is currently receiving or has received, since February 21, 2019, any revenue;

(iii)   any Contract between either Acquired Company and any other healthcare provider, network or facility or similar Person;

(iv)   any Contract between either Acquired Company, on the one hand, and such Acquired Company's Related Parties or Affiliates, on the other hand;

(v)   any Contract limiting the freedom of either Acquired Company to engage in any line of business or to compete with any other Person;

(vi)   any Contract containing any exclusivity, non-solicitation provision, "most favored nation," preferential pricing or similar provision;

(vii)   any bond, debenture, mortgage, note or other similar Indebtedness, or any Contract to create or issue any mortgage, note or other similar Indebtedness involving an amount of more than $20,000;

---

[4] NTD:  We need, please, a copy of the McBee contract regarding the billing services.

124129505.2

(viii)   any Contract pursuant to which (A) either Acquired Company has guaranteed the performance, Liabilities or obligations of any other Person, or (B) any Person has guaranteed the performance, Liabilities or obligations of either Acquired Company;

(ix)    any Contract that constitutes a surety bond, performance bond, guarantee or similar instrument to which either Acquired Company is a party;

(x)    any management, consulting, agency or similar Contract or commitment;

(xi)    any Contract relating to either Acquired Company's participation or membership in any joint venture, partnership or similar arrangement;

(xii)   any lease, sublease or similar Contract with any Person under which either Acquired Company is a lessee or sublessee of any real property;

(xiii)   any lease, sublease or similar Contract with any Person under which either Acquired Company is a lessor or sublessor of, or makes available for use to any Person (other than either Acquired Company), (A) any real property or (B) any portion of any premises otherwise occupied by either Acquired Company;

(xiv)   any Contract that involves (A) the acquisition, merger or purchase of all or substantially all of the assets or business of any Person, or (B) the purchase or sale of assets, or a series of purchases and sales of assets, involving aggregate consideration of $20,000 or more outside of the Ordinary Course of Business;

(xv)    any Contract or Judgment to which either Acquired Company is a party or by which it is bound that involves obligations (contingent or otherwise) ~~of~~by, or payments to, either Acquired Company in excess of $20,000 per fiscal year, or that may not be terminated without penalty on 30 days' notice or less;

(xvi)   any Contract pursuant to which either Acquired Company has indemnified or agreed to indemnify any Person for, or assumed any Liability relating to, Hazardous Materials subject to Environmental Laws;

(xvii)   any Contract evidencing the settlement of any Proceeding;

(xviii)  any material Contract other than as set forth above not entered into in the Ordinary Course of Business; and

(xix)   any Contract other than as set forth in <u>Schedule 2.22(a)</u> above to which either Acquired Company is a party or by which any of the Assets of either Acquired Company is bound or subject that is material to either Acquired Company or the use or operation of its Assets.

14

(b)     Seller, based on reasonable efforts, has delivered to Purchaser accurate and complete copies of each written Contract in its ~~possessiomn~~possession listed on Schedule 2.22(a) including all amendments, modifications and supplements thereto and, with respect to each unwritten Material Contract, Schedule 2.22(a) contains a summary of the material terms of such unwritten Material Contract.

(c)     To the knowledge of Seller, since February 21, 2019: (i) neither Acquired Company nor the other party or parties thereto, is in breach or non-compliance of any term of any Material Contract; (ii) neither Acquired Company has received notice in writing or in any other manner, of any default or breach or threat thereof, with respect to any Material Contract; (iii) neither Acquired Company has received any written notice, or any notice other than a written notice, of the intention of any third party to terminate any Material Contract, and no Person intends to terminate any Material Contract; (iv) no Person is renegotiating, or has the express contractual right to renegotiate, any amount paid or payable to either Acquired Company under any Material Contract or any other term or provision of any Material Contract, except as may be provided in such Material Contracts.   To the knowledge of Seller, there is no material claim pending or threatened against either Acquired Company relating to any services performed by either Acquired Company under any such Material Contract.

2.24   Assets of Acquired Companies.

(a)     Schedule ~~2.23~~2.24(a) sets forth an accurate and complete list of all material assets (including equipment, furniture, fixtures, vehicles, machinery, tools and appliances) owned by ~~each~~either Acquired Company or leased by ~~each~~either Acquired Company from third parties and used in the operation of the Business with an original value in excess of $25,000.

(b)     The applicable Acquired Company has good, assignable and marketable title to all of the owned assets identified on Schedule ~~2.23~~2.24(a), free and clear of any and all Encumbrances (other than the Encumbrances identified on Schedule ~~2.23~~2.24(b) (the "**Permitted Encumbrances**").

(c)     The assets identified on Schedule ~~2.23~~2.24(a) represent all of the material assets necessary to operate the Hospital, the Nursing School and the other businesses of the Acquired Companies in the manner currently conducted.

(d)     Each item of tangible personal property identified on Schedule ~~2.23~~2.24(a) is in the possession of either or both of the Acquired Companies.

2.25   Real Property.

(a)     Schedule ~~2.24~~2.25(a) contains an accurate and complete list of all real property owned by each Acquired Company (the "**Owned Real Property**").

(b)     Schedule ~~2.24~~2.25(b) contains an accurate and complete description of the real property that is leased or subleased by each Acquired Company (the "**Leased Real Property**").   Except for the Leased Real Property, there is no other real property leased or

15

subleased by either Acquired Company that is associated with, related to or used in connection with the Business. Seller has delivered, or caused to be delivered, to Purchaser true, correct and complete copies of all leases, agreements and subleases, and any amendments thereto and guaranties thereof, with respect to the Leased Real Property (collectively, the "**Leases**").

(c)    With respect to the Owned Real Property and the Leased Real Property (collectively, the "**Real Property**"):

(i)    there are no pending or, to the knowledge of Seller, threatened Proceedings affecting any of the Real Property (including Proceedings in condemnation, eminent domain, unlawful detainer, collections, alleged building code, health and safety or zoning violations, personal injuries or property damages alleged to have occurred at, on or in the Real Property or by reason of the condition or use of the Real Property), nor are there any Judgments in effect against either Acquired Company with respect to the lease or operation of the Real Property;

(ii)    except as set forth on Schedule 2.242.25(c)(ii), there are no occupancy agreements, leases, subleases, licenses, easements, concessions, tenancies or other agreements of a similar nature, written or oral, or any amendments thereto, to which Seller or either of the Acquired Companies is a party, granting to any Person the right of use or occupancy of all or any portion of the Real Property;

(iii)    except as set forth on Schedule 2.242.25(c)(iii), other than either Acquired Company, there are no Persons in possession of the  Real Property;

(iv)    there are no (A) outstanding options or rights of first refusal in favor of either Acquired Company to purchase the Real Property, or any portion thereof or interest therein, or (B) material agreements of any nature whatsoever (recorded or unrecorded), preventing or limiting either Acquired Company's right or ability to use the  Real Property or any portion thereof or interest therein;

(v)    to Sellers'the knowledge of Seller, no violation of Law or of any restrictive covenant by either Acquired Company exists with respect to any of the Real Property;

(vi)    to the knowledge of Seller, all of the landlords' material obligations under the Leases which have accrued have been performed and no claim, controversy, dispute, quarrel or disagreement exists between either Acquired Company and any owner or landlord of the  Real Property;

(vii)    the Leases are in full force and effect, and there are no existing defaults by either Acquired Company or, to the knowledge of Seller, any other party to any Lease, or any events that with the passage of time or the giving of notice, or both, would constitute an event of default by either Acquired Company

16

under any Lease to which it is a party, or, to the knowledge of Seller, by any other party to any Lease;

(viii)    except as described on Schedule ~~2.24~~2.25(c)(viii), no consent, waiver, approval or authorization is required from the landlord or lessee under any Lease as a result of the execution of this Agreement or the consummation of the transactions contemplated by this Agreement;

(ix)    neither Acquired Company is obligated to pay any leasing fees or commissions, brokerage fees or commissions, finder's fees or commissions or any compensation of any nature whatsoever to any Person with respect to the  Real Property (including due to the exercise of an extension option or any other rights by either Acquired Company under any of the Leases); and

(x)    to Seller's knowledge, no condemnation Proceedings relating to the Real Property are pending or, to the knowledge of Seller, threatened, and neither Seller nor either of the Acquired Companies has received written notice of any condemnation Proceedings related to the Real Property.

2.26    Intellectual Property.

(a)    Schedule ~~2.25~~2.26(a) sets forth an accurate and complete list of all material Software and every other material proprietary product or service necessary for, and used in connection with, the Business as currently conducted, excluding generally available 'off the shelf' Software, and such Schedule sets forth whether the Software is owned or licensed by either Acquired Company.  Each Acquired Company has obtained and possesses valid licenses to use all of the Software programs present on the computers and other Software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Business. The Acquired Companies have received all necessary consents from third parties with respect to the Intellectual Property.

(b)    Each Acquired Company has implemented commercially reasonable measures, consistent with current industry standards, to protect the confidentiality, integrity and security of ~~the IT Systems (~~the software, hardware, firmware, interfaces, networks~~,~~ and related systems, owned, licensed or operated by either Acquired Company (collectively, the '**IT Systems**')~~) (~~, and all information stored or contained therein or transmitted thereby)~~,~~ against any unauthorized use, access, modification or corruption and to ensure that such IT Systems are free from Contaminants. Each Acquired Company has, to ~~its~~Seller's knowledge, complied in all material respects with all applicable Laws and all publicly posted policies, notices~~,~~ and statements concerning the collection, use, processing, storage, transfer~~,~~ and security of personal information in the conduct of the each Acquired Company's business. Neither Acquired Company has (i) experienced any actual, alleged~~,~~ or suspected data breach or other material security incident involving personal information in ~~their~~its possession or control or (ii) been subject to or received any written notice of any audit, investigation, complaint~~,~~ or other action by any Governmental Authority or other Person concerning the collection, use, processing,

17

storage, transfer, or protection of personal information or actual, alleged, or suspected violation of any applicable Law concerning privacy, data security, or data breach notification.

(c)    Schedule 2.252.26(ec) sets forth an accurate and complete list of all material Intellectual Property necessary for, and used in connection with, the Business as currently conducted. The rights of each Acquired Company in the Intellectual Property used in or necessary for the conduct of the Business as currently conducted are valid, subsisting and enforceable.  Each Acquired Company has taken all reasonable steps to maintain the Intellectual Property and to protect and preserve the confidentiality of all trade secrets included in the Intellectual Property, including by requiring all Persons having access thereto to execute written non-disclosure agreements.

2.27    Proceedings; and Judgments.  Except as set forth on Schedule 2.262.27, there is no Proceeding pending or, to the knowledge of Seller, threatened, against either Acquired Company or any Affiliate of either Acquired Company. To the knowledge of Seller, no event or circumstance has occurred that could reasonably be expected to give rise to or serve as the basis for any Proceeding that, individually or in the aggregate, has resulted or could reasonably be expected to result in a material Liability to either Acquired Company, any Affiliate of either Acquired Company or the Business. Except as set forth on Schedule 2.262.27, there is no outstanding Judgment (a) to which either Acquired Company is a party, or (b) that prohibits or impairs or could reasonably be expected to prohibit or impair the consummation of the transactions under this Agreement. There is no Proceeding currently pending that was initiated by either Acquired Company against any other Person or which either Acquired Company intends to initiate against any other Person.

18

124129505.2

2.28    <u>Compliance with Laws</u>.

(a)    Except as set forth on <u>Schedule ~~2.27~~2.28</u>: (i) each Acquired Company is, and at all times since February 21, ~~2020~~2019 has been, in material compliance with all Laws that are applicable to it (including, but not limited to, all required filings and disclosures), the conduct of the Business or the ownership or use of either Acquired Company's Assets; (ii) to the knowledge of Seller, no event has occurred, and no condition or circumstance exists, that is reasonably likely (with or without notice or lapse of time, and without regard to any cure period) to constitute or result in a material violation by either Acquired Company of, or a material failure on the part of either Acquired Company to comply with, any Law; and (iii) since February 21, ~~2020~~2019, neither Acquired Company has received any notice in writing, or, to the knowledge of Seller, in any other manner, from any Governmental Authority or any other Person regarding any actual, alleged, possible or potential material violation of, or failure to comply with, any Law, except as a result of regulatory inspections in the ~~ordinary course~~<u>Ordinary Course</u> of ~~business~~<u>Business</u>.

