UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

---

IN RE:

AMERICORE HOLDINGS, LLC, *et al.*[1]

Debtors.

Chapter 11
Jointly administered
Case No. 19-61608

---

CAROL FOX, AS CHAPTER 11 TRUSTEE OF ELLWOOD MEDICAL CENTER OPERATIONS, LLC,

Plaintiff,

v.

FOUNTAIN HEALTHCARE SERVICES INC.; FIRST CHOICE LABORATORY LLC; GENEXE, LLC; PREVENTIVE HEALTH SERVICES LLC; PURSUIT CHARTER COMPANY LLC; DCMI, LLC; KEATON CASHE LANGSTON; DANIEL MICHAEL HURT; SONORAN DESERT PATHOLOGY ASSOCIATES, LLC; ASCENSION AVIATION LLC; RUSSELL KITCHEN; DIANA KITCHEN; BTTNG, LLC; FULGENT GENETICS, INC.; PEACH STATE HEALTH MANAGEMENT, LLC D/B/A AEON GLOBAL HEALTH,

Defendants.

Adversary No. 22 _____-

---

## **COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS**

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in parentheses): Americore Holdings, LLC (0115); Americore Health, LLC (6554); Americore Health Enterprises, LLC (3887); Ellwood Medical Center, LLC (1900); Ellwood Medical Center Real Estate, LLC (8799); Ellwood Medical Center Operations, LLC (5283); Pineville Medical Center, LLC (9435); Izard County Medical Center, LLC(3388); Success Healthcare 2, LLC (8861); St. Alexius Properties, LLC (4610); and St. Alexius Hospital Corporation #1 (2766) (collectively, the "Debtors").

Carol L. Fox, as Chapter 11 Trustee ("Ms. Fox" or "Trustee") of debtors Ellwood Medical Center Operations, LLC ("Ellwood"), files this Complaint against Fountain Healthcare Services Inc.; First Choice Laboratory LLC; Genexe, LLC; Preventive Health Services LLC; Pursuit Charter Company LLC; DCMI, LLC; Keaton Cashe Langston; Daniel Michael Hurt; Sonoran Desert Pathology Associates, LLC; Ascension Aviation LLC; Russell Kitchen; Diana Kitchen; BTTNG, LLC; Fulgent Genetics, Inc.; and Peach State Health Management, LLC d/b/a Aeon Global Health (collectively, the "Defendants") and alleges as follows:

## PLAINTIFF'S APPOINTMENT, PROCEDURAL OVERVIEW, JURISDICTION AND VENUE

1.      On December 31, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court under Chapter 11 of the Bankruptcy Code.

2.      Shortly thereafter, the United States Trustee's Office appointed an Official Unsecured Creditors Committee (the "Committee"), which  engaged the services of Nelson Mullins as counsel to the Committee. Within a few short weeks after being engaged as counsel to the Committee, the Committee along with the United States Trustee moved for appointment of a Chapter 11 Trustee. On the eve of the Committee taking the principal of the Debtors, Grant White's deposition, Mr. White relinquished his position as the debtor in possession and in open Court the day after, acknowledged that he could not and would not act as a fiduciary and remain as the Debtor-in-Possession on behalf of the Debtors.

3.      Thereafter, the Court entered an agreed order for the appointment of a Chapter 11 Trustee and directed the United States Trustees Office to immediately appoint

a Chapter 11 Trustee in these jointly administered cases. (*See* Main Case – ECF Nos. 260, 269, 270 and 352)

4.      On February 21, 2020, the United States Trustee filed its Notice of Appointment of Ms. Fox as Chapter 11 Trustee and on February 24, 2020, Ms. Fox filed her Notice of Acceptance of the Appointment as Trustee [*See* Main Case – ECF Nos. 260 and 269].

5.      Because of the complexities of these bankruptcy cases, the challenges presented by the Covid pandemic and the Debtors' wanton inadequacies of pre-petition record keeping, on or about October of 2021, the Trustee sought to extend the deadlines under 11 U.S.C. §§ 108 and 546 to bring avoidance and other causes of action in these cases.  The Court approved and entered an order extending those deadlines through and including May 2, 2022, and then entered a second order extending those deadlines through and including October 31, 2022.  Most recently, the Court entered a third order extending the deadlines through and including April 30, 2023 [*See* Main Case – ECF No. 1663].

6.      As described below, the Trustee has concluded that third parties orchestrated a clinical lab fraud scheme out of Ellwood and has been able to trace significant funds siphoned out of Ellwood through that fraudulent enterprise.

7.      This Complaint seeks to avoid those transfers and recover those funds from both defendants that were considered initial transferees as well as subsequent transferees pursuant to 11 U.S.C. § 550.

8.      This is a core proceeding pursuant to 28 U.S.C. Section 157 (b)(2)(A),(H), and (O).

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334 (b) and may enter any final orders and final judgments on this Complaint and Trustee consents to same.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

11.      The transfers that are the subject of this Complaint were all effectuated using bank accounts located in the United States of America.