(b)    Neither Acquired Company nor, to the knowledge of Seller, any Representative of either Acquired Company has engaged in any illegal or fraudulent conduct on behalf of, or for the benefit of, either Acquired Company. Neither Acquired Company, nor, to the knowledge of Seller, any of Representatives of Seller or either Acquired Company, on behalf of, or for the benefit of, either Acquired Company, has used any Entity or other funds for unlawful contributions, payments, gifts or entertainment, or made any unlawful expenditures relating to political or business activity or established or maintained any unlawful or unrecorded funds in violation of Law. Neither Acquired Company~~,~~ nor, to the knowledge of Seller, any of its Representatives, has accepted or received any unlawful contributions, payments, gifts or expenditures in violation of Law.

(c)    ~~Any~~ <u>To the Seller's knowledge, since February 21, 2019: (a) no</u> Governmental Authority ~~that~~ has threatened in writing, or~~, to the knowledge of Seller,~~ in any other manner, to suspend or terminate any of the operations of either Acquired Company~~, has been cleared;~~ and~~, to the knowledge of Seller,~~ <u>(b)</u> no event has occurred or circumstances ~~exist~~<u>have existed</u> that could reasonably be expected to give any Governmental Authority reason or cause to suspend or terminate any of the operations of either Acquired Company.

2.29    <u>Permits</u>.

(a)    <u>Schedule ~~2.28~~2.29</u> sets forth an accurate and complete list of each Permit held by each Acquired Company, and Seller has delivered to Purchaser accurate and complete copies of all such Permits <u>and, to the Seller's knowledge, amendments thereto,</u> held by each Acquired Company including the next renewal dates thereof. The Permits identified in <u>Schedule ~~2.28~~2.29</u>: (i) are valid and in full force and effect; and (ii) constitute all of the Permits necessary (A) to enable the Acquired Companies to conduct the Business in the manner it is currently conducted, and (B) to permit the Acquired Companies to own and use the Assets of the Acquired Companies in the manner in which they are currently owned and used.

124129505.2

(b)     Each Acquired Company  is in substantial  material compliance with the terms and requirements of the Permits identified or required to be identified on Schedule 2.28 2.29. To the knowledge of Seller, since February 21, 2019, no event has occurred and no condition or circumstance exists, has existed that is reasonably likely (with or without notice or lapse of time) to (i) constitute or result directly or indirectly in a material violation of or a material failure to comply with any term or requirement of any Permit identified or required to be identified on Schedule 2.28 2.29, or (ii) result in the revocation, withdrawal, suspension, cancellation, termination or modification of any Permit identified or required to be identified on Schedule 2.28 2.29.

(c)     Since February 21, 2020 2019, except as set forth on Schedule 2.28 2.29, neither Acquired Company has received any notice in writing or, to the knowledge of Seller, other than in writing, from any Governmental Authority regarding (i) any actual or possible violation of, or failure to comply with, any term or requirement of any Permit, or (ii) any actual or possible revocation, withdrawal, suspension, cancellation, termination or modification of any Permit. No Governmental Authority has at any time challenged in writing or, to the knowledge of Seller, other than in writing, the right of either Acquired Company to conduct the Business, or any portion thereof, as currently conducted.

(d)     All applications required to have been filed for the renewal of the Permits identified in Schedule 2.28 2.29 have been duly filed on a timely basis with the appropriate Governmental Authorities, and each other notice or filing required to have been given or made with respect to such Permits has been duly given or made on a timely basis with the appropriate Governmental Authorities.

2.30     Payor Participation.

(a)     SAHC (i) is eligible and certified for participation and reimbursement under Titles XVIII and XIX of the Social Security Act (the "**Medicare and Medicaid Programs**") and the TRICARE Program (the Medicare and Medicaid Programs, the TRICARE Program, and such other similar federal or state reimbursement or governmental health care programs for which SAHC is eligible (including "Federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f)) are referred to collectively as the "**Governmental Programs**"), (ii) currently participates in the Governmental Programs pursuant to provider agreements and in private, non-Governmental Programs (including any private insurance program) under which SAHC directly or indirectly is presently receiving payments (such private, non-Governmental Programs are referred to collectively as the "**Private Programs**"), (iii) is in good standing with Governmental Programs and Private Programs, and (iv) has no outstanding overpayments or refunds due to the Governmental Programs or the Private Programs in excess of $20,000 in the aggregate, except those occurring in the Ordinary Course of Business or as may otherwise be identified on the Interim Balance Sheet Sheets. SAHC has filed all claims and reports required to be filed prior to the date hereof (and SAHC will have timely filed all claims and reports required to be filed prior to the Closing Date) with respect to the Governmental Programs and the Private Programs, all fiscal intermediaries and/or carriers and other insurance carriers, and all such claims and reports are complete and accurate in all material respects and have been prepared in material compliance with Laws governing reimbursement and payment claims.

20

124129505.2

(b)    To the knowledge of Seller, all billing practices of SAHC with respect to all Governmental Programs and all Private Programs have been in compliance in all material respects with all applicable Laws applicable to such Governmental Programs and Private Programs.

(c)    (b) There are no pending or, to the knowledge of Seller, threatened appeals, adjustments, challenges, inquiries, audits, investigations or Proceedings or written notices of intent to audit and no audits or inquiries with respect to such prior claims or reports, except for such appeals or individual claim denials that have occurred in the Ordinary Course of Business and that are not material to the operations of the Business. SAHC has not been audited, surveyed or otherwise examined in connection with any Governmental Programs or Private Programs outside the Ordinary Course of Business and except for industry-wide inquiries of general nature.

2.31    Privacy and Security Compliance. Neither Acquired Company is currently in violation of the applicable requirements of the Laws governing the privacy of individually identifiable health information and the Laws governing the security of such information maintained in electronic form promulgated pursuant to HIPAA. Neither Acquired Company has received any complaint in writing, or, to the knowledge of Seller, in any other manner, nor, to the knowledge of Seller, has any complaint in writing, or, to the knowledge of Seller, in any other manner, been made to any third party, from any patient or guardian thereof regarding the improper disclosure of such patient's protected health information by either Acquired Company, any Affiliate thereof or any of their Representatives.

2.32    Health Care Laws.

(a)    Neither Acquired Company, nor to To the knowledge of Seller, since February 19, 2020, neither Acquired Company, any Affiliate thereof, nor any of the Representatives of either Acquired Company has since February 21, 2020 engaged in any activities which are prohibited under any Law relating to healthcare regulatory matters, including, without limitation: (i) 42 U.S.C. §§ 1320a-7, 7a and 7b, which are commonly referred to as the 'Federal Fraud Statutes'; (ii) 42 U.S.C. § 1395nn, which is commonly referred to as the 'Stark Law'; (iii) 31 U.S.C. §§ 3729-3733, which is commonly referred to as the 'False Claims Act'; (iv) 42 U.S.C. §§ 1320d through 1320d-8 and 42 C.F.R. §§ 160, 162 and 164, which are commonly referred to as the 'Health Insurance Portability and Accountability Act of 1996'; (v) 18 U.S.C. § 666, which is commonly referred to as the 'Federal Bribery Statute;' and (vi) any similar federal, state or local statutes or regulations.

(b)    The prohibited activities described in Section 2.32(a) include, but are not limited to, the following:

(i)    knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment;

124129505.2

(ii)     knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment;

(iii)     presenting or causing to be presented a claim for reimbursement that is for an item or service that was known or should reasonably have been known to be (A) not provided as claimed or (B) false or fraudulent;

(iv)     failing to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with intent to fraudulently secure such benefit or payment;

(v)     knowingly or willfully offering, paying, soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind (A) in return for referring an individual to a Person for the furnishing or withholding, or arranging for the furnishing or withholding, of any item or service for which payment may be made in whole or in part by any Governmental Program or Private Program, or (B) in return for purchasing, leasing, ordering or arranging for, or recommending purchasing, leasing, ordering or arranging for any good, facility, service or item for which payment may be made in whole or in part by any Governmental Program or Private Program; or

(vi)     knowingly and willfully making or causing to be made, or knowingly and willfully inducing or seeking to induce the making of, any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (A) a facility in order that the facility may qualify for any Governmental Program or Private Program or (B) information required to be provided under § 1124A of the Social Security Act (42 U.S.C. § 1320a 3).

(c)     (b) Neither To the knowledge of Seller, since February 19, 2019, neither Acquired Company nor any of its Representatives:

(i)     has been convicted of or charged with any violation of Law related to any Governmental Program;

(ii)     has been convicted of, charged with, or, to the knowledge of Seller, investigated for, any violation of Law related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation or controlled substances;

(iii)     to the knowledge of Seller, is or has been the subject of any inquiry or investigation by any Governmental Authority with respect to health care matters; or

22

(iv)    (i)  is excluded, suspended or debarred from participation, or is otherwise ineligible to participate, in any Governmental Program or has committed any violation of Law that could reasonably be expected to serve as the basis for any such exclusion, suspension, debarment or other ineligibility.

(d)    (c)  Neither Acquired Company has received any written notice indicating that its qualification as a participating provider in any Governmental Program or Private Program may be terminated or withdrawn, nor does either Acquired Company have reason to believe that such qualification may be terminated or withdrawn.

(e)    (d)  To the knowledge of Seller, no Person (whether a terminated employee, contractor or otherwise) has raised allegations relative to either Acquired Company that would qualify such Person as a relator under the Federal False Claims Act (31 U.S.C. §§ 3729-3733), including allegations of non-compliance with any state or federal anti-kickback, physician self-referral or billing or coding requirements.

2.33    Certificates of Need.  No application for any Certificate of Need, Exemption Certificate or declaratory ruling  (collectively, the "**Applications**")  has been made by either Acquired Company with any Governmental Authority that is currently pending or open before such Governmental Authority or has been approved but relates to projects not yet completed.

2.34    Accreditation.  Schedule 2.33 2.34 sets forth an accurate and complete list of all accreditations and certifications held by either of the Acquired Companies or the Facilities. All such accreditations/certifications are and shall be effective, unrestricted and in good standing as of the date hereof and as of the Closing Date.  Since  February 21 19, 2020 ,  no event has occurred or other fact exists with respect to such accreditations/certifications that allows, or after notice or the lapse of time or both, would allow, revocation or termination of any such accreditations/certifications, or would result in any other impairment in the rights of any holder thereof.  There is no pending or, to the knowledge of Seller, threatened Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, modify, or not renew any such accreditation/.  Since the date of its most recent survey by The Joint Commission, neither Seller nor the Hospital has made any changes in policy or operations that would cause the Hospital to lose such accreditations.  Since the date of its most recent National League for Nursing Accrediting Commission survey, neither Acquired Company nor the Nursing School has made any changes in policy or operations that would cause the Nursing School to lose such accreditations.

2.35    Compliance Program.  Seller has provided to Purchaser an accurate and complete copy of each Facility's current compliance program materials, including all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms and disciplinary policies. The Acquired Companies and the Facilities have conducted their operations materially in accordance with their respective compliance programs. Neither Acquired Company; (a) is a party to a Corporate Integrity Agreement with any Governmental Authority; (b) has reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) to the knowledge of Seller, has been the subject of any Government Program investigation conducted by any federal or state enforcement agency; (d) has been a defendant in any qui

23

124129505.2

tam/False Claims Act litigation (other than by reason of a sealed complaint of which Seller may have no knowledge); or (e) has been served with or received any search warrant, subpoena, civil investigation demand, contact letter, or, to the knowledge of Seller, telephone or personal contact by or from any federal or state enforcement agency (except in connection with medical services provided to third parties who may be defendants or the subject of investigation into conduct unrelated to the Business); or (f) to Seller's knowledge, has received any complaints through such Seller's or either of the Acquired Companies' compliance "hotline" from employees, independent contractors, vendors, Physicians, patients, or any other persons that could reasonably be considered to indicate that Seller or either Acquired Company has violated, or is currently in violation of, any Law. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.