**PRELIMINARY STATEMENT**

12.      Daniel Michael Hurt ("Hurt"), Keaton Cashe Langston ("Keaton"), and others yet to be identified (collectively, the "Lab Fraudsters"), represented to Grant White ("White"), the Debtors' principal, that they had expertise in the clinical lab field. White, who had little to no experience in the clinical lab field, based upon the representations made by the Lab Fraudsters, believed that the key to generating significant revenue for Ellwood, an acute care hospital in a nearby county adjacent to Pittsburgh that had suffered through five years of financial distress before Debtor Americore Health, LLC's acquisition of it, was to engage in a clinical laboratory outreach program.  At first, the Lab Fraudsters convinced White, to initiate a urine toxicology testing service for non-patients and submit claims to non-governmental third-party payors for tests that were not performed at Ellwood.  Once the third-party payors stopped payments because of the fraudulent claims submission and began to recoup their reimbursements, the Lab Fraudsters subsequently introduced White to a "Medicare outreach plan" to bill Medicare over $25 million dollars for cancer genetic testing ("CGx") and pharmacogenetic testing ("PBx") (CGx and PBx are collectively referred to as "Genetic Testing") on unwary and unsuspecting seniors who attended health fairs, senior centers, low-income housing areas and religious institutions like churches and synagogues.  None of the specimens screened for Genetic Testing involved a single patient from Ellwood but rather were

patients from a multitude of states outside of Pennsylvania, who believed that such testing was free if the patient was a Medicare beneficiary.  The Lab Fraudsters caused Ellwood to set up an elaborate system of receiving soccal swabs (i.e., cheek swabs) and referring each test out to molecular clinical labs and bill Medicare as if the Hospital had performed the tests.  Sham companies such as Defendants Fountain Healthcare Services, Inc and First Choice Laboratory LLC would pay medical professionals, marketing companies, themselves and the Lab Fraudsters' related companies in exchange for referring of these Medicare beneficiaries in violation of both state and federal anti-kick-back laws.  In the end, Defendants pocketed most of the money received from Medicare and Ellwood was forced to shut down for lack of funds to maintain its operations.

## The Medicare Program

13.    Medicare is a federal health care program providing benefits to individuals who are 65 years of age or older and who are entitled to retirement benefits, or who are disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries" or "patients."

14.    Medicare is a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and is considered a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

15.    Medicare has multiple components, called "parts," including, as relevant here, Part A and Part B.  Medicare Part A covers the costs of hospital care and inpatient services, such as surgical procedures, certain medical supplies utilized in inpatient care,

Case 19-61608-grs   Doc 1703   Filed 11/08/22   Entered 11/08/22 15:52:09   Desc Main
Document      Page 6 of 37

and certain ancillary services during an inpatient encounter. Additionally, Medicare Part A covers limited home health services, skilled nursing facility care, and hospice care. Medicare Part B covers the costs of physicians services and outpatient care, such as physical therapy, occupational therapy, and, as relevant here, laboratory testing services.

16.     As with all reimbursement by Medicare, for the most part, with very few exceptions not relevant herein, Medicare covers the cost of services billed under Part A and Part B only if, among other requirements, the relevant services are reasonable, medically necessary, and ordered by a treating physician. Medicare does not reimburse claims for services that are neither reasonable nor medically necessary. Likewise, Medicare does not reimburse claims for services that are procured through kickbacks or bribes. Such claims are deemed false and fraudulent because they violate Medicare laws, regulations, and program instructions.

17.     Hospitals occasionally provide outpatient services to patients who are not admitted in an inpatient capacity at the hospital or its emergency department. In these circumstances, hospitals are permitted to seek reimbursement through the Medicare Part A Outpatient Payment Prospective System ("OPPS"). The OPPS require hospitals to submit certain outpatient medical claims through their Part A Medicare Administrative Contractor, a private health care insurer that had been awarded a Medicare contract to administer and process medical claims ("MAC"). Reimbursement of such claims are paid through Medicare Part B (but at rates set for Part A reimbursements) for a variety of services, including, as relevant here, laboratory testing services.

18.     To enroll in Medicare, medical providers and suppliers, including hospitals and physicians, are required to obtain a National Provider Identifier ("NPI"). Providers are

also required to submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider. In addition, enrolling providers complete the CMS Form 855B, which specifically certifies the following: (1) the provider agrees to abide by applicable Medicare laws, regulations, and program instructions, including, but not limited to, the federal anti-kickback statute (42 U.S.C. § 1320a-1b(b)); (2) the provider understands that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (3) the provider is required to refrain from knowingly presenting or causing to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

19.    Under Medicare regulations, a medical provider is permitted to submit claims only for services actually rendered and is required to maintain patient records verifying the provision of services.

20.    To receive reimbursement for a covered service from Medicare, a medical provider is required to submit a claim, either electronically or in writing. The claim must include information identifying the medical provider submitting the claim, the medical provider rendering the service, the referring physician, the patient, and the services rendered. By submitting the claim, the provider certifies, among other things, that each service was rendered personally by the provider or under his or her direct supervision and incident to the provider's care, and that the service was medically necessary for the health or well-being of the patient.

21.    Every Medicare claim submitted by, or on behalf of, a physician, hospital, or other health care provider, includes an agreement by the provider to abide by

Medicare's rules and regulations. As a condition of payment, Medicare requires providers to certify that all information on the claim is true, correct, and complete.

## Background on Ellwood City Medical Center

22.    Ellwood operated an acute care hospital located in Ellwood City, Pennsylvania, in the Western District of Pennsylvania known as Ellwood City Medical Center. Ellwood maintained an on-site laboratory in Ellwood City Medical Center (hereinafter, the "Ellwood Laboratory") to perform testing for patients admitted to the hospital in an inpatient or outpatient capacity.