2.36    Medical Staff Matters.  Seller has made available to Purchaser true, correct and complete copies of the bylaws and rules and regulations of the medical staff of the Facilities, and all related credentialing policies, as well as a list of all individuals who maintain current medical staff membership and/or clinical privileges at the Facilities including, without limitation, the nature of each individual's professional specialty and board eligibility or certification (as applicable), the date each individual was last appointed or reappointed (as applicable) to the medical staff and/or was approved to receive clinical privileges.

2.37    Experimental Procedures.  During the past five (5) years, neither of the Acquired Companies nor the Facilities have performed or permitted the performance of any experimental or research procedure or study involving patients in the Facilities that were not authorized and/or conducted in accordance with the policies and procedures of the Facilities.

2.38    Insurance.

(a)    Schedule 2.372.38 sets forth an accurate and complete list of each insurance policy (specifying each insured, the insurer, the amount of coverage, the type of insurance, the policy number, the expiration date, the annual premium and any pending claim thereunder) maintained by or for the benefit of either Acquired Company, including any policy for which either Acquired Company is named as an additional insured. All such policies are in full force and effect, all premiums due and payable thereon have been paid (other than retroactive or retrospective premium adjustments that are not yet, but may be, required to be paid with respect to any period ending prior to the Closing Date, or payments to be made in the Ordinary Course of Business prior to the Closing Date), and no notice of cancellation or termination has been received by either Acquired Company with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation.

(b)    Schedule 2.372.38 sets forth, with respect to the pending or threatened Proceedings identified on Schedule 2.372.38, (i) whether either Acquired Company has provided the insurer with a notice of a claim under the applicable policy, (ii) if notice of a claim has been delivered under the applicable policy, whether the insurer is defending such claim, and (iii) whether either Acquired Company has received a reservation of rights notice from the insurer relating to such claim.

24

124129505.2

2.39    Tax Matters.    Except as set forth on Schedule 2.382.39    for all tax periods commencing on or after January 1, 2020February 21, 2019, to Seller's knowledge:

(a)    Each of the Acquired Companies has filed all Tax Returns required to be filed by it, including, without limitation, all Tax Returns relating to the Business (all of which are true and correct in all material respects).    All Taxes due and owing by each Acquired Company (whether or not shown on any Tax Return), including, without limitation, all Taxes with respect to the Business, have been paid.    Neither Acquired Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.    Neither Acquired Company is currently the beneficiary of any extension of time within which to file any Tax Return.

(b)    Each Acquired Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, or other third party, and all Internal Revenue Service Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.    Neither Acquired Company has taken and neither Acquired Company will take any action in respect of any Taxes (including, without limitation, any withholdings required to be made in respect of employees) which may have an adverse impact upon such Acquired Company, its Assets or the Business as of or subsequent to Closing Date.

(c)    There are no Tax Encumbrances on any of the Assets of either of the Acquired Companies and no basis exists for the imposition of any such Encumbrances.

(d)    No deficiencies for Taxes have been claimed, proposed or assessed in writing by any Governmental Authority for which either Acquired Company may have any liability or which may attach to its Assets.    There are no pending or threatened Proceedings for or relating to any liability in respect of Taxes for which either Acquired Company may have any liability or which may attach to its Assets.    There are no matters under discussion by Seller or either Acquired Company with any Governmental Authority with respect to Taxes that may result in an additional amount of Taxes for which either Acquired Company may have any liability or which may attach to its Assets.

(e)    Schedule 2.382.39 sets forth all elections with respect to Taxes affecting either Acquired Company or any of its Assets, which currently are in effect, including any election pursuant to Section 754 of the Code.

(f)    To Seller's knowledge, no tax appeals initiated by either Debtor are pending or have been filed with respect to any of the Real Property. Neither Seller nor either Acquired Company has received from any Governmental Authority or other Person having authority to impose such assessments, any written notice of actual or threatened special assessments or reassessments of the Real Property.

2.40    Environmental Matters.

(a)    Each Acquired Company is in material compliance with, and the Assets and the Business are in material compliance with, all Environmental Laws.

124129505.2

(b)     Neither Seller nor either Acquired Company has any liability under any Environmental Law with respect to any of the Assets or the Business, nor is either Acquired Company responsible for any liability of any other Person under any Environmental Law with respect to its Assets or the Business.  There are no pending or, to the knowledge of Seller, threatened Proceedings or Orders based on, and none of Seller and any of the Acquired Companies has received any formal or informal written notice of any complaint, Order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Authority or any other Person or knows or suspects any facts which would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Condition.

(c)     To the Seller's knowledge, there are not any Environmental Conditions existing or resulting from the operation of the Business or the Assets of either Acquired Company.

(d)     Each Acquired Company has been duly issued, and currently has and will maintain through the Closing Date, all approvals and Permits required under any Environmental Law with respect to the Assets of the Acquired Companies and the Business.   Schedule 2.392.40(d) sets forth an accurate and complete list of such Permits and approvals, all of which are valid and in full force and effect.  Each Acquired Company is in compliance with, and its Assets and the Business are in compliance with, all such Permits and approvals.  Except in accordance with such Permits and approvals, since January 1, 2020 there has been no release of material regulated by such Permits and approvals at, on, under, or from the Real Property in violation of Environmental Laws.

(e)     Except as set forth on Schedule 2.392.40(e), to Seller's knowledge, the Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and no Person has used any portion of the Real Property as a dump or landfill.

(f)     Seller has made available to Purchaser accurate and complete copies of all information in Seller's possession or control or in the possession or control of its Affiliates pertaining to the environmental history of the Real Property.

(g)     Seller will promptly furnish to Purchaser written notice of any material Environmental Condition or of any actions or notices described in this Section 2.40(g) arising or received after the date hereof and before the Closing.

(h)     Except as set forth on Schedule 2.40(h), to Seller's knowledge, no PCBs, lead paint, nor asbestos-containing materials are present on or in the Real Property.

2.41    Employee Benefit Plans.

(a)     Schedule 2.402.41 contains a true and complete list of all the following agreements, plans or other Contracts, covering any employee of the Business, which are presently

26

124129505.2

in effect:  (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and (ii) any other employee benefit plan, program, policy, or arrangement, whether written or unwritten, formal or informal, which Seller or either of the Acquired Companies currently sponsors, or to which Seller has any outstanding present or future obligations to contribute or other liability, whether voluntary, contingent or otherwise (collectively, the "**Plans**").  Seller has provided an accurate and complete copy of each of the Plans to Purchaser.

(b)    The Assets of each Acquired Company are not, and to the knowledge of Seller, they will not become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of Seller or either Acquired Company being aggregated with another entity pursuant to Section 414 of the Code (the "**ERISA Controlled Group**").

(c)    Neither Acquired Company nor any member of the ERISA Controlled Group of the Acquired Companies has sponsored, contributed to or had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) or 3(37)(A)) on or after September 26, 1980 on behalf of any employees of the Facilities.

(d)    Neither Acquired Company nor any member of  ERISA Controlled Group of the Acquired Companies has at any time sponsored or contributed to a "single employer plan" (as defined in ERISA Section 4001(a)(14)) to which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13)) are not part of the same ERISA Controlled Group.

(e)    Except as set forth on Schedule 2.40(e), there are no Proceedings pending or, to the knowledge of Seller, threatened against either Acquired Company with respect to the maintenance of the Plans, other than routine claims for benefits and other claims that are not material.

(f)    Each Acquired Company and its ERISA Controlled Group have complied in all material respects with substantially all of the continuation coverage requirements of Section 1001 of COBRA, and ERISA Sections 601 through 608, and Section 5000 of the Code.

(g)    All of the Acquired Company's Plans that are intended to satisfy Section 401 of the Code (the "**Retirement Plans**") from which assets may be involved in a "direct rollover" (as defined in Section 401(a)(31) of the Code) or other transfer to Purchaser's Retirement Plans have complied with the requirements of Section 401(a) of the Code.

2.42    Employee Matters.

(a)    Schedule 2.41 2.42(a) contains an accurate and complete list of all current employees of each Acquired Company, their current salary or wage rates, bonus and other compensation, accrued Paid Time Off, recognized date of hire, department, job title, scheduled hours per week, status as part-time, full time, PRN or temporary, and whether active or on leave of absence (and, if so, the type of leave).  To Seller's knowledge, since January 1, 2020, each

Acquired Company and each of the Plans has properly classified individuals providing services to such Acquired Company as independent contractors or employees, as the case may be.  All current employees of each Acquired Company are employees "at-will," unless otherwise specified in Schedule 2.41 2.42(a).  Except as disclosed on Schedule 2.41 2.42(a), neither Acquired Company is a party to any oral (express or implied) or written (i) employment agreement (including severance agreements), (ii) consulting agreement, or (iii) independent contractor agreement with any Person.

(b)      Since January 1, 2020, neither Acquired Company is delinquent in payments to any of its employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for it or any other amounts required to be reimbursed to such employees (including accrued Paid Time Off and other benefits) or in the payment to the appropriate Governmental Authority of all required Taxes, insurance, Social Security and withholding thereon.  As of the Closing, neither Acquired Company will have any obligation or liability to any of its employees or to any Governmental Authority for any such matters that are not properly reflected on the Interim Balance Sheets.

(c)      Except as set forth on Schedule 2.41 2.42(c):  (i) there is no pending or, to the knowledge of Seller, threatened employee strike, work stoppage or labor dispute at any of the Facilities, and none has occurred; (ii) to the knowledge of Seller, no union representation question exists respecting the employees of either Acquired Company, no demand has been made for recognition by a labor organization by or with respect to any of such employees, no union organizing activities by or with respect to any of such employees are taking place, and none of such employees is represented by any labor union or organization; (iii) no collective bargaining agreement exists or is currently being negotiated by Seller or either Acquired Company; (iv) there is no unfair practice claim against either Acquired Company before the National Labor Relations Board pending or, to the knowledge of Seller, threatened against or involving the Business or the Facilities; (v) each Acquired Company is in compliance with all Laws and Contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours; (vi) neither Acquired Company has engaged in any unfair labor practices; and (vii) there are no pending or, to the knowledge of Seller, threatened complaints or charges before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims or workers' compensation claims.

2.43      Immigration Act.  Each Acquired Company is in compliance with the terms and provisions of the Immigration Act.  For each of the employees employed in any of the Facilities for whom compliance with the Immigration Act is required, the Acquired Companies have obtained and retained a complete and true copy of each such employee's Form I-9 (Employment Eligibility Verification Form) and all other records or documents required to be prepared, procured or retained pursuant to the Immigration Act.  Neither Acquired Company has been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order (as such terms are defined in the Immigration Act) at any of the Facilities, nor has any Proceeding been initiated or threatened against either Acquired Company in connection with the Business, by reason of any actual or alleged failure to comply with the Immigration Act.

124129505.2

2.44    WARN Act.  Each Acquired Company has at all times complied in all material respects with the WARN Act and any similar applicable state Laws.  Schedule 2.43 2.44 lists the full name, job title, job site and unit, date of Employment Loss (as defined below), and type of Employment Loss (termination, layoff or reduction in work hours) of each employee of an Acquired Company or its Affiliates employed in any of the Facilities who has experienced an Employment Loss in the ninety (90) days preceding the date of this Agreement.  Except as set forth in this Agreement, neither Acquired Company presently intends to take any action that would result in an Employment Loss by any of its employees employed in any of the Facilities between the date of this Agreement and the Closing Date.  "Employment Loss" for this purpose shall mean (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (b) a layoff exceeding six (6) months or (c) a reduction in hours of work of more than fifty percent (50%), and "employee" shall mean any employee, including officers, managers and supervisors, but excluding employees who are employed for an average of fewer than 20 hours per week or who have been employed for fewer than six (6) of the preceding 12 months.