23.    Ellwood was an enrolled Medicare provider operating as an acute care hospital, or ACH—i.e., a hospital that provides inpatient and outpatient medical care and other related services for surgery, acute medical conditions, or injuries.

24.    The Ellwood Laboratory was a qualified hospital laboratory ("QHL"), a type of laboratory that provided certain clinical laboratory tests 24 hours a day, 7 days a week, to serve the hospital's emergency inpatient and outpatient needs as well as its emergency room. In addition to operating as a QHL, the Ellwood Laboratory acted by Medicare regulations as a so-called independent clinical laboratory, or ICL—when Ellwood Laboratory performed tests for persons who were not hospital inpatients or outpatients. ICLs typically perform services involving the biological, microbiological, serological, chemical, immune-hematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition.

25.    The Ellwood Laboratory was required to be certified under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), which established a set of

national standards for laboratories to ensure quality testing. Ellwood Laboratory maintained an active CLIA certification for certain testing services.

26.     At no time did the Ellwood Laboratory have a CLIA certification authorizing it to perform Genetic Testing.

27.     Medicare requires that all procedures performed by Ellwood or Ellwood Laboratory be ordered by the physician or practitioner who was treating the patient; that is, the physician who was furnishing a consultation or treating a patient for a specific medical problem and who used the results in the management of the patient's specific medical treatment.

## Reference Laboratories

28.     A reference laboratory arrangement exists when a laboratory receives a specimen for testing and sends the specimen to another laboratory for testing, rather than testing the specimen on-site. In this arrangement, the "referring" laboratory is the laboratory that originally received the specimen to be tested but referred the specimen to another laboratory to perform the laboratory test, the "reference" laboratory.

29.     As defined in Title 42, United States Code, Section 1833(h)(5)(A), a referring laboratory is permitted to bill for tests performed by a reference laboratory if the referring laboratory meets one of the following conditions:

a.     The referring laboratory was located in, or was part of, a rural hospital;

b.     The referring laboratory was wholly owned by the entity performing such test, the referring laboratory wholly owned the entity performing

such test, or both the referring laboratory and the entity performing such test were wholly owned by a third entity; or

c.     The referring laboratory did not refer more than 30 percent of the clinical laboratory tests for which it received requests for testing during the given calendar year.

30.     Medicare requires the disclosure of any reference laboratory arrangement using a modifier—"90"—on the claim form.

31.     At no time was Ellwood designated by CMS as a rural hospital for purposes of the restrictions concerning the use of reference laboratories, nor was it wholly owned by, or the owner of, any reference laboratory.

32.     During the relevant time period of April 2019 to September 2019, Ellwood submitted claims to Medicare for over 6,500 types of Genetic Testing on non-patients, far in excess of the 30% cap.  All of the Genetic Testing was referred to outside reference laboratories such as Fulgent Genetics, Inc. ("Fulgent") and Peach State Health Management, LLC d/b/a Aeon Global Health ("Peach State") among others. As such, Ellwood Laboratory was required to notify Medicare of exceeding the statutory cap and was required to have the reference laboratory bill Medicare, as it could not.

33.     Instead, during the relevant time period of April 2019 to September 2019, Ellwood submitted the nonpatient Genetic Testing claims to Medicare on Form 837i claims representing to Medicare that all the testing was being performed at Ellwood Laboratory, instead of either disclosing a "90" modifier giving the required information to Medicare regarding the name of the reference laboratory that actually performed the tests or allowing the reference laboratory to bill Medicare.

## Genetic Testing

## CGx

34.     Cancer genomic testing (CGx) uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future and identify patients that may benefit from U.S. Food and Drug Administration (FDA)-approved cancer treatments. CGx testing is not a method of diagnosing whether an individual presently has cancer.

35.     Medicare does not cover the costs associated with diagnostic testing that are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395(a)(1)(A). Except for certain statutory exceptions not applicable here, Medicare does not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

36.     Where diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposes additional requirements before covering the costs associated with such testing. Specifically, 42 C.F.R. § 410.32(a) provides: "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id*. "*Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary*." *Id* (emphasis added).

11

37.     Because CGx testing does not diagnose cancer, Medicare only covers the

costs associated with such tests in limited circumstances, including when a patient has

cancer and the patient's treating physician deems such testing necessary for the patient's

treatment of that cancer. Medicare does not cover CGx testing for patients who do not

have cancer or lack symptoms of cancer.

38.     Where a CGx test is procured through the payment of a kickback in violation

of federal law, a claim to Medicare for reimbursement for such test is fraudulent.

39.     At no time did the Ellwood Laboratory maintain CLIA-certified equipment to

conduct CGx testing on-site, nor employed qualified molecular experts to assess the

results of such tests.

## PGx

40.     Pharmacogenetic testing (PGx) detects specific genetic variations in genes

that impact the metabolism of certain medications, i.e., testing that helps determine,

among other things, whether certain medications would be effective if used by a particular

patient.

41.     PBX testing is not reimbursable by Medicare unless the patient has been

diagnosed with cancer.

42.     Additionally, Medicare provides limited coverage for PBx testing only to

improve safety in the use of specific medications by avoiding potentially harmful

medications, doses or adverse reactions known to occur with certain human genotypes.

**Telemedicine Arrangements**

43.    Telemedicine is a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to allow a physician to interact with a patient. Telemedicine companies provided telemedicine services to individuals by hiring physicians and other health care providers who are paid a per-consult fee to conduct remote consultations with patients.