2.45    OSHA.  Each Acquired Company has complied with all applicable Laws relating to employee health and safety with respect to the Business and its Assets, and neither Acquired Company has received any written notice from any Governmental Authority that past or present conditions of the Business or the Assets violate any applicable legal requirements or otherwise will be made the basis of any Proceeding based on OSHA violations or otherwise related to employee health and safety.

2.46    Brokers and Finders.  Except as set forth on Schedule 2.45 2.46, none of Seller or either of the Acquired Companies, or any of their Affiliates, nor any officer or director thereof, has engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder. Purchaser shall have no obligation or liability with respect to any finder, broker or agent set forth on Schedule 2.45 2.46.

2.47    Seller's Knowledge.  Carol Fox is a court-appointed fiduciary for Debtors and Carol Fox is making the foregoing representations and warranties solely in her capacity as Chapter 11 Trustee of the Debtors with no personal liability. In providing the representations and warranties set forth in this Article II, Seller has relied upon the books and records, bankruptcy filings and documentation created and maintained by Seller and the Acquired Companies, as well as certificates of executive officers of each of the Acquired Companies and other disclosures, documentation and information reviewed by Seller. Seller cannot warrant the accuracy or completeness of any such documentation, disclosures or information. Purchaser acknowledges and agrees that Seller has not and is not obligated to independently research, confirm or verify the accuracy or completeness of any information or documentation forming the basis, in whole or in part, for any of the representations and warranties set forth in this Article II.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents and warrants to Seller, as of the Execution Date and as of the Closing Date, as follows:

124129505.2

3.1 <u>Authorization</u>. Purchaser has full ~~corporate~~ power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. All ~~corporate and other~~ actions required to be taken by Purchaser to authorize the execution, delivery and performance of this Agreement, all documents executed by Purchaser which are necessary to give effect to this Agreement, and all transactions contemplated hereby, have been duly and properly taken or obtained by Purchaser. No ~~corporate or other~~ action on the part of Purchaser is necessary to authorize the execution, delivery and performance of this Agreement, all documents necessary to give effect to this Agreement, and all transactions contemplated hereby. The person signing this Agreement on behalf of Purchaser is duly authorized to do so.

3.2 <u>Binding Agreement</u>. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to the Enforceability Exceptions.

3.3 <u>Organization and Good Standing</u>. Purchaser is a Delaware limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware.

3.4 <u>No Violation</u>. Except as set forth in <u>Schedule 3.4</u>, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will: (a) violate, conflict with or result in a breach of any material provision of the organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any Governmental Authority, or if any approval, consent or filing is required, such requirement has been fully satisfied and no further authorizations, contents or filings shall be required to consummate the transactions contemplated by this Agreement; (c) violate any Law to which Purchaser is or may be subject; or (d) violate any Judgment by which Purchaser is bound.

3.5 <u>Legal Proceedings</u>. Except as described on <u>Schedule 3.5</u>, there are no Proceedings pending or, to the knowledge of Purchaser, threatened relating to or affecting Purchaser or any Affiliate of Purchaser before any Governmental Authority (whether judicial, executive or administrative) in which an adverse determination would adversely affect Purchaser's ability to consummate the transactions contemplated hereby. Neither Purchaser nor any Affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any Affiliate of Purchaser which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.6 <u>No knowledge of Seller's Breach</u>. As of the Execution Date, neither Purchaser nor any of its Affiliates has knowledge of any breach of any covenant, representation or warranty by Seller in Article II of this Agreement or of any condition or circumstance that would give Purchaser a right to terminate this Agreement.

3.7 <u>Ability to Perform</u>. Purchaser will have immediately available funds in cash, which are sufficient to pay the Purchase Price to be paid at Closing and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this

124129505.2

Agreement. Purchaser has provided Seller with sufficient evidence of Purchaser's financial capacity.

3.8     Solvency.  Purchaser is solvent and Purchaser will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement. For purposes hereof, the term "**solvency**" means that: (a) the fair salable value of Purchaser's tangible assets is in excess of the total amount of its liabilities (including, for purposes of this definition, all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured and disputed or undisputed); (b) Purchaser is able to pay its debts or obligations in the ordinary course of business as they mature; and (c) Purchaser has capital sufficient to carry on its businesses and all businesses which it is about to engage.

3.9     OFAC.  Purchaser and, to Purchaser's knowledge, each person or entity owning an interest in Purchaser (i) is not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar List, (ii) is not a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) is not an "**Embargoed Person**", and, to Purchaser's knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and to Purchaser's knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

3.10    Brokers and Finders.  Except as set forth in Schedule 3.10, neither Purchaser nor any Affiliate of Purchaser nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.11    Representations of Seller.  Purchaser acknowledges that it is purchasing the Purchased Interests without any representations or warranties, except as expressly provided in this Agreement, and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made by or on behalf of Seller, other than as expressly set forth in this Agreement.

~~3.12    Purchaser's Knowledge.    References in this Agreement to "**Purchaser's knowledge**" or "**the knowledge of Purchaser**" means the knowledge of the Chief Financial Officer of Purchaser and those representatives of Purchaser involved in the due diligence process~~

**ARTICLE IV**
**COVENANTS OF SELLER**

4.1     Access and Information; Inspections.

(a)     From the Execution Date through the date that is one (1) calendar day before the Closing Date, (a) Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours to the Acquired Companies' facilities,

31

properties, records and facilities to inspect the books, accounts, records and all other relevant documents and information with respect to the Acquired Companies and (b) Seller shall furnish Purchaser with such additional financial and operating data and other information as to the Acquired Companies as Purchaser or its representatives may from time to time reasonably request; *provided, however*, that all disclosures of information shall be consistent with any confidentiality or non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller or her representatives. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Acquired Companies.

(b)     Notwithstanding anything contained herein, Seller shall not be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2     <u>Seller's Efforts to Close</u>.  Seller shall use reasonable commercial efforts to satisfy all of the conditions precedent set forth in Article VI, Article VII, and Article VIII to Seller's or Purchaser's obligations under this Agreement to the extent that Seller's action or inaction can control or materially influence the satisfaction of such conditions.

4.3     <u>Cost Reports</u>.  Within the time required by applicable law, during the period from and including the Execution Date to and including the Closing Date, Seller will cause the Acquired Companies to prepare and file with applicable Governmental Authorities all cost reports relating to periods ending prior to the Closing Date. All amounts due to, or owed by, either Acquired Company for any such cost report settlements or adjustments will be for the account of such Acquired Company.

4.4     <u>~~Hospital~~Acquired Companies'</u> Operations.  During the period from and including the Execution Date to and including the Closing Date, Seller shall~~, with respect to the operation of the Hospital,~~ use commercially reasonable efforts to cause each of the Acquired Companies to:

(a)     carry on the Acquired Companies' operation of the Business consistent with past practice, subject ~~o~~to changes for the pandemic, but subject to the Bankruptcy Case and the Acquired Companies' obligations and actions in connection therewith;

(b)     maintain in effect the insurance coverages with respect to the assets of the Acquired Companies;

(c)     perform each Acquired Company's obligations under all of its Contracts in compliance with the Bankruptcy Code;

(d)     maintain each Acquired Company's assets in materially the same condition as on the Execution Date, ordinary wear and tear expected;

124129505.2

(e)      following entry of the Sale Order, permit and allow reasonable access by Purchaser and its representatives to the assets of each Acquired Company and the Facilities for inspection and to establish relationships with employees physicians, medical staff and others having business relations with each Acquired Company, provided, that such actions by Purchaser do not unreasonably interfere with the operations of the Hospital.

(f)      timely file or cause to be filed all material, reports, notices, and Tax Returns required to be filed and pay all required Taxes as they come due;

(g)      maintain all existing material approvals, permits and environmental permits relating to the Business and Facilities and the assets of each Acquired Company;

(h)      not terminate, amend or enter into any material contracts or agreements except in the Ordinary Course of Business; and

(i)      (h) have oversight and weekly reports, including in person meetings, with the Trustee and any other individuals Purchaser deems necessary to consummate the transactions described in this Agreement.

33

4.5    <u>Bankruptcy Court Matters</u>.

(a)    [As soon as reasonably practical following execution of this Agreement, Seller shall file a Motion to Approve Purchaser and this Agreement, and Approve Bid Protections (the "**Bid Protection Motion**").]

(b)    Seller agrees that the Sale Order and any Related Orders and any amendments, modifications, and/or supplements thereto, shall be in form and substance reasonably acceptable to Purchaser.

4.6    <u>No Solicitation of Other Bids</u>.  Seller covenants that:

(a)    None of the <u>Seller or the </u>Debtors shall, and none of them shall authorize or permit any of its Affiliates or any of its Representatives to, directly or indirectly: (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal.  ~~Each~~<u>Seller and each</u> Debtor shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Person conducted heretofore with respect to, or that could lead to, an Acquisition Proposal.  For purposes hereof, "**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Purchaser or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the Stock or Membership Interests, or all or any material portion of the assets or business of either Acquired Company.

(b)    In addition to the other obligations under this <u>Section 4.6</u>, Seller shall promptly (and in any event within three Business Days after receipt or issuance of an Acquisition Proposal by Seller, ~~either Acquired Company~~<u>any Debtor</u> or any of their respective Representatives) advise Purchaser orally and in writing of the existence of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, and shall confirm to Purchaser that such discussion immediately ceased and was caused to be terminated by Seller or such ~~Acquired Company~~<u>Debtor</u>, as the case may be.

(c)    The rights and remedies for noncompliance with this <u>Section 4.6</u> shall include, without limitation, having such provision specifically enforced by the Bankruptcy Court, it being acknowledged and agreed that any such breach shall cause irreparable injury to Purchaser and that money damages would not provide an adequate remedy to Purchaser.

**ARTICLE V**
**COVENANTS OF PURCHASER**

5.1    <u>Purchaser's Efforts to Close</u>.  Purchaser shall use reasonable commercial efforts to satisfy all of the conditions precedent set forth in Article VII and Article VIII to its or Seller's obligations under this Agreement, to the extent that Purchaser's action or inaction can reasonably

124129505.2

control or materially influence the satisfaction of such conditions. Prior to consummation of the transactions contemplated herein, Purchaser shall be permitted to communicate and meet with: (a) counterparties to the agreements and contracts of the Acquired Companies; (b) applicable Governmental Authorities regarding prospective compliance with regulatory requirements and related issues, so long as, in the case of each, such communications do not interfere, with the operations of the Business or the conduct of the Bankruptcy Case, notice is provided to Seller as to any communications or meetings with any Governmental Authority in advance, and Seller is afforded the opportunity to attend all such meetings and participate in all such calls.

5.2     <u>Required Governmental Approvals</u>.  Between the Execution Date and the Closing Date, Purchaser will: (a) use its commercially reasonable efforts to obtain, as promptly as practicable, all material governmental authorizations required of Purchaser to consummate the transactions contemplated hereby; (b) provide such other information and communications to Governmental Authorities as such Governmental Authorities may reasonably request; and (c) reasonably cooperate with Seller in Seller's obtaining, as soon as practicable, all material governmental authorizations required of Seller to consummate the transactions contemplated hereby. Without limiting the generality of the undertakings pursuant to this <u>Section 5.2</u>, Purchaser shall take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary to obtain approval for the transactions contemplated by this Agreement by any Governmental Authority; *provided, however*, such actions and things shall not include Purchaser's agreement to: (i) sell or otherwise dispose of specific assets or categories of assets or businesses now owned or hereafter acquired by Purchaser; (ii) terminate any existing relationships or contractual rights and obligations; or (iii) amend or terminate existing licenses or other Intellectual Property agreements and enter into such new licenses or other Intellectual Property agreements.

5.3     <u>Inspection; Repair and Restoration; Insurance</u>.