44.    Medicare Part B covers expenses for specified telemedicine services but only when certain requirements are met. These requirements include that:

      a.    the patient is located in a rural or health professional shortage area;

      b.    services are delivered via an interactive audio and video telecommunications system; and

      c.    the patient is at a practitioner's office or a specified medical facility—not at a patient's home—during the telemedicine consultation with a remote practitioner.

**The Defendants, Entities they Controlled, and Other Relevant Entities**

45.    Defendant Daniel Michael Hurt (Hurt) is a resident of Florida and is currently a criminal defendant in several healthcare fraud cases filed in the Western District of Pennsylvania, the Southern District of New Jersey, and the Southern District of Florida. Hurt and other individuals including Russell Kitchen and Keaton own, operate and maintain financial interests in several purported consulting and clinical lab entities including, Sonoran Desert Pathology Associates, LLC, First Choice Laboratory LLC and Fountain Healthcare Services LLC.

46.     Defendant First Choice Laboratory LLC ("First Choice") is a Florida Limited Liability Company and is owned by Russell L. Kitchen LLC and Russell Kitchen.  Russell L. Kitchen LLC is owned and managed by Hurt.

47.     Defendant Fountain Healthcare Services LLC ("Fountain") is a Delaware Corporation and is or was owned and controlled by Hurt and Keaton.

48.     Defendant Sonoran Desert Pathology Associates LLC ("Sonoran") is a California Limited Liability Company registered to do business in Florida and maintains the same principal address as First Choice, and upon information and belief is owned and controlled by Hurt.

49.     Defendant Ascension Aviation LLC ("Ascension") is a Delaware Limited Liability Company registered to do business in Florida and is owned and controlled by Hurt and Russell Kitchen.

50.     Defendant Pursuit Charter Company LLC ("Pursuit Charter") is a Delaware Company and upon information and belief is owned and controlled by Hurt.

51.     Defendant Genexe LLC ("Genexe") is a Delaware Limited Liability Company.

52.     Defendant DCMI LLC ("DCMI") is a Florida Limited Liability Company owned and controlled by Hurt.

53.     Defendant BTTNG LLC ("BTTNG") is a Delaware Limited Liability Company.[2]

---

[2] BTTNG is owned and controlled by Marc Levy and Jordan I. Shamah, both of whom, on information and belief, are residents of the State of Florida.  Mark Levy is also a defendant who plead guilty to healthcare fraud in a case in filed by the DOJ in the Southern District of Florida and is awaiting sentencing in October or November 2022.

54.     Defendant Preventive Health Services LLC ("Preventive Health") is a Wyoming Limited Liability Company with its principal place of business located in Maryland.

55.     Defendant Keaton Cashe Langston (Keaton) is a resident of the state of Mississippi.

56.     Defendant Fulgent Genetics, Inc. (Fulgent) is a Delaware Corporation with its principal place of business located in California.

57.     Defendant, Peach State Health Management, LLC d/b/a Aeon Global Health (Peach State) is a Georgia Limited Liability Company.

58.     Defendant Russell Kitchen is a resident of Florida.

59.     Defendant Diana Kitchen is a resident of Florida.

60.     On information obtained from the prior staff at Ellwood and Ellwood Laboratory, the Trustee believes that there are a multitude of other marketing companies (collectively, the "Marketeers") that were wrongfully engaged in a variety of marketing activities including hosting health fairs in public places, offering free Genetic Testing at long term care facilities and contacting Medicare beneficiaries by phone in order to obtain CGx and PBx soccal specimens (cheek swabs) from Medicare beneficiaries for subsequent submission to Ellwood Laboratory for Genetic Testing and who received illegal kickbacks, but whose identities remain secreted from the Trustee.

## The History of the Clinical Laboratory Fraud Program at Ellwood [3]

61.     On or around 2019, Keaton, the managing partner of Fountain, Hurt, the co-owner of Fountain and an individual who owned a corporation called HSD Consultants d/b/a Hospital Services Direct ("HSD"),  that Novitas, the MAC responsible for paying Medicare payments in Pennsylvania was the only MAC in the country that had not yet set up a molecular diagnostic service program called a MolDX Program.  The MolDX Program required laboratories who wished to gain coverage under the MAC's jurisdiction to submit claims for Genetic Testing:

    a.     to be enrolled in Medicare; and

    b.     to submit a technical assessment outlining the performance characteristics and clinical validity of its testing.

Instead, in Pennsylvania, which was a non-MolDX Program jurisdiction, any Medicare laboratory that believed it was competent to perform these complex molecular diagnostic tests could bill Novitas at a significantly higher rate than the MolDX Program jurisdictions, which on average was approximately $6,000 per specimen.

62.     Both Hurt, Keaton and others executed various sham agreements and business arrangements with Ellwood and Ellwood Laboratory that disguised the kick-backs scheme that Fountain, First Choice and HSD were to receive under the guise of "management services."[4]

---

[3] As early as October of 2017, White was approached by three individuals to embark upon a clinical lab program involving toxicology testing.

[4] The Trustee is still attempting to obtain financial information regarding the monies received by HSD that came directly or indirectly through Ellwood or the other Debtors.