(a)     From the Execution Date through the date that is one (1) calendar day before the Closing Date, Purchaser may conduct any inspections, investigations and reviews in a manner that does not damage the Real Property or interfere unreasonably with the operations of the Hospital or Nursing School, upon at least twenty-four (24) hours' prior notice to Seller, which notice may be given telephonically to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ or via email at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Purchaser and its Representatives shall not permit any liens to attach to the Real Property by reason of the exercise of its rights hereunder, and shall promptly repair any damage that occurs as a result of any inspections, investigations and reviews and shall promptly restore the Real Property to its prior condition following completion of such inspection, investigation or review. Such repairs and restoration shall be performed at Purchaser's sole expense. Purchaser shall at all times indemnify, save harmless and defend Seller from and against any and all claims, liabilities, loss, costs, damage and expenses (including reasonable attorneys' fees whether incurred at or before the trial level or in any appellate or bankruptcy or other Proceeding to determine the amount of such fees) which Seller or either Acquired Company may suffer, sustain or incur by reason of any act or omission of Purchaser or any employee, agent or independent contractor of Purchaser on the Real Property or in connection with such investigations, including, without limitation, any damage to any part of the Real Property, or injury to any person or damage to or destruction of personal property, and including the filing or enforcement of any construction or other statutory

35

or common law lien or claim against the Real Property, or any part thereof; *provided*, *however*, that in no event shall Purchaser have any liability hereunder: (i) relating to the negligence or willful misconduct of Seller, either Acquired Company, any tenant or any of their respective agents, employees or representatives; (ii) for any incidental, consequential, indirect, punitive, special or exemplary damages; or (iii) with respect to the mere discovery of any Hazardous Materials at the Real Property.

(b)      Purchaser shall at all times, from the Execution Date through the Effective Time, maintain in full force and effect insurance against loss or liability in connection with bodily injury, death, or property damage or destruction, occurring on or about the Real Property under one or more policies of commercial general liability insurance. Each policy shall be written on an occurrence basis, shall contain coverage at least as broad as that provided under the then-most current Insurance Services Office (ISO) commercial general liability insurance form which provides the broadest coverage, and shall contain a broad form contractual liability endorsement. The insurance coverage shall be in the amounts of not less than One Million Dollars ($1,000,000) per occurrence limit and a Four Million Dollar ($4,000,000) umbrella insurance policy. The insurance policies shall name Seller and the Acquired Companies and any other party reasonably designated by Seller as additional insureds, and such policies shall indicate that they shall not be terminated or modified in any way that would materially decrease the protection afforded Seller and the Acquired Companies under this Agreement without thirty (30) days' advance notice to Seller. Prior to commencing its inspection, Purchaser shall deliver to Seller a certificate of insurance evidencing the insurance coverages required by this Section.

5.4      Preservation and Access to Records After the Closing.  Upon reasonable notice, during normal business hours, at no out-of-pocket cost or expense to Purchaser, Purchaser will afford to the representatives of Seller access to and copies of the Hospital patient records and Nursing School records (collectively "**Facility Records**") to the extent they relate to any period prior to Closing for any reasonable purpose*; provided, however, that such access and provision of copies does not violate any Law*. In addition, subject to the proviso in the immediately preceding sentence, Seller shall be entitled, at Seller's sole cost and expense, to copy and/or remove any such Facility Records or copies thereof, for any reasonable purpose. Any original Facility Record so removed shall be promptly returned to Purchaser following its use by Seller. Any access granted to Seller in this Agreement shall be upon the condition that any such access not materially interfere with the normal business operations of Purchaser.

5.5      Misdirected Payments.  Seller covenants and agrees to remit to the Acquired Companies, with reasonable promptness, any payments received by Seller, which payments are on or in respect of accounts or notes receivable owned by (or are otherwise payable to) either or both of the Acquired Companies.

5.6      Governmental Approvals.

(a)      ~~Best~~Commercially Reasonable Efforts.  [5] Purchaser: (i) shall use ~~best~~commercially reasonable efforts to secure, as promptly as possible after the entry of the Sale Order, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from Governmental Authorities in order to carry out the transactions

[5] This section seems to largely duplicate Section 5.2.

36

124129505.2

contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled; and (ii) will provide such other information and communications to Governmental Authorities as Seller or such Governmental Authorities may reasonably request. Purchaser will provider Seller periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses. Purchaser is responsible for all filings with and requests to Governmental Authorities necessary to enable SAHC to continue to operate the Hospital at and after the Closing Date. Purchaser shall promptly, not later than thirty (30) days Business Days after the entry of the Sale Order or sooner if required by applicable Governmental Authorities, file all applications, licensing packages and prerequisite to obtaining the material licenses, permits and authorizations as set forth herein. Purchaser acknowledges that Seller may independently contact Governmental Authorities as part of this process.

(b)    <u>Change of Ownership Applications</u>.  Purchaser shall, promptly, but no later than ten (10) Business Days after the entry of the Sale Order, or sooner if required by applicable Governmental Authorities, file all applications, licensing packages and other documents with all applicable Governmental Authorities which are necessary for the continued operation of the Hospital and the consummation of the transactions hereunder, including the Hospital's license change of ownership application with the State of Missouri, the Hospital's pharmacy change of ownership application, and the Medicare and Medicaid change-of-ownership applications (collectively defined herein as the "**CHOWS**").

5.7    <u>Notice of Changes</u>.

(a)    From the Execution Date until the Closing, Seller shall promptly give notice to Purchaser of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct as of the date hereof or the Closing Date, or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Article VI or Article VII to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with any of the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with any of the transactions contemplated by this Agreement; and

(iv)    any Proceeding (A) commenced or, to the knowledge of Seller, threatened against, relating to or involving or otherwise affecting either of the Acquired Companies, the Business or their assets or Liabilities that, if pending on the Execution Date, would have been required to have been disclosed under to

Article II, or (2B) that relate to the consummation of the transactions contemplated by this Agreement.

(b)    Purchaser's receipt of information pursuant to this <u>Section 5.7</u> shall not operate as a waiver or modification of, or otherwise affect, any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Schedules to Article II of this Agreement.

**ARTICLE VI**
**BANKRUPTCY COURT APPROVAL**

6.1    <u>Bankruptcy Court Approval</u>.    The Parties acknowledge and agree that this Agreement and the consummation of the transactions contemplated under this Agreement are subject to approval of the Bankruptcy Court.  Seller shall promptly request entry of an order approving the Sale (the "**Sale Order**") in a form reasonably acceptable to Purchaser; *provided, however*, that the Parties acknowledge that the Bankruptcy Court may amend or modify the precise terms of the proposed Sale Order and, unless such amendments or modifications materially alter the transactions contemplated by this Agreement, the Parties shall be obligated to consummate such transactions pursuant to the terms of this Agreement, as altered by the Sale Order. For purposes of this Agreement, the Sale Order shall authorize the sale of the Stock and Membership Interests pursuant to Section 363(b) of the Bankruptcy Code on the terms and conditions set forth herein, free and clear of all Encumbrances.  Seller shall request that the Bankruptcy Court incorporate a good faith finding with respect to Purchaser into the Sale Order pursuant to Section 365(m) of the Bankruptcy Code.

6.2    <u>Appeal of Sale Order</u>.  In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay as well as written notice of any motion or application filed in connection with any appeal. Seller shall, in consultation with Purchaser, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against any appeal of the Sale Order; *provided, however*, Purchaser shall be responsible for paying any and all fees, costs or expenses, including, without limitation, attorneys' fees and costs, incurred by the Seller in connection with any appeal or other Proceeding challenging the Sale commenced following entry of the Sale Order.

**ARTICLE VII**
**SELLER'S CONDITIONS PRECEDENT**

The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Seller:

7.1    <u>Representations and Warranties</u>.  Each of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

7.2    <u>Covenant Performance</u>.    At or prior to the Closing, Purchaser shall have performed or complied in all material respects with each and all of its obligations, covenants,

38

124129505.2

agreements and conditions required to be performed or complied with by it at or prior to the Closing; *provided*, *however*, that this condition will be deemed to be satisfied unless (a) Purchaser was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within [fifteen (15)] Business Days after receipt of such notice and (b) the manner in which such obligations, covenants, agreements and conditions have not been performed would be materially adverse to Seller.

7.3     <u>Execution and Delivery</u>.    Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered under the terms of this Agreement.

7.4     <u>Authorization</u>.    The Bankruptcy Court shall have approved this Agreement, and transactions contemplated by this Agreement, without material modifications, unless expressly agreed to by the Parties in writing, through the entry of the Sale Order and no temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated by this Agreement shall have been issued by any court of competent jurisdiction or any other Governmental Authority and remain in effect on the Closing Date.

## ARTICLE VIII
## PURCHASER'S CONDITIONS PRECEDENT

The obligations of Purchaser hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Purchaser:

8.1     <u>Representations and Warranties</u>.    Each of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

8.2     <u>Covenant Performance</u>.    At or prior to the Closing, Seller shall have performed or complied in all material respects with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Seller at or prior to the Closing; *provided*, *however*, that this condition will be deemed to be satisfied unless (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within [fifteen (15)] Business Days after receipt of such notice and (b) the manner in which such obligations, covenants, agreements and conditions have not been performed would be materially adverse to Purchaser.

8.3     <u>Execution and Delivery</u>.    Seller shall have executed and delivered all documents, instruments and certificates required to be executed and delivered under the terms of this Agreement.

8.4     <u>Authorization</u>.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated by this Agreement shall have been issued by any court of competent jurisdiction or any other Governmental Authority and remain in effect on the Closing Date.

39

124129505.2

8.5     Bankruptcy Court Approval.

(a)     Entry of Sale Order.  The Bankruptcy Court shall have entered the Sale Order, the form and substance of which shall be reasonably acceptable to Purchaser, approving this Agreement and the consummation of the transactions contemplated by this Agreement pursuant to Sections 363 and 365 of the Bankruptcy Code.

(b)     Enforceability of Sale Order.  On the Closing Date, the Sale Order shall (i) be in full force and effect, (ii) not have been voided, reserved or vacated or subject to a stay, (iii) not have been materially amended, modified or supplemented in any way without Purchaser's prior written consent, and (iv) be a Final Order, unless otherwise agreed by the Parties in writing as part of an expedited closing. For purposes of this Agreement, a "**Final Order**" means an order of the Bankruptcy Court as to which no appeal or notice of appeal has been timely filed as of the Closing Date, or, if any of the foregoing has been timely filed, no stay pending appeal has been granted; as to which the time for challenging the Sale Order has expired; and as to which no stay is in effect.