63.     The Marketeers, such as Preventive Health, BTTNG, and Genexe acting in concert with and at Hurt and Keaton's direction, among others, contacted thousands of Medicare beneficiaries throughout the United States by targeting them with marketing campaigns inducing them to submit Genetic Testing specimens by means of cheek swabs sent to the Medicare beneficiaries' homes or provided to them at purported "health fairs", among other acquisition methods.

64.     In addition to the Marketeers, Hurt, Keaton, and others used individuals associated with entities that Hurt and Keaton controlled, including Sonoran, to obtain Genetic Testing specimens from Medicare beneficiaries.

65.     Hurt, Keaton and others, in conjunction with the Marketeers, worked with a network of telemedicine health care providers to obtain prescriptions for Genetic Testing, without regard to the fact that those telemedicine health care providers did not conduct proper telemedicine visits, were not treating the Medicare beneficiaries for cancer or symptoms of cancer (or for any other condition), did not use the test results in the treatment of the beneficiaries, and generally were not qualified to understand and interpret the CGx or PBx -related test results.

66.     Hurt, Keaton, and others offered and paid kickbacks to the Marketeers, among others, in exchange for their efforts to cause Medicare beneficiaries to submit Genetic Testing samples to the Marketeers who in turn forwarded those specimens to Ellwood Laboratory in support of Ellwood's subsequent claims to Medicare.

67.     Although the Marketeers shipped and caused to be shipped Genetic Testing specimens directly to Ellwood Laboratory, Hurt, Keaton and others directed Ellwood Laboratory staff to then re-package and re-ship such specimens to reference laboratories

like Fulgent and Peach State because, as Hurt, Keaton, and others knew, Ellwood

Laboratory did not possess CLIA-certified equipment or personnel to conduct on-site

Genetic Testing. Instead, after specimens were accessioned (received, sorted, entered

into the laboratory information system, labelled with barcoded labels and processed) by

Ellwood Laboratory, they were referred out to other molecular independent laboratories,

primarily to Fulgent and Peach State (and others not yet identified).

68.    Hurt, Keaton and others caused Ellwood Laboratory to submit claims to

Medicare using the Ellwood National Provider Identifier or NPI for fraudulent Genetic

Claims for testing regularly exceeded $12,000 per beneficiary and reimbursement

sometimes exceeded $6,000 per test.

69.    Hurt, Keaton, and others caused Medicare to reimburse fraudulent Genetic

Testing claims despite the fact that such testing and related services were not medically

necessary and knowing that such testing and services were procured through illegal

kickbacks.

70.    Hurt and Keaton, individually and through the companies they controlled,

as described in above, solicited and received kickbacks from Ellwood—specifically, a

portion of the Medicare reimbursements paid to Ellwood in connection with the fraudulent

Genetic Testing. Hurt and Keaton, acting through First Choice and Fountain, entered into

sham agreements and business arrangements with Ellwood that disguised the kickbacks

as purportedly legitimate payments, including payments related to management services

at the Ellwood Laboratory. In reality, the payments were based on the volume of Genetic

Testing and the amount of resulting Medicare reimbursements received by Ellwood, in

violation of federal law and Medicare regulations.

71.    Hurt and Keaton used a portion of the kickback payments they received from Ellwood to pay additional kickbacks to the Marketeers, among others, Preventive Health, Genexe, BTTNG and Sonoran.

72.    Hurt and Keaton entered into sham contracts with the Marketeers in order to make it appear that the Marketeers were engaged in, and being paid for, legitimate marketing and referral services, when the payments were actually tied to the volume of samples for Genetic Testing the Marketeers obtained.

73.    Based upon extensive discussions with the Ellwood Laboratory staff, the Trustee believes that Hurt, Keaton, and others regularly communicated with the Ellwood Laboratory staff by text message and email regarding Ellwood's bank account balances and anticipated Medicare reimbursement amounts. Likewise, Hurt, Keaton, and others regularly directed Ellwood staff to transfer Medicare reimbursements between Ellwood's bank accounts, including its operating and laboratory accounts, and external bank accounts that Hurt and Keaton controlled, including bank accounts associated with First Choice and Fountain.

**The Transfers Relating to Genetic Testing**

74.    The Trustee has determined that beginning on March 1, 2019 and continuing through September 6, 2019, the Ellwood billed and received from Medicare in excess of $25 million for Genetic Testing, of which $12,923,300.00 was transferred to Fountain and $4,863,809.39 was transferred to First Choice as more specifically identified below and further illustrated by the chart attached hereto as **Composite Exhibit A**:

   a.    On or about April 10, 2019, Ellwood transferred the amount of $121,000.00 from the Ellwood Medical Center Operations

WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

b.  On or about April 10, 2019, Ellwood transferred the amount of $97,254.43 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

c.  On or about April 22, 2019, Ellwood transferred the amount of $350,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

d.  On or about April 22, 2019, Ellwood transferred the amount of $266,554.96 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

e.  On or about April 29, 2019, Ellwood transferred the amount of $150,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain  JP Morgan Chase account #XXXXX5511.

f.  On or about May 1, 2019, Ellwood transferred the amount of $200,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

g.    On or about May 6, 2019, Ellwood transferred the amount of $420,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

h.    On or about May 7, 2019, Ellwood transferred the amount of $250,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

i.    On or about May 13, 2019, Ellwood transferred the amount of $182,300.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

j.    On or about May 16, 2019, Ellwood transferred the amount of $600,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

k.    On or about May 16, 2019, Ellwood transferred the amount of $250,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

l.    On or about May 24, 2019, Ellwood transferred the amount of $750,000.00 from the Ellwood Medical Center Operations

WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

m.      On or about May 24, 2019, Ellwood transferred the amount of $250,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

n.      On or about May 30, 2019, Ellwood transferred the amount of $1,150,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

o.      On or about May 30, 2019, Ellwood transferred the amount of $350,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

p.      On or about June 5 and 6, 2019, Ellwood transferred the amount of $800,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

q.      On or about June 6, 2019, Hurt caused Ellwood staff to initiate a funds transfer in the amount of $300,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

r.      On or about June 13, 2019, Ellwood transferred the amount of $1,000,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

s.      On or about June 14, 2019, Ellwood transferred the amount of $300,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

t.      On or about June 19, 2019, Ellwood transferred the amount of $700,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

u.      On or about June 20, 2019, Ellwood transferred the amount of $350,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

v.      On or about June 25, 2019, Ellwood transferred the amount of $1,000,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9003 to the Fountain JP Morgan Chase account #XXXXX5511.

w.      On or about June 26, 2019, Ellwood transferred the amount of $300,000.00 from the Ellwood Medical Center Operations

WesBanco account #XXXXX9003 to the First Choice JP Morgan Chase account #XXXXX7002.

x.      On or about June 28, 2019, Ellwood transferred the amount of $200,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the Fountain JP Morgan Chase account #XXXXX5511.

y.      On or about June 28, 2019, Ellwood transferred the amount of $150,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the First Choice JP Morgan Chase account #XXXXX7002.

z.      On or about July 12, 2019, Ellwood transferred the amount of $2,100,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the Fountain JP Morgan Chase account #XXXXX5511.

aa.     On or about July 12, 2019, Ellwood transferred the amount of $500,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the First Choice JP Morgan Chase account #XXXXX7002.

bb.     On or about July 16, 2019, Ellwood transferred the amount of $1,200,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the Fountain JP Morgan Chase account #XXXXX5511.

cc.     On or about July 16, 2019, Ellwood transferred the amount of $300,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727to the First Choice JP Morgan Chase account #XXXXX7002.

dd.     On or about July 29, 2019, Ellwood transferred the amount of $700,000.00 from the Ellwood WesBanco account #XXXXX9727 to the Fountain JP Morgan Chase account #XXXXX5511.

ee.     On or about July 29, 2019, Ellwood transferred the amount of $400,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the First Choice JP Morgan Chase account #XXXXX7002.

ff.     On or about August 6, 2019, Ellwood transferred the amount of $1,300,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the Fountain JP Morgan Chase account #XXXXX5511.

gg.     On or about August 6, 2019, Ellwood transferred the amount of $600,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9727 to the First Choice JP Morgan Chase account #XXXXX7002.

hh.     On or about September 6, 2019, Ellwood transferred the amount of $200,000.00 from the Ellwood Medical Center Operations WesBanco account #XXXXX9558 to the Fountain JP Morgan Chase account #XXXXX5511.

75.     From the above-referenced funds received by Fountain from Ellwood, Fountain made the following subsequent transfers from its JP Morgan Chase account #XXXXX5511:

    a.    $3,450,000.00 to Genexe;

    b.    $3,180,000.00 to Preventive Health;

    c.    $3,015,000.00 to Pursuit Charter;

    d.    $1,146,000.00 to DCMI;

    e.    $971,500.00 to Keaton, individually;

    f.    $689,998.00 to BTTNG; and

    g.    $192,800.00 to Hurt, individually.

Detailed lists reflecting each transfer made by Fountain to each of the above-referenced Defendants are attached hereto as **Composite Exhibit B.**

76.     From the above-referenced funds received by First Choice from Ellwood, First Choice made the following subsequent transfers from its JP Morgan Chase account #XXXXX7002:

    a.    $2,453,321.05 to American Express Company ("AMEX");

    b.    $739,281.61 to Sonoran;

    c.    $411,000.00 to Ascension; and

    d.    $161,200.00 to Russell and Diana Kitchen, jointly.

Detailed lists reflecting each transfer made by First Choice to each of the above-referenced Defendants are attached hereto as **Composite Exhibit C.**

77.     Of the $2,453,321.00 that First Choice paid to AMEX from its JP Morgan Chase account #XXXXX7002 from funds that originated from Ellwood, during the same

relevant period of time, First Choice paid to reference laboratories the following amounts through First Choice's AMEX account:

      a.     $1,923,300.00 to Fulgent; and

      b.     $179,750.00 to Peach State.

Detailed lists reflecting each transfer made by First Choice through AMEX to each of the above-referenced Defendants are attached hereto as **Composite Exhibit D.**

78.    As independent reference clinical laboratories, both Fulgent and Peach State were required under Medicare regulations to verify the authenticity and veracity of the physician orders, the appropriate patient diagnosis, and the proper billing information that the referring laboratory provided to Medicare. This was not done.

79.    The term "fraudulent transfer(s)" used below is that which is described under either 11 U.S.C. Section 548(a)(1)(B) and 11 U.S.C. Section 548(a)(1)(A).

<u>**COUNT I**</u>

**(Avoidance of Fraudulent Transfer to First Choice
under 11 U.S.C. § 548(a)(1)(B))**

80.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, which are incorporated by reference as if fully set forth herein.