## ARTICLE IX
## TERMINATION

9.1     Termination.  This Agreement may be terminated at any time prior to the Closing under any of the following circumstances:

(a)     by the mutual written consent of the Parties;

(b)     by Seller, if Purchaser has committed a material breach of this Agreement, which material breach is adverse to Seller, and such breach has not been (i) waived in writing by Seller or (ii) cured by Purchaser to the reasonable satisfaction of Seller within [ten (10)] Business Days after Seller provides Purchaser written notice of such breach; *provided, however*, Seller shall not be permitted to terminate this Agreement pursuant to this Section 9.1(b) if Seller is also in material breach of this Agreement;

(c)     by Purchaser, if Seller has committed a material breach of this Agreement, which material breach is adverse to Purchaser, and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Seller to the reasonable satisfaction of Purchaser within [ten (10)] Business Days after Purchaser provides Seller of a written notice of such breach; *provided, however*, Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 9.1(c) if Purchaser is also in material breach of this Agreement;

(d)     by Seller, if satisfaction of any condition in Article VII is or becomes impossible to satisfy at or prior to the Closing and Seller has not waived such condition in writing (provided that the failure to satisfy the applicable condition has occurred by reason other than (i) Seller's failure to comply with its obligations under this Agreement or (ii) Seller's failure to provide any delivery required at the Closing as a result of Seller being unwilling or unable to close the transaction on the Closing Date);

124129505.2

(e)    by Purchaser, if satisfaction of any condition in Article VIII is or becomes impossible to satisfy at or prior to the Closing and Purchaser has not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) Purchaser's failure to comply with its obligations under this Agreement or (ii) Purchaser's failure to provide any delivery required at the Closing as a result of Purchaser being unwilling or unable to close the transaction on the Closing Date);

(f)    by either Party, if the Bankruptcy Court fails to approve the Sale in accordance with the terms of this Agreement or any subsequent agreement between the Parties, subject to non-material modification, or enters an order precluding the consummation of the transactions contemplated hereunder;

(g)    by either Party, if the Closing has not occurred on or before the Outside Date, unless the Closing is rescheduled to a later date pursuant to this Agreement; *provided, however*, neither Party may terminate pursuant to this provision if the failure to close on or before the Outside Date is the result of such Party's failure to comply with its obligations under this Agreement; or

(h)    [by Purchaser, if (i) prior to the Closing Date, one or more of the cases in the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or dismissed or (ii) the Bankruptcy Court enters an order pursuant to Section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to _____.][2]

9.2    <u>Effect of Termination</u>.  With the exception of the Parties' rights and obligations under Article XI, if this Agreement is terminated in accordance with the provisions of <u>Section 9.1</u>, all further obligations of the Parties under this Agreement shall terminate immediately. Such termination shall not affect or abrogate the ability of the Parties to exercise any rights or assert any claims or causes of action under Article XI, including in the event of termination under ~~Sections~~<u>Section 9.1(b)</u> or <u>Section 9.1(c)</u>. Each Party acknowledges and agrees that the agreements contained in this <u>Section 9.2</u> are integral to the transactions contemplated by this Agreement, that this <u>Section 9.2</u> shall survive (without alteration) any termination under <u>Section 9.1</u>, and the Parties would not have entered into this Agreement without the provisions of this <u>Section 9.2</u>.

**ARTICLE X**
**POST-CLOSING MATTERS**

10.1    <u>No</u> Survival of Representations~~, and~~ Warranties ~~and Covenants~~.  The representations and warranties ~~of Seller~~ in Article II <u>and Article III</u> of this Agreement shall <u>not</u> survive the Closing ~~as follows:~~

(a)    ~~the representations and warranties of Seller in Sections _____ of this Agreement (the "**Seller Fundamental Representations**") shall survive the Closing for two years;~~

---

[2] ~~Is this provision necessary?~~

~~124129505.2~~

~~(b)    the    representations    and    warranties    of    Seller    in    Sections
_____    of this Agreement shall survive the Closing for one year; and~~

~~(c)    all of the remaining representations and warranties of Seller in Article II of
this Agreement shall survive the Closing for three years.~~

~~Notwithstanding    the    foregoing,    any    claims    asserted    in    good    faith    with    reasonable
specificity (to the extent known at such time) by notice given by the non-breaching Party to the
breaching    Party    on    or    prior    to    the    expiration    date    of    the    applicable    survival    period    shall    not
thereafter    be    barred    by    the    expiration    of    the    applicable    survival    period    and    such    claims    shall
survive until finally resolved.~~

10.2    Survival of Covenants and Agreements.    All covenants and agreements of the
Parties contained in this Agreement that are intended to survive the Closing shall survive the
Closing indefinitely or for the period explicitly specified therein.

~~10.2    Representations and Warranties Insurance.    Purchaser's sole post-Closing remedy
as to any misrepresentation by Seller or breach of representation or warranty by Seller shall be
under the representations and warranties insurance policy to which [insert name of carrier] has
bound coverage in favor of Purchaser.~~[3]

10.3    Access to Records

.[46]

(a)    Purchaser shall cooperate with Seller, her representatives, any of her
affiliates or professionals, the Official Committee of the Unsecured Creditors of  the Acquired
Companies, the Debtors' estate representative(s) and any liquidating trustee of the Debtors'
bankruptcy estates (collectively, the "**Applicable Parties**") and their insurance carriers in
connection with the administration of the Debtors' bankruptcy estates, including, without
limitation, in connection with all claims, actions, causes of action or audits relating to the
pre-Closing operation of the Acquired Companies or the Business that any Applicable Party may
elect to pursue, dispute or defend, in respect of events occurring prior to the Effective Time with
respect to the operation of the Acquired Companies or the Business. Such cooperation shall
include, without limitation, providing copies of any relevant documents and communications and
making any employees of SAHC available for interviews, depositions, hearings and trials and
other assistance in connection with the administration of the Debtors' bankruptcy estates, or the
bankruptcy estates of any Affiliates of the Debtors, and such cooperation shall also include
making all of SAHC's employees reasonably available to assist in the securing and giving of
evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done
without payment of any fees or expenses to Purchaser, SAHC or to such employees).

(b)    To the maximum extent permitted by law, if Purchaser receives any
requests or demands, by subpoena or otherwise, including, without limitation, documents relating
to the operations of either of the Acquired Companies or the Business prior to the Effective

---

[3] ~~This provision is subject to additional language.~~
[46] This provision appears to substantively duplicate Section 5.4.

~~124129505.2~~

Time, prior to any disclosure of such documents, Purchaser shall notify Seller not later than three (3) Business Days after receipt of such request or demand and shall provide Seller with the opportunity to object to, and otherwise coordinate with respect to, such request or demand. Purchaser shall cooperate reasonably with and provide reasonable assistance to Seller in objecting to any such request or demand.

(c)     [Notwithstanding anything to the contrary contained herein, Seller shall be permitted to make and retain a copy of any and all documents and communications of the Acquired Companies that may be relevant to the administration of the Acquired Companies' bankruptcy estates, including, without limitation, any electronically stored information. Purchaser shall grant Seller, or any employee, agent, representative, successor or Affiliate of Seller, reasonable access to the books and records of Purchaser as well as any computers, servers, tangible storage devices, cloud-based storage accounts or servers, or any other media or medium for the storage of electronic information or data (collectively, "**ESI Devices**"), as well as any access and authorization necessary to make and retain copies of any of the foregoing and, to the extent contained on any ESI Device, copy or create an image of the ESI Devices, including any metadata. To the extent Purchaser, following the Effective Time, utilizes any ESI Devices used by the Acquired Companies prior to the Closing Date, Purchaser agrees and consents to the copying or imaging of such ESI Devices in their entirety, including information related to the Acquired Companies' operations following the Effective Time; *provided, however*, that Seller shall keep any information, documentation, communications, or data recovered from any ESI Devices exclusively related to the Acquired Companies' operations for the period following the Effective Time confidential, unless the disclosure of such information is necessary for the administration of the Acquired Companies' bankruptcy estates, including, without limitation, the enforcement of this Agreement, the exercise or exploitation of any rights granted or retained under this Agreement, or as otherwise compelled pursuant to any requests for the production of documents by subpoena or other court order. Purchaser acknowledges and agrees that Seller may require access to the Acquired Companies' books and records, documents, communications and ESI Devices following the Effective Time and such access may be required on an expedited basis in order to protect the interests of the Acquired Companies' bankruptcy estates. Any request for access pursuant to this Section 10.2 may be made by electronic mail or overnight courier to the addresses provided for the delivery of notices to Purchaser under Section 13.6, below, which requests shall be deemed received and effective upon delivery. Purchaser shall respond to any written request for access made pursuant to this Section 10.3 not later than three (3) Business Days and provide access to the requested material not later than seven (7) Business Days following delivery of the subject request. In the event Purchaser fails to respond or provide access within the time required under this Section 10.3(c), Seller may move *ex parte*, in accordance with the applicable rules and procedures of the Bankruptcy Court, for an order compelling Purchaser to comply with the provisions of this Section 10.3 and awarding Seller reasonable fees and costs, including, without limitation, reasonable attorneys' fees and costs, incurred in connection with such Proceedings.]

(d)     Purchaser shall be responsible for the payment of, and Seller shall have no liability or responsibility for, any fees, costs or expenses, including, without limitation, attorneys' fees and costs, incurred by Purchaser in complying with its obligations under this Section 10.3.

124129505.2

10.4    ==Turnover and Accounting of Receipts==. [57] If Seller is in possession of or receives any funds that belong to either of SAHC or SAP, Seller shall promptly pay such amounts to SAHC or SAP, as the case may be. Purchaser shall have the right, once every thirty (30) days, to request and receive records from Seller reflecting any deposits into Seller's bank account(s) or otherwise received by Seller and, once every year, to audit by an independent and competent auditor, at Purchaser's sole expense, the bank records and remittance advices of Seller. In the event of a dispute regarding Purchaser's rights to any funds described in this <u>Section 10.4</u>, the Parties shall present such dispute to the Bankruptcy Court pursuant to a motion to enforce this Agreement, each Party, to the extent necessary, waiving any rights or requirements under Rule 7001 of the Federal Rules of Bankruptcy Procedure for resolution of any such dispute pursuant to an adversary proceeding. The Bankruptcy Court shall have exclusive jurisdiction to resolve any disputes regarding Purchaser's rights to funds under this Agreement or obligations to turnover any funds under this <u>Section 10.4</u>.

## ARTICLE XI
## DEFAULT AND LIMITATION OF LIABILITY

11.1    <u>Purchaser Default</u>.  If Purchaser commits any material breach or default under this Agreement prior to the Closing, Seller shall be entitled to sue for damages or specific performance of the terms of this Agreement and recover any and all fees, costs and expenses, including, without limitation, any attorneys' fees and costs, incurred by Seller as a result of Purchaser's breach or default. The foregoing remedies are in addition to the right to terminate this Agreement under Section 9.1. The termination of this Agreement pursuant to Section 9.1 shall not abrogate or limit the rights of Seller to sue for damages pursuant and subject to the terms of this Section 11.1.

11.2    <u>Seller Default</u>.    If Seller commits any material breach or default under this Agreement prior to the Closing, Purchaser shall be entitled to sue for damages or specific performance of the terms of this Agreement and recover any and all fees, costs and expenses, including, without limitation, any attorneys' fees and costs, incurred by Purchaser as a result of Seller's breach or default. The foregoing remedies are in addition to the right ~~toterminate~~<u>to terminate</u> this Agreement under Section 9.1. The termination of this Agreement pursuant to Section 9.1 shall not abrogate or limit the rights of Purchaser to sue for damages pursuant and subject to the terms of this Section 11.2.

11.3    <u>No Recourse to Third Parties</u>.  Notwithstanding anything in Sections 11.1 or 11.2 to the contrary, all claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the Parties to this Agreement. No Person who is not a Party to this Agreement shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of a Party against its owners or Affiliates) for any obligations or liability arising under, in connection with or related to this Agreement or for any claim based on, in respect of, or by reason of this Agreement or its negotiation or execution; and each Party hereto

---

[57] This provision seems to substantively duplicate Section 5.5.

124129505.2

waives and releases all such liabilities, claims and obligations against any such Person who is not a Party.

11.4    Limitation of Seller's Liability.  Seller is entering into this Agreement solely in her capacity as Chapter 11 Trustee of the Acquired Companies. Neither Seller, in her personal capacity or as Chapter 11 Trustee for non-Party Affiliates of the Acquired Companies, nor GlassRatner Advisory & Capital Group LLC shall be liable to Purchaser for any claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), or any amounts or obligations due or owing to Purchaser by Seller, in her capacity as Chapter 11 Trustee of the Acquired Companies, under this Agreement.

## ARTICLE XII
## RISK OF LOSS

12.1    Assumption of Risk.  Purchaser assumes any and all risks of loss or damage to the Assets as of the Effective Time. ~~Sections~~Section 12.2 and Section 12.3 govern the allocation of risk with respect to any event(s) of loss or damage to the Assets prior to the Effective Time. Any event of loss or damage unknown to Seller as of or first discovered by the Parties, or either of them, following the Effective Time shall be deemed to occur after the Effective Time for purposes of this Article XII, regardless of whether the event of loss or damage relates to a condition in existence on or an event prior to the Effective Time.