81.    The payments made by Ellwood to Defendant First Choice in the total amount of $4,863,809.39 were fraudulent transfers that occurred during the two-year period immediately preceding the Petition Date.

82.    Ellwood did not receive reasonably equivalent value for making the fraudulent transfer.

83.    The fraudulent transfer was made to or for the benefit of Defendant First Choice.

84.     At the time of the fraudulent transfer, Ellwood:

a.      was insolvent of became insolvent as a result of the fraudulent transfer;

b.      was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Ellwood was unreasonably small capital; or

c.      intended to incur, or believed that it would incur, debts that would be beyond Ellwood's ability to pay as such debts matured.

85.     Ellwood is entitled to avoid the fraudulent transfer pursuant to 11 U.S.C. § 548 (a)(1)(B).

## COUNT II

**(Avoidance of fraudulent transfer to First Choice
under 11 U.S.C. § 548(a)(1)(A))**

86.     Plaintiff restates and realleges the foregoing paragraphs 1 through 79, which are incorporated by reference as if fully set forth herein.

87.     The payment made by Ellwood to Defendant First Choice in the amount of $4,863,809.39 were fraudulent transfers that occurred during the two-year period immediately preceding the Petition Date.

88.     The fraudulent transfer was made with actual intent to hinder, delay or defraud those entities to which Ellwood was or became, on the date that such transfer was made, indebted.

89.     The fraudulent transfer was made to or for the benefit of the Defendant First Choice.

90.     Ellwood is entitled to avoid fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT III

### (Avoidance of fraudulent transfer to Fountain
### under 11 U.S.C. § 548(a)(1)(B))

91.     Plaintiff restates and realleges the foregoing paragraphs 1 through 79, which are incorporated by reference as if fully set forth herein.

92.     The payment made by Ellwood to Fountain in the amount of $12,923,300.00 were fraudulent transfers that occurred during the two-year period immediately preceding the Petition Date.

93.     Ellwood did not receive reasonably equivalent value for making the fraudulent transfer.

94.     At the time of the fraudulent transfer, Ellwood:

a.     was insolvent of became insolvent as a result of the fraudulent transfer:

b.     was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Ellwood was unreasonably small capital; or

c.     intended to incur, or believed that it would incur, debts that would be beyond Ellwood's ability to pay as such debts matured.

95.     Ellwood is entitled to avoid fraudulent transfers pursuant to 11 U.S.C. § 548 (a)(1)(B).

## COUNT IV

### (Avoidance of fraudulent transfer to Fountain
### under 11 U.S.C. § 548(a)(1)(A))

96.     Plaintiff restates and realleges the foregoing paragraphs 1 through 79, which are incorporated by reference as if fully set forth herein.

97.     The payment made by Ellwood to Defendant Fountain in the amount of $12,923,300.00 were fraudulent transfers that occurred during the two-year period immediately preceding the Petition Date.

98.     The fraudulent transfer was made with actual intent to hinder, delay or defraud those entities to which the Ellwood was or became, on the date that such transfer was made, indebted.

99.     The fraudulent transfer was made to or for the benefit of the Defendant Fountain.

100.    Ellwood is entitled to avoid fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT V

### (Recovery of Fraudulent Transfers Under 11 U.S.C. § 550)

101.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 81 through 85, 87 through 90, 92 through 95 and 97 through 100, which are incorporated by reference as if fully set forth herein

102.    Plaintiff is entitled to avoid the fraudulent transfers articulated in Counts 1-4 made by Ellwood both directly to Defendants First Choice and Fountain specified therein pursuant to the Bankruptcy Code Section 548(a)(1)(A) and Section 548(a)(1)(B).

103.    As specified in Counts 1-6, Defendants First Choice and Fountain are the initial transferees of the fraudulent transfers and were the entities for whose benefit the fraudulent transfers were made.

104.    Pursuant to Bankruptcy Code Section 550(a)(1), Plaintiff is entitled to recover from the Defendants First Choice and Fountain the fraudulent transfers made by Ellwood to the Defendants First Choice and Fountain specified in Counts 1-4, plus interest thereon to the date of payment and the costs of this action.

## COUNT VI

### (Recovery of Fraudulent Transfer to Genexe
### under 11 U.S.C. § 550)

105.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

106.    The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant Genexe is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $3,450,000.00.

107.    Ellwood is entitled to recover the amount of $3,450,000.00 from Genexe pursuant to 11 U.S.C. § 550(a)(2).

## COUNT VII

### (Recovery of Fraudulent Transfer to Preventive Health
### under 11 U.S.C. § 550)

108.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

109.    The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant Preventive Health is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $3,180,000.00.

110.    Ellwood is entitled to recover the amount of $3,180,000.00 from Defendant Preventive Health pursuant to 11 U.S.C. § 550(a)(2).

## COUNT VIII

### (Recovery of Fraudulent Transfer to Pursuit Charter
### under 11 U.S.C. § 550)

111.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

112.    The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant Pursuit Charter is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $3,015,000.00.

113.    Ellwood is entitled to recover the amount of $3,015,000.00 from Defendant Pursuit Charter pursuant to 11 U.S.C. § 550(a)(2).

## COUNT IX

### (Recovery of Fraudulent Transfer to DCMI
### under 11 U.S.C. § 550)

114.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

115.    The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant DCMI is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $1,146,000.00.