12.2    Minor Damage.  In the event of loss, destruction or damage to the Assets, or any portion thereof, that is not "major" (as hereinafter defined in Section 12.4), this Agreement shall remain in full force and effect provided Seller either (a) replaces the lost or destroyed Assets and performs any necessary repairs to the damaged Assets or (b) assigns to Purchaser all of Seller's or the Acquired Companies' right, title and interest to any claims and proceeds that Seller may have with respect to any casualty insurance policies or condemnation awards relating to the lost, destroyed or damaged Assets. In the event that Seller elects to replace the lost or destroyed Assets and repair the damaged Assets, Seller shall use reasonable efforts to complete such replacements and repairs promptly and the Closing Date shall be extended a reasonable time in order to allow for the completion of such repairs, unless otherwise agreed by the Parties in writing. If Seller elects to assign a casualty claim to Purchaser, the Purchase Price shall be reduced by an amount equal to any unpaid deductible amount under any applicable insurance policy or uninsured amount.

12.3    Major Damage.  In the event of a "major" loss, destruction or damage to the Assets, or any portion thereof, Purchaser may terminate this Agreement by giving written notice to Seller. Except as provided in Section 9.2, Purchaser shall have no recourse, claims or causes of action against, or right to damages from, Seller's bankruptcy estate in the event of termination of this Agreement due to "major" loss or damage. If Purchaser elects to proceed with Closing, Seller shall (a) assign to Purchaser all of Seller's right, title and interest to any claims and proceeds Seller or the Acquired Companies may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question and (b) the Purchase Price shall be

45

reduced by an amount equal to any unpaid deductible amount under any applicable insurance policy and any uninsured loss.

12.4    Definition of "Major" Loss or Damage.  For purposes of ~~Sections~~Section 12.2 and Section 12.3, "major" loss or damage refers to the following: (i) loss or damage to the Assets, or any portion thereof, such that the cost of replacing or repairing the lost, destroyed or damaged Assets to a condition substantially identical to their condition as of the Execution Date would be, in the opinion of an architect selected by Seller and reasonably approved by Purchaser, equal to or greater than $~~500,000.00~~250,000.00, and (ii) any loss equal to or greater than ~~[DAMAGES AMOUNT $500,000.00]~~$250,000.00 due to a condemnation. If Purchaser does not give notice to Seller of Purchaser's reasons for disapproving an architect within ten (10) Business Days after receipt of notice of the proposed architect, Purchaser shall be deemed to have approved the architect selected by Seller. Unless mutually agreed in writing by the Parties, the opinion of the architect selected pursuant to this Section 12.4 shall control the determination of whether any loss or damage qualifies as a "major" loss or damage for purposes of ~~Sections~~Section 12.2 and Section 12.3.

## ARTICLE XIII
## GENERAL PROVISIONS

13.1    Further Assurances and Cooperation.  Each Party shall execute, acknowledge and deliver to the other Party any and all other assignments, consents, approvals, assurances, documents and instruments reasonably requested by such Party at any time and shall take any and all other actions reasonably requested by such Party at any time for the purpose of obtaining Bankruptcy Court approval of this Agreement, consummating the transactions hereunder, and fulfilling such Party's obligations hereunder. After consummation of the transactions contemplated by this Agreement, the Parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

13.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties. No Party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other Party; *provided, however*, Purchaser may assign this Agreement to an entity or entities controlling, controlled by or under common control with Purchaser (such entity, the "**Purchaser Assignee**") without the prior written consent of Seller, so long as the Purchaser Assignee assumes the obligations of Purchaser under and agrees to be bound by all terms of this Agreement. Purchaser's assignment of this Agreement or any of its rights or obligation hereunder shall not relieve Purchaser of its obligations under this Agreement prior to or following the Closing, unless expressly agreed in writing by Seller.

13.3    Governing Law; Venue.  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of Missouri (without giving effect to the principles of conflicts of laws thereof that would result in the application of the laws of any other jurisdiction), except to the extent that the laws of such State are superseded by the

46

Bankruptcy Code or other applicable federal law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole forum for the adjudication of any matters arising under or in connection with this Agreement, the exclusive jurisdiction of the Bankruptcy Court. The Parties hereby consent to the jurisdiction of the Bankruptcy Court and waive their right to challenge any Proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens and, to the extent necessary, consent to the Bankruptcy Court entering any final orders, judgments or decrees necessary to resolve any matter pending before the Bankruptcy Court arising out of or related to this Agreement or the transactions contemplated by this Agreement.

13.4    <u>Amendments</u>.    This Agreement may not be amended other than by written instrument signed by both of the Parties.

13.5    <u>Exhibits, Schedules and Disclosure Schedule</u>.    The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein. From the Execution Date until the Closing, the Parties agree that Seller may update the Disclosure Schedule, as necessary, upon written notice to Purchaser; *provided*, *however*, that the applicable representations and warranties shall not be deemed amended by such updated Disclosure Schedule. Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all Sections as to which it is reasonably apparent that such disclosure should also apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. The Disclosure Schedule is arranged in sections and subsections corresponding to the numbered and lettered Sections and subsections of this Agreement merely for convenience.

13.6    <u>Notices</u>.    Any notice, demand, letter or other communication required, permitted, or desired to be given hereunder shall be delivered via (a) electronic mail and (b) personal delivery, overnight courier, or United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller: | Carol L. Fox, Chapter 11 Trustee<br>200 E. Broward Blvd., Ste. 1010<br>Fort Lauderdale, FL 33301<br>cfox@glassratner.com |
| With a copy to: | Elizabeth A. Green<br>Tiffany Payne Geyer<br>Jimmy D. Parrish<br>BakerHostetler LLP<br>200 S. Orange Ave., Ste. 2300<br>Orlando, FL 32801-3432<br>egreen@bakerlaw.com<br>tpaynegeyer@bakerlaw.com<br>jparrish@bakerlaw.com |

47

If to Purchaser:     The Third Friday Total Return Fund, L.P.
                 85 North Congress Avenue
                 Delray Beach, FL 33445
                 Attention: Michael Lewitt
                 Email: mlewitt@thirdfriday.com

With a ~~copy~~copies to:  Bradley S. Shraiberg, Attorney at Law
                 2385 NW Executive Center Drive
                 Suite 300
                 Boca Raton, FL 33431
                 ~~bss@slp.law~~

                 bss@slp.law

                 -and-

                 Jonathan "Tre" Dixon, III, Attorney at Law
                 Carlton Fields, P.A.
                 P.O. Box 3239
                 Tampa, FL 33601
                 jdixon@carltonfields.com

The failure to deliver a copy of any notice, demand, letter or other communication upon the Party as required in this Section above and upon the related "copy" recipient shall render the delivery ineffective. Either Party may change, remove or replace any recipient designated under this Section 13.6 through the provision of written notice on the other Party (with a copy to any related "copy" recipient) in accordance with the provisions of this Section, which notice shall be effective one (1) business day following receipt by the other Party.  The giving of a copy of a notice to a "copy" recipient shall not constitute the giving of notice to the applicable Party.

      13.7   Headings.  The headings contained in this Agreement and in the Attachments and Schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Attachments or Schedules hereto.

      13.8   Joint Authorship.  This Agreement shall be construed according to its fair meaning and as if authored by all Parties hereto.

      13.9   Gender and Number; Construction.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation." The words "herein," "hereof" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement. References to a "party", unless the context otherwise requires, means a Party to

124129505.2

this Agreement and includes references to such Party's successors and permitted assigns; and references to a "third party" means a person that is not a Party to this Agreement.

13.10    Third Party ~~Beneficiary~~Beneficiaries.    None of the provisions contained in this Agreement are intended by the Parties, nor shall they be deemed, to confer any benefit on any person not a Party to this Agreement.

13.11    Expenses and Attorneys' Fees.    Except as otherwise provided in this Agreement, each Party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including, without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, whether or not the transactions contemplated hereby are consummated.

13.12    Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on both Parties. The Parties agree that facsimile or electronic .PDF copies of signatures shall be deemed originals for all purposes hereof and that a Party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement.

13.13    Entire Agreement.    This Agreement, the Disclosure Schedule, the Exhibits and Schedules, and the documents referred to in this Agreement contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

13.14    No Waiver.    Any term, covenant or condition of this Agreement may be waived at any time by the Party that is entitled to the benefit thereof but only by a written notice signed by such Party expressly waiving such term or condition. The waiver of any term, covenant or condition shall not be construed (a) as a waiver of any other term, covenant or condition of this Agreement or (b) as a waiver of any subsequent breach of the same term, covenant or condition.

13.15    Severability.    ~~With the exception of Sections        , if~~If any term, provision, condition or covenant of this Agreement or the application thereof to any Party or circumstance is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of Seller or Purchaser under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

124129505.2

13.16   <u>Time is of the Essence</u>.   Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

[*SIGNATURE PAGE TO FOLLOW*]

124129505.2

This Agreement has been entered into as of the date set forth in the opening paragraph of this Agreement.

**PURCHASER:**

**The Third Friday Total Return Fund, L.P.**

**By:**   **Third Friday GP, LLC**, a Delaware limited liability company

By: _____
        Michael Lewitt, as Manager

**SELLER:**

**Carol L. Fox, as Chapter 11 Trustee of St. Alexius Properties, LLC, St. Alexius Hospital Corporation # 1, and Success Healthcare 2, LLC**

By: _____
        Carol L. Fox, as Chapter 11 Trustee

## ATTACHMENT 1

### Certain Definitions

In addition to the other definitions contained in this Agreement, the following terms will, when used in this Agreement, have the following respective meanings:

"***Accounts Receivable***" means _____.

"***Acquired Companies***" means SAHC and SAP.

"***Acquisition Proposal***" has the meaning set forth in <u>Section 4.6</u>.

"***Affiliate***" means, with respect to any Entity, any Person who or that directly or indirectly owns or controls, is owned or controlled by, or is under direct or indirect common ownership or control with, such Entity. Without limiting the generality of the foregoing, a Person shall be deemed to "own" an Entity if such Person owns, directly or indirectly, more than 50% of the capital stock or other equity interest of such Entity. A Person shall be deemed to control an Entity if it possesses the power to direct the management and policies of an Entity whether through the ownership of voting securities, through partnership or membership interests, by contract or otherwise; and control shall be presumed if the Person holds more than 50% of the voting power in the Entity or the ability to appoint or elect more than 50% of the governing board or managers of the Entity.

"***Agreement***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Assets***"  means all of the properties and other assets of SAHC and SAP including, without limitation, the Personal Property and the Real Property.

"***Business***" means the Hospital, the Nursing School, the other businesses and operations at or from the Facilities, as currently conducted or as contemplated to be conducted in the future.

"***Business Day***" means each day other than a Saturday, Sunday or other day on which commercial banks in Tampa, Florida, are authorized or required by Law to close.

"***CARES Act***" means The Coronavirus Aid, Relief, and Economic Security Act.

"***Carol Fox***" has the meaning set forth in the opening paragraph of this Agreement.

"***Closing***" has the meaning set forth in <u>Section 1.3</u>.

"***Closing Date***" has the meaning set forth in <u>Section 1.3</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended, and all regulations, and rules and other guidance promulgated thereunder.

"***Contract***" means any contract, agreement, understanding, arrangement, deed, power of attorney, option, lease, license, insurance policy, commitment or other instrument of any kind,

whether written or oral, to which a Person is a party, or under which such Person is otherwise bound.

"***COVID Relief Programs***" means, collectively, the CARES Act, the FFCRA and all Terms and Conditions, FAQs, rules and guidance issued by any Governmental Authority related thereto, including any programs or facilities established by the Board of Governors of the Federal Reserve System to which the U.S. Treasury Department has provided financing as contemplated by Title IV of the CARES Act.

"***Effective Time***" has the meaning set forth in <u>Section 1.3</u>.

"***Employee***" has the meaning set forth in <u>Section 2.43</u>.

"***Encumbrances***" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction or encumbrance of any kind, including any restriction on use, voting (in the case of any security or equity interest) or financing statement under the Laws of any jurisdiction.

"***Enforceability Exceptions***" means any applicable bankruptcy, reorganization, insolvency, moratorium, other laws affecting creditors' rights generally and general principles of equity.

"***Entity***" means any corporation, partnership, limited liability company, professional association or other entity.