116. Ellwood is entitled to recover the amount of $1,146,000.00 from Defendant DCMI pursuant to 11 U.S.C. § 550(a)(2).

## COUNT X

**(Recovery of Fraudulent Transfer to Keaton
under 11 U.S.C. § 550)**

117. Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

118. The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant Keaton is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $971,500.00.

119. Ellwood is entitled to recover the amount of $971,500.00 from Defendant Keaton pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XI

**(Recovery of Fraudulent Transfer to BTTNG
under 11 U.S.C. § 550)**

120. Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92 through 95, and 97 through 100, which are incorporated by reference as if fully set forth herein.

121. The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable transfer and Defendant BTTNG is the immediate transferee of a portion of that avoidable fraudulent transfer in the amount of $689,998.00.

122. Ellwood is entitled to recover the amount of $689,998.00 from Defendant BTTNG pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XII

### (Recovery of Fraudulent Transfer to Hurt
### under 11 U.S.C. § 550)

123.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 92

through 95, and 97 through 100, which are incorporated by reference as if fully set forth

herein.

124.    The transfer of $12,923,300.00 by Ellwood to Fountain is an avoidable

transfer and Defendant Hurt is the immediate transferee of a portion of that avoidable

fraudulent transfer in the amount of $192,800.00.

125.    Ellwood is entitled to recover the amount of $192,800.00 from Defendant

Hurt pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XIII

### (Recovery of Fraudulent Transfer to Sonoran
### under 11 U.S.C. § 550)

126.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 81

through 85, and 87 through 90, which are incorporated by reference as if fully set forth

herein.

127.    The transfer of $4,863,809.39 by Ellwood to First Choice is an avoidable

transfer and Defendant Sonoran is the immediate transferee of a portion of that avoidable

fraudulent transfer in the amount of $739,281.61.

128.    Ellwood is entitled to recover the amount of $739,281.61 from Defendant

Sonoran pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XIV

### (Recovery of Fraudulent Transfer to Ascension
### under 11 U.S.C. § 550)

129.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 81

through 85, and 87 through 90, which are incorporated by reference as if fully set forth

herein.

130.    The transfer of $4,863,809.39 by Ellwood to First Choice is an avoidable

transfer and Defendant Ascension is the immediate transferee of a portion of that

avoidable fraudulent transfer in the amount of $411,000.00.

131.    Ellwood is entitled to recover the amount of $411,000.00 from Defendant

Ascension pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XV

### (Recovery of Fraudulent Transfer to Russell and Diana Kitchen
### under 11 U.S.C. § 550)

132.    Plaintiff restates and realleges the foregoing 1 through 79, 81 through 85,

and 87 through 90, which are incorporated by reference as if fully set forth herein.

133.    The transfer of $4,863,809.39 by Ellwood to First Choice is an avoidable

transfer and Defendants Russell and Diana Kitchen are the immediate transferee of a

portion of that avoidable fraudulent transfer in the amount of $161,200.00.

134.    Ellwood is entitled to recover the amount of $161,200.00 from Defendant

Russell and Diana Kitchen, jointly and severally, pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XVI

### (Recovery of Fraudulent Transfer to Fulgent
### under 11 U.S.C. § 550)

135.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 81 through 85, and 87 through 90,  which are incorporated by reference as if fully set forth herein.

136.    The transfer of $4,863,809.39 by Ellwood to First Choice is an avoidable transfer and Defendant Fulgent is the mediate transferee of a portion of that avoidable fraudulent transfer in the amount of $1,923,300.00 paid through First Choice's AMEX account.

137.    Ellwood is entitled to recover the amount of $1,923,300.00 from Defendant Fulgent pursuant to 11 U.S.C. § 550(a)(2).

## COUNT XVII

### (Recovery of Fraudulent Transfer to Peach State
### under 11 U.S.C. § 550)

138.    Plaintiff restates and realleges the foregoing paragraphs 1 through 79, 81 through 85, and 87 through 90, which are incorporated by reference as if fully set forth herein.

139.    The transfer of $4,863,809.39 by Ellwood to First Choice is an avoidable transfer and Defendant Peach State is the mediate transferee of a portion of that avoidable fraudulent transfer in the amount of $179,750.00 paid through First Choice's AMEX account.

140.    Ellwood is entitled to recover the amount of $179,750.00 from Defendant Peach State pursuant to 11 U.S.C. § 550(a)(2).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in the Plaintiff's favor and against the Defendants, and specifically:

A)      Avoid the transfers based upon Counts 1-4 above;

B)      Award the Plaintiff a money judgment upon Counts 5-17 through Section 550 of the Bankruptcy Code;

C)      Award the Plaintiff prejudgment interest on the amounts to be recovered through Section 550 of the Bankruptcy Code; and

E)      Award the Plaintiff all other just and appropriate relief as the Court deems appropriate.

**DATED**: November 8, 2022

NELSON MULLINS RILEY & SCARBOROUGH LLP
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, FL 33394
Ph. 954-764-7060 | Fax 954-761-8135

2 South Biscayne Boulevard - 21st Floor
Miami, FL  33131
Ph. 305-373-9400 | Fax 305-995-6416

*/s/ Frank P. Terzo*
Frank P. Terzo
Florida Bar No. 906263
Frank.Terzo@nelsonmullins.com
Gary M. Freedman
Florida Bar No. 727260
Gary.Freedman@nelsonmullins.com

*Special Counsel for Carol Fox, Chapter 11 Trustee*