"***Environmental Condition***" means any event, circumstance or conditions related in any manner whatsoever to:  (a) the current or past presence or spill, emission, discharge, disposal, release or threatened release of any Hazardous Materials, into the environment; (b) the on-site or off-site treatment, storage, disposal or other handling of any Hazardous Material originating on or from the Real Property; (c) the placement of structures or materials into waters of the United States; (d) the presence of any Hazardous Materials in any building, structure or workplace or on any portion of the Real Property; or (e) any violation of Environmental Laws at or on any part of the Real Property or arising from the activities of Seller, any Affiliate of Seller, or any other Person at the Facilities involving Hazardous Materials.

"***Environmental Law***" means any Law pertaining to environmental matters including Hazardous Materials.

"***Environmental Permit***" means all Permits required under any Environmental Law necessary to operate the Business as currently conducted.

"***Equity Securities***" means: (a) any common, preferred, or other capital stock, limited liability company interest or unit, partnership, limited partnership or general partnership interest, or similar security; (b) any warrants, options or other rights to, directly or indirectly, acquire any security described in clause (a) of this definition; (c) any other security containing equity features

124129505.2

124129505.3

or profit participation features; (d) any security or instrument convertible or exchangeable, directly or indirectly, with or without consideration, into or for any security described in clauses (a) through (c) of this definition or another similar security (including convertible notes); and (e) any security carrying any warrant or right to subscribe for or purchase any security described in clauses (a) through (d) above or any similar security.

"***Execution Date***" shall have the meaning set forth in the opening paragraph of this Agreement.

"***Exhibits***" means the exhibits to this Agreement.

"***Facilities***" means (a) the Hospital, (b) all other healthcare facilities, healthcare operations (including the Nursing School) or physician practices owned, leased, managed or operated by either of the Acquired Companies, and (c) all assets and operations ancillary to or associated with any of the foregoing.

"***FFCRA***" means the Families First Coronavirus Response Act.

"***GAAP***" means U.S. Generally Accepted Accounting Principles, consistently applied.

"***Governing Documents***" means, with respect to any particular Entity: (a) if a corporation, the articles or certificate of incorporation and the bylaws; (b) if a general partnership, the partnership agreement and any statement of partnership; (c) if a limited partnership, the limited partnership agreement and the articles or certificate of limited partnership; (d) if a limited liability company, the articles or certificate of organization or articles or certificate of formation and operating agreement, regulations, limited liability company agreement, or company agreement; (e) if another type of Entity, any articles, certificate, charter or similar document adopted or filed in connection with the creation, formation or organization of the Entity; (f) all equity holders' agreements, partnership agreements, operating or limited liability company agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization or management of any Entity or relating to the rights, duties and obligations of the equity holders of any Entity; and (g) any amendment or supplement to any of the foregoing.

"***Governmental Authority***" means any federal, state, local or foreign government or any court of competent jurisdiction, administrative agency, bureau or commission or other governmental authority or instrumentality, domestic or foreign.

"***Governmental Order***" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"***Governmental Programs***" has the meaning set forth in Section 2.29(a).

"***Hazardous Materials***" means: (a) those substances defined in or regulated under the following federal statutes and their state counterparts and all regulations thereunder—the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Solid

124129505.2

124129505.3

Waste Disposal Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Clean Water Act, the Safe Drinking Water Act, the Atomic Energy Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Clean Air Act and the Occupational Safety and Health Act; (b) petroleum and petroleum products, including crude oil and any fractions thereof; (c) natural gas, synthetic gas and any mixtures thereof; (d) polychlorinated biphenyls, asbestos and radon; (e) medical waste, including infectious waste, non-infectious waste and etiologic waste; and (f) any substance, material or waste regulated by any Governmental Authority pursuant to any Environmental Laws.

"*__HIPAA__*" means the Health Insurance Portability Act of 1996, as amended.

"*__Indebtedness__*" means: (a) with respect to any Person (including, for the avoidance of doubt, each of the Acquired Companies), all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person for any (i) indebtedness for borrowed money (including overdraft facilities), (ii) deferred price of property, goods or services (other than trade payables incurred in the Ordinary Course of Business that are less than 45 days past due), (iii) reimbursement and other obligations for surety bonds, (iv) letters of credit, (v) obligations evidenced by notes, bonds, debentures or similar contracts, (vi) capital lease obligations, (vii) Contracts relating to interest rate protection, swap agreements or collar agreements (including any breakage or similar costs payable in connection with any of the foregoing), (viii) contingent purchase price payment, earnout or similar payment, and (ix) guaranties of any of the foregoing; and (b) with respect to each Acquired Company, all obligations in respect of principal, accrued interest, penalties, fees and premiums for any payable or indebtedness of either Acquired Company that is owing to any other Entity or any of its Affiliates.

"*__Intellectual Property__*" means any intellectual or industrial property and other proprietary rights that may exist or be created under the laws of any jurisdiction throughout the world, and any applications for registration and registrations of the foregoing property or rights (whether pending, existing, abandoned or expired), including:

(a)      all registered or unregistered trademarks, service marks, trade names and general intangibles of a similar nature (including corporate names, logos, trade dress, slogans and product names), and the goodwill associated therewith, and all rights in Internet web sites, Internet domain names, uniform resource locators, and keywords and purchased search terms;

(b)      all patents and patent applications (including all original applications, divisionals, continuations, continuations-in-part, re-examinations, extensions or reissues thereof), and all conceptions, inventions and discoveries that may be patentable;

(c)      all registered and unregistered copyrights and other rights of authorship in both published and unpublished works, and all moral rights therein, including all applications; and

(d)      all information that derives economic value from not being generally known, and any other information that is proprietary or confidential, including, know-how, ideas, processes,

Attachment 1 Page  4

documentation, information, data, customer lists, software (in both object code and source code form), data, process technology, plans, drawings, designs and specifications.

"***IT Systems***" has the meaning set forth in Section 2.25(d).

"***Judgment***" means any: (a) order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, writ or award issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency or other Governmental Authority or any arbitrator or arbitration panel; or (b) Contract with any Governmental Authority entered into in connection with any Proceeding.

"***Law***" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, rule, regulation, ruling, determination or decision that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"***Leased Real Property***" has the meaning set forth in Section 2.24(b).

"***Leases***" has the meaning set forth in Section 2.24(b).

"***Liability***" or "***Liabilities***" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"***Losses***" shall include any claim, loss, damage, injury, liability, action, suit, settlement, judgment, award, fine, penalty, Tax, fee, including any legal fee, expert fee, accounting fee or advisory fee, charge, cost or expense including any cost of investigation, defense, penalty, fee and disbursement of counsel; *provided*, *however*, that "Loss" shall not mean punitive damages except to the extent that a third party recovers punitive damages against an Indemnified Party.

"***Material Adverse Effect***" means any change, event or effect that, when taken individually or together with all other adverse changes, events or effects, has had or could reasonably be expected to have a material adverse effect on the Business, Assets, liabilities, results of operations or financial condition of the Acquired Companies taken as a whole; *provided, however*, that a Material Adverse Effect shall not include any one or more of the following: (a) any change, event or effect in general economic conditions or in the securities markets of the U.S. in general; (b) any change, event or effect with respect to the healthcare industry that has not affected or does not affect the Acquired Companies in a materially disproportionate manner; (c) any change, event or effect with respect to the practice of urology (including the business aspects thereof) that has not affected or does not affect the Acquired Companies in a materially disproportionate manner; (d) any change, event or effect with respect to policies, practices or procedures of managed care companies or intermediaries that has not

124129505.2

124129505.3

affected or does not affect the Acquired Companies in a materially disproportionate manner; (e) any change, event or effect with respect to Medicare, Medicaid, TRICARE or other governmental payment or reimbursement program that has not affected or does not affect the Acquired Companies in a materially disproportionate manner; (f) any change, event or effect resulting from any change or proposed change in Law including, without limitation, the federal Patient Protection and Affordable Care Act; (g) any change, event or effect resulting from any action taken by Purchaser or Seller pursuant to or in accordance with this Agreement (solely to the extent such act is specifically identified in this Agreement) or at the specific request of Purchaser, or (h) any change, event or effect resulting from any "Act of God," including, but not limited to, any hurricane, fire, earthquake or other natural disaster other than any epidemic, pandemic or disease outbreak (including, but not limited to, COVID-19).

"***Material Contract***" has the meaning set forth in Section 2.22(a).

"***Medicare and Medicaid Programs***" has the meaning set forth in Section 2.29(a).

["***Nursing School***" means the nursing education program being operated by SAHC.]

"***Open Source Materials***" has the meaning set forth in Section 2.25(c).

"***Ordinary Course of Business***" means an action taken by either Acquired Company that is consistent in nature, scope and magnitude with the past practices of the Acquired Companies and is taken in the ordinary course of the normal, day-to-day operations of the Acquired Companies.

"***Outside Date***" has the meaning set forth in Section 1.3.

"***Owned Real Property***" has the meaning set forth in Section 2.24(a).

"***Paid Time Off***" means the an employees' accrued vacation, sick, holiday or other paid time off and related taxes and other payroll obligations with respect thereto.

"***Party***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Personal Property***" means all of the assets and properties of SAHC and SAP other than Real Property, including, without limitation, the Intellectual Property.

"***Permit***" means any: (a) permit, license, certificate, franchise, concession, ratification, permission, clearance, confirmation, endorsement, waiver, certification, designation, rating, registration, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law; or (b) right under any Contract with any Governmental Authority.

"***Permitted Encumbrances***" has the meaning set forth on Schedule 2.23(b).

124129505.2

124129505.3

"***Person***" means any individual, firm, corporation, partnership, limited liability company, trust, other Entity, joint venture or Governmental Authority.

"***Plans***" has the meaning set forth in <u>Section 2.40(a)</u>.

"***Private Programs***" has the meaning set forth in <u>Section 2.29(a)</u>.

"***Proceeding***" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"***Purchase Price***" has the meaning set forth in <u>Section 1.2</u>.

"***Purchaser***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Real Property***" means the Leased Real Property and the Owned Real Property.

"***Related Party***" means, with respect to any Person, any shareholder, partner, member, director, manager or officer of such Person, or any family member of any of the foregoing.

"***Representatives***" means, with respect to a Person, such Person's shareholders, partners, members, directors, managers or officers.

"***SAHC***" has the meaning set forth in the Recitals.

"***SAP***" has the meaning set forth in the Recitals.

"***Seller***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Seller Fundamental Representations***" has the meaning set forth in Section 101(a) of this Agreement.

"***SH2***" has the meaning set forth in the opening paragraph of this Agreement.

"***Software***" means all computer software and all versions and forms thereof, including all source code, object code, executable code, binary code, files, objects, comments, screens, user interfaces, report formats, templates, menus, buttons and icons, and all documentation and other items related thereto, including all data, materials, manuals, design notes and other items and documentation related thereto or associated with the foregoing.

"***Tax***" or "***Taxes***" (and with correlative meaning, "***Taxable***") means any United States federal, state or local, or non-United States, income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, natural resources, severance, stamp, withholding, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, net worth, intangibles, social security, unemployment, disability, payroll, license, employee or other tax or

124129505.2

124129505.3

similar levy, of any kind whatsoever, including any interest, penalties or additions to tax in respect of the foregoing.

"***Tax Authority***" means any Governmental Authority having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"***U.S.***" means the United States of America.

124129505.2

124129505.3

Document comparison by Workshare 10.0 on Monday, December 21, 2020
11:55:36 AM

| Input: | |
|---|---|
| Document 1 ID | iManage://TPADOCS/dbCarlton01/124129505/2 |
| Description | #124129505v2<dbCarlton01> - Third Friday  Stock Purchase Agreement (Americore) |
| Document 2 ID | iManage://TPADOCS/dbCarlton01/124129505/3 |
| Description | #124129505v3<dbCarlton01> - Third Friday  Stock Purchase Agreement (Americore) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 372 |
| Deletions | 305 |
| Moved from | 4 |
| Moved to | 4 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 685 |